UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN BOYD, VERYL SWITZER, GILLAN
ALEXANDER, ROD BRADSHAW, WILBURT
HOWARD, PAT DAILEY, MELVIN ERB, and
DENNIS BROTHERS on behalf of themselves
and all others similarly situated,

                    Plaintiffs,

        v.

AWB LIMITED and AWB (U.S.A.) LIMITED,

                    Defendants.

ECF CASE

No. 1:07 CV 3007 (GEL)

---

## NOTICE OF MOTION TO DISMISS THE
## CONSOLIDATED CLASS ACTION COMPLAINT

PLEASE TAKE NOTICE that, upon the Consolidated Class Action Complaint, a

copy of which is annexed hereto, the accompanying declaration of Timothy G. Cameron,

executed August 17, 2007, with exhibits thereto, and the accompanying Memorandum of Law in

Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint, Defendants

AWB Limited and AWB (U.S.A.) Limited hereby move this Court before the Honorable Gerard

E. Lynch in Courtroom 6B at The Daniel Patrick Moynihan United States Courthouse, 500 Pearl

Street, New York, New York, 10007, for an Order pursuant to Fed. R. Civ. P. 12(b)(1) and (6)

dismissing with prejudice the Consolidated Class Action Complaint and granting such other and further relief as the Court deems just and proper.

August 17, 2007.

CRAVATH, SWAINE & MOORE LLP

by

Robert N. Baron
Timothy G. Cameron
Members of the Firm

825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants AWB Limited and AWB (U.S.A.) Limited*

To:

Seth R. Gassman
COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
150 East 52nd Street, 30th Floor
New York, NY 10022
Telephone (212) 838-7797

Michael D. Hausfeld
Benjamin D. Brown
Hilary K. Ratway
Andrea L. Hertzfeld
COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
West Tower, Suite 500
1100 New York Avenue, NW
Washington, DC 20005
Telephone (202) 408-4600

L. Palmer Foret
THE LAW FIRM OF L. PALMER FORET, PC
1735 20th Street, NW
Washington, DC 20009
Telephone (202) 332-2404

Roderick E. Edmond
Craig T. Jones
EDMOND & JONES, LLP
  127 Peachtree Street N.E.
    Suite 410
      Atlanta, GA 30303
        Telephone (404) 525-1080

Michael P. Lehmann
FURTH, LEHMANN & GRANT, LLP
  225 Bush Street, 15th Floor
    San Francisco, CA 94104
      Telephone (415) 433-2070

Bruce L. Simon
Gary S. Soter
PEARSON, SIMON, WARSHAW, PENNY, LLP
  44 Montgomery Street, Suite 1200
    San Francisco, CA 94104
      Telephone (415) 433-9000

Roberta D. Liebenberg
Donald L. Perelman
FINE, KAPLAN & BLACK, RPC
  1835 Market Street, 28th Floor
    Philadelphia, PA 19103
      Telephone (215) 567-6565

*Counsel for Plaintiffs John Boyd, Veryl Switzer, Gillan Alexander, Rod Bradshaw, Wilburt Howard and Pat Dailey*

Gerald J. Rodos
Mark R. Rosen
Jeffrey B. Gittleman
Chad A. Carder
BARRACK, RODOS & BACINE
  3300 Two Commerce Square
    2001 Market Street
      Philadelphia, PA 19103
        Telephone (215) 963-0600

A. Arnold Gershon
Gloria Kui
BARRACK, RODOS & BACINE
  1350 Broadway, Suite 1001
    New York, NY 10018
      Telephone (212) 688-0782

Anthony J. Bolognese
Joshua H. Grabar
BOLOGNESE & ASSOCIATES, LLC
    One Penn Center
        1617 JFK Boulevard, Suite 650
            Philadelphia, PA 19103
                Telephone: (215) 814-6750

*Counsel for Plaintiff Melvin Erb*

Steven A. Asher
Mindee J. Reuben
WEINSTEIN KITCHENOFF & ASHER LLC
    1845 Walnut Street
        Suite 1100
            Philadelphia, PA 19103
                Telephone (215) 545-7200

W. Joseph Bruckner
Richard A. Lockridge
Lisa M. Pollard
LOCKRIDGE GRINDAL NAUEN PLLP
    Suite 2200
        100 Washington Avenue South
            Minneapolis, MN 55401
                Telephone (612) 339-6900

Joseph C. Kohn
KOHN, SWIFT & GRAF, PC
    One South Broad Street
        Suite 2100
            Philadelphia, PA 19107
                Telephone (215) 238-1700

Thomas S. McNamara
INDIK & MCNAMARA, PC
    100 South Broad Street
        Suite 2300
            Philadelphia, PA 19110
                Telephone (215) 567-7125

*Counsel for Plaintiff Dennis Brothers*

SENT TO CHAMBERS
FOR REVIEW

JUL 1 0 2007

U.S.D.C.S.D.N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JOHN BOYD, VERYL SWITZER, GILLAN ALEXANDER, ROD BRADSHAW, WILBURT HOWARD, PAT DAILEY, MELVIN ERB, and DENNIS BROTHERS on behalf of themselves and all others similarly situated, ) ) ) ) ) ) ) ) ) | Civil Action No. 1:07-cv-03007-GEL |
| Plaintiffs, ) ) | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| v. ) ) | Jury Trial Demanded |
| AWB LIMITED and AWB (U.S.A.) LIMITED ) ) ) | |
| Defendants. ) ) | |

The above-named plaintiffs (collectively, "Plaintiffs"), by and through their

undersigned attorneys, bring this action on behalf of themselves and all others similarly

situated against Defendants AWB Limited and AWB (U.S.A.) Limited (collectively,

"AWB") alleging as follows:

## INTRODUCTION

1.    This action arises out of a bribery and money laundering conspiracy

conducted by Defendant AWB, an exporter of Australian-grown wheat to Iraq, and its co-

conspirators, including various agencies of the Iraqi government, a Jordanian trucking

company, and international shipping companies. Pursuant to this conspiracy, AWB and

its co-conspirators formed an enterprise through which they paid bribes to the Iraqi

government under the Saddam Hussein regime with money illegally funneled from the United Nations Oil for Food Program through bank accounts in the United States.

2.      Defendant AWB participated in the bribery and money laundering conspiracy in order to achieve, maintain, and exploit a monopoly on wheat sold in Iraq and to foreclose the market to U.S.-grown wheat.  AWB's conduct, in combination with that of its co-conspirators, did, in fact, foreclose the Iraqi market to U.S.-grown wheat and proximately caused a direct, substantial, and reasonably foreseeable decrease in prices at which U.S. wheat farmers were able to sell their wheat in the United States.

3.      Plaintiffs bring this action on behalf of a class of U.S. hard red winter wheat farmers who were injured as a direct and proximate result of AWB's conduct, alleging violations of the Racketeering Influenced Corrupt Organizations Act ("RICO), 18 U.S.C. § 1962(c), Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, and the Robinson-Patman Act, 15 U.S.C. § 13(c).

