UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN BOYD, VERYL SWITZER, GILLAN
ALEXANDER, ROD BRADSHAW, WILBURT
HOWARD, PAT DAILEY, MELVIN ERB, and
DENNIS BROTHERS on behalf of themselves
and all others similarly situated,

                                Plaintiffs,

            v.

AWB LIMITED and AWB (U.S.A.) LIMITED,

                           Defendants.

---

ECF CASE

No. 1:07 CV 3007 (GEL)

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS
# THE CONSOLIDATED CLASS ACTION COMPLAINT

Robert H. Baron
Timothy G. Cameron
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants*
*AWB Limited and AWB (U.S.A.) Limited*

August 17, 2007

## TABLE OF CONTENTS

Page

Table of Authorities ............................................................................................... iii

Explanation of Citation Forms................................................................................ ix

Factual Background .................................................................................................1

Argument .................................................................................................................3

I.    Plaintiffs' Antitrust Claims (Counts I, II, III and V) Must Be Dismissed for Lack
      of Subject Matter Jurisdiction.......................................................................3

      A.    AWB's Alleged Conduct in Iraq Did Not Have a "Direct, Substantial and
            Reasonably Foreseeable Effect" on American Domestic Commerce ..........4

      B.    The Alleged Domestic Effect of AWB's Conduct Cannot Properly Give Rise
            to an Antitrust Claim ...............................................................................6

II.   Plaintiffs Lack Standing To Assert Their Antitrust Claims (Counts I, II, III & V).............7

      A.    Plaintiffs Have Not Demonstrated "Antitrust Injury" ...................................8

            1.    Plaintiffs Do Not Allege That There Was Any Anticompetitive Effect in
                  the Relevant Market (i.e., Iraq) ...........................................................9

            2.    Plaintiffs Also Lack Standing to Allege an Antitrust Injury in the
                  Relevant Market (i.e., Iraq) ...............................................................10

      B.    Plaintiffs Are Not the Proper Parties to Bring this Action Against AWB.................11

III.  Plaintiffs' Claim Pursuant to Section 1 of the Sherman Act (Count II) Must Be
      Dismissed for Failure to State a Claim .......................................................13

      A.    Plaintiffs Have Not Adequately Alleged a Contract, Combination or
            Conspiracy in Restraint of Trade.............................................................13

      B.    Plaintiffs Have Not Adequately Alleged an Injury to Competition in the
            Relevant Market (i.e., Iraq)......................................................................16

IV.   Plaintiffs' Claim Pursuant to Section 2 of the Sherman Act (Count I) Must Be
      Dismissed for Failure to State a Claim .......................................................16

      A.    Plaintiffs Have Failed to State a Claim For Monopolization ....................16

            1.    Plaintiffs Have Failed Adequately to Allege That Defendants Possessed
                  Monopoly Power .................................................................................17

i

        2.   Plaintiffs Have Failed Adequately to Allege That Defendants Sought Monopoly Power in the Relevant Market ...........................................................18

   B.  Plaintiffs Have Failed to State a Claim For Conspiracy to Monopolize ....................20

V.   Plaintiffs' Claim Pursuant to Section 3 of the Clayton Act (Count III) Must Be Dismissed for Failure to State a Claim ...........................................................................20

   A.  Plaintiffs Have Failed Adequately to Allege the Existence of an Exclusive Dealing Arrangement........................................................................................21

   B.  Plaintiffs Have Failed Adequately to Allege an Anticompetitive Effect Caused by Defendants' Alleged Conduct.................................................................22

VI.  Plaintiffs' Claim Pursuant to Section 2(c) of the Robinson-Patman Act (Count V) Must Be Dismissed for Failure to State a Claim.................................................................23

VII. Plaintiffs' RICO Claim (Count IV) Must Be Dismissed ....................................................25

   A.  Plaintiffs' RICO Claim Must Be Dismissed For Lack of Subject Matter Jurisdiction...................................................................................................25

        1.   This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' RICO Claim Under the Conduct Test ..............................................................26

        2.   This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' RICO Claim Under the Effects Test ..............................................................27

   B.  Plaintiffs' RICO Claim Must Be Dismissed Because Plaintiffs Lack RICO Standing .........................................................................................................27

        1.   Plaintiffs' Alleged Injury Was Not Directly Caused by AWB's Alleged Conduct..................................................................................................28

        2.   Plaintiffs' Alleged Injury Was Not a Reasonably Foreseeable Consequence of AWB's Alleged Conduct ............................................29

   C.  Plaintiffs' RICO Claim Must Be Dismissed Because Plaintiffs Have Not Pleaded the Existence of "Racketeering Activity" Under RICO.................................30

        1.   Plaintiffs Have Not Alleged a Violation of the FCPA ........................................32

        2.   The OECD Convention Does Not Create "Unlawful Activity" and in Any Event Has Been Incorporated Into the FCPA.............................................34

Conclusion .................................................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

## Cases

A&E Prods. Group L.P. v. The Accessory Corp., No. 00 Civ. 7271 (LMM), 2001
WL 1568238 (S.D.N.Y. Dec. 7, 2001).................................................................. 20

A.I.B. Express, Inc. v. FedEx Corp., 358 F. Supp. 2d 239 (S.D.N.Y. 2004) .............................. 19

Abdullahi v. Pfizer, Inc., No. 01 Civ. 8118 (WHP), 2005 WL 1870811 (S.D.N.Y.
Aug. 9, 2005) ........................................................................................................ 34

Alfadda v. Fenn, 935 F.2d 475 (2d Cir. 1991)............................................................................ 26

Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal., 190 F.3d 1051 (9th Cir. 1999) ............................ 10

Anheuser-Busch, Inc. v. G.T. Britts Distrib., Inc., 44 F. Supp. 2d 172 (N.D.N.Y.
1999) ...................................................................................................................... 22

Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991 (2006) .......................................................... 29

Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc., 241 F.3d 696 (9th Cir.
2001) ...................................................................................................................... 10

Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459
U.S. 519 (1983)................................................................................................ passim

Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103 (2d
Cir. 2001) .............................................................................................................. 26

Baisch v. Gallina, 346 F.3d 366 (2d Cir. 2003).......................................................................... 28

Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994) ........................................................................... 8

Barr Labs., Inc. v. Quantum Pharmics, Inc., 827 F. Supp. 111 (E.D.N.Y. 1993) ........................ 30

Beck v. Prupis, 529 U.S. 494 (2000) ......................................................................................... 30

Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955 (2007)...................................................... 4, 13, 14, 15

Bennett v. Cardinal Health Marmac Distribs. Inc., No. 02 CV 3095 (JG), 2003
WL 21738604 (E.D.N.Y. July 14, 2003) ............................................................... 21

Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide,
Inc., 369 F.3d 212 (2d Cir. 2004)..................................................................... 23, 24

Page(s)

Broadway Delivery Corp. v. United Parcel Serv. Of Am., Inc., 651 F.2d 122 (2d.
    Cir. 1981) .................................................................................................................... 17

Brown Shoe v. United States, 370 U.S. 294 (1962) ....................................................... 7

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977).................................. 7, 8, 23

Cancall PCS, LLC v. Omnipoint Corp., No. 99 CIV 3395 (AGS), 2000 WL
    272309 (S.D.N.Y. Mar. 10, 2000)............................................................................ 22

Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., 996 F.2d 537 (2d
    Cir. 1993) ............................................................................................................ 9, 16

Citicorp Int'l Trading Co. v. W. Oil & Refining Co., No. 88 Civ. 5377 (RWS),
    1991 WL 4502 (S.D.N.Y. Jan. 16, 1991)............................................................ 32, 34

Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36 (1977)............................... 13

Daniel v. Am. Bd. Of Emergency Med., 428 F.3d 408 (2d Cir. 2005) ...................... 7, 8

de Atucha v. Commodity Exch., Inc. 608 F. Supp. 510 (S.D.N.Y. 1985).................... 12

Deem v. Lockheed Corp., 749 F. Supp. 1230 (S.D.N.Y. 1989) .................................. 20

Den Norske Stats Oljeselskap AS v. HeereMac VOF, 241 F. 3d 420 (5th Cir.
    2001) ........................................................................................................................ 5

Denney v. Deutsche Bank AG, 443 F.3d 253 (2d Cir. 2006)..................................... 28

E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23 (2d Cir. 2006) .......... 16, 17

Elec. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240 (2d
    Cir. 1997) ...................................................................................................... 16, 17, 19

F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155 (2004) ....................... 4, 6

First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159 (2d Cir. 2004)....................... 31

Floors-N-More, Inc. v. Freight Liquidators, 142 F. Supp. 2d 496 (S.D.N.Y. 2001) ............. passim

FTC v. Henry Broch & Co., 363 U.S. 166 (1960)...................................................... 24

George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136 (2d Cir. 1998) .................. 9, 10

GICC Capital Corp. v. Tech. Fin. Group, Inc., 67 F.3d 463 (2d Cir. 1995)................. 31

Page(s)

Giro v. Banco Espanol de Credito, S.A., No. 98 Civ. 6195 (WHP), 1999 WL 440462 (S.D.N.Y. June 28, 1999)............................................................. 25, 26, 27

Gorman v. Consol. Edison Corp., 488 F.3d 586 (2d Cir. 2007) .................................... 1

H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229 (1989).................................................... 31

Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258 (1992) ....................................... 28

Ill. Brick Co. v. Illinois, 431 U.S. 720 (1977) ............................................................. 7

In re Elevator Antitrust Litig., No. 04 CV 1178 (TPG), 2006 WL 1470994 (S.D.N.Y. May 30, 2006) ................................................................... 19, 20

In re Intel Corp. Microprocessor Antitrust Litig., 452 F. Supp. 2d 555 (D. Del. 2006) ....................................................................................... 5, 6

Int'l Audiotext Network, Inc. v. AT&T, 893 F. Supp. 1207 (S.D.N.Y. 1994)............................ 14

Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co., 812 F.2d 786 (2d Cir. 1987)..................... 20

Intimate Bookshop, Inc. v. Barnes & Noble, Inc., 88 F. Supp. 2d 133 (S.D.N.Y. 2000) .................................................................................. 24

Kahn v. iBiquity Digital Corp., No. 06 Civ. 1536 (NRB), 2006 WL 3592366 (S.D.N.Y. Dec. 7, 2006)....................................................................... 14, 19

Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc., 191 F.3d 229 (2d Cir. 1999)....................................................................... 29

Latino Quimica-Amtex S.A. v. Akzo Nobel Chemicals B.V., No. 03 Civ. 10312 (HB) (DF), 2005 WL 2207017 (S.D.N.Y. Sept. 8, 2005)............................ 4, 5, 6, 10

Lerner v. Fleet Bank, N.A., 318 F.3d 113 (2d Cir. 2003).............................................. 29

Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir. 2006).............................................. 28

Leung v. Law, 387 F. Supp. 2d 105 (E.D.N.Y. 2005) .................................................. 29

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ................................ 3, 4

Medgar Evers Houses Tenants Ass'n v. Medgar Evers Houses Assocs., 25 F. Supp. 2d 116 (E.D.N.Y. 1998)........................................................... 29

Monsieur Touton Selection, Ltd. v. Future Brands, LLC, No. 06 Civ. 1124 (SAS), 2006 WL 2192790 (S.D.N.Y. Aug. 1, 2006) .................................................. 23, 25

Page(s)

N. S. Fin. Corp. v. Al-Turki, 100 F.3d 1046 (2d Cir. 1996) ................................................... 26, 27

N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med., 430 F. Supp. 2d 140 (S.D.N.Y. 2006) ................................................................................................................................... 8

Nasser v. Andersen Worldwide Société Coop., No. 02 Civ. 6832 (DC), 2003 WL 22179008 (S.D.N.Y. Sept. 23, 2003) ................................................................................ 26, 27

Oahu Gas Serv., Inc. v. Pac. Res. Inc., 838 F.2d 360 (9th Cir. 1988) ......................................... 18

Ocean View Capital, Inc. v. Sumitomo Corp. of Am., No. 98 Civ. 4067 (LAP), 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ............................................................... 8, 10, 11

Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283 (2d Cir. 2006)..... 8, 10, 11, 13

PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101 (2d Cir. 2002) ......................................... 16, 17, 18

Powers v. British Vita, P.L.C., 57 F.3d 176 (2d Cir. 1995)........................................................... 30

Reading Indus., Inc. v. Kennecott Copper Corp., 631 F.2d 10 (2d Cir. 1980) ............................. 12

Sanjuan v. Am. Bd. Of Psychiatry & Neurology, Inc., 40 F.3d 247 (7th Cir. 1995) .................... 7

Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26 (1976) .......................................................... 10

Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber, 327 F.3d 173 (2d Cir. 2003)........................... 32

Stutts v. De Dietrich Group, No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006)............................................................................................... 34

Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320 (1961) ..................................................... 22

Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90 (2d Cir. 1998) ......................... 9, 17, 18

United Magazine Co. v. Murdoch Magazines Distribution, 146 F. Supp. 2d 385 (S.D.N.Y. 2001) ................................................................................................................ 23, 24

United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377 (1956) ....................................... 17

United States v. Grinnell, 384 U.S. 563 (1966) ........................................................................... 17

United States v. LSL Biotechnologies, 379 F.3d 672 (9th Cir. 2004) ........................................... 5

Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004) ......................................................................................................................................... 18

Page(s)

Vicon Fiber Optics Corp. v. Scrivo, 201 F. Supp. 2d 216 (S.D.N.Y. 2002) ................................ 29

Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256 (2d Cir. 2001) .......................... 9

W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch, No. 03 Civ. 8606
    (RWS), 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004).......................................................... 34

**Statutes & Rules**

15 U.S.C. § 1 ....................................................................................................................... 1, 13

15 U.S.C. § 13(c) ................................................................................................................ 1, 23

15 U.S.C. § 14 ..................................................................................................................... 1, 21

15 U.S.C. § 15 .......................................................................................................................... 7

15 U.S.C. § 2 ....................................................................................................................... 1, 16

15 U.S.C. § 6a .......................................................................................................................... 4

15 U.S.C. § 6a(1) ..................................................................................................................... 4

15 U.S.C. § 6a(2) ..................................................................................................................... 4

15 U.S.C. § 78dd-1 ................................................................................................................. 31

15 U.S.C. § 78dd-2 ................................................................................................................. 31

15 U.S.C. § 78dd-2(a) ....................................................................................................... 32, 33

15 U.S.C. § 78dd-2(c)(1) ....................................................................................................... 33

15 U.S.C. § 78dd-3 ................................................................................................................. 31

15 U.S.C. § 78dd-3(a) ............................................................................................................ 33

18 U.S.C. § 1952 ............................................................................................................... 31, 32

18 U.S.C. § 1952(a) ................................................................................................................ 31

18 U.S.C. § 1952(b) ................................................................................................................ 31

18 U.S.C. § 1956 ............................................................................................................... 31, 32

18 U.S.C. § 1956(a) ................................................................................................................ 31

Page(s)

18 U.S.C. § 1956(c) ............................................................................... 31

18 U.S.C. § 1957 .............................................................................. 31, 32

18 U.S.C. § 1957(f) ............................................................................. 31

18 U.S.C. § 1961(1) ............................................................................. 31

18 U.S.C. § 1961(5) ............................................................................. 30

18 U.S.C. § 1962(c) ................................................................ 1, 25, 30, 31

18 U.S.C. § 1964(c) ............................................................. 25, 27, 28, 30

Fed. R. Civ. P. 8(a)(2) ..........................................................................14

Fed. R. Civ. P. 12(b)(1) ......................................................................... 1

Fed. R. Civ. P. 12(b)(6) ......................................................................... 1

International Anti-Bribery and Fair Competition Act of 1998, Pub. L. 105-366,
    112 Stat. 3302 (1998) ...................................................................... 35

N.Y. Penal Law § 180.00 ...................................................................... 24

Organized Crime Control Act of 1970, Pub. L. No. 90-452, 1970 U.S.C.C.A.N.
    (84 Stat.) 1073 ................................................................................ 25

Statement by President William J. Clinton Upon Signing S. 2375, 1998
    U.S.C.C.A.N. 771-72 (November 10, 1998) ....................................... 35

## Other Authorities

Convention on Combating Bribery of Foreign Public Officials in International
    Business Transactions, November 21, 1997, DAFFE/IME/BR(97)20 .............................. 32, 34

Paul A. Volcker, Chairman, Indep. Inquiry Comm. Into the United Nations Oil-
    For-Food Programme, Manipulation of the Oil-For-Food Programme by the
    Iraqi Regime (October 27, 2005) ....................................................... 33, 34

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this memorandum of law:

- "Complaint" or "<u>Boyd</u> ¶ [ ]" for references to the Consolidated Class Action Complaint filed in this matter, dated July 10, 2007.

- "Cameron Decl. Exh. [ ]" for references to exhibits attached to the Declaration of Timothy G. Cameron filed herewith, sworn to August 17, 2007.

- "<u>RICO Legislative History</u>" for references to the Organized Crime Control Act of 1970, Pub. L. No. 90-452, 1970 U.S.C.C.A.N. (84 Stat.) 1073.

- "Volcker Report [ ]" for references to Paul A. Volcker, Chairman, Indep. Inquiry Comm. Into the United Nations Oil-For-Food Programme, <u>Manipulation of the Oil-For-Food Programme by the Iraqi Regime</u> (October 27, 2005).

- "OECD Convention" for references to the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, November 21, 1997, DAFFE/IME/BR(97)20.

- "Anti-Bribery Act of 1998" for references to the International Anti-Bribery and Fair Competition Act of 1998, Pub. L. 105-366, 112 Stat. 3302 (1998).

- "Anti-Bribery Act Signing Stmt." for references to the Statement by President William J. Clinton Upon Signing S. 2375, 1998 U.S.C.C.A.N. 771-72 (November 10, 1998).

Defendants AWB Limited and AWB (U.S.A.) Limited (collectively, "AWB") submit this Memorandum of Law in Support of their Motion to Dismiss the Consolidated Class Action Complaint, pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.[1]

## FACTUAL BACKGROUND

This is a putative class action brought on behalf of "[a]ll persons and entities that grew and sold hard red winter wheat in the United States from the period June 1, 1999 until at least March 20, 2003". (Boyd ¶ 32.) Plaintiffs allege that AWB, through its participation in the United Nations's Oil For Food Programme ("OFFP"),[2] conspired to "achieve, maintain and exploit a monopoly on wheat sold in Iraq" and by "foreclos[ing] the Iraqi market to U.S.-grown wheat" caused a "decrease in prices at which U.S. wheat farmers were able to sell their wheat in the United States". (Id. ¶ 2.) Plaintiffs allege AWB's conduct violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (id. ¶¶ 104-18), Section 3 of the Clayton Act, 15 U.S.C. § 14 (id. ¶¶ 119-25), the Robinson-Patman Act, 15 U.S.C. § 13(c) (id. ¶¶ 140-46), as well as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (id. ¶¶ 126-39).

*Plaintiffs' Conspiracy Allegations:*  In June 1999, AWB received a wheat tender from the IGB that required AWB to pay "the cost of transporting the wheat by road from the

---

[1] While, for purposes of this motion, the Court must accept the factual allegations in the Complaint as true, see Gorman v. Consol. Edison Corp., 488 F.3d 586, 591-92 (2d Cir. 2007), AWB rejects plaintiffs' allegations of wrongdoing and unlawfulness as asserted therein.

[2] According to plaintiffs, because of U.S. sanctions, U.S.-grown wheat was not sold to Iraq between 1990 and 1997. (Boyd ¶ 63.) "In 1997, however, U.S.-grown wheat re-entered the market under the UN Oil for Food Program." (Id.) Under the Programme, proceeds from the sale of Iraqi oil were deposited into a UN-controlled escrow account in New York ("the U.N. Escrow Account"), which Iraq was then permitted to use to pay suppliers for food, medicine and humanitarian goods. (Id. ¶ 64.) Those suppliers were chosen by the Iraqi Government, pursuant to a tender process. (Id. ¶ 65.) With respect to purchases by Iraq of wheat, the Iraq Grain Board ("IGB") advertised tenders for contracts, and forwarded bids to the Iraqi Ministry of Trade, which then selected bidders to invite to Baghdad to negotiate a contract with the IGB. (Id. ¶¶ 65, 71.) Once wheat shipments were certified by U.N. inspectors, the U.N. would issue a letter of credit in favor of the supplier, to be drawn against the U.N. Escrow Account. (Id. ¶¶ 66, 77.)

point of entry into Iraq . . . to the various governorates throughout Iraq". (Id. ¶ 70.) Plaintiffs

contend that these "newly imposed inland transportation fees were not, in fact, designed to cover

the cost of transportation inside Iraq, but instead were illegal payments to the Government of

Iraq". (Id. ¶ 72.) Plaintiffs allege that AWB agreed to pay those fees "in order to maintain its

monopoly status in Iraq", and that AWB and the IGB further conspired to include those fees in

wheat contract prices that were approved by the U.N. and then recouped by AWB from the U.N.

Escrow Account.[3] (Id. ¶¶ 73, 74, 77, 80, 81.) Plaintiffs allege that AWB and the IGB attempted

to conceal their conspiracy not only by incorporating those fees into the wheat contract price

submitted to the U.N., but also by using, and conspiring with, various intermediaries, including a

Jordanian trucking company and certain ship owners.[4] (Id. ¶¶ 81-83, 86-87.)

  *Plaintiffs' Antitrust Allegations:* Plaintiffs claim that, between 1999 and 2003:

(1) because of the alleged conspiracy described above (id. ¶ 69); (2) the Iraqi Government

purchased little or no U.S.-grown wheat (id. ¶ 91);[5] (3) which resulted in higher "Ending Stocks"

---

[3] According to plaintiffs, those fees – which, including an additional "after-sales-service-fee" imposed by the Iraqi Government in mid-2000, totaled over $221.7 million – were "revenue neutral" to AWB, and "did not directly affect . . . the price for which the wheat was sold". (Boyd ¶¶ 77, 79, 80, 99.)

[4] Plaintiffs allege that AWB conspired with the Iraqi Ministry of Trade, the IGB, the Iraqi State Water Transport Company ("ISWTC") and Alia Transportation (a Jordanian trucking company) – all of which were under the control of the Iraqi Government – as well as Ronly Holdings Limited (a shipping company), Tse Yu Hong Metal Limited (a shipping company) and AWB Chartering (a division of AWB). (Boyd ¶¶ 14-22.)

[5] Of the 100 million metric tons ("mmt") of wheat traded annually worldwide, Iraq imports approximately 3 mmt of hard wheat per year. (Boyd ¶¶ 43, 61.) At its peak in the 1980s, Iraq purchased 29 percent (or 0.87 mmt) of that wheat from the U.S. and 38 percent (or 1.14 mmt) from Australia. (Id. ¶ 62.) From 1990-1997, when American farmers were forbidden from exporting wheat to Iraq, the Australian share of the Iraqi market grew to 73 percent (or 2.19 mmt). (Id. ¶ 63.) In 1998, when the U.S. was again permitted to export wheat to Iraq under the OFFP, Iraq purchased 6 percent (or 0.18 mmt) of its wheat from the U.S. – representing 0.58 percent of total U.S. wheat exports and 1.3 percent of total U.S. hard red winter wheat exports that year. (Id. ¶¶ 52, 61, 67.) After 1999, Iraq again stopped purchasing wheat from the U.S. (Id. ¶ 91.) Consequently, plaintiffs' claim is that because, and only because, of AWB's actions, Iraq stopped purchasing roughly 6 percent of its annual wheat requirements from the U.S. during

(defined as "the supply of wheat in the U.S. that remains unsold at the end of a current crop year") (id. ¶¶ 57, 93); (4) which resulted in wheat futures contracts trading on U.S. commodity exchanges at lower prices (id. ¶¶ 56-57); (5) which resulted in a lower price of wheat in the United States (id. ¶¶ 57, 93); (6) which resulted in plaintiffs being unable to sell their wheat in the United States for as much money as they would have otherwise been able to (id. ¶ 94). For purposes of their antitrust claims, plaintiffs define the relevant product market as "the market for bread wheat imported by Iraq, including, but not limited to, U.S.-grown hard red winter wheat, Australian hard wheat, and Russian hard wheat" (id. ¶ 40), the relevant geographic market as "Iraq" (id. ¶ 41), and the relevant pricing mechanism market as "the world" (id. ¶ 42).

