# EXHIBIT A



# INDEPENDENT INQUIRY COMMITTEE
## INTO
# THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

## MANIPULATION OF THE OIL-FOR-FOOD
## PROGRAMME BY THE IRAQI REGIME

Oil Transactions and Illicit Payments
Humanitarian Goods Transactions and Illicit Payments
The Escrow Bank and the Inspection Companies
Other UN-Related Issues

Paul A. Volcker, Chairman
Richard J. Goldstone, Member
Mark Pieth, Member

October 27, 2005
www.iic-offp.org

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## TABLE OF CONTENTS

**CHAPTER 1 – SUMMARY OF THE REPORT ON MANIPULATION**

SUMMARY OF REPORT ................................................................................................ 1

**CHAPTER 2 – OIL TRANSACTIONS AND ILLICIT PAYMENTS**

I.     INTRODUCTION AND SUMMARY ........................................................ 9

II.    IMPLEMENTATION OF THE OIL-FOR-FOOD PROGRAMME ................ 15

     A. THE INITIAL PHASES .................................................................... 15
     B. THE POLITICIZATION OF OIL ALLOCATIONS .................................... 15
     C. IMPOSITION OF SURCHARGES ........................................................ 18
     D. THE PHASE IX CRISIS ................................................................. 18
     E. THE COLLECTION OF SURCHARGES ................................................ 19

III.   RUSSIA .............................................................................................. 22

     A. DISTRIBUTION OF OIL ALLOCATIONS ............................................ 23
     B. POLITICAL ALLOCATIONS ............................................................ 27
     C. SURCHARGE PAYMENTS ON RUSSIAN CONTRACTS ........................... 38

IV.   FRANCE ............................................................................................ 47

     A. PREFERENTIAL OIL ALLOCATIONS ................................................ 47
     B. JEAN-BERNARD MÉRIMÉE ........................................................... 49
     C. CHARLES PASQUA/BERNARD GUILLET ........................................... 53
     D. CLAUDE KASPEREIT, E.O.T.C., AND MARC RICH + CO. ................. 61
     E. SERGE BOIDEVAIX .................................................................... 67
     F. GILLES MUNIER ....................................................................... 74

V.    OTHER POLITICAL BENEFICIARIES ................................................. 79

     A. GEORGE GALLOWAY ................................................................. 79
     B. ROBERTO FORMIGONI/MARCO MAZARINO DE PETRO ...................... 89
     C. FATHER JEAN-MARIE BENJAMIN AND ALAIN BIONDA ..................... 99
     D. SANDI MAJALI ......................................................................... 103

VI.   OIL TRADERS AND THE PHASE IX CRISIS ....................................... 115

     A. INTRODUCTION ......................................................................... 115
     B. BAYOIL ................................................................................... 115
     C. TAURUS .................................................................................. 125
     D. GLENCORE ............................................................................... 143
     E. VITOL ..................................................................................... 156
     F. COASTAL PETROLEUM COMPANY .................................................. 171

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## TABLE OF CONTENTS

**VII. TRAFIGURA, IBEX AND THE *ESSEX* TOP-OFFS** ....................................... **176**

   A. TRAFIGURA AND IBEX ENERGY–THE OIL TOP-OFF SCHEME ............................ 176
   B. BRIBERY OF SAYBOLT INSPECTOR ...................................................... 179
   C. THE FINANCIAL TRAIL OF THE *ESSEX* TOP-OFF SCHEME ................................... 182
   D. UNITED NATIONS RESPONSE TO THE *ESSEX* TOP-OFF ALLEGATIONS ............... 186
   E. EXPLANATIONS OF SAYBOLT, ARMANDO CARLOS OLIVEIRA, AND TRAFIGURA 188

**VIII. RESPONSES OF OIL TRADING COMPANIES** ............................................ **190**

   A. RESPONSE OF ALCON PETROLEUM LTD. ............................................. 191
   B. RESPONSE OF ALFA-ECO ................................................................ 193
   C. RESPONSE OF FENAR PETROLEUM LTD. ............................................. 194
   D. RESPONSE OF GLENCORE ............................................................... 196
   E. RESPONSE OF ITALTECH .................................................................. 199
   F. RESPONSE OF TAURUS PETROLEUM LTD. ........................................... 200
   G. RESPONSE OF TRAFIGURA ............................................................... 201
   H. RESPONSE OF VITOL S.A. ............................................................... 209
   I. RESPONSE OF ZARUBEZHNEFT ........................................................ 212
   J. RESPONSE OF ARMANDO OLIVEIRA ................................................. 213
   K. RESPONSE OF BERNARD GUILLET ..................................................... 214
   L. RESPONSE OF CHARLES PASQUA ...................................................... 216
   M. RESPONSE OF GEORGE GALLOWAY ................................................... 218
   N. RESPONSE OF HAMIDA NA'ANA ..................................................... 220
   O. RESPONSE OF JEAN-MARIE BENJAMIN .............................................. 225
   P. RESPONSE BY MARC RICH GROUP .................................................... 227
   Q. RESPONSE BY ROBERTO FORMIGONI .................................................. 229
   R. RESPONSE BY SANDI MAJALI-IVUME ................................................ 230
   S. RESPONSE BY MARTIN SCHENKER .................................................... 237
   T. RESPONSE BY SERGE BOIDEVAIX ...................................................... 238
   U. RESPONSE OF SUDHIR JAYA ............................................................ 240


**CHAPTER 3 – HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS**

**I. INTRODUCTION AND SUMMARY** ............................................................ **249**

**II. IRAQI PURCHASES OF HUMANITARIAN GOODS AND OIL SPARE PARTS UNDER THE PROGRAMME** ............................................................ **252**

   A. THE EVOLUTION OF IRAQ'S PURCHASES ........................................... 252
   B. RULES GOVERNING TRANSACTIONS WITH IRAQ ................................. 253
   C. COORDINATION OF IRAQ'S PURCHASES ........................................... 257
   D. CONCENTRATION OF GOODS SUPPLIERS ........................................... 261
   E. TRANSPORT OF GOODS AND HANDLING OF CARGOES AT UMM QASR .............. 262

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## TABLE OF CONTENTS

III.  **INITIAL IMPOSITION OF FEES ON HUMANITARIAN CONTRACTS: PHASES VI THROUGH VIII** .......................................................................... 265

    A.  ASSIGNMENT OF RESPONSIBILITIES FOR INLAND TRANSPORTATION ................ 265
    B.  INTRODUCTION OF MANDATORY TRANSPORTATION CHARGES ........................ 266
    C.  PAYMENT MECHANISMS FOR INTERNAL TRANSPORTATION FEES .................... 270
    D.  DISTRIBUTION AND USE OF INTERNAL TRANSPORTATION FEES ...................... 273