## PARTIES

**Plaintiffs**

4.      John Boyd is a resident of Baskerville, Virginia.  At all times relevant, Plaintiff Boyd grew hard red winter wheat on 1,000 acres of land in Virginia.  Plaintiff Boyd sold his hard red winter wheat in the United States.

5.      Veryl Switzer is a resident of Manhattan, Kansas.  At all times relevant, Plaintiff Switzer grew hard red winter wheat on 800 acres of land in Kansas.  Plaintiff Switzer sold his hard red winter wheat in the United States.

6.     Gillan Alexander is a resident of Nicodemus, Kansas. At all times relevant, Plaintiff Alexander grew hard red winter wheat on 2,000 acres of land in Kansas. Plaintiff Alexander sold his hard red winter wheat in the United States.

7.     Rod Bradshaw is a resident of Oakley, Kansas. At all times relevant, Plaintiff Bradshaw grew hard red winter wheat on 4,000 acres of land in Kansas. Plaintiff Bradshaw sold his hard red winter wheat in the United States.

8.     Wilburt Howard is a resident of Oakley, Kansas. At all times relevant, Plaintiff Howard grew hard red winter wheat on 1,000 acres of land in Kansas. Plaintiff Howard sold his hard red winter wheat in the United States.

9.     Pat Dailey is a resident of Chester, Montana. At all times relevant, Plaintiff Dailey grew hard red winter wheat on his farm in Montana. Plaintiff Dailey sold his hard red winter wheat in the United States.

10.    Plaintiff Melvin Erb is a resident of Bison, Kansas. At all time relevant, Plaintiff Erb grew hard red winter wheat in Kansas. Plaintiff Erb sold his hard red winter wheat in the United States.

11.    Plaintiff Dennis Brothers is a resident of Potter, Nebraska. At all times relevant, Plaintiff Brothers grew hard red winter wheat in Nebraska. Plaintiff Brothers sold his hard red winter wheat in the United States.

**Defendants**

12.    AWB Limited is an Australian corporation with headquarters located at 380 La Trobe Street, Melbourne, 3000, Victoria, Australia. AWB Limited is the exclusive manager and marketer of all bulk wheat exports from Australia and one of the world's largest wheat exporters. AWB Limited operates on its own behalf, and through

- 3 -

its wholly-owned and controlled subsidiaries, including but not limited to AWB International Limited, which serve as agents of AWB Limited. At all times relevant, AWB Limited maintained an office in the United States.

13.     AWB (U.S.A.) Limited is a Delaware corporation with its headquarters located at ODS Tower, Suite 1510, 601 SW Second Avenue, Portland, Oregon 97204. AWB (U.S.A.) Limited is a subsidiary wholly owned and controlled by Defendant AWB Limited. At all times relevant, AWB (U.S.A.) Limited served as an agent of AWB Limited, including as a regulated trading agent on commodity exchanges in the United States.

## UNNAMED CO-CONSPIRATORS

14.     To coordinate its participation in the UN Oil for Food Program, the Government of Iraq, while it was under the control of the Saddam Hussein regime, established a variety of committees, including the Supreme Command Council and the Economic Affairs Committee (collectively, the "Iraqi Government" or "Government of Iraq"). The Supreme Command Council oversaw Iraq's purchases of humanitarian goods, including wheat, under the Oil for Food Program. Vice President Taha Yassin Ramadan headed this high-level body, which included key government officials such as President Saddam Hussein and Deputy Prime Minister Tariq Aziz. The Supreme Council broadly instructed other supervisory bodies and the various ministries, including the Ministry of Trade, participating in the Oil for Food Program. The Economic Affairs Committee helped formulate the Iraqi Government's methods and rates of collecting inland transportation and after-sales-service fees described herein.

15.     Mr. Zuhair Daoud, the former director of the Iraqi Grain Board, along with other former employees of the Iraqi Grain Board, acting as agents of the Iraqi Grain Board while it was under the control of the Saddam Hussien regime (collectively, the "IGB"), were responsible for soliciting bids for the purchase of wheat for Iraq under the UN Oil for Food Program and imposing the inland transportation and after-sales-service fees described herein.

16.     Dr. Mohammed Medhi Saleh, former Iraqi Minister of Trade, along with other former employees of the Iraqi Ministry of Trade, acting as agents of the Iraqi Ministry of Trade while it was under the control of the Saddam Hussien regime (collectively, the "Ministry of Trade"), were responsible for selecting bidders to invite to Baghdad to negotiate wheat contracts with the IGB.

17.     Former employees of the Iraqi State Water Transport Company, acting as agents of the Iraqi State Water Transport Company while it was under the control of the Saddam Hussien regime (collectively, "ISWTC") were responsible for collecting the inland transportation and after-sales-service fees described herein.

18.     Alia Transportation ("Alia") is a Jordanian corporation. Alia was partly owned by and acted as an agent of the Iraqi Government while it was under the control of the Saddam Hussien regime to collect the inland transportation and after-sales-service fees described herein.

19.     Ronly Holdings Limited ("Ronly") is an international shipping company. Ronly acted as an agent and intermediary for AWB's payment of the inland transportation and after-sales-service fees described herein.

20.    Tse Yu Hong Metal Limited ("Tse Yu Hong") is an international shipping company. Tse Yu Hong acted as an agent and intermediary for AWB's payment of the inland transportation and after-sales-service fees described herein.

21.    AWB Chartering is a division within AWB which provided ocean freight chartering services. AWB Chartering acted as an agent and intermediary for AWB's payment of the inland transportation and after-sales-service fees described herein.

22.    The Ministry of Trade, the IGB, the ISWTC, Alia, Ronly, Tse Yu Hong, and AWB Chartering are referred to herein collectively as the Conspirators.

23.    At all relevant times, the Conspirators acted in concert with AWB as a continuing enterprise that engaged in the illegal conduct alleged herein.

24.    The acts alleged herein that were done by each of the Conspirators in furtherance of the enterprise were fully authorized by each of the Conspirators, or ordered or done by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction or control of its affairs.

25.    Any and all averments herein against the named Defendants are also averred against these Conspirators as if set forth at length.

### JURISDICTION AND VENUE

26.    Plaintiffs' claims for injuries sustained by reason of Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, and Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), are brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and

- 6 -

26, to recover treble damages, as well as the costs of this suit, including reasonable attorneys' fees.

27.     This Court has original federal question jurisdiction over all Sherman Act, Clayton Act, and Robinson-Patman Act claims asserted in this Complaint, pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15.

28.     Plaintiffs' claims for injuries sustained by reason of Defendants' violation of RICO, 18 U.S.C. § 1962(c), are brought pursuant to 18 U.S.C. § 1964(c) to recover treble damages, as well as the costs of this suit, including reasonable attorneys' fees.

29.     This Court has original federal question jurisdiction over Plaintiffs' RICO claim asserted in this Complaint, pursuant to 28 U.S.C. §§ 1331, 1337, and 18 U.S.C. § 1964(c).