## ARGUMENT

### I. PLAINTIFFS' ANTITRUST CLAIMS (COUNTS I, II, III AND V) MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.

The alleged unlawful conduct complained of by plaintiffs occurred outside the U.S.[6] The principal effect of that conduct, which forms the basis for plaintiffs' antitrust claims – namely the alleged "foreclosure of the Iraqi wheat market to U.S.-grown wheat" (id. ¶ 94) – also occurred outside the U.S. Because both the conduct and effects at issue here are overwhelmingly extraterritorial, this Court lacks subject matter jurisdiction over plaintiffs' antitrust claims.

"American antitrust laws do not regulate the competitive conditions of other nations' economies". Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582 (1986). In furtherance of that principle, the Foreign Trade Antitrust Improvements Act of 1982,

---

the proposed class period, and that caused "a direct, substantial and reasonably foreseeable decrease in prices" at which plaintiffs could sell their wheat in the U.S. (Id. ¶ 94.)

[6] Not only was the alleged conspiracy supposedly formed outside the U.S., in Baghdad, by representatives of AWB (an Australian company) and the Iraqi Government (see Boyd ¶¶ 71-72), but all of AWB's alleged co-conspirators – described by plaintiffs as "various agencies of the Iraqi government, a Jordanian trucking company, and international shipping companies" (see id. ¶ 1) – are foreign entities with no alleged connection to the U.S. (id. ¶¶ 14-22).

15 U.S.C. § 6a ("FTAIA"), excludes from the scope of the U.S. antitrust laws all non-import

activity involving foreign commerce (including "export activities" and "other commercial

activities taking place abroad"), unless the conduct at issue both "(1) sufficiently affects

American commerce, i.e., it has a 'direct, substantial, and reasonably foreseeable effect' on

American domestic, import or (certain) export commerce, and (2) has an effect of a kind that

antitrust law considers harmful, i.e., the 'effect' must 'giv[e] rise to a [Sherman Act] claim'".

F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 162 (2004) (citing 15 U.S.C.

§ 6a(1), (2)).[7] Because the conduct here did not sufficiently affect American commerce, and

because it did not have an effect of a kind that U.S. antitrust law considers harmful, plaintiffs'

antitrust claims should be dismissed for lack of subject matter jurisdiction.

**A.    AWB's Alleged Conduct in Iraq Did Not Have a "Direct, Substantial and Reasonably Foreseeable Effect" on American Domestic Commerce.**

In an obvious but misconceived attempt to get around the FTAIA, plaintiffs allege

that AWB's extraterritorial conduct "caused a direct, substantial and reasonably foreseeable

decrease in prices" at which plaintiffs were able to sell their wheat in the U.S. (Boyd ¶ 110.)

That conclusory pleading is insufficient to support jurisdiction.

Plaintiffs' reliance upon boilerplate allegations that merely repeat the statutory

language will not be deemed sufficient without the factual predicate to support them. See Bell

Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1967 (2007) ("a district court must retain the power to

insist upon some specificity in pleading before allowing a potentially massive factual

---

[7] While the FTAIA applies specifically to Sherman Act claims, see 15 U.S.C. § 6a, the standard set forth in the FTAIA has also been applied to decline jurisdiction over Clayton Act claims, see, e.g., Latino Quimica-Amtex S.A. v. Akzo Nobel Chemicals B.V., No. 03 Civ. 10312 (HB) (DF), 2005 WL 2207017, at *1, 8-9 (S.D.N.Y. Sept. 8, 2005). The Robinson-Patman Act has also been found not to apply extraterritorially. See Matsushita, 475 U.S. at 574 (denying, inter alia, plaintiffs' Robinson-Patman Act claim because it would be inappropriate for American manufacturers to recover antitrust damages from Japanese competitors "based solely on an alleged cartelization of the Japanese market").

controversy to proceed") (quoting Associated Gen. Contractors of Cal., Inc. v. Cal. State Council

of Carpenters, 459 U.S. 519, 528 n.17 (1983) ("AGC")); see also Latino Quimica-Amtex S.A,

2005 WL 2207017, at *13. Such a factual predicate is totally lacking here. Plaintiffs do not

plead that any of AWB's alleged conduct was directed specifically toward the U.S., and

according to plaintiffs' own pleadings, the alleged harm in the U.S. – a decrease in the prices at

which plaintiffs could sell their wheat in this country (see, e.g., Boyd ¶¶ 94, 110) – occurred only

as a consequence of the alleged global interrelatedness of the U.S. and Iraqi wheat markets.[8] But

the "mere inter-dependence of markets" is not enough to meet the jurisdictional requirements of

the FTAIA. Latino Quimica-Amtex S.A., 2005 WL 2207017, at *12.[9] Plaintiffs cannot

overcome the FTAIA, and establish subject matter jurisdiction for their antitrust claims, solely

by "rely[ing] on general market principles to allege that, in a global market, an effect of

anticompetitive conduct in one location . . . will cause a ripple effect that will necessarily 'be

felt' in others". See id., 2005 WL 2207017, at *13. Rather, "[c]ourts discussing the 'direct

effects' requirement of the FTAIA have recognized that 'direct effect' means that there must be

an 'immediate consequence' of the alleged anticompetitive conduct with no intervening

developments". In re Intel Corp. Microprocessor Antitrust Litig., 452 F. Supp. 2d 555, 560 (D.

Del. 2006) (quoting United States v. LSL Biotechnologies, 379 F.3d 672, 680 (9th Cir. 2004)).

---

[8] See, e.g., Boyd ¶ 93 (alleging that the decrease in prices at which plaintiffs were able to sell their wheat in the United States resulted from "the global nature of the wheat pricing mechanism, the effect of supply and demand forces in any given sub-market on prices in other sub-markets, and the fact that the foreclosure of U.S.-grown wheat from the Iraqi market would result in higher Ending Stocks and lower prices in the United States").

[9] See also Den Norske Stats Oljeselskap AS v. HeereMac VOF, 241 F. 3d 420, 427 n.24 (5th Cir. 2001) (rejecting allegation of worldwide conspiracy as insufficient to satisfy jurisdictional requirements of FTAIA and stating that "the assumed existence of a single, unified, global conspiracy does not relieve [plaintiff] of its burden of alleging that its injury arose from the conspiracy's proscribed effects on United States commerce").

Plaintiffs' theory of injury fails to meet that standard. Far from identifying a "direct", or even "reasonably foreseeable", effect of AWB's alleged conduct in the U.S., plaintiffs rely upon a "chain of effects [that] is full of twists and turns, which themselves are contingent upon numerous developments". In re Intel Corp., 452 F. Supp. 2d at 560. Plaintiffs' claim of injury in this case presupposes that: (1) because of the alleged conspiracy between AWB, the IGB and others between 1999 and 2003 (Boyd ¶ 69); (2) the Iraqi Government purchased little or no U.S.-grown wheat (id. ¶ 91); (3) which caused there to be higher "Ending Stocks" in the U.S. (id. ¶¶ 57, 93); (4) which caused wheat future contracts to trade on various U.S. commodity exchanges at lower prices (id. ¶¶ 56-57); (5) which caused the price of wheat in the United States to decrease (id. ¶¶ 57, 93); (6) which caused plaintiffs to be unable to sell their wheat in the United States for as much money as they would otherwise have been able to (id. ¶ 94). Needless to say, plaintiffs' theory is based on a multitude of speculative and changing factors affecting business, including market conditions, costs, alternative factors affecting supply and demand and world-wide economic and political conditions. See In re Intel Corp., 452 F. Supp. 2d at 561 (rejecting as inappropriate under the FTAIA a "but-for theory of causation", as plaintiffs advance here). The alleged causal link between AWB's extraterritorial acts and the alleged harm in the U.S. does not, and cannot, satisfy plaintiffs' burden of establishing proximate cause. That alleged link far is too indirect and unforeseeable to establish subject matter jurisdiction. See Latino Quimica-Amtex S.A., 2005 WL 2207017, at *13.

**B.       The Alleged Domestic Effect of AWB's Conduct Cannot Properly Give Rise to an Antitrust Claim.**

AWB's alleged conduct did not give rise to "an effect [in the U.S.] of a kind that antitrust law considers harmful". Empagran, 542 U.S. at 162. The domestic effect complained of by plaintiffs – a decrease in the prices at which plaintiffs could sell their wheat in the U.S.

(see, e.g., Boyd ¶¶ 94, 110) – is not a result that antitrust law considers harmful. Lowering the price of wheat in the U.S. might affect competitors, but it is not an injury to competition. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) ("the antitrust laws . . . were enacted for 'the protection of competition, not competitors'") (quoting Brown Shoe v. United States, 370 U.S. 294, 320 (1962)). Even if plaintiffs were harmed by AWB's conduct (which is unlikely and speculative), that is "insufficient to show harm to competition". Floors-N-More, Inc. v. Freight Liquidators, 142 F. Supp. 2d 496, 501 (S.D.N.Y. 2001).[10]

Because plaintiffs have failed to demonstrate either that AWB's extraterritorial conduct had the requisite domestic effects in the U.S., or that such effects properly give rise to U.S. antitrust claims, this Court lacks subject matter jurisdiction over Counts I, II, III and V.

## II.    PLAINTIFFS LACK STANDING TO ASSERT THEIR ANTITRUST CLAIMS (COUNTS I, II, III & V).

Plaintiffs' antitrust claims should also be dismissed because plaintiffs lack "antitrust standing" to bring them. Antitrust standing is distinct from the standing requirement imposed by the Constitution. While "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact", the antitrust standing inquiry focuses on whether the plaintiff is the proper party to bring the private antitrust action at issue.[11]  See AGC,

---

[10] The notion that a party was injured by not being able to charge a higher price for its goods is antithetical to the purpose behind the antitrust laws. As the Second Circuit has noted, "'[t]he claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up'". Daniel v. Am. Bd. Of Emergency Med., 428 F.3d 408, 439 (2d Cir. 2005) (quoting Sanjuan v. Am. Bd. Of Psychiatry & Neurology, Inc., 40 F.3d 247, 251-52 (7th Cir. 1995)).

[11] A finding of antitrust standing is a necessary prerequisite to a private antitrust claim because, despite the broad language of Section 4 of the Clayton Act, 15 U.S.C. § 15, "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property". AGC, 459 U.S. at 535. As the Supreme Court has recognized, although "[a]n antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy . . . 'there is a point beyond which the wrongdoer should not be held liable'". AGC, 459 U.S. at 534-35 (quoting Ill. Brick Co. v. Illinois, 431 U.S. 720, 760 (1977) (Brennan, J., dissenting)).

459 U.S. at 536 n.31. The Second Circuit has prescribed a "two-pronged analysis to determine whether a plaintiff has antitrust standing". Balaklaw v. Lovell, 14 F.3d 793, 798 n.9 (2d Cir. 1994). First, a court must determine whether plaintiff has suffered an "antitrust injury". Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 290 (2d Cir. 2006). Second, if antitrust injury has been established, the court must determine whether the plaintiff is the proper party to bring the action. Id. at 290-91; see also Daniel, 428 F.3d at 443. In other words, a court must consider whether "there is some other reason other than failure to allege antitrust injury that prevents plaintiff from being an efficient enforcer of the antitrust laws". N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med., 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006) (citing Daniel, 428 F.3d at 443). Plaintiffs in this case cannot meet either prong of that test.