IV.  **THE BROADENING OF THE KICKBACK SCHEME** ................................ 276

    A.  INTRODUCTION OF AFTER-SALES-SERVICE FEES ........................................... 276
    B.  EXPANSION OF THE TRANSPORTATION FEE SCHEME ..................................... 280
    C.  PAYMENT MECHANISMS FOR AFTER-SALES-SERVICE FEES AND THE USE OF BANK GUARANTEES .................................................................................. 285
    D.  OTHER FEES ............................................................................................. 290
    E.  COLLECTION AND USE OF ILLICIT FUNDS ................................................... 291

V.  **OTHER MANIPULATIONS OF THE PROGRAMME** ................................ 293

    A.  DIVERSION OF GOODS WITHIN IRAQI MINISTRIES ....................................... 293
    B.  RESALE OF PROGRAMME GOODS OUTSIDE IRAQ ......................................... 294
    C.  SUBSTANDARD GOODS ............................................................................... 295
    D.  ABOVE-MARKET PRICING OF GOODS .......................................................... 297

VI.  **COMPANY EXAMPLES – OVERVIEW** .................................................... 300

VII.  **IRAQI FRONT COMPANIES** ................................................................... 302

    A.  ALIA FOR TRANSPORTATION AND GENERAL TRADE ...................................... 302
    B.  AL-HODA INTERNATIONAL TRADING CO. .................................................... 306
    C.  AL WASEL & BABEL GENERAL TRADING LLC. ............................................. 308

VIII. **MAJOR FOOD COMPANIES** ................................................................... 311

    A.  AWB LTD. ................................................................................................ 311
    B.  CHAIYAPORN RICE CO. LTD. ...................................................................... 325
    C.  HOLDING COMPANY FOR FOOD INDUSTRIES ............................................... 328
    D.  VIETNAM NORTHERN FOOD CORPORATION AND VIETNAM DAIRY JOINT STOCK COMPANY .............................................................................................. 329

IX.  **MAJOR TRADING COMPANIES** ............................................................ 334

    A.  BELHASA GROUP OF COMPANIES ................................................................ 334
    B.  BELMETALENERGO AND INFOBANK ............................................................ 336
    C.  BUKKEHAVE A/S ....................................................................................... 340
    D.  GINZA ...................................................................................................... 344
    E.  JAWALA CORPORATION SDN. BHD. ............................................................. 345
    F.  PHOENIX INVESTMENT INTERNATIONAL ..................................................... 347
    G.  RUSSIAN ENGINEERING COMPANY .............................................................. 349
    H.  SES INTERNATIONAL CORP. ....................................................................... 354

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## TABLE OF CONTENTS

|  | I. | SINOCHEM | 356 |
| X. | | MAJOR INDUSTRIAL COMPANIES | 360 |
|  | A. | ATLAS COPCO AIRPOWER N.V. | 360 |
|  | B. | DAIMLERCHRYSLER AG | 365 |
|  | C. | MALONEY INDUSTRIES INC. | 371 |
|  | D. | SIEMENS COMPANIES | 375 |
|  | E. | VOLVO CONSTRUCTION EQUIPMENT | 381 |
|  | F. | WEIR GROUP PLC | 384 |
| XI. | | RESPONSES OF HUMANITARIAN GOODS COMPANIES | 391 |
|  | A. | RESPONSE OF ALIA FOR TRANSPORTATION AND GENERAL TRADE CO. | 392 |
|  | B. | RESPONSE OF ATLAS COPCO N.V. | 394 |
|  | C. | RESPONSE OF AUSTRALIAN WHEAT BOARD | 395 |
|  | D. | RESPONSE OF BELMETALENERGO | 400 |
|  | E. | RESPONSE OF BUKKEHAVE | 401 |
|  | F. | RESPONSE OF CHAIYAPORN RICE CO, LTD. | 404 |
|  | G. | RESPONSE OF DAIMLER CHRYSLER AG | 405 |
|  | H. | RESPONSE OF INTERNATIONAL ENGINEERING GROUP | 408 |
|  | I. | RESPONSE OF JAWALA CORPORATION SDN BHD | 412 |
|  | J. | RESPONSE OF MALONEY INDUSTRIES | 415 |
|  | K. | RESPONSE OF PHOENIX INVESTMENT INTERNATIONAL | 416 |
|  | L. | RESPONSE OF RUSSIAN ENGINEERING COMPANY | 419 |
|  | M. | RESPONSE OF SIEMENS AG | 421 |
|  | N. | RESPONSE OF SINOCHEM INTERNATIONAL CORPORATION | 422 |
|  | O. | RESPONSE OF VIETNAM NORTHERN FOOD CORPORATION (VINAFOOD 1) | 425 |
|  | P. | RESPONSE OF VOLVO CONSTRUCTION EQUIPMENT | 426 |
|  | Q. | RESPONSE OF THE WEIR GROUP PLC | 428 |
|  | R. | RESPONSE OF ZARUBEZHNEFT | 431 |

## CHAPTER 4 – THE ESCROW BANK AND CONFLICTING INTERESTS

| I. | | INTRODUCTION AND SUMMARY | 433 |
| II. | | BACKGROUND | 435 |
|  | A. | STRUCTURE OF BNP AND ITS PROGRAMME ACTIVITIES | 435 |
|  | B. | FEES EARNED FOR PROGRAMME ACTIVITIES | 436 |
|  | C. | CONTRACTUAL CONTEXT FOR BNP'S PROGRAMME ACTIVITIES | 439 |
| III. | | LETTERS OF CREDIT AND TRANSPARENCY | 441 |
|  | A. | LETTERS OF CREDIT ISSUED IN THE NAME OF PARTIES OTHER THAN THE CONTRACT HOLDER | 441 |

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## TABLE OF CONTENTS

    B.  CASE STUDY: ACTEC, GLENCORE, AND BNP PARIBAS GENEVA ................... 443
    C.  CASE STUDY: BULF DRILLING, TEXACO, AND BNP NEW YORK ...................... 446

IV.  SURCHARGE PAYMENTS AND DUE DILIGENCE ................................... 450

    A.  BNP AND SURCHARGES ................................................................. 450
    B.  REVIEW OF HIGH RISK TRANSACTIONS ............................................ 452

V.  THE BANK'S RESPONSE ................................................................. 459

    A.  THE BANK'S CONTENTIONS ............................................................. 459
    B.  THE UNITED NATIONS' KNOWLEDGE OF PROGRAMME ABUSES ...................... 460