30.     This Court also has original diversity jurisdiction over all claims brought in this Count pursuant to 28 U.S.C. § 1332(d)(2)(C) because the amount in controversy in this action exceeds the sum of $5 million, exclusive of interests and costs, and at least one member of the Class of Plaintiffs is a citizen of a State, and at least one Defendant is a citizen of a foreign State.

31.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (d) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Specifically, at all times relevant, AWB maintained a bank account in New York through which it illegally laundered money for the Iraqi Government under control of the Saddam Hussein regime. Additionally, until October 2000, AWB maintained an office in New York which was integral to the conduct of the affairs of the enterprise. The U.S. office ensured that AWB was paid efficiently and promptly for the

- 7 -

shipments of wheat to Iraq under the Oil for Food Program and monitored the progress of

UN approvals of contracts between AWB and the IGB that were executed under the Oil

for Food Program.  Timothy Snowball, the General Manager of the AWB New York

office, knowingly and actively participated in the bribery and money laundering

conspiracy alleged herein.  In furtherance of the conspiracy, Mr. Snowball communicated

with other AWB employees via the mail and wires from New York about the conduct of

the affairs of the enterprise.

### CLASS ACTION ALLEGATIONS

32.     Plaintiffs bring this action on their own behalf and as a class action

pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the

following Class:

> All persons and entities that grew and sold hard red winter
> wheat in the United States from the period June 1, 1999
> until at least March 20, 2003 (the "Class Period").
> Excluded from the Class are all federal, state, governmental
> and national entities and Defendants and their co-
> conspirators and the respective predecessors, subsidiaries,
> affiliates, and business partners of each.

33.     Plaintiffs do not know the exact number of members of the Class.  Due to

the nature of the trade and commerce involved, however, Plaintiffs believe that the

members of the Class number at least in the thousands and are sufficiently numerous and

geographically dispersed throughout the United States so that joinder of all members is

impracticable.

34.     Plaintiffs' claims are typical of the claims of other Class members.

35.     There are questions of law and fact common to all the Classes, including:

> a.     Whether Defendants possessed monopoly power in the relevant
>        market;

- 8 -

b. Whether Defendants acquired or maintained monopoly power in the relevant market through anticompetitive conduct;

c. Whether Defendants and the Conspirators conspired to monopolize the relevant market;

d. Whether Defendants' conduct constitutes a violation of 15 U.S.C. § 2;

e. Whether Defendants and the Conspirators conspired to restrain trade;

f. Whether Defendants' conduct constitutes a violation of 15 U.S.C. § 1;

g. Whether Defendants and the Conspirators were associated in fact as an enterprise as defined in 18 U.S.C. § 1961(4);

h. Whether Defendants and the Conspirators engaged in a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5);

i. Whether Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c);

j. Whether Defendants' conduct constitutes a violation of 15 U.S.C. § 13(c);

k. Whether Defendants' conduct constitutes a violation of 15 U.S.C. § 14;

l. Whether Defendants and the Conspirators fraudulently concealed their conduct;

m. Whether the conduct of Defendants and the Conspirators, as alleged in this Complaint, caused injury to the businesses or property of Plaintiffs and the members of the Class; and

n. Whether Plaintiffs and members of the Class are entitled to damages, and if so, the amount.

36. The questions of law and fact common to the Class predominate over any questions that may affect only individual members.

37.    Plaintiffs are represented by counsel competent and experienced in the prosecution of class action litigation, and will fairly and adequately protect the interests of the members of the Class.

38.    Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class with respect to the subject matter of this litigation.

39.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

## THE RELEVANT MARKETS

40.    The relevant product market is the market for bread wheat imported by Iraq, including, but not limited to, U.S.-grown hard red winter wheat, Australian hard wheat, and Russian hard wheat.

41.    The relevant geographic market is Iraq.

42.    The relevant pricing mechanism market is the world.  Although there is not a single global price for wheat, there is a single, highly integrated pricing mechanism by which wheat prices are established in all geographic sub-markets.  The market forces according to which wheat prices are set in geographic sub-markets around the world are inherently interrelated.  That worldwide pricing mechanism (*see* paragraphs 54 through 60 below) relates wheat supply and demand, and therefore wheat prices, in any given market, causally to market events in every other market worldwide.  Events in any one geographic sub-market thus have a direct, proximate and foreseeable effect on the prices

in every other geographic sub-market. Consequently, anticompetitive conduct in any given sub-market causes direct, proximate, and foreseeable price effects in all sub-markets around the world.

## TRADE AND COMMERCE AFFECTED

43.    Over 500 million metric tons ("mmt") of wheat are produced yearly worldwide. The world wheat trade accounts for approximately 100 mmt, or 20% of the total amount of wheat produced. Accordingly, throughout the Class Period, there was a continuous and uninterrupted flow of transactions and shipments of wheat in interstate and foreign commerce.

44.    At all times relevant, AWB was engaged in the marketing, distribution, and sale of wheat in the global market. AWB sold a substantial amount of wheat in foreign commerce in numerous countries around the world, including Iraq.

45.    Because a worldwide pricing mechanism (*see* paragraphs 54 through 60 below) relates wheat supply and demand, and therefore wheat prices in sub-markets worldwide, AWB's conduct had a direct, proximate and foreseeable effect on the prices of wheat in the United States.

46.    Thus, AWB's business activities that are the subject of this Complaint were within the flow of and had a direct, substantial, and reasonably foreseeable effect on interstate and foreign trade and commerce.

## FACTUAL ALLEGATIONS

### The Wheat Market Structure and Pricing

47.    Wheat is a highly differentiated product. It is divided into two major types: common wheat and durum wheat. Common wheat, which is used for baking,

accounts for approximately 95% of world wheat production while the remaining 5% of world wheat production is durum, which is used for pasta products and couscous.

48.    Criteria such as kernel hardness and color are used to broadly classify wheat in the world marketplace. These, and selected other characteristics, sub-divide wheat further by best end purpose. For example, hard wheat flour has excellent bread baking properties; soft wheat flour is well-suited for cakes, cookies, and Asian noodles.

49.    Substitution among wheat classes is imperfect, and consumer preferences differ among countries, suggesting that wheat characteristics are an important determinant of wheat trade.

50.    The world wheat trade is dominated by a few exporting countries:  the United States, Canada, Australia, the European Union ("EU"), and Argentina.  These countries supply approximately 80% of wheat traded in the world market.

51.    The United States produces durum wheat as well as five classes of common wheat:  hard red winter, hard red spring, soft red winter, hard white and soft white wheat.  Canada produces primarily hard red spring wheat, Canadian Western Red spring, and durum wheat.  The EU produces soft wheat and durum wheat.  Australia primarily produces a winter wheat that is similar to hard red winter wheat.  And Argentina produces a wheat with characteristics of both soft and hard wheat.