### A.    Plaintiffs Have Not Demonstrated "Antitrust Injury".

Antitrust injury is "more than injury causally linked to an illegal presence in the market", it is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful". Brunswick Corp., 429 U.S. at 489. The antitrust injury requirement ensures that the antitrust laws are used for the purposes for which Congress enacted them, namely "'to assure customers the benefit of price competition' and to protect 'the economic freedom of participants in the relevant market'". Ocean View Capital, Inc. v. Sumitomo Corp. of Am., No. 98 Civ. 4067 (LAP), 1999 WL 1201701, at *3 (S.D.N.Y. Dec. 15. 1999) (quoting AGC, 459 U.S. at 538) (emphasis added). Here, plaintiffs have failed to allege antitrust injury because they have failed to allege either (1) any anticompetitive effect in the alleged relevant market; or (2) that they even participated in that alleged market.

8

      1.    **Plaintiffs Do Not Allege That There Was Any Anticompetitive Effect in the Relevant Market (i.e., Iraq).**

"The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, 'that the challenged action has had an <u>actual</u> adverse effect on competition as a whole in the relevant market'". <u>George Haug Co. v. Rolls Royce Motor Cars Inc.</u>, 148 F.3d 136, 139 (2d Cir. 1998) (quoting <u>Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.</u>, 996 F.2d 537, 543 (2d Cir. 1993)). Here, plaintiffs define the relevant product market for purposes of their antitrust claims as "the market for bread wheat imported by Iraq" and the relevant geographic market as "Iraq". (<u>Boyd</u> ¶¶ 40-41.) However, plaintiffs do not allege any adverse effect whatsoever on competition in that market. Plaintiffs do not allege, for example, that AWB's conduct resulted in higher wheat prices in Iraq, reduced wheat output or decreased wheat quality. <u>Virgin Atl. Airways Ltd. v. British Airways PLC</u>, 257 F.3d 256, 264 (2d Cir. 2001) ("whether an actual adverse effect has occurred is determined by examining factors like reduced output, increased prices and decreased quality"); <u>see also</u> <u>Tops Markets, Inc. v. Quality Markets, Inc.</u>, 142 F.3d 90, 96 (2d Cir. 1998). To the contrary, plaintiffs admit that the payment by AWB of the allegedly illegal "inland transportation fee" "did not directly affect . . . the price for which the wheat was sold" to the Iraqi Government.[12] (<u>Boyd</u> ¶ 77.) The only allegation that plaintiffs do make regarding the Iraqi wheat market is that, because of the activities of AWB and the alleged conspirators, "U.S.-grown wheat was completely foreclosed from the Iraqi market" between 1999 and 2003. (<u>See, e.g.</u>, <u>id.</u> ¶ 91.) But, as noted above (<u>see</u> Section I.B., <u>supra</u>), that is, at most, merely an allegation of harm to potential <u>competitors</u> of AWB, and not of an "actual

---

[12] Further, plaintiffs concede that the alleged relevant market (the Iraqi wheat market) was a market regulated and controlled by the U.N. under the OFFP. (<u>See</u> <u>Boyd</u> ¶¶ 63-66.)

9

adverse effect on competition as a whole in the [Iraqi] market". George Haug Co., 148 F.3d at 139 (internal quotations omitted); see also Floors-N-More, Inc., 142 F. Supp. 2d at 501-02.

### 2.    Plaintiffs Also Lack Standing to Allege an Antitrust Injury in the Relevant Market (i.e., Iraq).

In order to assert an antitrust injury, a party must also either be "a consumer []or a competitor in the market in which trade was restrained". AGC, 459 U.S. at 539; see also George Haug Co., 148 F.3d at 140 (finding that plaintiff did not have standing to assert any antitrust injury because plaintiff did not allege that it was a competitor in the relevant market).

The question of whether plaintiffs have antitrust standing, including standing to assert antitrust injury, must be answered by reference to the individual named plaintiffs. See Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976); Latino Quimica-Amtex S.A., 2005 WL 2207017, at *1 n.2. None of the named plaintiffs, however, is alleged ever to have sold, or even attempted to sell, wheat either in or to Iraq. Likewise, none of the named plaintiffs is alleged ever to have submitted a tender or otherwise participated in the tender process set up under the auspices of the OFFP. (See Boyd ¶ 65.) Indeed, each of the eight named plaintiffs is alleged only to have "sold his [or her] hard red winter wheat in the United States". (Id. ¶¶ 4-11.) Because plaintiffs are not competitors or consumers in the relevant market (i.e., Iraq), they cannot, as a matter of law, assert that they suffered any antitrust injury in that market.[13] Plaintiffs, therefore, lack antitrust standing. Paycom Billing Servs. Inc., 467 F.3d at 291-92.

---

[13] Even if plaintiffs suffered an injury in the U.S. as a result of AWB's alleged conduct – which is speculative and unlikely – that does not change the conclusion that they lack standing to assert an antitrust injury. See, e.g., Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc., 241 F.3d 696, 705 (9th Cir. 2001) ("Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury") (quoting Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal., 190 F.3d 1051, 1057 (9th Cir. 1999)). Allegations of a conspiracy in one market that follow a "tenuous causal chain of events" to another market where plaintiffs have been injured are insufficient to meet this standing requirement. See Ocean View Capital, Inc., 1999 WL 1201701, at *4.

**B.**     **Plaintiffs Are Not the Proper Parties to Bring this Action Against AWB.**

"Even if a plaintiff adequately alleges an antitrust injury" – which has not

occurred here – "it may still be held to lack standing" if certain factors indicate that that person is

not the proper antitrust plaintiff. Id. at 290. Those factors include:

> "(1) '[T]he directness or indirectness of the asserted injury'; (2) 'the
> existence of an identifiable class of persons whose self-interest would
> normally motivate them to vindicate the public interest in antitrust
> enforcement'; (3) the speculativeness of the alleged injury; and (4) the
> difficulty of identifying damages and apportioning them among direct and
> indirect victims so as to avoid duplicative recoveries."

Id. at 290-91; see also AGC, 459 U.S. at 540-45 (same). Analysis of those factors confirms

plaintiffs' lack of antitrust standing here.

First, as discussed above, plaintiffs' asserted injury is extremely indirect. (See

Section I.A, supra.) Plaintiffs do not allege that they were damaged in the market in which the

alleged anticompetitive conduct occurred (i.e., Iraq), but instead conjecture that they were

injured elsewhere, in the U.S., as a result of a tortuously convoluted chain of causal events,

crucially including the "global nature of the wheat pricing mechanism". (Boyd ¶ 93.) At any

point in that chain, outside factors unrelated to the alleged conspiracy could have intervened to

cause a decrease in the price of wheat sold in the United States.[14] See Ocean View Capital, Inc.,

1999 WL 1201701, at *4 (finding no antitrust standing where "it is possible that the increased

. . . prices for the specified period of time were due to factors wholly unrelated to defendants'

transactions"). However, direct causation will not be established for antitrust standing purposes

when there are "numerous complex transactions which must be considered" and "additional

factors that must be evaluated to make a determination as to how the markets interact, if they

---

[14] Plaintiffs acknowledge that possibility, describing "Ending Stocks" as only the "main" –
but not exclusive – determinant of U.S. wheat prices. (Boyd ¶ 57.)

do". de Atucha v. Commodity Exch., Inc. 608 F. Supp. 510, 516 (S.D.N.Y. 1985).  That is
plainly true here.

        Second, plaintiffs are not persons whose self interests would "motivate them to
vindicate the public interest in antitrust enforcement" in this case.  AGC, 459 U.S. at 542.  As the
Supreme Court has noted, the most appropriate plaintiffs are those who were directly affected by
the anticompetitive conduct – i.e., persons who attempted to sell wheat to Iraq, but were not
permitted to do so.  See id. at 541-42.  The present plaintiffs are not those persons.  (See Section
II.A.2, supra.)  Moreover, it is ludicrous to suggest that plaintiffs' interest is to vindicate
America's "public interest in antitrust enforcement" when their complaint in this case is that
wheat prices in this country were lowered by the conduct complained of.

        Third, plaintiffs' claims of injury are wildly speculative.  See AGC, 459 U.S. at
542-43 (rejecting antitrust injury theory because, inter alia, it was "highly speculative").  "[T]o
find antitrust damages in this case would engage the court in hopeless speculation concerning the
relative effect of an alleged conspiracy in the market [for wheat in Iraq] on the price of [wheat in
United States], where countless other market variables could have intervened to affect those
pricing decisions."  Reading Indus., Inc. v. Kennecott Copper Corp., 631 F.2d 10, 13-14 (2d Cir.
1980).  Where, as here the alleged injuries are "based on conjectural theories of injury and
attenuated economic causality that would mire the courts in intricate efforts to recreate the
possible permutations in the causes and effects of a price change", the injury is too speculative
for antitrust standing purposes.  Id. at 14.

        Fourth, allowing plaintiffs to pursue their antitrust claims here would engender
great difficulty in apportioning liability between plaintiffs, who allegedly suffered indirect injury
in the U.S., and wheat exporters who might claim to have suffered direct injuries in Iraq.  See

Paycom Billing Servs. Inc., 467 F.3d at 294.  Accordingly, "the probability of duplicative

recoveries would be very large".  Id.

   For the foregoing reasons, plaintiffs lack antitrust standing.  Counts I, II, III and V

of the Complaint should therefore be dismissed.

## III. PLAINTIFFS' CLAIM PURSUANT TO SECTION 1 OF THE SHERMAN ACT (COUNT II) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.

   Section 1 of the Sherman Act states that "[e]very contract, combination . . . or

conspiracy, in restraint of trade or commerce . . . is declared to be illegal".  15 U.S.C. § 1.[15]

Plaintiffs' Section 1 claim must be dismissed because plaintiffs (1) have not adequately pleaded

the existence of any agreement in restraint of trade;[16] and (2) have not alleged an injury to

competition in the relevant market identified by plaintiffs (i.e., Iraq).

### A. Plaintiffs Have Not Adequately Alleged a Contract, Combination or Conspiracy in Restraint of Trade.

   Stating a claim under Section 1 "requires a complaint with enough factual matter

(taken as true) to suggest that an agreement was made".  Bell Atl. Corp., 127 S. Ct. at 1965.

"[L]abels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do."  Id.  It is not enough to plead facts that are "merely consistent" with an agreement in

restraint of trade; a plaintiff must provide facts at least "plausibly suggesting" such an

agreement.  Id. at 1966; see also Kahn v. iBiquity Digital Corp., No. 06 Civ. 1536 (NRB), 2006

---

[15] Plaintiffs' claims should be analyzed under the "rule of reason" rather than the "per se" approach.  The allegation that AWB's conduct in Iraq resulted, through a convoluted chain of events (see Section I.A, supra), in lower wheat prices in the U.S. does not come close to falling within the limited category of "manifestly anticompetitive" restraints which courts analyze under the per se rule.  See Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49-50 (1977).

[16] "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade . . . but only restraints effected by a contract, combination or conspiracy, . . . the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express".  Bell Atl. Corp., 127 S.Ct. at 1964 (internal citations omitted).

WL 3592366, at *4 (S.D.N.Y. Dec. 7, 2006) ("To state a claim under Section 1, plaintiffs must do more than merely allege the existence of a conspiracy . . . . They must provide some factual support for the allegation.") (internal quotations omitted).

Plaintiffs' Section 1 pleadings, which are cursory and devoid of any factual support, fail to meet that standard.  Plaintiffs simply recite generically that "AWB and the Conspirators entered into and engaged in a combination and conspiracy to restrain trade in the relevant markets" (Boyd ¶ 113), and "[t]he combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among AWB and the Conspirators" (id. ¶ 114).  The Supreme Court has confirmed that such empty, conclusory pleading is insufficient, even under the liberal standard of Rule 8(a)(2) of the Federal Rules of Civil Procedure.[17]  See Bell Atl. Corp., 127 S. Ct. at 1964-66; see also Fed. R. Civ. P. 8(a)(2).

Although not referenced in plaintiffs' Section 1 pleadings (see Boyd ¶¶ 112-18), the only agreements mentioned in the Complaint (although again, without any specificity) are the contracts between AWB and the Iraqi Government for the sale of wheat.  (See, e.g., id. ¶¶ 74, 76, 78.)  Nothing in plaintiffs' pleadings about those contracts, however, plausibly suggests that those contracts operated in restraint of trade, or otherwise violated Section 1.[18]  While plaintiffs do allege that those agreements contained improper kickbacks to the Iraqi Government, imposed

---

[17] The Supreme Court found plaintiffs' pleadings in Bell Atl. Corp., which were more detailed than here, to be insufficient.  See 127 S. Ct. at 1963 n.2 ("Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of Section 1 of the Sherman Act.")  As the Court observed, "a defendant seeking to respond to [these] conclusory [§ 1] allegations . . . would have little idea where to begin".  Id. at 1970 n.10.