VI.  THE COMMITTEE'S EVALUATION ................................................... 461


## CHAPTER 5 – THE INSPECTION COMPANIES

I.  INTRODUCTION AND SUMMARY .................................................. 463

II.  SAYBOLT ...................................................................................... 465

    A.  BRIBERY OF ARMANDO CARLOS COSTA OLIVEIRA ........................... 466
    B.  REQUEST FOR OIL ALLOCATION BY PETER BOKS ............................ 466

III.  LLOYD'S ....................................................................................... 472

IV.  COTECNA ..................................................................................... 474

    A.  CONTRACT PERFORMANCE .............................................................. 474
    B.  REVIEW OF ADDITIONAL ALLEGATIONS ........................................... 475

V.  RESPONSES OF INSPECTION COMPANIES ........................................... 479

    A.  RESPONSE OF COTECNA SA .......................................................... 480
    B.  RESPONSE OF SAYBOLT INTERNATIONAL B.V. ................................. 492


## CHAPTER 6 – ISSUES RELATING TO ACTIVITIES OF HUMANITARIAN COORDINATORS

I.  INTRODUCTION AND SUMMARY .................................................. 507

II.  HANS VON SPONECK .................................................................. 508

III.  TUN MYAT .................................................................................. 510

IV.  RESPONSES OF HUMANITARIAN COORDINATORS ............................ 514

    A.  RESPONSE OF TUN MYAT .............................................................. 515
    B.  RESPONSE OF H.C. VON SPONECK ................................................. 517

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## TABLE OF CONTENTS

**CHAPTER 7 – REVIEW OF SECRETARY-GENERAL BOUTROS-GHALI BANK ACCOUNTS**

I.     INTRODUCTION AND SUMMARY ............................................................... 519

II.    ANALYSIS OF BANK ACCOUNTS OF FORMER SECRETARY-GENERAL BOUTROS-GHALI ........................................................................................ 521

    A. CAISOR SERVICES ACCOUNT DISBURSEMENTS TO A LEIA BOUTROS-GHALI ACCOUNT ..................................................................................................... 521

    B. CAISOR SERVICES ACCOUNT DISBURSEMENTS TO A NADLER FAMILY ACCOUNT ..................................................................................................... 524

III.   RESPONSE OF BOUTROS BOUTROS-GHALI ........................................... 526


**APPENDIX A – EXPLANATION OF COMMITTEE TABLES**


**APPENDIX B – CONSIDERATIONS OF RESPONSE FROM JOSEPH STEPHANIDES**


**APPENDIX C – RESPONSES TO PRIOR COMMITTEE REPORTS**


**APPENDIX D - ERRATA**


**APPENDIX E – GLOSSARY**


**APPENDIX F – STAFF LIST**

**REPORT ON PROGRAMME MANIPULATION**
CHAPTER THREE
HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS

## III. INITIAL IMPOSITION OF FEES ON HUMANITARIAN CONTRACTS: PHASES VI THROUGH VIII

Beginning in Phase VI (May to December 1999), the Government of Iraq systematically attempted to obtain funds—outside the escrow account—in relation to humanitarian contracts under the Programme. Initially, the Iraqi regime characterized this scheme as a means of covering the cost of transporting goods from Iraqi ports and borders to warehouses inside Iraq. Payments by goods suppliers to ISCWT, which oversaw Iraqi ports and coordinated the collection of these funds, occurred in a variety of ways. But the vast majority of these kickbacks were made through front companies that posed as legitimate providers of trucking services. These early efforts by the regime to manipulate the Programme to its own advantage laid the groundwork for the broader and more lucrative kickback policy introduced in Phase VIII (June to December 2000).

### A. ASSIGNMENT OF RESPONSIBILITIES FOR INLAND TRANSPORTATION

Neither the Iraq-UN MOU, Resolution 986, nor any subsequent Security Council resolutions specified how goods procured by Iraq were to be transported beyond the designated entry points. Starting in Phase VI, however, Iraq frequently asked suppliers shipping to Umm Qasr to bear responsibility for internal transportation.

According to Iraqi officials interviewed by the Committee, Iraqi authorities ordinarily permitted trucks carrying goods across land borders to continue to Baghdad or to the requested drop-site. By contrast, private entities—apart from a small number of local Iraqi firms—were not allowed to transport goods discharged at Umm Qasr to locations inside Iraq. Through subsidiary SOEs, either the Ministry of Transportation or the Ministry of Trade administered the trucking of these cargoes to internal warehouses. Two Ministry of Transportation SOEs were involved directly in inland transportation: ISCWT and the Iraqi State Company for Land Transportation ("Land Transport"). The majority of transportation provided by the Ministry of Trade was executed by IGB, an SOE responsible for purchasing wheat, rice, and other essential foodstuffs. No other bodies of the Government of Iraq had trucking fleets capable of providing services of this nature.[422]

Contracts for humanitarian goods signed during Phases I through V of the Programme reflect the division of transportation responsibilities between goods suppliers and the Government of Iraq. Those contracts specifying Trebil, Al Waleed, or Zakho as designated points of entry typically

---

[422] Ahmed Murtada Ahmed Al-Khalil interview (Nov. 5, 2004); Iraq officials interviews; Hussain Al-Khawam interview (May 24, 2005).

provided for "CIF to Baghdad," obligating suppliers to transport cargoes inside Iraqi borders.[423] By contrast, contracts specifying the delivery of goods to Umm Qasr included unit prices with the designations "CIF Free out Umm Qasr," "CIF Free on board," or "CIF Free on truck." Under these provisions, the supplier was required to finance directly and arrange sea freight to Iraq, but was not responsible for internal transportation. In such cases, Iraq itself bore the costs of inland transportation.[424]

## B. INTRODUCTION OF MANDATORY TRANSPORTATION CHARGES

On June 10, 1999 (Phase VI), the Iraqi Economic Affairs Committee issued a directive ordering ministries to impose non-negotiable "transportation fees" on all goods requiring inland delivery by Iraqi trucks. This tariff was levied on all cargoes delivered to Umm Qasr and sometimes on cargoes shipped overland to Iraq.[425] The Economic Affairs Committee set these fees depending on the kind of goods being transported, the form of packaging, the point of entry into Iraq, and the phase in which the contract was signed. The fees were payable to designated Iraqi entities and regime-controlled front companies. Although the Ministry of Transportation oversaw the collection of these funds, a fee schedule was circulated to all Iraqi ministries at the beginning of each phase.[426]

---

[423] See, e.g., Programme contract, COMM nos. 1114 (Sept. 8, 1997) (involving the Aous Group of Industries's provision to the Iraqi State Company for Foodstuffs Trading of 800 tons of detergent powder to the designated entry point of Trebil and specifying a price of "USD 720 per ton net cost insurance and freight Baghdad"), 4077 (June 27, 1998) (involving Sovtur's provision to the Ministry of Trade and IGB of 4.5 million polypropylene bags to the designated entry point of Zakho and specifying a price of $12.52 per hundred bags and CIF Mosul via Zakho), 50540 (Feb. 24, 1999) (involving the provision by Liebherr France, S.A to the Ministry of Irrigation of sixty hydraulic excavators with spare parts to the designated entry point of Al-Waleed and specifying $10,800 of freight charges and CIF Baghdad); Iraq official interview (noting that most of the contracts for goods imported overland were CIF to warehouses or Iraqi end-users).