52.    The United States is the world's largest exporter of wheat.  Exports are crucial for the U.S. wheat market, averaging nearly half of total use since the 1990s.  Of particular importance to the U.S. wheat market is hard red winter wheat.  From 1996 to 2000, the United States exported an annual average of 31.1 mmt of wheat, of which 13.8 mmt was hard red winter wheat.

- 12 -

53.    The main competitor of U.S.-grown hard red winter wheat in the export

market is an Australian-grown hard wheat. The major export markets for the United

States' hard red winter wheat and the Australian equivalent are countries in the Middle

East and Asia. Although Argentina also produces a wheat comparable to U.S.-grown

hard red winter wheat, Argentina generally exports only to other South American

countries.

54.    Prices of wheat are a function of market supply and demand forces.

Because of the global nature of the wheat trade, supply and demand forces in any given

geographic sub-market are interrelated with those in every other sub-market and thus

wheat prices worldwide are interrelated. Market conditions and events in any one

geographic sub-market causally effect prices in other sub-markets around the world.

55.    This holds true of the wheat market in the United States. U.S. wheat

prices are directly affected by market conditions and events in those sub-markets around

the world into which the U.S. exports its wheat.

56.    Futures contracts, which are used for price discovery for U.S.-grown

wheat, are traded on three different commodity exchanges: the Chicago Board of Trade,

the Kansas City Board of Trade, and the Minneapolis Grain Exchange. Although each

exchange focuses on different classes of wheat, prices on each exchange tend to move

together. Likewise, prices paid to U.S. farmers for their wheat move in parallel to prices

on the commodity exchanges.

57.    With regard to the pricing of wheat, the main determinant is the projected

"Ending Stocks," the supply of wheat in the U.S. that remains unsold at the end of a

current crop year. Lower Ending Stocks cause higher prices, and conversely higher Ending Stocks cause lower prices.

58.     Changes in demand for U.S.-grown wheat affect projected Ending Stocks which cause price changes on the major commodity exchanges. Specifically, when Ending Stocks are lower because of high sales of U.S.-grown wheat in export markets, higher prices result, and when Ending Stocks are higher because of low sales of U.S.-grown wheat in export markets, lower prices result.

59.     Excess Ending Stocks resulting from decreased export sales of U.S.-grown wheat in a particular market cannot simply be diverted to another export market because of a number of factors, including the lack of substitution between wheat classes, the inelasticity of demand, and transportation costs.

60.     Thus, where market conditions dictate an increase or decrease in the amount of U.S.-grown wheat purchased in a particular export market, wheat prices in the U.S. are directly, proximately, and foreseeably affected.

**Competition in the Iraqi Wheat Import Market**

61.     Wheat consumption in Iraq is about 4 mmt per year. Iraq grows about 1 mmt per year and imports the remaining amount. Iraq's purchases of wheat have been limited to bread baking wheat, more specifically, hard red winter wheat from the United States and its equivalents primarily from Australia.

62.     Historically, Iraq has been a top importer of U.S.-grown hard red winter wheat.[1] During the 1980s, U.S.-grown wheat had a 29% share of the Iraqi wheat market, second only to Australian-grown wheat, which had a 38% share.

---

[1]     Hereinafter, the term "U.S.-grown wheat" is limited to U.S. grown hard red winter wheat.

- 14 -

63.    Because of U.S. sanctions on Iraq from 1990 to 1997, U.S.-grown wheat was not sold to Iraq during that period. In the absence of competition from U.S.-grown wheat, Australian-grown wheat gained a monopoly in the Iraqi wheat market, with 73% of the market. In 1997, however, U.S.-grown wheat re-entered the market under the UN Oil for Food Program, which permitted Iraq to sell oil to pay for food, medicine, and humanitarian goods.

64.    Direct financial transactions with the Government of Iraq were prohibited. Therefore, under the Oil for Food Program, proceeds from the sale of Iraqi oil were deposited by the purchaser into a UN-controlled escrow account at Banque Nationale de Paris ("BNP") in New York and Iraq's payments to suppliers of food, medicine, and humanitarian goods were made from the escrow account.

65.    Under the Oil for Food Program, agencies of the Iraqi Government, such as the IGB in the case of wheat purchases, would advertise tenders for contracts. The IGB forwarded bids to the Ministry of Trade, which selected bidders to invite to Baghdad to negotiate a contract with the IGB for the sale of wheat.

66.    Wheat shipped under the Oil for Food Program was required to be certified by UN-retained border inspectors at one of four main border inspection points. Once the wheat was certified, notice was sent to the UN Treasury which issued a letter of credit in favor of the supplier to be drawn from the UN-controlled escrow account at BNP.

67.    By 1998, U.S.-grown wheat had re-gained a 6% market share in Iraq.

**AWB's Enterprise to Unlawfully Monopolize the Iraqi Market**

68.     U.S.-grown wheat was the only real competitive threat to the Australian wheat monopoly as the U.S. was the only other country that produced a sufficient volume of the class of wheat purchased by Iraq to meet Iraq's volume demands.

69.     In 1999, recognizing the growing threat of competition from U.S-grown wheat to the monopoly achieved by AWB in the Iraqi market, AWB and the Conspirators willfully and purposefully formed an enterprise for the purpose of securing and maintaining AWB's monopoly through anticompetitive conduct. In order to achieve the illegal purpose of the enterprise, AWB began paying kickbacks to the Iraqi Government in an elaborate conspiracy whereby U.S. dollars in the UN Oil for Food Program escrow account were funneled and laundered through AWB's bank account in the United States and its co-conspirators, and ultimately paid to the Iraqi Government.

70.     In June 1999, AWB received a wheat tender from the IGB under the Oil for Food Program for the supply of wheat to Iraq for delivery between October and December of that year. Unlike previous tenders under the Program, this one required AWB to pay the cost of transporting the wheat by road from the point of entry into Iraq, the port of Umm Qasr, to the various governorates throughout Iraq.

71.     Following the issuance of the wheat tender, the IGB invited representatives of AWB to Baghdad to discuss the new terms and conditions of the contract in person; the IGB would not discuss them by facsimile or telephone.

72.     On June 21, 1999, employees of AWB, Mr. Emons and Mr. Hogan, traveled to Iraq to meet with Mr. Daoud, then Director General of the IGB. During their meeting, it became clear that the newly imposed inland transportation fees were not, in

fact, designed to cover the costs of transportation inside Iraq, but instead were illegal payments to the Government of Iraq. It also became clear that in order to secure its monopoly and avoid losing its market share in Iraq, AWB would have to pay the inland transportation fee.

73.    AWB knew that the conspiracy was illegal but nevertheless agreed to participate in order to maintain its monopoly status in Iraq. Iraq was a large and profitable market which comprised 10% of the Australian-grown wheat export market. As an independent investigation of AWB's conduct later found:

> The question posed within AWB was:
>
> > *What must be done to maintain sales to Iraq?*
>
> The answer given was:
>
> > *Do whatever is necessary to retain the trade. Pay the money required by Iraq. It will cost AWB nothing because the extra costs will be added into the wheat price and recovered from the UN escrow account. But hide the making of those payments for they are in breach of sanctions.*

74.    AWB and the IGB agreed, as part of their conspiracy, that the illegal payment being referred to as "inland transportation fees" would be included in the wheat contract prices submitted to the UN and then recouped from the UN-controlled escrow account. By referring to these payments as "inland transportation fees," AWB and the Conspirators affirmatively sought to conceal their illegal conduct.