[18] See Int'l Audiotext Network, Inc. v. AT&T, 893 F. Supp. 1207, 1222 (S.D.N.Y. 1994) ("The issue is whether the Agreement, together with the facts – as opposed to conclusions – alleged by [plaintiffs] are a sufficient basis from which to infer that the Agreement 'unreasonably' restrains trade.").

by Iraq to get around the sanctions regime[19] (see, e.g., id. ¶¶ 69-70, 72), plaintiffs do not allege, nor can they, that AWB and the Iraqi Government expressly agreed – either as part of those agreements or elsewhere – that Iraq would not purchase wheat from U.S. growers between 1999 and 2003. There is no factual basis for such an allegation. Indeed, as plaintiffs concede, Iraq (and Iraq alone) made the decision about how, when, at what price and from whom it purchased wheat.[20] (See id. ¶¶ 65, 70.) U.S. wheat sales to Iraq prior to the commencement of the alleged conspiracy were already minimal: in 1998, only 6 percent of Iraq's wheat imports came from the U.S., and only 1.3 percent of the U.S.'s hard red winter wheat exports went to Iraq. (See id. ¶ 67; see also n.5, supra.) Given the abysmal relations between Iraq and the U.S. between 1999 and 2003 – after all, the U.S. was the author of the sanctions regime that created such hardship in Iraq during that period (see id. ¶ 63) – it is preposterous to suggest that Iraq would choose to do business with U.S. wheat growers during that period, if it could source its wheat requirements from elsewhere. Plaintiffs' conclusory allegation that AWB conspired with Iraq "in order to maintain its monopoly status in Iraq" (id. ¶ 73), without any facts showing an unlawful agreement to restrain trade, is therefore insufficient to plead a violation of Section 1. See Bell Atl. Corp., 127 S. Ct. at 1966; see also Floors-N-More, Inc., 142 F. Supp. 2d at 502 (the allegation "without any further elaboration, that defendants' action has furthered [its] monopolistic power . . . is insufficient to survive a motion to dismiss"). Because plaintiffs have not pleaded an agreement in restraint of trade under § 1 of the Sherman Act, Count II of the Complaint should be dismissed.

---

[19] Plaintiffs concede, however, that as part of the tender process implemented by Iraq, it was the IGB that unilaterally imposed the "inland transportation fees" complained of by plaintiffs as the basis for the alleged conspiracy. (Boyd ¶¶ 70, 72.)

[20] In addition, each contract at issue received U.N. approval under the OFFP. (Boyd ¶ 81.)

**B.    Plaintiffs Have Not Adequately Alleged an Injury to Competition in the Relevant Market (i.e., Iraq).**

A plaintiff bringing a claim under Section 1 must adequately allege injury to competition in the relevant market. E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 28 n.3 (2d Cir. 2006) ("the plaintiffs' failure to proffer allegations of harm to competition is fatal to their antitrust claims").[21]  For the reasons discussed above (see Section II.A.1, supra), plaintiffs have not alleged any actual adverse effect on competition in what plaintiffs themselves defined as the relevant product market, namely "the market for bread wheat imported by Iraq". (Boyd ¶ 40.)  Because plaintiffs have not adequately alleged an injury to competition as required for a Section 1 claim, Count II of the Complaint should be dismissed.

**IV.    PLAINTIFFS' CLAIM PURSUANT TO SECTION 2 OF THE SHERMAN ACT (COUNT I) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.**

Plaintiffs allege that AWB violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing, and by conspiring to monopolize, the market for wheat sales to Iraq.  (See Boyd ¶¶ 104-11.)  Plaintiffs' pleadings are insufficient to state a claim based on either alleged activity.  At no time was AWB ever a monopolist with respect to wheat sales to Iraq.

**A.    Plaintiffs Have Failed to State a Claim For Monopolization.**

To state a claim for monopolization under Section 2, plaintiff must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power". PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002)

---

[21] See also Elec. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 244 (2d Cir. 1997); Capital Imaging Assocs., 996 F.2d at 543 (plaintiffs bear the initial burden of demonstrating that the challenged behavior "had an actual adverse effect on competition as a whole in the relevant market").

(per curiam) (quoting United States v. Grinnell, 384 U.S. 563, 570-71 (1966)).  Plaintiffs here

have demonstrated neither.[22]

### 1.   Plaintiffs Have Failed Adequately to Allege That Defendants Possessed Monopoly Power.

For purposes of Section 2, the Supreme Court has defined monopoly power as the

"power to control prices or exclude competition".[23]  United States v. E.I. du Pont de Nemours &

Co., 351 U.S. 377, 391 (1956).  Here, according to plaintiffs' own pleading, it was not AWB, but

the Iraqi Government, that had the power to "control prices or exclude competition" in the Iraqi

wheat market throughout the relevant period.  (See, e.g., Boyd ¶¶ 65, 70-71, 81.)  Plaintiffs do

not allege, nor could they, that AWB had the power either to control prices or to exclude

competitors.  AWB merely bid on tenders for wheat contracts issued by the IGB – it was up to

---

[22] A viable claim under Section 2 must also show harm to competition in the relevant market.  E & L Consulting, Ltd., 472 F.3d at 31; see also Elec. Commc'ns. Corp., 129 F.3d at 246 ("We reject [plaintiff's] section 2 claim for substantially the same reasons outlined in our discussion of [plaintiff's] section 1 claim.  The agreement [at issue] . . . cannot harm competition, and therefore cannot serve to further an alleged monopolization scheme.").  As discussed in Sections II.A.1 and III.B, supra, plaintiffs have not alleged actual harm to competition in the Iraq market.  Plaintiffs' Section 2 claim (Count I) should thus be dismissed.

[23] While monopoly power can sometimes be inferred from a high market share, the Second Circuit has cautioned against viewing high market share as the sole determinative factor in assessing the existence of such power.  See, e.g., Tops Markets, Inc, 142 F.3d at 98-99.  "The trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence."  Broadway Delivery Corp. v. United Parcel Serv. Of Am., Inc., 651 F.2d 122, 128 (2d. Cir. 1981).  The "pertinent inquiry in a monopolization claim . . . is whether the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power".  PepsiCo, Inc., 315 F.3d at 108.  In that inquiry, courts "cannot be blinded by market share figures and ignore marketplace realities".  Tops Markets, 142 F.3d at 99.  In Tops Markets, despite plaintiff's pleading that defendant had over a 70% market share (as here, see Boyd ¶ 63), the Second Circuit indicated that it would "draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics".  Id. at 98.  The Court determined that despite defendant's high market share, the nature of the market at issue did not support an inference that defendant had monopoly power.  See id. at 98-99.  If defendant "were to raise its prices above their competitive level, new competitors could and would enter the market and, by undercutting those prices, quickly erode [defendant's] market share".  Id. at 99.  "[D]espite its high market share, no other evidence . . . supports the conclusion that [defendant] can control prices or exclude competition".  Id.

the IGB to decide how, when, at what price and from whom it purchased wheat. (See id.)
Indeed, plaintiffs concede that AWB's alleged payment of the "inland transportation fees" at
issue "did not directly affect either the price for which the wheat was sold or the amount from
which AWB calculated its profit on the sale". (Id. ¶ 77.) Thus, the IGB, not AWB, controlled
the price at which wheat was sold to Iraq, as well as who was able to participate in that market.[24]

   In such circumstances, the fact that AWB had a high market share means nothing.
As in Tops Markets Inc., if AWB sought to raise its prices above competitive levels, the IGB
would have contracted with competitors who could and would have entered the market by
undercutting AWB's prices, thereby eroding AWB's market share. See Tops Markets Inc., 142
F.3d at 99; see also Oahu Gas Serv., Inc. v. Pac. Res. Inc., 838 F.2d 360, 366 (9th Cir. 1988) ("A
high market share, though it may ordinarily raise an inference of monopoly power, will not do so
in a market with low entry barriers or other evidence of a defendant's inability to control prices
or exclude competitors." (internal citation omitted)). Plaintiffs' pleadings are thus insufficient
to establish that AWB had monopoly power over the Iraqi wheat market.

   **2. Plaintiffs Have Failed Adequately to Allege That Defendants Sought
    Monopoly Power in the Relevant Market.**

   Plaintiffs have also failed adequately to plead the second element of
monopolization: the "willful acquisition or maintenance of that power". PepsiCo, Inc., 315 F.3d
at 105 (internal quotation omitted). "[P]ossession of monopoly power will not be found
unlawful unless it is accompanied by an element of anticompetitive conduct." Verizon
Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004).

---

  [24] The U.N. also exercised control over who could participate in the Iraqi wheat market,
through its administration of the OFFP, and its approval of all wheat contracts with Iraq. (See
Boyd ¶ 81.) The U.N.'s role further confirms AWB's lack of monopoly power in Iraq.

Here, plaintiffs' allegations of anticompetitive conduct are far too conclusory to support a Section 2 claim.  See In re Elevator Antitrust Litig., No. 04 CV 1178 (TPG), 2006 WL 1470994, at *12 (S.D.N.Y. May 30, 2006) (dismissing Section 2 claims where "[t]he allegations are in the most general form possible, claiming monopolization, [and] harm to competition"); see also Kahn, 2006 WL 3592366, at *5-6 (same).  At best, all plaintiffs allege is that:

> "In 1999, recognizing the growing threat of competition from U.S.-grown wheat to the monopoly achieved by AWB in the Iraqi market, AWB and the Conspirators willfully and purposefully formed an enterprise for the purpose of securing and maintaining AWB's monopoly through anticompetitive conduct."

(Boyd ¶ 69.)  Those boilerplate assertions are unsupported by any facts, and are insufficient to plead a monopolization claim.  See Elec. Commc'ns Corp., 129 F.3d at 243 ("a pleader [can] enjoy all favorable inference from facts that have been pleaded" but cannot substitute "conclusory statements" for "minimally sufficient factual allegations").  As with their Section 1 allegations, plaintiffs provide no explanation as to what the alleged "anticompetitive conduct" actually was, or how it either "secur[ed] or maintain[ed] AWB's [alleged] monopoly".  As explained above, the alleged payment by AWB of the "inland transportation fees" can have had no anticompetitive effects in the Iraqi wheat market – plaintiffs concede that the price of wheat in Iraq was unchanged by any such payments.  (See Boyd ¶ 77.)  Moreover, plaintiffs do not allege, and there is no basis to believe, that AWB and the Iraqi Government ever agreed that Iraq would not purchase wheat from U.S. growers between 1999 and 2003, or that AWB ever suggested such a thing.  (See Section III.A, supra.)  Plaintiffs' pleadings are insufficient to establish that AWB at any time sought to monopolize the Iraqi wheat market.  See A.I.B. Express, Inc. v. FedEx Corp., 358 F. Supp. 2d 239, 249 (S.D.N.Y. 2004) (dismissing complaint where plaintiff failed to provide defendant "any notice of how it willfully acquired or maintained

monopoly power in the [relevant] market"). Plaintiffs' monopolization claim should therefore be dismissed.

**B.    Plaintiffs Have Failed to State a Claim For Conspiracy to Monopolize.**

Plaintiffs also allege that AWB "conspired with others" to monopolize the Iraqi wheat market. (Boyd ¶ 107.) To plead a claim for conspiracy to monopolize, plaintiff must show "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy". Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co., 812 F.2d 786, 795 (2d Cir. 1987); see also A&E Prods. Group L.P. v. The Accessory Corp., No. 00 Civ. 7271 (LMM), 2001 WL 1568238, at *5 (S.D.N.Y. Dec. 7, 2001) ("A claim of conspiracy to monopolize requires proof of concerted action, overt acts, and specific intent."). Once again, naked allegations of conspiracy will not suffice. "Like claims brought under Section 1 of the Sherman Act, mere allegations that defendants conspired or agreed to monopolize are insufficient. Without allegations containing some basis in fact for such assertions, a Section 2 claim must be dismissed." In re Elevator Antitrust Litig., 2006 WL 1470994, at *11.