[424] See, e.g., Programme contract, COMM no. 1032 (Sept. 9, 1997) (involving AWB's provision to IGB of 300,000 tons of Australian wheat and reflecting the "[b]uyers guarantee that vessel with draft not exceeding 11.0 meters salt water on arrival at one safe Berth at Umm Qasr is acceptable" at the price of "USD 195.00 pmt CIF free out Umm Qasr"); Iraq official interview; see also EXPORT911, "International Commercial Terms," http://www.export911.com/e911/export/comTerm.htm (defining key international trade terms such as CIF and free on board).

[425] Ahmed Murtada Ahmed Al-Khalil interview (Nov. 5, 2004); Iraq officials interviews; Ahmed Murtada Ahmed Al-Khalil letter to Hikmat Al-Azzawi (Mar. 11, 2003) (translated from Arabic) (noting a letter dated June 10, 1999 ordering the imposition of transportation fees from Umm Qasr); Hussein Al-Khawam interview (May 24, 2005) (discussing Iraq's collection of inland transportation fees on goods transported from Aqaba to destinations within Iraq); Osama Azer interview (Sept. 27, 2005) (same); Remon Sulaiman interview (Sept. 27, 2005) (same).

[426] Ahmed Murtada Ahmed Al-Khalil interview (Nov. 5, 2004); Iraq officials interviews.

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## CHAPTER THREE
## HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS

A memorandum circulated by Deputy Prime Minister Al-Azzawi in August 2000 on behalf of the Economic Affairs Committee contains one of the earliest examples of such a fee schedule. This memorandum is representative of the categories of transportation fees imposed by Iraq on goods discharged at Umm Qasr. As indicated below in this memorandum, different rates applied for sized goods, packed goods, goods shipped in bulks, and goods shipped in containers. Vehicles were divided into three different categories based on their size and weight. Fees on goods that did not fall within the categories included in the table were determined by "special agreement" between the supplier and the designated transport agent inside Iraq. These new rates were to be imposed immediately on all contracts that had not yet been submitted to the 661 Committee for approval.[427]



[Translation from Arabic-page 1 of 2]

Republic of Iraq
Council of Ministers
Economic Affairs Committee
No: L.S 1984
Date: 6 / 8 / 2000

**Confidential and Urgent**

To: All Ministries - Minister's office (except Transport &
      Communication Ministry)

Military Industry Commission
Planning Commission
Youth & Sport Commission
Legislative Council of Self-Governing Region
Executive Council of Self-Governing Region
Central Bank of Iraq
Board of Supreme Audit
Atomic Energy Organization
Baghdad Municipality
Electricity Commission
Tourism Commission
Al-Qadisia Warriors Sponsorship Commission
Al-Thawra House for Press and Publishing

**Subject: Tariff for transporting MOU goods**

Based on port services, land transport, insurance, and
handling services in warehouses, the Economic Affairs
Committee decided the following:-
  1. Approving the new tariff in the below table and making
     sure that all generated revenues go to the general
     treasury in full:-

---

[427] ISCWT record, Hikmat Al-Azzawi memorandum to Iraqi Ministries (Aug. 6, 2000) (translated from Arabic).

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## CHAPTER THREE
## HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS



**Figure: Hikmat Al-Azzawi memorandum to Iraqi Ministries (Aug. 6, 2000) (translated from Arabic) (excerpt).**

When interviewed, several suppliers indicated that Iraq initially justified the introduction of transportation fees as necessary to cover internal costs. More specifically, Iraqi authorities stated that the government could not afford to pay its truck drivers and related transportation expenses. Similarly, an Iraqi official with knowledge of the Ministry of Transportation's internal operations noted that the charges levied on goods delivered to Umm Qasr were intended to cover the cost of salaries, furniture, premises, and all expenses associated with transport and port services. Deputy Prime Minister Al-Azzawi's memorandum of August 2000 expressed a similar view, noting that the "tariff for transporting MOU goods" was based on "port services, land transport, insurance and delivery services." This memorandum claimed also that ISCWT, Land Transport, the State Company for Ports, certain divisions of the Ministry of Trade, and the National Insurance Company "provide[d] services in return for the tariff" on procured goods.[428]

---

[428] Luong The Phiet interview (July 19, 2005); Chaiyaporn interview; Ahmed R. Habboush, Dawood A. Mohammed, and Ra'ed Abu-Rumman interviews (May 2 and 4, 2005); Chee Ah What and Hazmat Khan interview (July 25, 2005); Iraq official interview; Ministry of Transportation record, Hikmat Al-Azzawi memorandum to Iraqi Ministries (Aug. 6, 2000) (translated from Arabic).

# REPORT ON PROGRAMME MANIPULATION
## CHAPTER THREE
## HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS

Significantly, Iraq did not request that suppliers pay this tariff at their own expense. Rather, Iraq incorporated the cost of paying transportation fees into the contracts it signed with suppliers, which were funded from the escrow account. According to suppliers and Iraqi officials interviewed by the Committee, contract negotiations after the imposition of transportation fees normally followed the following sequence: As an initial matter, the purchasing body of the Government of Iraq and the supplier negotiated a unit price, inclusive of insurance and transportation to Iraq, for the commodity being procured. Once a mutually acceptable price had been reached, the purchasing body informed the supplier of the internal transportation fees it would be required to "pay" directly to Iraq in connection with the contract. If the supplier agreed to these terms, the previously negotiated unit price was increased in accordance with the rates dictated by the Economic Affairs Committee. This revised unit price was included in the final version of the contract signed between the purchasing body and the supplier and submitted to the United Nations for approval and funding from the escrow account.[429]

Following contract approval, an Iraqi entity responsible for the collection of payments contacted the supplier and informed it of the exact amount owed and the designated payment mechanism. Once this entity had confirmed that the supplier had paid, the supplier's goods were permitted to enter Iraq. In this manner, through contractors under the Programme, Iraq illicitly obtained escrow funds, which it could use for its own purposes. The only disadvantage to suppliers under this scheme lay in the timing of contract execution: Because funds were not released from the escrow account until after an inspection agent had authenticated the arrival of goods at the Iraqi border, suppliers typically were obligated to remit transportation fees in advance of their payment by the United Nations.[430]

Over the course of the Programme, contracts signed between Iraq and suppliers increasingly reflected this scheme by specifying the final destination of "CIF all Iraqi Governates" or "CIF Baghdad."[431] This imposed an obligation on the seller to pay for transportation services inside Iraq after its goods had been discharged at Umm Qasr. The specific means by which this internal transportation would be effected were only rarely included in United Nations contracts and, despite occasional discussions and inquiries regarding inland transportation payments, neither the

---

[429] Ahmed Murtada Ahmed Al-Khalil interview (Nov. 5, 2004); Iraq officials interview; Mai Hoai Anh interview (July 22, 2005); Chee Ah What and Hazmat Khan interview (July 25, 2005); Chaiyaporn interview.