75.    In furtherance of the conspiracy, AWB and the IGB would first negotiate a mutually acceptable price for the sale of wheat. These negotiations took place in person in Baghdad, through e-mails, facsimile transmissions, and telephone conversations between AWB and the IGB.

76.    After the price for the sale of wheat had been agreed to, the IGB "inland transportation fee" was then added to that price in order to arrive at a final contract price. Thus, the price per ton specified in contracts submitted to the UN reflected not just the value of the wheat itself, but also included the illegal kickback paid by AWB to the IGB disguised as the "inland transportation fee." The "inland transportation fee" was not denoted as a separate line item on the contract, but rather was combined into the price so that its payment was not reflected in the contract.

77.    The amount of the "inland transportation fee" AWB paid was offset by the recovery of a commensurate amount from the UN-controlled escrow account as part of the proceeds of the sale of that wheat. As a result, the payment by AWB of the "inland transportation fee" did not directly affect either the price for which the wheat was sold or the amount from which AWB calculated its profit on the sale. It was in this sense that AWB employees described the fees as "revenue neutral."

78.    In connection with AWB's first three contracts from late 1999 to mid-2000, for example, "inland transportation fees" ranged between $10.80 and $12 per metric ton ("pmt"). In mid-2000, in addition to the "inland transportation fee," Iraq imposed an "after-sales-service fee" on AWB.

79.    As had been the case with "inland transportation fees," for all contracts from mid-2000 forward, Iraq incorporated "after-sales-service fees" into the amount that was paid to AWB out of the escrow account. Accordingly, contract negotiations after the imposition of "after-sales-service fees" operated in much the same way they had during the period when only "inland transportation fees" were applied.

- 18 -

80.    The "inland transportation fees" and the "after-sales-service fees" were collapsed into one very high "inland transportation fee." Thereafter, the amount of the illegal kickback paid to Iraq rose to between $14 and $15 pmt in 2000, and then sharply increased for contracts from 2001 to the spring of 2003 to between $45 and $56 pmt.

81.    Because the contracts submitted to the UN for approval included the illegal "inland transportation fees" being paid to Iraq in the price of the wheat rather than reflecting it as a separate line item, they were approved without question. The proceeds of wheat sales payable to AWB out of the UN escrow fund, which unbeknownst to the UN included the illegal fees meant for the Iraqi Government, were transferred from the UN escrow fund directly into the U.S. dollar account maintained by AWB with the Bank of New York in New York.

82.    To avoid detection and in furtherance of their conspiracy, the IGB and AWB agreed that Alia, a Jordanian trucking company, would act as a conduit for payment to the Iraqi State Water Transport Company ("ISWTC"), the government agency designated to collect "inland transportation fees." ISWTC maintained an account at a Jordanian bank into which Alia would deposit "inland transportation fees" it collected from AWB.

83.    Alia posed as a legitimate provider of transportation services from the port of Umm Qasr. However, Alia was not required to undertake or arrange any trucking service and otherwise functioned only as a collection agent for the payment of transportation fees to the Iraqi Government.

84.     The following generally depicts the flow of money under the scheme:



85.     Initially, AWB's payments to Alia were made by AWB Chartering, AWB's freight chartering services division, from AWB's U.S. dollar accounts at the Bank of New York to Alia's account at a Jordanian bank. For example, on November 26, 1999, AWB Chartering transferred $453,600 to Alia. On December 8, 1999, AWB Chartering transferred $504,000 to Alia.

86.     Knowing that Alia was simply an agent of the Iraqi Government, AWB thereafter sought to further conceal its participation in the conspiracy by employing intermediaries to make payments to Alia. In some instances, AWB Chartering would pay the "inland transportation fees" along with the freight cost to the owner of the ship chartered by AWB to carry the wheat to Iraq. The ship owner, at the direction of AWB, would then pay Alia the "inland transportation fees."

87.     In other instances, AWB interposed an intermediary between itself and the ship owner, which allowed AWB to pay freight and the "inland transportation fees" to the intermediary, which in turn paid the freight costs to the shipping company and the

"inland transportation fees" to Alia, at the direction of AWB. The intermediary employed by AWB was Ronly Holdings Limited or its nominee, Tse Yu Hong Metal Limited ("Tse Yu Hong").

88.    There was no sound commercial reason for interposing both the ship owners who carried the wheat to Iraq and later Ronly (and its nominee, Tse Yu Hong) between AWB and Alia. Neither the ship owners nor Ronly had undertaken to effect or arrange for the discharge or delivery of the wheat in Iraq and had not entered into (or proposed to enter into) any contractual relationship with Alia for that purpose.

89.    Each of the intermediaries, including Alia, knew of the illegality of the monetary transfers and thus knowingly and willingly joined the conspiracy. Each was paid a fee or commission for its services and thus had a pecuniary interest in the conspiracy.

90.    The conspiracy had the intended effect of illegally funneling U.S. dollars to Iraq through the UN escrow account established as part of the Oil for Food Program. Between July 1999 and March 2003, AWB and its co-conspirator, the IGB, disguised the payment of bribes in the form of "inland transportation fees" in 21 wheat contracts they negotiated. In total, AWB paid over $224 million in bribes to Iraq.

91.    The conspiracy also had the intended effect of maintaining AWB's monopoly in the market for wheat in Iraq. During the 1999-2000 season, for example, AWB sold a record 2.4 mmt of wheat to Iraq, accounting for 98% of the wheat supplied to Iraq that season. During that season and for the remainder of the Oil for Food Program, which ended in 2003, U.S.-grown wheat was completely foreclosed from the Iraqi market.

**Injury to Plaintiffs and Members of the Class**

92.    U.S.-grown wheat was the only viable alternative to Australian-grown wheat for sale to Iraq. Canada, Argentina, and the European Union, which all produce a type of wheat equivalent to the hard red winter wheat purchased by Iraq, produce small volumes which they generally export only locally. Had AWB and the Conspirators not formed an enterprise through which they engaged in a bribery and money laundering conspiracy to unlawfully monopolize the market, more U.S.-grown wheat would have been sold to the IGB.

93.    As a key participant in the global wheat market and the exclusive wheat exporter from Australia, AWB understood the global nature of the wheat pricing mechanism, the effect of supply and demand forces in any given sub-market on prices in other sub-markets, and the fact that the foreclosure of U.S.-grown wheat from the Iraqi market would result in higher Ending Stocks and lower prices in the United States.

94.    Therefore, AWB's and the Conspirators' foreclosure of the Iraqi wheat market to U.S.-grown wheat proximately caused a direct, substantial, and reasonably foreseeable decrease in prices at which Plaintiffs and members of the Class were able to sell their wheat in the United States.