Plaintiffs' Complaint is devoid of any allegations that would support a conspiracy to monopolize claim. There are no factual assertions of concerted action deliberately entered into by AWB with the specific intent to achieve an unlawful monopoly in Iraq. See Deem v. Lockheed Corp., 749 F. Supp. 1230, 1237 (S.D.N.Y. 1989) (dismissing conspiracy to monopolize claim where the "complaint fails to adequately allege defendants' specific intent to monopolize"). Plaintiffs' claim for conspiracy to monopolize should therefore be dismissed.

**V.    PLAINTIFFS' CLAIM PURSUANT TO SECTION 3 OF THE CLAYTON ACT (COUNT III) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.**

Section 3 of the Clayton Act prohibits "any person engaged in commerce" from

conditioning the lease or sale of goods or commodities upon the purchaser's agreement not to use the product of a competitor, but only if the effect may be "to substantially lessen competition or tend to create a monopoly in any line of commerce". 15 U.S.C. § 14. Section 3 thus "provides a cause of action for anticompetitive product tying and exclusive dealing arrangements". Bennett v. Cardinal Health Marmac Distribs. Inc., No. 02 CV 3095 (JG), 2003 WL 21738604, at *6 (E.D.N.Y. July 14, 2003); see also Floors-N-More, Inc., 142 F. Supp. 2d at 499. A claim under Section 3 requires both (1) an agreement, and (2) an anticompetitive effect. See 15 U.S.C. § 14. Plaintiffs have failed adequately to plead either.

### A.    Plaintiffs Have Failed Adequately to Allege the Existence of an Exclusive Dealing Arrangement.

Solely for purposes of their Clayton Act claim, plaintiffs allege that "AWB . . . entered into agreements with the IGB for the sale of wheat pursuant to which AWB has conditioned the payment of bribes on the IGB's agreement to refrain from purchasing wheat from other suppliers". (Boyd ¶ 120.) However, as explained above, nowhere in the Complaint are there any facts pleaded to support the conclusion that AWB conditioned its alleged payment of the "inland transportation fees" at issue – which, as a matter of law, cannot constitute bribes (see Section VI, infra) – on exclusivity for AWB, or that the IGB ever agreed to such a condition. (See Section III.A, supra.) Plaintiffs do not identify the form of that supposed agreement between AWB and IGB, or when or how it allegedly came into existence. Indeed, there is nothing in the Complaint to suggest that Iraq's decision not to purchase wheat from U.S. growers during 1999 to 2003 was anything other than an unremarkable, unilateral decision by Saddam Hussein's Iraq, not to give business to its implacable adversary, the U.S., when other sources of wheat were available. (See Section III.A, supra.) Plaintiffs' conclusory, boilerplate

pleadings are thus insufficient to allege a claim under Section 3 of the Clayton Act. See Floors-N-More, Inc., 142 F. Supp. 2d at 499.

**B.      Plaintiffs Have Failed Adequately to Allege an Anticompetitive Effect Caused by Defendants' Alleged Conduct.**

Plaintiffs have also failed to state a claim under Section 3 of the Clayton Act because they do not allege any injury to competition in the relevant market – i.e., the "market for bread wheat imported by Iraq".[25]   (Boyd ¶ 40; see Section II.A.1, supra.)  Plaintiffs concede that any agreement between AWB and IGB requiring payment of the "inland transportation fees" at issue "did not directly affect . . . the price for which the wheat was sold" to Iraq.  (Id. ¶ 77.) Moreover, while they conclusorily allege that "U.S.-grown wheat was completely foreclosed from the Iraqi market" (id. ¶ 91), plaintiffs fail to identify a single seller of U.S. wheat that was actually foreclosed from that market.  Indeed, none of the named plaintiffs is alleged even to have tried to sell wheat to Iraq.  (See id. ¶¶ 4-11.)

Even if an alleged anticompetitive effect in the U.S. wheat market could satisfy this requirement of a claim under Clayton Act § 3 (and it cannot, for the U.S. wheat market is not the relevant market alleged), the Complaint would fail to state a claim.  The alleged harm complained of here – not being able to sell wheat at a higher price – is not a cognizable anticompetitive effect; it is, at most, an injury to a competitor, and not to competition.  See

---

[25] The Supreme Court has noted that "[i]n practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate [Section 3] unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected".  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961); see also Cancall PCS, LLC v. Omnipoint Corp., No. 99 CIV 3395 (AGS), 2000 WL 272309, at *5 (S.D.N.Y. Mar. 10, 2000) (finding that plaintiffs' allegations did not state claims under Section 1 of the Sherman Act or Section 3 of the Clayton Act because they did not demonstrate "a substantially adverse effect on competition in the relevant market in general") (internal quotations omitted); Anheuser-Busch, Inc. v. G.T. Britts Distrib., Inc., 44 F. Supp. 2d 172, 175 (N.D.N.Y. 1999) (granting plaintiff's motion to dismiss defendants' Section 3 counterclaim because it failed to "allege sufficient facts to support an allegation of an adverse effect on market-wide competition").

Brunswick Corp., 429 U.S. at 488; see also Section I.B, supra.  Plaintiffs' claim under Section 3

of the Clayton Act (Count III) should therefore be dismissed.

## VI.    PLAINTIFFS' CLAIM PURSUANT TO SECTION 2(c) OF THE ROBINSON-PATMAN ACT (COUNT V) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), makes it unlawful

for (1) any person; (2) to pay or receive; (3) anything of value (except for services rendered);

(4) when the payment is made to or by the other party to the transaction, or to or by an agent,

representative or intermediary of any other party to the transaction; (5) in connection with a sale

or purchase of goods.  See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts

Worldwide, Inc., 369 F.3d 212, 218 (2d Cir. 2004) ("Blue Tree Hotels").  Here, plaintiffs allege

that AWB has violated Robinson-Patman because "AWB provided items of value in the form of

transportation and after-sale-services fees to the Government of Iraq and/or its respective agents,

representatives, or other intermediaries" (Boyd ¶ 142), not "for services rendered in connection

with the sale of goods, wares, or merchandise", but rather "to gain a competitive advantage over

Plaintiffs and members of the Class" (id. ¶ 143).  Plaintiffs characterize the alleged payment of

those transportation and after-sales-services fees as "kickbacks" and "bribes" paid to the Iraqi

Government.  (See id. ¶¶ 69, 90.)  Plaintiffs' pleadings are insufficient to state a claim.[26]

First, the Second Circuit has not determined that commercial bribery, as alleged

here, is even actionable under Section 2(c).  See Blue Tree Hotels, 369 F.3d at 221.[27]  Given that

---

[26] As with plaintiffs' other antitrust claims, plaintiffs' Section 2(c) pleadings are replete with boilerplate and conclusory assertions.  (See Boyd ¶¶ 140-46.)  That is insufficient.  See Monsieur Touton Selection, Ltd. v. Future Brands, LLC, No. 06 Civ. 1124 (SAS), 2006 WL 2192790, at *4 (S.D.N.Y. Aug. 1, 2006) (dismissing plaintiff's Robinson-Patman Act claims where "the Complaint provides an abundance of conclusory statements asserting defendants' malfeasance, but is devoid of allegations from which, even drawing all inferences in plaintiff's favor, a court could conclude that [plaintiff] has stated a claim").

[27] See also Monsieur Touton Selection, Ltd., 2006 WL 2192790, at *4; United Magazine Co.

Section 2(c) was enacted to target abusive brokerage practices used by large buyers seeking to obtain indirect price concessions, see id. (citing, inter alia, FTC v. Henry Broch & Co., 363 U.S. 166, 168-69 (1960)), the alleged kickback scheme here is plainly outside the intended scope of Section 2(c). See Intimate Bookshop, Inc. v. Barnes & Noble, Inc., 88 F. Supp. 2d 133, 140 (S.D.N.Y. 2000) ("the case law and legislative history of Section 2(c) make it clear that Section 2(c) was not intended to apply outside of the brokerage context").

Second, even if this Court were to find that commercial bribery is actionable under Section 2(c), plaintiffs' allegations here are insufficient to state a claim for commercial bribery, and therefore must be dismissed. In New York, commercial bribery is defined as "confer[ring], or offer[ring] or agree[ing] to confer, any benefit upon an employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs". N.Y. Penal Law § 180.00 (cited in Blue Tree Hotels, 369 F.3d at 222). Thus, to be considered commercial bribery, the party receiving the bribe must work for the principal, the principal must not consent to the receipt of the bribe, and the bribing party must intend that the bribe influence the receiving party's conduct with respect to his or her employer's affairs. Here, however, it is alleged that AWB was "required" to make payments to the Iraqi Government, i.e., the principal, pursuant to wheat tenders issued under the OFFP. (See, e.g., Boyd ¶ 70.) Such payments cannot constitute commercial bribery.[28] Accordingly, there is no basis for plaintiffs' Section 2(c) claim.[29] Plaintiffs' Robinson-Patman Act claim (Count V) should be dismissed.

---

v. Murdoch Magazines Distribution, 146 F. Supp. 2d 385, 396 (S.D.N.Y. 2001).

[28] See United Magazine Co., 146 F. Supp. 2d at 397 ("To the extent that section 2(c) prohibits bribery, it prohibits cases of commercial bribery involving a breach of a fiduciary duty by the buyer's agent. . . . The allegation that a discount or payment passed from one business to another does not implicate bribery involving a breach of fiduciary duty.") (emphasis added;

## VII.  PLAINTIFFS' RICO CLAIM (COUNT IV) MUST BE DISMISSED.

In addition to their antitrust claims, plaintiffs have alleged that AWB's conduct violated RICO, 18 U.S.C. § 1962(c), by engaging in an "enterprise" which was alleged to have been "designed to and did unlawfully funnel U.S. dollars to the Government of Iraq and achieve, maintain, and exploit AWB's monopoly position in the Iraq wheat market".[30]  (Boyd ¶ 130.) Plaintiffs' RICO claim must be dismissed because:  (1) this Court lacks subject matter jurisdiction over plaintiffs' RICO claim; (2) plaintiffs lack standing to assert their RICO claim; and (3) plaintiffs have failed to state a claim under the RICO statute.

### A.    Plaintiffs' RICO Claim Must Be Dismissed For Lack of Subject Matter Jurisdiction.

Nothing in the text or history of the RICO statute reveals that Congress intended the statute to be applied extraterritorially, as plaintiffs are trying to do here.[31]  Courts have thus

---

internal quotations omitted).

[29] Even if the alleged payments could be considered bribes, plaintiffs have failed adequately to allege the full details of the bribery scheme. "To the extent that . . . an action exists [under Section 2(c) for commercial bribery], a plaintiff must at a minimum allege that payments were made with the intent to influence improperly the conduct of another by bestowing a benefit, [as] the essence of receiving a bribe is in the agreement or understanding that the recipient's conduct will be influenced by the benefit."  Monsieur Touton Selection, Ltd., 2006 WL 2192790, at *4 (internal citations omitted).  Plaintiffs' pleadings with respect to the agreed-upon "benefit" are inadequate.  Plaintiffs allege only that the challenged payments were made "to gain a competitive advantage" (Boyd ¶ 143), without specifying what that advantage was, or how it was to be achieved.  AWB is not required to guess.  Plaintiffs' pleadings are thus insufficient.

[30] Section 1964(c) provides a private cause of action to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter".  18 U.S.C. § 1964(c). Plaintiffs allege a violation of Section 1962(c), pursuant to which it is unlawful for any person to conduct or participate in the conduct of the affairs of an "enterprise" that is engaged in or affects interstate or foreign commerce through a pattern of "racketeering activity" or collection of an unlawful debt.  18 U.S.C. § 1962(c); see also Boyd ¶¶ 126-39.