[430] Iraq officials interviews; Otham Al-Absi interview (May 21, 2005); Confidential witness interview (May 20, 2005); Chee Ah What and Hazmat Khan interview (July 25, 2005); Chaiyaporn interview; Ahmed R. Habboush, Dawood A. Mohammed, and Ra'ed Abu-Rumman interviews (May 2 and 4, 2005). In some cases, the mechanism and amount of payment was provided in advance of the signing of the contract. In addition, some suppliers were permitted to pay their transport costs after the release of funds from the escrow account. Iraq officials interviews.

[431] Iraq officials interviews; Confidential witness interview (noting that the use of the phrase "CIF Baghdad" was used as a justification to charge inland transportation costs). This is consistent with a sampling of Programme contracts from different phases of the Programme.

Secretariat nor the 661 Committee ever considered closely whether current arrangements violated the sanctions regime—even as interpreted by OLA.[432]

Sales agents interviewed by the Committee stated that they were aware of the requirement to pay inland transportation fees to Iraqi government agencies.[433]

## C. PAYMENT MECHANISMS FOR INTERNAL TRANSPORTATION FEES

As noted above, when introducing inland transportation fees, the Economic Affairs Committee charged ISCWT with collecting funds derived from this tariff. In practice, fees could be paid in four ways: (1) in cash to an ISCWT representative at Umm Qasr or in Baghdad; (2) in cash to the Rashid Bank or Rafidain Bank in Baghdad; (3) by bank transfer to the ISCWT account at the Amman Branch of Rafidain Bank; or (4) by bank transfer to accounts held by front companies in Jordan or the United Arab Emirates. The Iraqi regime did not favor one particular mechanism. However, because large volumes of cash were difficult and dangerous to transport and suppliers were hesitant to make bank transfers directly to Iraqi authorities, payments through front companies became the preferred method of many suppliers. In some instances, private agents (rather than front companies) facilitated payments to ISCWT's account.[434]

Normally, either the purchasing body of the Government of Iraq or ISCWT informed the supplier which front company to use in connection with a particular contract. When the Iraqi regime introduced the illicit inland transportation scheme, Alia and Amman Shipping, both based in Amman, Jordan, were two of the most frequently used front companies. These companies posed as legitimate providers of transportation services from the port of Umm Qasr, but in practice provided only limited services at port and otherwise functioned as little more than conduits for

---

[432] See, e.g., "Programme Management Report," vol. III, pp. 73-75, 107-08 (regarding several limited efforts by OIP involving inland transportation fees); OIP notes of informal 661 Committee meeting, p. 2 (Feb. 1, 2001) (responding to inquiries about inland transportation fees, OIP indicated that it was awaiting guidance from OLA); OIP notes of informal 661 Committee meeting, p. 2 (Apr. 11, 2001) (noting, by an OIP representative, that most Programme contracts by then included the cost of inland transportation and that, if the 661 Committee precluded the circulation of such contracts, key humanitarian sectors "might well come to a halt").

[433] Saud Ayyash interview (Sept. 28, 2005) (regarding involvement as a sales agent under the Programme with Carmel Air-Conditioning); Ghazi Ibrahim interview (Sept. 26, 2005) (same with International Industrial Development); Joseph Salem interview (Sept. 23, 2005) (same with Techno Middle East).

[434] Iraq officials interviews; Ahmed Murtada Ahmed Al-Khalil interview (Nov. 5, 2004); Mai Hoai Anh interview (July 22, 2005) (noting that shipmasters were highly fearful that transporting and delivering cash to ISCWT would lead to them "getting killed"); Chee Ah What and Hazmat Khan interview (July 25, 2005) (noting the use of an agent).

the payment of transportation fees to ISCWT. In exchange, the companies received a small percentage of the fees they channeled to the regime.[435]

This relationship was delineated in a letter from Minister of Trade Mohammad Mehdi Saleh to ISCWT (with copies to Rafidain Bank in Baghdad and the Ministry of Finance). The letter included the following directive from the Economic Affairs Committee:

> The State Company for Water Transport, through its representative in Amman, regularly follows up on transfers of money received from MOU suppliers through Umm Qasr by Jordanian front companies within two business bank days after deducting the commission percentage of 0.25% to the account of the State Company for Water Transport at Rafidain [Bank] Amman no. (8229) to guarantee that the money is under the control of the Iraqi government, bearing in mind to immediately pay off amounts received from suppliers into the company's account at Amman bank (whenever this is possible).[436]

All money paid by front companies or suppliers into ISCWT's account at the Amman branch of Rafidain Bank was transferred promptly into the company's account at the Baghdad branch of the same bank. Upon receipt of these funds, Rafidain Bank Baghdad would notify ISCWT. In addition, the front companies themselves would inform ISCWT that a supplier had fulfilled its obligations.[437]

---

435 Iraq officials interviews; Otham Al-Absi interview (noting that Alia provided no transportation services and channeled funds to ISCWT in exchange for a commission); Hussein Al-Khawam interview (May 24, 2005) (noting that Alia acted as a front company for ISCWT in exchange for a commission); Confidential witness interviews (noting the use of Alia and Amman Shipping to channel funds to ISCWT); Chaiyaporn interview (noting that IGB instructed Chaiyaporn to make inland transportation payments through Alia and Amman Shipping); Mai Hoai Anh interview (July 22, 2005) (noting that the Iraqi Ministry of Trade informed Vinamilk that the Government of Iraq had "changed methods" and all transportation charges were to be paid to Alia in the future); Chee Ah What and Hazmat Khan interview (July 25, 2005) (noting that ISCWT told Jawala Corporation to pay inland transportation fees to Alia).