**Fraudulent Concealment**

95.    AWB never disclosed its payment of inland transportation fees to the UN or any other enforcement authority.

96.    By its very nature, the bribery and money laundering conspiracy was inherently self-concealing. Additionally, AWB and the Conspirators affirmatively and fraudulently concealed their unlawful conspiracy.

- 22 -

97.     The conspiracy alleged herein was affirmatively concealed and carried out in a manner that precluded detection. For example, AWB and the Conspirators met and communicated secretly concerning bribes in the form of inland transportation and "after-sales-service fees" and paid said bribes through intermediary co-conspirators so as to avoid detection. Additionally, AWB submitted contracts concealing the payment of "inland transportation fees" and "after-sales-service fees" to the UN. Even the UN, the very entity charged with overseeing contracts under the Oil for Food Program, was unaware of the conspiracy.

98.     On March 19, 2004, after the discovery of documents by the Conditional Provisional Authority in Iraq, UN Secretary-General Kofi Anan announced the launch of an independent investigation of bribery allegations in the Oil for Food Program.

99.     On October 27, 2005, the Independent Inquiry Committee into the UN Oil-For-Food Program issued its report (the "Volcker Report"), which found, "In total, AWB paid a total of over $221.7 million in transportation fees, including the after-service-sales fee. This corresponds to more than fourteen percent of the illicit funds collected by the Iraqi regime under its kickback schemes."[2] The Volcker report concluded, "Little doubt remains that AWB made large numbers of payments to Alia, and these payment in turn were channeled to the Iraqi regime."

100.     Following the release of the Volcker Report implicating AWB, in November 2005, the Australian Government similarly announced the launch of an independent investigation (the "Cole Inquiry"). The Cole Inquiry conducted public and

---

[2]     The Volcker Report is available at http://www.iic-offp.org/story27oct05.htm.

private hearings, examined in detail the transaction between AWB and Iraq and the

relationship of those transactions to the UN and the law in Australia.

101.    On November 27, 2006, the Cole Inquiry issued its approximately 2000-

page report setting forth the bribery and money laundering conspiracy engaged in by

AWB and its co-conspirators in detail.[3]  The report concluded in part:

> The conduct of AWB and its officers was due to a failure in corporate
> culture.  The question posed within AWB was:
>
> > *What must be done to maintain sales to Iraq?*
>
> The answer given was:
>
> > *Do whatever is necessary to retain the trade. Pay the money
> > required by Iraq.  It will cost AWB nothing because the extra costs
> > will be added into the wheat price and recovered from the UN
> > escrow account.  But hide the making of those payments for they
> > are in breach of sanctions.*
>
> No one asked, 'What is the right thing to do?'  Instead, much time and
> money was spent trying to determine if arrangements could be formulated
> in such a way as to avoid breaching the law or sanctions, whether conduct
> could be protected, by various subterfuges, from discovery or scrutiny,
> and whether actions were legal or illegal.  There was a lack of openness
> and frankness in AWB's dealing with the Australian Government and the
> United Nations.  At no time did AWB tell the Australian Government of
> the United Nations of its true arrangements with Iraq.  And when inquiries
> were mounted into its activities it took all available measures to restrict
> and minimize disclosure of what had occurred.

102.    None of the facts or information available to Plaintiffs and members of the

Class prior to March 19, 2004, if investigated with reasonable diligence, which Plaintiffs

in fact exercised, could or would have led to the discovery of the conspiracy alleged

herein.

---

[3]      The Cole Inquiry report is available at http://www.offi.gov.au/agd/WWW/unoilforfoodinquiry.
nsf/Page/Report.

103.    As a result of the fraudulent concealment of the conspiracy, the running of any statue of limitations has been tolled with respect to any claims of Plaintiffs and members of the Class.

### COUNT I
### Violation of Section 2 of the Sherman Act
### 15 U.S.C. § 2

104.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the paragraphs above.

105.    Throughout the Class Period, AWB possessed monopoly power in the market for wheat sales to Iraq.

106.    Through the anticompetitive conduct described herein, AWB has willfully acquired and/or maintained its monopoly power in this market. AWB has acted with an intent to illegally acquire and/or maintain its monopoly, and its anticompetitive conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

107.    AWB has also combined and conspired with others in furtherance of its efforts to monopolize the market for wheat in Iraq.

108.    There are no legitimate business justifications for AWB and the Conspirator's conduct, and any purported legitimate business justifications are mere pretexts.

109.    Because the relevant pricing mechanism by which wheat prices are set is global, Plaintiffs and members of the Class were injured in their business or property as a direct and foreseeable result of AWB and the Conspirators' bribery and money laundering conspiracy.

110.    Specifically, AWB and the Conspirators' conspiracy foreclosed the Iraqi wheat market to U.S.-grown wheat and proximately caused a direct, substantial, and reasonably foreseeable decrease in prices at which Plaintiffs and members of the Class were able to sell their wheat in the United States during the Class Period.

111.    Plaintiffs and members of the Class have been injured in their business and property in an amount to be established at trial.

## COUNT II
### Violation of Section 1 the Sherman Act
### 15 U.S.C. § 1

112.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the paragraphs above.

113.    Beginning at least as early as June 1, 1999, AWB and the Conspirators entered into and engaged in a combination and conspiracy to restrain trade in the relevant markets. This combination and conspiracy, engaged in by AWB and the Conspirators, was an unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

114.    The combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among AWB and the Conspirators.

115.    There are no legitimate business justifications for AWB and the Conspirator's conduct, and any purported legitimate business justifications are mere pretexts.

116.    Because the relevant pricing mechanism by which wheat prices are set is global, Plaintiffs and members of the Class were injured in their business or property as a

direct and foreseeable result of AWB and the Conspirators' bribery and money laundering conspiracy.

117.    Specifically, AWB and the Conspirators' conspiracy foreclosed the Iraqi wheat market to U.S.-grown wheat and proximately caused a direct, substantial, and reasonably foreseeable decrease in prices at which Plaintiffs and members of the Class were able to sell their wheat in the United States during the Class Period.

118.    Class members have been injured in their business and property in an amount to be established at trial.

**COUNT III**
**Violation of Section 3 of the Clayton Act**
**15 U.S.C. § 14**

119.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the paragraphs above.

120.    AWB has entered into agreements with the IGB for the sale of wheat pursuant to which AWB has conditioned the payment of bribes on the IGB's agreement to refrain from purchasing wheat from other suppliers, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

121.    The effect of these arrangements has been to substantially lessen competition in the relevant markets.

122.    There are no legitimate business justifications for AWB and the Conspirator's conduct, and any purported legitimate business justifications are mere pretexts.

123.    Because the relevant pricing mechanism by which wheat prices are set is global, Plaintiffs and members of the Class were injured in their business or property as a

direct and foreseeable result of AWB and the Conspirators' bribery and money laundering conspiracy.