[31] The purpose articulated by Congress in passing the RICO statute – namely, to "seek the eradication of organized crime in the United States", RICO Legislative History at 1073 (emphasis added) – demonstrates Congressional intent that RICO be applied domestically.  In the case of RICO, it is thus unclear "whether Congress would have wished the precious resources of United States courts to be devoted to foreign transactions rather than to leave the problem to foreign countries".  Giro v. Banco Espanol de Credito, S.A., No. 98 Civ. 6195 (WHP), 1999 WL

dismissed RICO claims where a plaintiff is unable to demonstrate either (1) that conduct material

to the completion of the alleged RICO scheme occurred in the United States (the "conduct test"),

or (2) that the alleged transactions had substantial and direct adverse effects within the United

States (the "effects test"). N. S. Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051-53 (2d Cir. 1996).

Under either test, plaintiffs' claims must be dismissed.

### 1.    This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' RICO Claim Under the Conduct Test.

Subject matter jurisdiction will exist under the "conduct test" "only where

conduct material to the completion of the fraud occurred in the United States". Giro, 1999 WL

440462, at *3 (citing Alfadda v. Fenn, 935 F.2d 475, 479 (2d Cir. 1991)) (emphasis added). The

conduct alleged must have "directly caused" plaintiffs' loss in order for subject matter

jurisdiction to exist. Nasser v. Andersen Worldwide Société Coop., No. 02 Civ. 6832 (DC),

2003 WL 22179008, at *3 (S.D.N.Y. Sept. 23, 2003). "Mere preparatory activities, and conduct

far removed from the consummation of the fraud, will not suffice to establish jurisdiction." Id.

As discussed earlier, the alleged unlawful conduct complained of by plaintiffs –

including, in particular, the formation of the alleged conspiracy or "enterprise" and the

imposition by Iraq of the allegedly improper "transportation fees" here at issue – all occurred

outside the U.S.[32] (See Section I & n.6, supra; see also Boyd ¶¶ 70-72.) Plaintiffs' pleadings

---

440462, at *4 (S.D.N.Y. June 28, 1999) (internal quotation omitted); see also Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103, 129 (2d Cir. 2001) (finding that the U.S. Congress did not intend to reach foreign tax law violations through RICO).

[32] The only conduct alleged to have occurred in the U.S. is entirely incidental to the alleged conspiracy and "enterprise": namely, that AWB had an office in the U.S. that allegedly "ensured that AWB was paid efficiently and promptly for . . . shipments of wheat to Iraq under the [OFFP] and monitored the UN approvals of contracts" and a bank account in New York that was used to receive amounts payable to AWB under the OFFP. (Boyd ¶¶ 31, 135-36.) Not only is ministerial work of that nature not material to, and "far removed from the consummation of the fraud", but it was not the direct cause of plaintiffs' alleged loss, for the reasons described above. Nasser, 2003 WL 22179008, at *3; see Section I.A, supra. Plaintiffs' boilerplate and conclusory

thus fail the "conduct test". Nasser, 2003 WL 22179008, at *5 (dismissing complaint for lack of subject matter jurisdiction where, as here, "[p]laintiffs [did] not allege any facts of U.S. conduct material to the completion of the fraud") (internal quotation omitted).

### 2. This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' RICO Claim Under the Effects Test.

Plaintiffs' pleadings also fail the "effects test". Under the version of that test borrowed from the securities laws, jurisdiction will be found to exist over predominantly foreign conduct only if that conduct had "substantial effects within the United States", that were the "direct and foreseeable result" of the alleged conduct. N. S. Fin. Corp., at 1051. "Remote and indirect effects" will not suffice. Id.; see also Giro, 1999 WL 440462, at *3.

For the reasons explained above, the supposed "effect" of AWB's extraterritorial conduct complained of by plaintiffs – namely, a decrease in the prices at which plaintiffs could sell their wheat in the U.S. (see, e.g., Boyd ¶ 94) – is not a "direct and foreseeable result" of the alleged conduct. (See Sections I.A, II.B, supra.) Plaintiffs' pleadings thus also fail the "effects test". See Giro, 1999 WL 440462, at *4 (holding that a court "does not have jurisdiction over a conspiracy among foreign actors to extort money from a foreign plaintiff when the actions took place in Spain and there was no substantial effect in the United States").

Because this Court lacks subject matter jurisdiction over plaintiffs' RICO claim (Count IV) under either the "conduct" or "effects" test, that claim should be dismissed.

### B. Plaintiffs' RICO Claim Must Be Dismissed Because Plaintiffs Lack RICO Standing.

Plaintiffs also lack standing to assert their RICO claim.[33] The Second Circuit has

_____

allegations to the contrary (see, e.g., Boyd ¶¶ 135-38), without more, are insufficient.

[33] RICO provides a private right of action only for those plaintiffs who have been "injured in [their] business or property by reason of a violation of section 1962". 18 U.S.C. § 1964(c)

limited standing under 18 U.S.C. § 1964(c) to those plaintiffs whose injuries were caused

proximately or directly by the alleged RICO predicate acts. See Baisch v. Gallina, 346 F.3d 366,

373 (2d Cir. 2003) ("a plaintiff does not have standing if he suffered an injury that was indirectly

(and hence not proximately) caused by the racketeering activity or RICO predicate acts").[34] A

plaintiff is required to allege and show that: (1) he suffered an injury that was directly caused by

the alleged racketeering activity or RICO predicate acts;[35] and (2) he suffered a direct injury that

was foreseeable. Id. at 373-74. Plaintiffs can satisfy neither of those tests.

### 1. Plaintiffs' Alleged Injury Was Not Directly Caused by AWB's Alleged Conduct.

For the reasons discussed above, the alleged injury complained of by plaintiffs

was not directly caused by AWB's alleged conduct, or the alleged racketeering activity. (See

Section I.A, supra.) The alleged harm that is the basis for plaintiffs' RICO claim (namely, a

decrease in the prices at which plaintiffs could sell their wheat in the U.S. (Boyd ¶ 138)), is far

too attenuated from the alleged racketeering activity (namely, "unlawfully funnel[ing] U.S.

dollars to the Government of Iraq" (id. ¶ 130)), to meet the "direct injury" requirement of

Section 1964(c). See Baisch, 346 F.3d at 373; see also Sections I.A, II.B, supra.

---

(emphasis added). That language requires a plaintiff to show that its injuries were proximately or directly caused by a defendant's actionable conduct. See Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258, 268 (1992).

[34] Proximate cause for purposes of Section 1964(c) presents a higher bar to standing than proximate cause at common law. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 284-85 (2d Cir. 2006) ("Lerner II"). As a result, "RICO standing is a more rigorous matter than standing under Article III". Denney v. Deutsche Bank AG, 443 F.3d 253, 266 (2d Cir. 2006).

[35] A plaintiff bringing suit under RICO must also "show that both he [or she] is within the class the statute sought to protect and that the harm done was one that the statute was meant to prevent". Lerner II, 459 F.3d at 284 (internal quotation omitted). The Second Circuit has subsumed that requirement into the statutory proximate cause analysis under 18 U.S.C. § 1964(c). Id. at 283-285; see also Baisch, 346 F.3d at 373 ("[O]ur RICO proximate cause analysis adequately incorporates the zone-of-interests test's concerns in most cases").

### 2. Plaintiffs' Alleged Injury Was Not a Reasonably Foreseeable Consequence of AWB's Alleged Conduct.

The proximate cause requirement of Section 1964(c) also requires that the claimed damages be a reasonably foreseeable consequence of the alleged RICO violations. See Lerner v. Fleet Bank, N.A., 318 F.3d 113, 123 (2d Cir. 2003) ("Lerner I"). For that analysis, "a predicate act cannot be deemed to have proximately caused a plaintiff's injury, even if it was an integral part of the underlying criminal scheme, unless the plaintiff's original loss could not have occurred without the commission of the predicate act". Leung v. Law, 387 F. Supp. 2d 105, 122 (E.D.N.Y. 2005).[36] A plaintiff will not meet Section 1964's proximate injury requirement – and hence will not have standing – if that plaintiff's injury "could have resulted from factors other than [plaintiff's] alleged acts of fraud". Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991, 1996-98 (2006).[37] Likewise, "[a] RICO plaintiff cannot circumvent the proximate cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense". Id. at 1997 (citing AGC, 459 U.S. at 537).

For the reasons described above, plaintiffs' alleged injury – a decrease in the prices at which plaintiffs could sell their wheat in the U.S. (Boyd ¶ 138)) – was not a reasonably foreseeable consequence either of AWB's alleged conduct or the alleged racketeering activity here at issue. (See Section I.A, supra.) Plaintiffs do not allege that they were direct or intended

---

[36] See also Vicon Fiber Optics Corp. v. Scrivo, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002) ("A predicate act does not proximately cause an injury if it merely furthers, facilitates, permits or conceals an injury that happened or could have happened independently of the act.").

[37] See also Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 240 (2d Cir. 1999) (finding lack of proximate cause where "plaintiffs' alleged damages might have derived" from other potential sources); Medgar Evers Houses Tenants Ass'n v. Medgar Evers Houses Assocs., 25 F. Supp. 2d 116, 121 (E.D.N.Y. 1998) (finding lack of proximate cause where "the fact finder would be required to determine whether" plaintiffs' alleged injury "in fact resulted from the [defendants'] false statements to HUD, as opposed to, for example, the defendants' poor management").

victims of the alleged RICO enterprise, and they concede that the alleged price effect in the U.S.

of which they complain depends entirely on a tortuously convoluted chain of causal events,

predicated upon the "global nature of the wheat pricing mechanism". (Boyd ¶ 93; see Sections

I.A, II.B, supra.) At any point in the chain, a multitude of speculative and changing factors

including market conditions, costs, alternative factors affecting supply and demand, and world-

wide economic and political conditions, could have caused the decrease in U.S. prices

complained of by plaintiffs.[38] See Powers v. British Vita, P.L.C., 57 F.3d 176, 189-90 (2d Cir.

1995) (the "direct injury" proximate cause requirement of Section 1964(c) cannot be satisfied if

the "chain of causation from defendants' . . . conduct to [plaintiffs'] loss has been severed");

Barr Labs., Inc. v. Quantum Pharmics, Inc., 827 F. Supp. 111, 115-16 (E.D.N.Y. 1993) (granting

motion to dismiss RICO claims because "intervening actions" destroyed the causal link between

the alleged fraud and plaintiff's claimed injury).

Because plaintiffs' alleged injury was neither directly caused by the alleged

racketeering activity, nor reasonably foreseeable as a consequence thereof, plaintiffs lack RICO

standing. Plaintiffs' RICO claim (Count IV) should therefore be dismissed.

### C.    Plaintiffs' RICO Claim Must Be Dismissed Because Plaintiffs Have Not Pleaded the Existence of "Racketeering Activity" Under RICO.

To state a civil RICO claim under Section 1962(c), a plaintiff must demonstrate at

the pleading stage that defendant, inter alia, engaged in a "pattern" of "racketeering activity". 18

U.S.C. §§ 1961(5), 1962(c); see Beck v. Prupis, 529 U.S. 494, 497 (2000). Such a "pattern"

---

[38] Indeed, plaintiffs acknowledge the potential influence of external factors, unrelated to the alleged racketeering activities, on U.S. wheat prices. Plaintiffs allege that AWB's conduct resulted in higher "Ending Stocks" in the U.S., which, as a general assertion, "cause[s] lower prices". (Boyd ¶ 57.) Despite that allegation, plaintiffs nevertheless concede that Ending Stocks are only the "main", but not exclusive, determinant of U.S. wheat prices. (Id.; see also Section II.B & n.14, supra.) Because other market forces can, and do, influence U.S. wheat prices, plaintiffs cannot establish proximate causation, as required by 18 U.S.C. § 1964(c).

must consist of at least two "predicate acts" by the defendants that are "related, <u>and</u> . . . amount

to or pose a threat of continued criminal activity". <u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229,

239 (1989); <u>see also</u> 18 U.S.C. § 1961(1) (defining "racketeering activity"). Here, the "predicate

acts" alleged by plaintiffs include violations by AWB and its co-conspirators (<u>see</u> <u>Boyd</u> ¶ 22) of

the Travel Act, 18 U.S.C. § 1952 (<u>id.</u> ¶¶ 131, 132(a)), and the federal money-laundering statutes,

18 U.S.C. §§ 1956-57 (<u>id.</u> ¶¶ 131, 132(b)-(d)).

　　　　In addition to those "predicate acts", plaintiffs must also plead one or more

underlying "unlawful acts" that establish that AWB has in fact violated the Travel Act, 18 U.S.C.