436 Ministry of Transportation record, Mohammad Mehdi Saleh memorandum to ISCWT (Dec. 21, 2000) (translated from Arabic).

437 Ibid.; see also Iraq official interview.

# REPORT ON PROGRAMME MANIPULATION
## CHAPTER THREE
## HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS

*(Translation from Arabic-page 6 of 6)*

Republic of Iraq
Ministry of Trade

**Department:**
**No:**
**Date:**

A copy to:

- Ministry of Finance / Minister's office/ Finance Consultations Department/ Ref. to Economic Affairs Committee letter no. L.S 3264 dated 16/12/2000 ..for your review….regards.
- Al- Rafidain Bank/ General Manager/ following up on our letter /M.T/ 7/10/14665 dated 26/11/2000/ we attach paragraphs (A, B, C from 3) of the meeting report together with the Economic Affairs Committee's approval no. 3264 dated 16/12/2000 and to work accordingly as this matter relates to the bank (Main branch, as well as the Amman or Beirut or others).. Regards.

\- Paragraphs-

An appropriate mechanism has been put in place by the General Manager of Al- Rafidain Bank and designated individuals in both the Trade and Transport & Communication Ministries to deliver main and extra transport fees as well as services fees deposited into Al-Rafidain Bank/ Amman to Baghdad to prevent risk of money blockage and provides cash in foreign currency inside the country. The following procedures were agreed upon:

A. The State Company for Water Transport, through its representative in Amman, regularly follows up on the transfer of money received from MOU suppliers through Umm Qasr by Jordanian front companies within two business bank days after deducting the commission percentage of 0.25% to the account of the State Company for Water Transport at Rafidain-Amman no. (8229) to guarantee that the money is under the control of the Iraqi government, bearing in mind to immediately pay off amounts received from suppliers into the company's account at Amman bank (whenever this is possible)
B. As soon as Al-Rafidain Bank in Amman receives any amount from Jordanian front companies, they are responsible for transferring it to the account of the State Company for Water Transport at the main branch of Al-Rafidain Bank-Baghdad no. 415 in cash or bank clearance and inform the State Company for Water Transport in Baghdad of bank note transfers by express mail of the new mechanism.
C. The main branch of Al-Rafidain Bank-Baghdad is responsible for informing the State Company for Water Transport in Baghdad of cash transfers to their account no. (415) from Amman as soon as they receive the money whether in cash or via clearance and to provide them with a weekly bank statement.

\- To be followed-

**Figure: Mohammed Mehdi Saleh memorandum to ISCWT (translated from Arabic) (excerpt).**

If ISCWT had not received confirmation of a supplier having paid into an Iraqi-controlled bank account, it generally would not permit discharge of the supplier's cargoes. In such circumstances, the supplier or vessel chartering company incurred demurrage of thousands of dollars a day. One supplier interviewed by the Committee recalled that a supplier's failure to pay fees, even on just one contract, resulted in large demurrage and prevented the vessel's entire contents from being offloaded.[438]

---

[438] Iraq officials interviews; Ahmed Murtada Ahmed Al-Khalil interview (Nov. 5, 2004) (noting that demurrage resulted from ships sitting idle in port); Chee Ah What and Hazmat Khan interview (July 25, 2005).

# REPORT ON PROGRAMME MANIPULATION
## CHAPTER THREE
## HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS

## D. DISTRIBUTION AND USE OF INTERNAL TRANSPORTATION FEES

As noted above, Iraqi representatives initially presented inland transportation fees to suppliers as necessary to fund actual costs. However, this is belied by recent admissions of Iraqi officials familiar with the inland transportation scheme as well as by documentary evidence obtained in this investigation. When interviewed, officials explained that the transportation fees were unusually high and included a generous margin of profit that was transferred to accounts held by the Iraqi Ministry of Finance or CBI. In particular, former Minister of Oil Rashid noted that the inland transportation fees were introduced to generate supplemental cash and did not relate to internal costs. Beyond these Iraqi witnesses, an individual closely involved with a Middle Eastern company in the channeling of revenues to the regime noted that the Government of Iraq paid its drivers "peanuts" and retained a large portion of the inland transportation fees as a de facto kickback. Similarly, a senior officer of Alia stated the actual inland transportation costs were minimal and that the fee essentially "was a payment to the Government of Iraq."[439]

The claim that the revenues generated from the inland transportation scheme were used exclusively to cover inland transportation costs is also inconsistent with the Government of Iraq's internal accounting. Internal Iraqi documents note that, with each successive phase of the Programme, the Iraq regime successfully diverted additional funds accrued from inland transportation charges to Iraqi ministries and government organs unconnected to transportation services. This practice is illustrated by a table that the Ministry of Transportation prepared in 2000 ("ISCWT Table"), noting inland transportation fees on goods delivered from Umm Qasr. The ISCWT Table reflects the fees charged on commodities shipped by vessel to Iraq between Phases VI and VIII and indicates how the proceeds were distributed to Iraqi entities.[440]

---

[439] Iraq officials interviews; Amer Rashid interview (Oct. 29, 2004); Confidential witness interview; Othman Al-Absi interview (May 21, 2005). Mr. Al-Absi was General Manager of Alia. Ibid.

[440] Ministry of Transportation record, "MOU Transport Tariff" (2000) (translated from Arabic) (hereinafter "ISCWT Table") (noting the allocations of internal transportation fees and corresponding disbursements); see also Iraq official interview (reviewing detailed Iraqi records of illicit payments); Ministry of Transportation record, Form for transferring MOU goods, COMM no. 1100013 (June 12, 2002) (translated from Arabic) (providing an example, which is discussed in greater detail below, of how illicit revenues were divided among Iraqi entities).

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## CHAPTER THREE
## HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS

| Fees | Phase | Land | Ports | Water | Grains Trade | Types of Trade | Finance | Insurance | The rest of the ministries | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| **MOU Transport Tariff** | | | | | | | | | | |
| **Allocations** | | | | | | | | | | **Notes** |
| **1- Transportation fees for unpacked goods (Wheat)** | | | | | | | | | | |
| $12 | sixth | 9 | 3 | 5% | Silo/Platforms 1 or 2 | | | | | 0.25% Water commision |
| $14 | seventh | 9 | Silo/Platforms 1 or 2 | 5% | Silo/Platforms 2 or 1 | 1.5 | | 0.5 | | |
| $26 | eighth | 9 | 1-2-3 | 5% | Silo/Platforms 2 or 1 | 1.5 | 11 services extra 10 or 7 | 0.5 | | Service and additional transportation fees are determined by the beneficiary |
| | Ninth | | | | | | | | | |
| **2- Transportion fees for packed goods and *illegible*** | | | | | | | | | | |
| $13 | sixth | 9 | 4 | 5% | | | | | | 0.25% Water commision |
| $15 | seventh | 9 | 4 | 5% | | 1.5 | | 0.5 | | |
| $25 $10 additional | eighth | 9 | 4 | 5% | 1.5 | | | 0.5 | | Service fees are determined by importer |
| | Ninth | | | | | | | | | |
| **3- Container transportation fees** | | | | | | | | | | |
| 20 40 498 - 531 | sixth | 336 | 20 feet 40 feet 130 - 195 | 5% , 10% | | | Extra 10 | | | 0.25% Water commision |
| 20 feet 40 feet 390 - 600 | seventh | 20 40 205 - 335 | 130 - 195 | 10 | | 20 feet 40 feet 25 45 | Extra 10 | 20 feet 40 feet 10 - 15 | 20 40 25 - 45 | |
| 600 - 900 | eighth | 205 - 335 | 130 -195 | 10 | | 25 45 | 20 40 220 - 300 | 10-15 | 25 - 45 | Service fees are determined by importer |
| | Ninth | | | | | | | | | |
| **4- Transportation fees for heavy loads** | | | | | | | | | | |
| 354 | sixth | 252 | 112 | 5% | | | | | | 0.25% Water commision |
| 420 | seventh | 252 | 112 | 5% | | 42 | | 14 | | |
| 900 | eighth | 393 | 200 | 20 | | | 290 | | | |
| | Ninth | | | | | | | | | |
| **5- Driving transportation fees** | | | | | | | | | | |
| one car 100 | sixth | 70 | 25 | 5 | | | | | | 0.25% Water commision |
| 100 | seventh | 70 | 25 | 5 | | | | | | |
| 500 big 400 medium 300 small | eighth | 150 big 125 medium 105 small | 135 110 80 | 15 | | | 200 150 100 | | | |
| | Ninth | | | | | | | | | |
| **6- Transportation fees for carried cars** | | | | | | | | | | |
| | sixth | | | | | | | | | |
| | seventh | | | | | | | | | |
| 900 big 450 medium 300 small | eighth | 390 195 130 | 200 100 66.66 | 20 10 8.67 | | | 250 145 96.67 | | | |
| | Ninth | | | | | | | | | |

**Figure: "MOU Transport Tariff" (2000) (translated from Arabic).**

Although fees increased slightly between Phases VI and VII and substantially between Phases VII and VIII, the funds earmarked to entities involved in port and transportation services remained constant. For example, in Phases VI through VIII, Land Transport (noted as "Land") was consistently allocated $9 out of the total fees levied on each metric ton, while the State Company for Ports (noted as "Ports") received between $1 and $3. The set schedule provided for other ministries, companies, and departments, such as IGB, Ministry of Trade, and National Insurance Company (noted as "Grains Trade," "Trade Formation," and "Insurance," respectively) to receive only small percentages of total revenues.[441]

---

[441] "ISCWT Table"; Iraq officials interviews. Funds were distributed by means of transfers out of ISCWT's account at Rafidain Bank in Baghdad to accounts controlled by Iraqi entities at CBI. The prices noted for Phase VIII are consistent with those listed in the Economic Affairs Committee's memorandum of August 6, 2000. Ministry of Transportation record, Hikmat Al-Azzawi memorandum to Iraqi Ministries (Aug. 6, 2000) (translated from Arabic).

# REPORT ON PROGRAMME MANIPULATION
## CHAPTER THREE
## HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS

This table notes that only one entity's share of inland transportation fees significantly increased between phases: the Ministry of Finance. This ministry did not receive any portion of fees collected on bulk goods in Phases VI and VII, but was afforded as much as $10 per metric ton ("pmt")—higher than any other beneficiary—in Phase VIII. Likewise, it received only $10 per container during the first two phases of the transportation fee scheme, but was awarded $300 per container in Phase VIII. Moreover, these remittances to the Ministry of Finance did not reflect any assistance by the ministry in the handling or transport of goods and, in fact, as discussed below, may have included a portion of the after-sales-service fees. Rather, they denoted a cash surplus that would be retained at CBI and spent at the Iraqi regime's discretion.[442]

---

[442] "ISCWT Table"; Iraq officials interviews.

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## CHAPTER THREE
## HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS

# IV.    THE BROADENING OF THE KICKBACK SCHEME

Approximately one year after the Iraqi regime began requiring certain contractors to pay transportation fees to ministerial entities and front companies, it expanded its kickback program to include a mandatory "after-sales-service fee." This new tariff, which in most instances was eventually equal to ten percent of the original contract value, applied to all goods purchased by each ministry, regardless of point of entry into Iraq or means of transportation. This obligation was enforced through the final phase of the Programme, often in conjunction with other fees, and had earned the regime more than $1 billion by spring of 2003.

## A. INTRODUCTION OF AFTER-SALES-SERVICE FEES

On August 3, 2000, two months after the start of Phase VIII, Vice President Ramadan circulated a memorandum to all Iraqi ministries that described a recent meeting of the Command Council. The memorandum stated that the Command Council had discussed the issue of "making additional revenues for commercial contracts" and had decided on the following directives:

1.  Gather all commercial contracts titled ((After Sales Services or any other suitable version that achieves the purpose of the contract and is based on the nature of that contract)).

2.  The allocated percentages for bullet (1) above will be as follows:

    a.  From 2-5% for food and medication (excluding medical tools and equipment)

    b.  From 5-10% for everything but food and medication.

3.  The delegated minister and the head of the entity not related to a ministry are authorized to determine the rate amount in bullet (2) above, based on the nature of the materials that are under contract and at the highest rate whenever possible.[443]

These instructions signaled the imposition of after-sales-service fees, a mandatory kickback to be paid by all suppliers to Iraq. Unlike transportation fees, which were levied based on the weight or size of the procured commodity, after-sales-service fees constituted a fixed percentage of the monetary value of the goods under purchase. This percentage, which was initially suggested at two to five percent for food and medicine and five to ten percent for all other items, could be raised or lowered at the discretion of the minister overseeing the contract in question. In October 2000, the Command Council raised the minimum percentage to ten percent, noting that any after-sales-service fees above this threshold would be viewed as "commendable." From this point

---

[443] Ministry of Oil record, Taha Yassin Ramadan memorandum to Iraqi Ministries (Aug. 3, 2000) (translated from Arabic) (double parentheses in original).