124.    Specifically, AWB and the Conspirators' conspiracy foreclosed the Iraqi wheat market to U.S.-grown wheat and proximately caused a direct, substantial, and reasonably foreseeable decrease in prices at which Plaintiffs and members of the Class were able to sell their wheat in the United States during the Class Period.

125.    Class members have been injured in their business and property in an amount to be established at trial.

## COUNT IV
### Violation of Racketeering Influenced Corrupt Organizations Act
### 18 U.S.C. § 1962(c)

126.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the paragraphs above.

127.    During all relevant times, AWB and the Conspirators were persons and were associated in fact as an enterprise engaging in and affecting interstate and foreign commerce.

128.    Each member of the enterprise had a specific role in the enterprise: the Iraqi Government oversaw purchases under the UN Oil for Food Program and formulated methods and rates for collecting inland transportation and after-sales-service fees; the Ministry of Trade was responsible for selecting bidders to invite to Baghdad to negotiate wheat contracts with the IGB under the UN Oil for Food Program; the IGB was responsible for soliciting bids for the purchase of wheat for Iraq under the UN Oil for Food Program and imposing the inland transportation and after-sales-service fees; the ISWTC was responsible for collecting the inland transportation and after-sales service

fees for the Iraqi government; AWB was responsible for submitted false contracts to the UN and illegally transferring U.S. dollars from the UN escrow account to the ISWTC and/or Alia; Alia operated as a front company for the Iraqi government and was responsible for transferring U.S. dollars to the ISWTC; and Ronly, Tse Yu Hong, and AWB Chartering were responsible for transferring U.S. dollars to the ISWTC and/or Alia.

129.   These roles were interrelated and dependent on each other for purposes of carrying out the common goals of the enterprise, thereby giving the enterprise a cohesive structure.

130.   The enterprise described herein was at all relevant times a continuing enterprise. From July 1999 until at least March 2003, the enterprise was designed to and did unlawfully funnel U.S. dollars to the Government of Iraq and achieve, maintain, and exploit AWB's monopoly position in the Iraqi wheat market.

131.   AWB and the Conspirators, together and individually, for the purpose of executing and attempting to execute the bribery and money laundering scheme alleged herein did unlawfully, willfully, and knowingly conduct and participate, directly and indirectly, in the conduct of said enterprise's affairs through a pattern of racketeering activity. Their actions include multiple related acts in violation of: (1) Interstate and Foreign Travel to Aid Racketeering, 18 U.S.C. § 1952; (2) Money Laundering, 18 U.S.C. § 1956; and (3) Engaging in Monetary Transactions in Proceeds from Specified Unlawful Activities, 18 U.S.C. § 1957.

132.   The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), consisted of multiple acts of racketeering by AWB and the Conspirators herein,

was interrelated, not isolated, and was perpetrated for the same or similar purposes by the same persons. Such activity extends over a substantial period of time, specifically the entire duration of the Class Period. Such activities occurred after the effective date of 18 U.S.C. §§ 1961 *et seq.*, and the last such act occurred within ten years of the commission of a prior act of racketeering activity. These racketeering activities included repeated acts of:

      (a)    Interstate and Foreign Travel in Aid of Racketeering Enterprises: AWB and its employees and/or agents acting on its behalf, aided and abetted by the Conspirators, traveled in interstate or foreign commerce or used the mail or any facility in interstate or foreign commerce, with intent to do so and thereafter distributed or attempted to distribute the proceeds of any unlawful activity, or promoted, managed, established, carried on, or facilitated the promotion, management, establishment, or carrying on, of any unlawful activity or attempted to do so. Said unlawful activity included, but was not limited to, bribery in violation of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 to -3, violations of the Organization for Economic Cooperation and Development Convention on Combating Bribery of Foreign Officials in International Business Transactions.

      (b)    Money Laundering--Transaction: AWB and its employees and/or agents acting on its behalf, aided and abetted by the Conspirators, with knowledge that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct a financial transaction that, in fact, involved or would have involved the proceeds of

specified unlawful activity. AWB did so with the intent to promote or to attempt

to promote the carrying on of specified unlawful activity; or knowing that the

transaction was designed in whole or in part to conceal or disguise the nature, the

location, the source, the ownership, or the control of the proceeds of specified

unlawful activity. Such acts are in violation of 18 U.S.C. § 1956.

      (c)    Money Laundering--Transportation: AWB and its employees

and/or agents acting on its behalf, aided and abetted by the Conspirators,

transported, transmitted, transferred or attempted to transport, transmit, or transfer

a monetary instrument or funds from a place in the United States to or through a

place outside the United States or to a place in the United States from or through a

place outside the United States with the intent to promote or to attempt to promote

the carrying on of specified unlawful activity; or knowing that the monetary

instrument or funds involved in the transportation, transmission, or transfer or

attempted transportation, transmission or transfer represented the proceeds of

some form of unlawful activity and knowing that such transportation,

transmission or transfer was designed in whole or in part to conceal or disguise

the nature, the location, the source, the ownership, or the control of the proceeds

of specified unlawful activity. Such actions are in violation of 18 U.S.C. § 1956.

      (d)    Monetary Transactions in Proceeds from Specified Unlawful

Activities: AWB and its employees and/or agents acting on its behalf, aided and

abetted by the Conspirators, knowingly engaged or attempted to engage in a

monetary transaction in criminally derived property of a value greater than

$10,000, which property was or would have been derived from specified unlawful

activity. AWB committed or attempted to commit that offense in the United States (or in any special maritime and territorial jurisdiction of the United States). Such actions are in violation of 18 U.S.C. § 1957.

133.    The persons alleged herein to have violated 18 U.S.C. § 1962(c) are separate from, though employed by or associated with the enterprise.

134.    AWB and the Conspirators each had a role in the racketeering activity that was distinct in the undertaking of those acting on its behalf. AWB and the Conspirators also attempted to benefit, and did benefit, from the activity of their employees and agents alleged herein, and thus were not passive victims in the racketeering activity, but active perpetrators.

135.    A substantial part of the conduct alleged herein occurred in the United States. Specifically, AWB maintained banks accounts at the Bank of New York in New York, New York. These accounts were used to receive amounts payable to AWB for the sale of wheat to Iraq from the UN escrow account during the Class Period. These accounts were also used to illegally transfer money to the Government of Iraq via its agents in furtherance of the enterprise's conspiracy during the Class Period. Without these accounts, the money laundering and bribery scheme could not have occurred.

136.    Additionally, AWB maintained an office in the United States, initially in New York and later in Oregon, which was integral to the conduct of the affairs of the enterprise. The U.S. office ensured that AWB was paid efficiently and promptly for the shipments of wheat to Iraq under the Oil for Food Program and monitored the progress of UN approvals of contracts between AWB and the IGB that were executed under the Oil for Food Program. Mr. Snowball, an employee in the AWB U.S. office, knowingly and

actively participated in the bribery and money laundering conspiracy alleged herein. In furtherance of the conspiracy, Mr. Snowball communicated with other AWB employees via the mail and wires from the United States about the conduct of the enterprise.