§ 1952, and the federal money-laundering statutes, 18 U.S.C. §§ 1956-57.[39] Without that

showing, plaintiffs cannot establish that AWB did, in fact, commit the predicate acts necessary to

show a pattern of racketeering activity, as required for Section 1962(c) liability. 18 U.S.C.

§ 1962(c). In other words, in the absence of an adequate pleading of one or more unlawful acts

by AWB sufficient to establish the commission of the alleged predicate acts, plaintiffs' RICO

claim must fail, and should be dismissed for failure to state a claim.[40]

　　　　Here, plaintiffs attempt to satisfy the underlying "unlawful activity" requirement

by alleging violations of (1) the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1 to -3

---

[39] The Travel Act requires that the conduct alleged involve an "unlawful activity", 18 U.S.C. § 1952(a)(1)-(3), and defines "unlawful activity", in relevant part, as "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or any act which is indictable . . . under Section 1956 or 1957 of this title", 18 U.S.C. § 1952(b)(2). Section 1956 requires that the financial transaction in question "represent[] the proceeds of some form of specified unlawful activity", 18 U.S.C. § 1956(a)(1), and provides a list of acts that can constitute "unlawful activity", 18 U.S.C. § 1956(c)(7)(A)-(E). Section 1957, which prohibits monetary transactions in property derived from "specified unlawful activities", necessarily requires the presence of an "unlawful activity", and incorporates that definition of that term provided in Section 1956. 18 U.S.C. § 1957(f)(3).

[40] <u>See, e.g.</u>, <u>First Capital Asset Mgmt., Inc. v. Satinwood, Inc.</u>, 385 F.3d 159, 178-82 (2d Cir. 2004) (dismissing RICO claim where plaintiffs had failed adequately to plead the requisite predicate acts); <u>GICC Capital Corp. v. Tech. Fin. Group, Inc.</u>, 67 F.3d 463, 465-67 (2d Cir. 1995) (same).

("FCPA"), and (2) the Organization for Economic Cooperation and Development Convention on

Combating Bribery of Foreign Officials in International Business Transactions ("OECD

Convention").[41]  (Boyd ¶ 132(a).)  However, because plaintiffs have failed adequately to allege a

violation of the FCPA, and because the OECD Convention cannot serve as an "unlawful

activity" for purposes of 18 U.S.C. §§ 1952, 1956 and 1957, plaintiffs cannot establish the

requisite predicate acts required for Section 1962 liability.  Plaintiffs' RICO claim thus fails.

### 1.      Plaintiffs Have Not Alleged a Violation of the FCPA.

Plaintiffs allege that AWB "unlawfully funnel[ed] U.S. dollars to the Government

of Iraq" to "achieve, maintain, and exploit AWB's monopoly position in the Iraqi wheat market".

(Boyd ¶ 130.)[42]  That allegation, however, falls outside the scope of the FCPA.[43]

First, the alleged payments at issue cannot constitute a violation of the FCPA

because, contrary to the specific language of the statute, they were not made to a "foreign

official", "foreign political party" or to "any person" with the knowledge that such funds would

be given to a "foreign official" or "foreign political party".  15 U.S.C. §§ 78dd-2(a)(1)-(3), 78dd-

---

[41] Notably, plaintiffs plead those alleged "unlawful activities" only in the context of their Travel Act claims under 18 U.S.C. § 1952.  (See Boyd ¶ 132(a).)  For purposes of their claims under 18 U.S.C. § 1956, plaintiffs refer only to "some form of unlawful activity" (id. ¶¶ 132(b), (c)) and, for 18 U.S.C. § 1957, to some undefined "specified unlawful activity" (id. ¶ 132(d)).  That is insufficient, and enough reason alone to disregard those alleged predicate acts.

[42] Plaintiffs' conclusory FCPA pleadings fail to "set forth the circumstances, occurrences and events supporting the claim as well as the time, place and content of the claim".  Citicorp Int'l Trading Co. v. W. Oil & Refining Co., No. 88 Civ. 5377 (RWS), 1991 WL 4502, at *6 (S.D.N.Y. Jan. 16, 1991) (dismissing claim where plaintiff claimed only that defendant "did knowingly and intentionally make unauthorized payments to officials of foreign governments").

[43] To violate the FCPA, a plaintiff must show that a defendant (1) made use of a means or instrumentality of interstate commerce; (2) corruptly; (3) in furtherance of an offer or payment of anything of value to any person; (4) while knowing that the money would be offered or given directly to any foreign official, foreign political party or official thereof, or to any candidate for foreign political office; (5) for purposes of influencing any act or decision of such foreign official, political party or official thereof in their official capacity.  See 15 U.S.C. §§ 78dd-2(a); see also Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber, 327 F.3d 173, 179-180 (2d Cir. 2003).

32

3(a)(1)-(3).  Instead, those alleged payments were imposed by, and made to, the Iraqi

Government itself.[44]  Under the specific language of the FCPA, payments made to foreign

governments, even if intended to influence that government's actions, do not fall within the

scope of the FCPA.[45]  Id.  Without an FCPA violation, AWB's conduct cannot violate RICO.

Second, even if plaintiffs could establish an FCPA violation, the alleged payments

at issue here fall within one of the enumerated affirmative defenses specified in the statute.  It is

a complete affirmative defense to an FCPA violation that "the payment, gift, offer, or promise of

anything of value that was made, was lawful under the written laws and regulations of the

foreign official's, political party's, party official's, or candidate's country".  See, e.g., 15 U.S.C.

§ 78dd-2(c)(1).  Here, the "inland transportation fees" and "after-sales-services fees" complained

of by plaintiffs were imposed upon AWB under Iraqi law, pursuant to an official directive of the

Iraqi Government.[46]  That was also the finding of the United Nations' Independent Inquiry

Committee, chaired by Paul A. Volcker:[47]

> "On June 10, 1999 . . . the Iraqi Economic Affairs Committee issued a
> directive ordering ministries to impose non-negotiable 'transportation

---

[44] See, e.g., Boyd ¶ 1 ("AWB . . . paid bribes to the Iraqi government); id. ¶ 69 ("AWB began paying kickbacks to the Iraqi Government"); id. ¶ 72 ("illegal payments to the Government of Iraq"); see also id. ¶¶ 70-72, 81, 83, 90.

[45] The FCPA criminalizes improper payments or gifts to, inter alia, a "foreign official" or "foreign political party" for purposes of "influencing" or "inducing" such person or entity improperly "to use its or his influence with a foreign government . . . to affect or influence any act or decision of such government".  15 U.S.C. §§ 78dd-2(a)(1)-(3), 78dd-3(a)(1)-(3) (emphasis added).  The FCPA simply does not address, and therefore does not criminalize, payments made directly to the foreign government itself, as alleged here.  Id.; see also Section VI, supra.

[46] See, e.g., Boyd ¶ 72 (stating that the transportation fees were "imposed" upon AWB); id. ¶ 78 ("in addition to the 'inland transportation fee', Iraq imposed an 'after-sales-service fee' on AWB"); id. ¶ 128 ("the Iraqi Government . . . formulated methods and rates for collecting inland transportation and after-sales-service fees; . . . the IGB was responsible for . . . imposing the inland transportation and after-sales services fees; [and] the ISWTC was responsible for collecting the inland transportation and after-sales service fees for the Iraqi government").

[47] Plaintiffs refer to the Volcker Report in paragraph 99 of the Complaint.

> fees' on all goods requiring inland delivery by Iraqi trucks. . . . The
> Economic Affairs Committee set these fees. . . . Although the Ministry of
> Transportation oversaw the collection of these funds, a fee schedule was
> circulated to all Iraqi ministries at the beginning of each phase."

(Volcker Report 266, attached hereto as Cameron Decl. Exh. A.)[48]  The requirement that those

fees be paid was thus part of the written law of Iraq.  AWB's compliance with Iraqi law cannot

constitute an FCPA violation.[49]  Plaintiffs' RICO claim therefore fails.

### 2.  The OECD Convention Does Not Create "Unlawful Activity" and in Any Event Has Been Incorporated Into the FCPA.

The OECD Convention does not create a private right of action, sufficient to

constitute an "unlawful activity" necessary for RICO liability.  See generally OECD Convention,

attached hereto as Cameron Decl. Exh. B.[50]  Rather than implementing the OECD Convention as

a distinct law, Congress amended the FCPA's scope to include foreign firms and persons who

---

[48] "Approximately one year after the Iraqi regime began requiring certain contractors to pay transportation fees . . ., it expanded its kickback program to include a mandatory 'after-sales-service fee.'" Volcker Report 276 (Cameron Decl. Ex. A). In order to enforce those fees, "Vice President Ramadan circulated a memorandum to all Iraqi ministries", which included "directives" to impose fees at the rates listed in that memorandum. Id.

[49] In addition, plaintiffs have not alleged adequately that AWB (U.S.A.) Limited violated the FCPA or committed any other "unlawful activity". The Complaint contains only generalized assertions that "until October 2000", AWB maintained an office in New York that was somehow "integral to the conduct of the affairs of the enterprise". (Boyd ¶ 31.) Such "mere conclusions of law" need not be accepted, W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch, No. 03 Civ. 8606 (RWS), 2004 WL 2187069, at *4 (S.D.N.Y. Sept. 29, 2004) (internal quotation omitted), especially when they fail to "differentiate" the "role[s] of the particular defendants". Citicorp Int'l Trading, 1991 WL 4502, at *4. Far from differentiating between defendants AWB Limited and AWB (U.S.A.) Limited, the Complaint joins them together in the very first paragraph and does not differentiate between them once. (Boyd ¶ 1.)

[50] In order for an international treaty, like the OECD Convention, to create a private right of action, the treaty must be "self-executing", i.e., provide such a right explicitly, or the private right of action must be provided in the implementing U.S. federal statute. See, e.g., Stutts v. De Dietrich Group, No. 03-CV-4058 (ILG), 2006 WL 1867060, at *6-7 (E.D.N.Y. June 30, 2006) (finding no private right of action under the Geneva Convention or United Nations Security Council Resolutions; see also Abdullahi v. Pfizer, Inc., No. 01 Civ. 8118 (WHP), 2005 WL 1870811, at *9-14 (S.D.N.Y. Aug. 9, 2005).

take any act in furtherance of a corrupt payment while in the United States.[51] Thus, plaintiffs'

claim that AWB violated the OECD Convention (Boyd ¶ 132(a)) is wholly duplicative of

plaintiffs' claim that AWB violated the FCPA – and, for the same reasons, is insufficient to

constitute the requisite "unlawful activity" necessary for RICO liability.  (See Section VII.C.1,

supra.)  As a consequence, plaintiffs cannot establish the requisite "pattern" of "racketeering

activity" necessary for liability under Section 1962(c).  18 U.S.C. § 1962(c).  Plaintiffs' RICO

claim (Count IV) should therefore be dismissed.

## CONCLUSION

For the foregoing reasons, defendants AWB Limited and AWB (U.S.A.) Limited

respectfully request that the Court enter an order dismissing with prejudice all counts of the

Consolidated Class Action Complaint, dated July 10, 2007.

August 17, 2007.

CRAVATH, SWAINE & MOORE LLP

by _____

Robert H. Baron
Timothy G. Cameron
Members of the Firm

825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants AWB Limited and
AWB (U.S.A.) Limited*

---

[51] See Anti-Bribery Act of 1998; see also Anti-Bribery Act Signing Stmt. ("It is with great pleasure that I sign today S. 2375, the 'International Anti-Bribery and Fair Competition Act of 1998'.  This Act makes certain changes in existing law to implement the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, which was negotiated under the auspices of the [OECD].").