# REPORT ON PROGRAMME MANIPULATION
## CHAPTER THREE
## HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS

forward, ten percent was the standard amount levied, but in some instances fees could be as high as thirty percent.[444]

No Iraqi officials interviewed by the Committee have expressed awareness of guidelines stipulating when the standard ten percent fee should be raised or lowered.  One official noted that some ministers applied higher percentages to contracts for goods that required assembly inside Iraq and lower rates to commodities that arrived ready to operate.  This official also stated that contracts for the provision of services (e.g., repair or installation) tended to incur higher than average fees because the item under contract was not as easily quantified and therefore easier to inflate.  For example, a service project executed in three stages easily could be noted as a more costly four-stage project without detection by United Nations inspectors or contract processors.  Another Iraqi official noted that the Ministry of Trade was inclined to impose high percentages, but that the Ministry of Oil was not because Oil Minister Rashid feared corruption among his employees.  In addition, the Ministry of Oil was concerned that substandard oil spare parts would have constrained Iraq's oil production and therefore would have decreased the regime's illicit revenue.[445]

As had been the case with transportation fees, Iraq incorporated after-sales-service fees into the contract value that was paid to the supplier out of the escrow account.  Accordingly, contract negotiation after the imposition of after-sales-service fees operated in much the same way it had during the period when only transportation fees applied.  Iraqi officials across a number of ministries have explained that suppliers were informed or reminded of their obligation to pay the additional percentage after they had participated in a tender process and been selected by a purchasing body to contract under the Programme.  If a supplier agreed to these terms, its contract value would be inflated by the percentage demanded by the contracting ministry.  Often this upward revision was accomplished by increasing the unit price, but in many instances an explicit after-sales-service fee equal to the levied amount was inserted in the contract.  In other instances, the fee was disguised as a performance bond or a maintenance or training expense.[446]

Suppliers initially could pay after-sales-service fees in one lump sum or in installments corresponding with individual shipments or deliveries of goods.  In most cases, these payments had to be executed before the goods in question reached the Iraqi border.  Otherwise, ISCWT (for deliveries to Umm Qasr) or ministry officials (for land deliveries) would not permit the goods to

---

[444] Ibid.; Ministry of Oil record, Khalil Yassin Al-Ma'mouri memorandum to Iraqi Ministries (Oct. 25, 2000) (translated from Arabic) (raising the minimum after-sales-service fee threshold to ten percent); Mohammad Mehdi Saleh interviews (Aug. 10 and Nov. 18, 2004); Amer Rashid interview (Oct. 29, 2004); Isam Rashid Al-Huwaysh interview (Oct. 22, 2004); Ahmed Murtada Ahmed Al-Khalil (Nov. 5, 2004); Iraq officials interviews.

[445] Mohammad Mehdi Saleh interview (Aug. 10, 2004); Iraq officials interviews.

[446] Iraq officials interviews; Confidential witness interviews (regarding maintenance expenses); see, e.g., Bassam Deek interview (Aug. 12, 2005) (noting that the Iraqi Ministry of Oil requested that Flowserve (then known as Ingersoll-Dresser Pumps), for which Mr. Deek serves as an Area Manager, pay an after-sales-service fee in lieu of directly providing maintenance services).

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## CHAPTER THREE
## HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS

be discharged at port or unloaded at warehouses.  Certain contractors that Iraqi authorities viewed as reliable were permitted to make payments after goods had arrived in Iraq and funds had been released from the escrow account.[447]

After August 2000, many purchasing bodies began demanding that suppliers sign auxiliary contracts guaranteeing payment of after-sales-service fees.  A memorandum circulated by the Ministry of Trade in October 2000 stipulated that these agreements had to be drafted in such a way that "the supplier commits to paying off the amount of the After Sales Services as one lump sum, or in installments . . . such that the payment is made before the goods are received."  Side agreements ranged in format, content, and level of detail.  Some specified payment mechanisms and bank details while others included only a pledge from the supplier to execute a funds transfer.[448]

---

[447] Ministry of Oil record, Mohammed Mehdi Saleh memorandum to Taha Yassin Ramadan (Oct. 27, 2000) (noting that Iraqi purchasing bodies could exercise discretion when choosing which suppliers would be obligated to provide bank guarantees in advance of contract execution); Ministry of Agriculture letter to Trading Division (Oct. 23, 2001) (permitting supplier Belhasa Motors to discharge its cargoes in advance of paying after-sales-service fees); Ahmed Murtada Ahmed Al-Khalil interview (Nov. 5, 2004); Ministry of Oil record, Taha Yassin Ramadan memorandum to Iraqi Ministries (Nov. 22, 2000) (translated from Arabic); Iraq officials interviews.

[448] Ministry of Oil record, Mohammed Mehdi Saleh memorandum to Taha Yassin Ramadan (Oct. 27, 2000) (translated from Arabic); Ahmed Murtada Ahmed Al-Khalil interview (Nov. 5, 2004); Iraq officials interviews.

INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME

# REPORT ON PROGRAMME MANIPULATION
## CHAPTER THREE
## HUMANITARIAN GOODS TRANSACTIONS AND ILLICIT PAYMENTS



Figure: Company side agreements, COMM nos. 1230790 (Jan. 18, 2002), 1201773 (Jan. 14, 2003).

Shipping agents interviewed by the Committee stated that after-sales-service fees were mandatory on all goods entering Iraq after Phase VIII. None of them were aware of any goods being allowed into Iraq on a Phase VIII or later contract, for which the ten percent fee had not been paid. In fact, to avoid incurring additional costs if goods were refused at the border, shipping companies explained that they routinely confirmed payment of all fees prior to transporting goods to Iraq.[449] Similarly, sales agents interviewed by the Committee stated that they were aware of the requirement to pay after-sales-service fees from Phase VIII onwards.[450]

---

[449] Elias Atallah and Reem Andoni interview (May 18, 2005) (discussing after-sales-service fees as understood through involvement with Amin Kawar & Sons); Fathi Khalil interview (Sept. 23, 2005) (same through involvement with Al-Ghaith Shipping); Emad Abdelhadi interview (Sept. 27, 2005) (same through involvement with Barwil Shipping); Renmon Sulaiman interview (Sept. 27, 2005) (same through involvement with T. Gargour & Fils); Osama Azer interview (Sept. 27, 2005) (same through involvement with Orient Transport); M. G. Maghami and K. Divakaran interview (Sept. 24, 2005) (same through involvement with Simatech Shipping); Walid Dawood interview (Sept. 25, 2005) (same through involvement with United Arab Shipping Company); see also Ismael Theeb and Khaled Al-Shareef interview (May 23, 2005) (same through experience of driving truckloads of goods under the Programme).

[450] Saud Ayyash interview (Sept. 28, 2005) (regarding involvement as a sales agent under the Programme with Carmel Air-Conditioning); Mazin Lawrence interview (Sept. 27, 2005) (same with Comet); Ghazi