137.    The conduct alleged herein also had a substantial effect in the United States. Because the relevant pricing mechanism by which wheat prices are set is global, Plaintiffs and members of the Class were injured in their business or property as a direct and foreseeable result of AWB and the Conspirators' bribery and money laundering conspiracy.

138.    Specifically, AWB and the Conspirators' conspiracy foreclosed the Iraqi wheat market to U.S.-grown wheat and proximately caused a direct, substantial, and reasonably foreseeable decrease in prices at which Plaintiffs and members of the Class were able to sell their wheat in the United States during the Class Period.

139.    Plaintiffs and members of the Class have been injured in their business and property in an amount to be established at trial.

**COUNT V**
**Violation of the Robinson-Patman Act**
**15 U.S.C. § 13(c)**

140.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the paragraphs above.

141.    AWB is engaged in the business of selling wheat. Plaintiffs and members of the Class are also engaged in the business of selling wheat.

142.    AWB is engaged in interstate and foreign commerce. In the course of commerce, AWB provided items of value in the form of transportation and after-sale-services fees to the Government of Iraq and/or its respective agents, representatives, or

other intermediaries in connection with the sale of goods, wares, or merchandise. At the time of such transactions, the person receiving the value was or was subject to the direct or indirect controls of the Government of Iraq.

143.    AWB did not provide these items of value to the Government of Iraq and/or its respective agents, representatives, or other intermediaries for services rendered in connection with the sale of goods, wares, or merchandise. Rather, AWB provided these items of value to gain a competitive advantage over Plaintiffs and members of the Class.

144.    Because the relevant pricing mechanism by which wheat prices are set is global, Plaintiffs and members of the Class were injured in their business or property as a direct and foreseeable result of AWB and the Conspirators' bribery and money laundering conspiracy.

145.    Specifically, AWB and the Conspirators' conspiracy foreclosed the Iraqi wheat market to U.S.-grown wheat and proximately caused a direct, substantial, and reasonably foreseeable decrease in prices at which Plaintiffs and members of the Class were able to sell their wheat in the United States during the Class Period.

146.    Plaintiffs and members of the Class have been injured in their business and property in an amount to be established at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and members of the Class pray for judgment against AWB jointly and severally as follows:

1.    For treble damages pursuant to 18 U.S.C. § 1964(c);

2.    For treble damages pursuant to 15 U.S.C. § 15(a);

- 34 -

3.    For pre-judgment and post-judgment interest;

4.    For any and all costs of suit herein incurred, including, but not limited to

attorneys' fees and costs; and

5.    For such other and further relief that the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs respectfully demand a trial by jury on all issues raised herein.


Dated: July 10, 2007



Seth R. Gassman (SG-8116)
COHEN, MILSTEIN, HAUSFELD & TOLL,
PLLC
150 East 52nd Street
Thirtieth Floor
New York, NY 10022
Phone: 212-838-7797
Fax: 212-838-7745

Michael D. Hausfeld
Benjamin D. Brown
Hilary K. Ratway
Andrea L. Hertzfeld
COHEN, MILSTEIN, HAUSFELD & TOLL,
PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Phone: 202-408-4600
Fax: 202-408-4699

L. Palmer Foret
THE LAW FIRM OF L. PALMER
FORET, PC
1735 20th Street N.W.
Washington, DC 20009
Phone: 202-332-2404
Fax: 202-332-2808

Roderick E. Edmond
Craig T. Jones
EDMOND & JONES, LLP
127 Peachtree Street N.E., Suite 410
Atlanta, GA 30303
Phone: 404-525-1080
Fax: 404-525-1073

Michael P. Lehmann
FURTH, LEHMANN & GRANT, LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Phone: 415-433-2070
Fax: 415-982-2076

Bruce L. Simon
PEARSON, SIMON, WARSHAW, PENNY,
LLP
44 Montgomery Street, Suite 1200
San Francisco, CA 94104
Phone: 415-433-9000
Fax: 415-433-9008

Gary S. Soter
PEARSON, SIMON, WARSHAW, PENNY,
LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Phone: 818-788-8300
Fax: 818-788-8104

Roberta D. Liebenberg
Donald L. Perelman
FINE, KAPLAN & BLACK, RPC
1835 Market Street, 28th Floor
Philadelphia, Pennsylvania 19103
Phone: 215-567-6565
Fax: 215-568-5872

***Counsel for Plaintiffs John Boyd, Veryl
Switzer, Gillan Alexander, Rod Bradshaw,
Wilburt Howard, and Pat Dailey***

Gerald J. Rodos
Mark R. Rosen
Jeffrey B. Gittleman
Chad A. Carder
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600

and

A. Arnold Gershon (AG-3809)
Gloria Kui (GK-5661)
BARRACK, RODOS & BACINE
1350 Broadway, Suite 1001
New York, NY 10018
Telephone: (212) 688-0782

Anthony J. Bolognese
Joshua H. Grabar
BOLOGNESE & ASSOCIATES, LLC
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, PA 19103
Telephone: (215) 814-6750

*Counsel for Plaintiff Melvin Erb*


Steven A. Asher (SA-3357)
Mindee J. Reuben (MR-1554)
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street
Suite 1100
Philadelphia, PA 19103
Phone: 215-545-7200
Facsimile: 215-545-6535

Joseph C. Kohn (JK-1755)
KOHN, SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: 215-238-1700
Facsimile: 215-238-1968

- 37 -

W. Joseph Bruckner (WB-9328)
Richard A. Lockridge
Lisa M. Pollard
LOCKRIDGE GRINDAL NAUEN PLLP
Suite 2200
100 Washington Avenue South
Minneapolis, MN 55401
Telephone: 612-339-6900
Facsimile: 612-339-0981

Thomas S. McNamara (TM-3317)
INDIK & MCNAMARA, P.C.
100 South Broad Street, Suite 2230
Philadelphia, Pennsylvania 19110
Telephone: 215-567-7125
Fax: 215-563-8330

*Counsel for Plaintiff Dennis Brothers*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN BOYD, VERYL SWITZER, GILLAN ALEXANDER, ROD BRADSHAW, WILBURT HOWARD, PAT DAILEY, MELVIN ERB, and DENNIS BROTHERS on behalf of themselves and all others similarly situated,, <br><br> Plaintiffs, <br><br> -against- <br><br> AWB LIMITED and AWB (U.S.A.) LIMITED, <br><br> Defendants. | Civil Action No.  1:07-cv-03007-GEL <br><br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** |

### CERTIFICATE OF SERVICE

I, Lynette Drayton, hereby certify that on this 10th day of July 2007, that the undersigned has this day served the Consolidated Class Action Complaint upon the persons listed below by hand.

**Counsel for AWB Limited and AWB (U.S.A.) Limited**

Robert H. Baron
Timothy G. Cameron
CRAVATH, SWAINE & MOORE, LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

_Lynette Drayton_
Lynette Drayton