**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ———————————————— ) | | |
| JOHN BOYD et al., ) | | |
| ) | | |
| Plaintiffs, ) | | Case No. 07-cv-3007 |
| ) | | |
| v. ) | | |
| ) | | |
| AWB LIMITED and AWB (U.S.A.) ) | | |
| LIMITED, ) | | |
| ) | | |
| Defendants. ) | | |
| ———————————————— ) | | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED COMPLAINT**

TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND .............................................................................. 2

ARGUMENT ...................................................................................................... 5

I.      MOTION TO DISMISS STANDARD................................................... 5

II.     THE COURT HAS SUBJECT MATTER JURISDICTION OVER
        PLAINTIFFS' ANTITRUST CLAIMS.................................................. 6

        A.      Plaintiffs Allege That Defendants' Conduct Had a Direct, Substantial and
                Reasonably Foreseeable Effect on U.S. Commerce ............................................. 7

        B.      Plaintiffs Allege that the Domestic Effects of AWB's Conduct Gives Rise
                to Their Antitrust Claims ................................................... 11

III.    PLAINTIFFS HAVE STANDING TO BRING THEIR ANTITRUST CLAIMS ......... 12

        A.      Plaintiffs Have Pled Facts Sufficient to Establish Antitrust Injury .................... 12

        B.      Plaintiffs Are the Proper Parties To Bring This Action....................................... 15

                1.      Standing is Not Limited to Consumers and Competitors ....................... 15

                2.      Plaintiffs' Injuries Are Sufficiently Direct and Not Speculative ............ 16

                3.      Wheat Exporters Are Not More Appropriate Plaintiffs......................... 17

                4.      Because Damages Sought By Plaintiffs Are Not Duplicative Of
                        Those Belonging To Any Other Potential Claimants, There Will
                        Be No Difficulty With Apportionment ................................... 19

IV.     PLAINTIFFS PROPERLY STATE A CLAIM UNDER SECTION 1 OF THE
        SHERMAN ACT ................................................................................... 20

        A.      Plaintiffs Have Alleged A Plausible Conspiracy ................................................. 21

        B.      Plaintiffs Plead Harm to Competition in the Relevant Market ........................... 23

V.      PLAINTIFFS PROPERLY STATE A CLAIM UNDER SECTION 2 OF THE
        SHERMAN ACT ................................................................................... 25

        A.      Plaintiffs Have Properly Stated A Claim For Monopolization............................ 25

                1.      Plaintiffs Have Adequately Alleged that AWB Held Monopoly
                        Power ................................................................................... 25

                2.      Plaintiffs Have Alleged in That AWB Willfully Sought to
                        Maintain Monopoly Power .................................................. 27

        B.      Plaintiffs Have Properly Stated A Claim For Conspiracy To Monopolize ......... 28

                1.      AWB Engaged in Concerted Action With Other Conspirators in
                        Furtherance of the Conspiracy .............................................. 29

2.      AWB and its Conspirators Acted With the Specific Intent to Maintain AWB's Monopoly ...................................................................... 29

VI.    PLAINTIFFS PROPERLY STATE A CLAIM UNDER SECTION 3 OF THE CLAYTON ACT ................................................................................................ 30

VII.   PLAINTIFFS PROPERLY STATE A CLAIM UNDER SECTION 2 (C) OF THE ROBINSON-PATMAN ACT.............................................................................. 32

A.     Commercial Bribery Is Actionable Under Section 2(c)..................................... 32

B.     Plaintiffs Allege Sufficient Facts to Support Their Section 2(c) Claim .............. 33

C.     The Payments Alleged By Plaintiffs Constitute Commercial Bribery Under Section 2(c) ...................................................................................... 34

VIII.  PLAINTIFFS PROPERLY STATE A RICO CLAIM ............................................. 36

A.     The Alleged Predicate Acts Occurred in the United States and Therefore the Extraterritorial Application of RICO is Not Required.................................. 36

B.     Plaintiffs' Allegations Are More Than Adequate to Invoke the Extraterritorial Application of RICO .................................................... 39

1.      Plaintiffs' Allegations Satisfy the Conduct Test...................................... 40

2.      Plaintiffs' Allegations Also Satisfy the Effects Test ............................... 40

C.     Plaintiffs Have Standing to Prosecute Their RICO Claim................................. 41

D.     Plaintiffs Have Adequately Alleged Racketeering Activity Under RICO........... 45

1.      Plaintiffs Have Adequately Alleged Defendants' Violations of the FCPA.......................................................................................... 48

2.      Plaintiffs May Establish Their Predicate Acts Even Without Proving a Violation of the FCPA.......................................................... 50

CONCLUSION....................................................................................................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
    369 F.3d 732 (3d Cir. 2004)................................................................................32

*Alfadda v. Fenn*,
    935 F.2d 475 (2d Cir. 1991)...............................................................................36

*Amarel v. Connell*,
    102 F.3d 1494 (9th Cir. 1996) ................................................................13, 16, 23

*American Health Sys., Inc. v. Visiting Nurse Ass'n of Greater Philadelphia*,
    1994 WL 314313 (E.D. Pa. June 29, 1994) ............................................13, 17, 23

*Anza v. Ideal Steel Supply Corp.*,
    126 S. Ct. 1991 (2006)......................................................................................44

*Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*,
    459 U.S. 519 (1983) ("*AGC*")...............................................................12, 18, 19

*Associated Radio Serv. Co. v. Page Airways*,
    624 F.2d 1342 (5th Cir. 1980) ......................................................................21, 26

*ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..............................................................................5, 27

*Baisch v. Gallina*,
    346 F.3d 366 (2d Cir. 2003).............................................................................41, 44

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994)..................................................................................12

*Bell Atl. Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) ................................................................................. passim

*Bernstein v. Misk*,
    948 F. Supp. 228 (E.D.N.Y. 1997) .......................................................................45

*Biddle Purchasing Co. v. Federal Trade Comm'n*,
    96 F.2d 687 (2d Cir. 1938)...................................................................................35

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982)............................................................................................15

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
  369 F.3d 212 (2d Cir. 2004).................................................................. passim

*Bristol Tech., Inc. v. Microsoft Corp.*,
  42 F. Supp.2d 153 (D. Conn. 1998).................................................................14

*Broadcast Music, Inc. v. Hearst/ABC Viacom Entm't Servs.*,
  746 F. Supp. 320 (S.D.N.Y. 1990).................................................................21

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*,
  651 F.2d 122 (2d Cir. 1981) .................................................................26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977).................................................................12

*California v. ARC Am. Corp.*,
  490 U.S. 93 (1989).................................................................20

*Central Telecomms., Inc. v. TCI Cablevision, Inc.*,
  800 F.2d 711 (8th Cir. 1986) .................................................................13

*City of Atlanta v. Ashland-Warren, Inc.*,
  No. C 81-106A, 1981 WL 2187 (N.D. Ga. Aug. 20, 1981).................................................................22

*Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*,
  271 F.3d 374 (2d Cir. 2001).................................................................40, 41

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962).................................................................6

*Coors Brewing Co. v. Miller Brewing Co.*,
  889 F. Supp. 1394 (D. Colo. 1995).................................................................10

*Crimpers Promotions, Inc. v. Home Box Office, Inc.*,
  724 F.2d 290 (2d Cir. 1983).................................................................. passim

*Daishowa Int'l v. North Coast Export Co.*,
  No. C-81-574, 1982 WL 1850 (N.D. Cal. May 24, 1982).................................................................9, 23

*Daniel v. American Bd. of Emergency Medicine*,
  428 F.3d 408 (2d Cir. 2005).................................................................13

*Doctor's Hosp. v. Southeast Med. Alliance*,
  123 F.3d 301 (5th Cir. 1997) .................................................................14

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006).................................................................14

*Environmental Tectonics v. W.S. Kirkpatrick, Inc.*,
  847 F.2d 1052 (3d Cir. 1988) .................................................................36

*Erickson v. Pardus*,
  127 S. Ct. 2197 (2007) ...........................................................................48

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004) .................................................................................7

*Federal Paper Bd. Co., Inc. v. Amata*,
  693 F. Supp. 1376 (D. Conn. 1988) .......................................................33

*Fitch v. Kentucky-Tennessee Light & Power Co.*,
  136 F.2d 12 (6th Cir. 1943) ...................................................................32

*Flier v. Cayuga Cty.*,
  No. 5:03-CV-578, 2007 WL 2655698 (N.D.N.Y. Sept. 15, 2006) ........41

*Floors-N-More, Inc. v. Freight Liquidators, Inc.*,
  142 F.Supp.2d 496 (S.D.N.Y. 2001) ......................................................24

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
  386 F.3d 485 (2d Cir. 2004) ..............................................................25, 26

*George Haug Co. v. Rolls Royce Motor Cars, Inc.*,
  148 F.3d 136 (2d Cir. 1998) ...................................................................24

*Grace v. E.J. Kozin Co.*,
  538 F.2d 170 (7th Cir. 1976) .................................................................32

*Hansel 'N Gretel Brand, Inc. v. Savitsky*,
  No. 94 civ. 4027, 1997 WL 543088 (S.D.N.Y. Sept. 3, 1997) ..............40

*Harris v. Duty Free Shoppers Ltd. P'ship*,
  940 F.2d 1272 (9th Cir. 1991) ...............................................................33

*Hartford Fire Ins. Co. v. California*,
  509 U.S. 764 (1993) ..............................................................................6, 7

*Heerwagen v. Clear Channel Comm'ns*,
  435 F.3d 219 (2d Cir. 2006) ..........................................................25, 26, 27

*Howard Hess Dental Labs Inc. v. Dentsply Intern'l Inc.*,
  424 F.3d 363 (3d Cir. 2005) ...................................................................18

*Illinois Brick Co. v. Illinois*,
  431 U.S, 720 (1977) ...............................................................................19

v

*In re Elevator Antitrust Litig.*,
  No. 06-3128-CV, 2007 WL 2471805 ..................................................................6

*In re NCAA I-A Walk-On Football Players Litig.*,
  398 F. Supp.2d 1144 (W.D. Wash. 2005)........................................................23

*In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*,
  No. 06-643, 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007) .......................5

*In re Rubber Chems. Antitrust Litig.*,
  504 F. Supp. 2d 777 (N.D. Cal. 2007) ............................................................11

*In re Warfarin Sodium Antitrust Litig.*,
  No. MDL 98-1232, 1998 WL 883469 (D. Del. Dec. 7, 1998) ...............34

*International Distrib. Ctrs., Inc. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987) ..................................................................20, 28

*Iqbal v. Hasty*,
  490 F.3d 143 (2d Cir. 2007).................................................................................6

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
  98 F. Supp.2d 480 (S.D.N.Y. 2000).............................................................36, 37

*Larry R. George Sales Co. v. Cool Attic Corp.*,
  587 F.2d 266 (5th Cir. 1979) ...........................................................................32

*Latino Quimica-Amtex S.A. v. Akzo Nobel Chems. B.V.*,
  No. 03 Civ. 10312, 2005 WL 2207017 (S.D.N.Y. Sept. 8, 2005).........10

*Mandeville Island Farms v. American Crystal Sugar Co.*,
  334 U.S. 219 (1948)...............................................................................13, 15

*McElhenney Co. v. Western Auto Supply Co.*,
  269 F.2d 332 (4th Cir. 1959) ..........................................................................30

*Metallgesellschaft AG v. Sumitomo Corp. of Am.*,
  325 F.3d 836 (7th Cir. 2003) ..........................................................................11

*MM Global Services, Inc. v. Dow Chem. Co.*,
  No. 3:02CV1107, 2004 WL 556577 (D. Conn. Mar. 18, 2004)...........10

*Monsieur Touton Selection v. Future Brands, LLCS*,
  2006 WL 2192790 (S.D.N.Y. Aug. 1, 2006)................................................33, 34

*Moore v. Guesno*,
  485 F. Supp.2d 300 (W.D.N.Y. 2007) ...........................................................41

*National Group for Commc'ns and Computers Ltd. v. Lucent Techs., Inc.*,
420 F. Supp.2d 253 (S.D.N.Y. 2006)......................................................................40

*National Macaroni Mfrs. Ass'n v. Federal Trade Comm'n*,
345 F.2d 421 (7th Cir. 1965) ..............................................................................14

*North-South Fin. Corp. v. Al-Turki*,
100 F.3d 1046 (2d Cir. 1996)..................................................................36, 39, 40

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*,
No. 04-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006)............................7, 35, 36

*Pani v. Empire Blue Cross Blue Shield*,
152 F.3d 67 (2d Cir.1998)......................................................................................49

*Philip Morris, Inc. v. Grinnell Lithographic Co., Inc.*,
67 F. Supp.2d 126 (E.D.N.Y. 1999) ...............................................................33, 35

*Reazin v. Blue Cross and Blue Shield of Kan., Inc.*,
899 F.2d 951 (10th Cir. 1990) .........................................................................14, 16

*Republic of Columbia v. Diageo N. Am. Inc.*,
No. 04-CV-4372 (NGG), 2007 WL 1813744 (E.D.N.Y. June 19, 2007)..........39, 42

*Sanner v. Board of Trade of City of Chicago*,
62 F.3d 918 (7th Cir. 1995) ........................................................................... passim

*Schlaifer Nance & Co. v. Estate of Warhol*,
119 F.3d 91 (2d Cir. 1997).....................................................................................44

*Schwab v. Philip Morris*,
449 F.Supp.2d 992 (E.D.N.Y. 2006) .....................................................................42

*Stephen Jay Photography, Ltd. v. Olan Mills*,
903 F.2d 988 (4th Cir. 1990) ...........................................................................32, 35

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'sl B.V. v. Schreiber*,
327 F.3d 173 (2d Cir. 2003)...................................................................................47

*Tampa Elec. Co. v. National Coal Co.*,
365 U.S. 320 (1961)...............................................................................................30

*Thai Airways Int'l Ltd. v. United Aviation Leasing B.V.*,
842 F. Supp. 1567 (S.D.N.Y. 1994) ...........................................................36, 37, 38

*Three Crown Ltd. P'ship v. Caxton Corp.*,
817 F. Supp. 1033 (S.D.N.Y.1993).........................................................................21

*Tire Sales Corp. v. Cities Serv. Oil Co.*,
    637 F.2d 467 (7th Cir. 1980) ...............................................30

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)....................................................13, 23, 24

*Tops Mkts, Inc. v. Quality Mkts, Inc.*,
    142 F.3d 90 (2d Cir. 1998)......................................................24, 27

*Trugman-Nash Inc. v. New Zealand Dairy Bd.*,
    954 F. Supp. 733 (S.D.N.Y. 1997)........................................22

*United Magazine Co. v. Murdoch Magazines Distrib., Inc.*,
    No. 00 CIV 3367, 2001 WL 1607039 (S.D.N.Y. Dec. 17, 2001)...........................................34

*United States v. Jenkins*,
    943 F.2d 167 (2d Cir. 1991) ...................................................45

*United States v. LWL Biotechnologies*,
    379 F.3d 672 (9th Cir. 2004) ...................................................9

*United States v. Maher*,
    108 F.3d 1513 (2d Cir. 1997)....................................................45

*Verizon Comm'ns. Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)...................................................................27

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001).......................................................24

*Westchester Radiological Assocs., P.C. v. Empire Blue Cross and Blue Shield, Inc.*,
    659 F. Supp. 132 (S.D.N.Y. 1987)...........................................15, 18, 19

## OTHER AUTHORITIES

Franklin A. Gevurtz, *Commerical Bribery and the Sherman Act, the Case for Per Se Illegality*, 42 U. Miami L. Rev. 365 (1987) ...........................................13

Franklin A. Gevurtz, *Using the Antitrust Laws to Combat Overseas Bribery by Foreign Companies: A Step to Even the Odds in International Trade*, 27VAJIL 211 (1987)...............9

Pierre Vogelenzang, Note, *Foreign Sovereign Compulsion in American Antitrust Law*, 33 Stan. L. Rev. 131 (1980)...........................................................29

## INTRODUCTION

This action is predicated upon a well-documented bribery scheme arising out of the United Nations Oil for Food Program ("OFFP"). Two independent reports, one commissioned by the United Nations (the "Volcker Report") and the other by the Australian government (the "Cole Report"), have both concluded that Defendant AWB Limited, an exporter of Australian-grown wheat to Iraq, illegally funneled money from the OFFP in order to pay bribes to the Iraqi government in exchange for obtaining Iraqi wheat contracts. As a result of this scheme, the Iraqi market was entirely foreclosed to U.S.-grown wheat, decreasing prices at which Plaintiffs, U.S. wheat farmers, were able to sell their grain.

Despite the fact that the Complaint contains detailed factual allegations of the bribery scheme taken from the Volcker Report and Cole Report and incorporates them by reference,[1] Defendants argue that Plaintiffs' Complaint does not sufficiently plead a plausible conspiracy as required by the Supreme Court's recent decision in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). Defendants also mischaracterize Plaintiffs' allegations and offer their own versions of the events that took place, often in direct contradiction to the findings in the Volcker Report and Cole Report, in violation of the principle that on a Rule 12(b)(6) motion, the allegations in the Complaint must be taken as true.

Contrary to Defendants' assertions, Plaintiffs have pled sufficient facts to state claims under the Sherman Act, the Clayton Act, the Robinson-Patman Act and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs have also pled sufficient facts to

---

[1]    Here, the Complaint cites and discusses the Cole Report, a five-volume report with appendices consisting of thousands of AWB and other documents, and the Volcker Report. Compl. at ¶¶ 99, 101. The Court may consider the reports and their exhibits in assessing the viability of the Complaint on a motion to dismiss. *Cortec Indus. Inc. v. Sun Holdings LP*, 949 F.2d 42, 47 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.").

demonstrate that subject matter jurisdiction is appropriate under the antitrust laws and RICO because the conspiracy both took place, in part, in the U.S. and had substantial effects in the U.S. Finally, Plaintiffs have alleged an injury, cognizable under both the antitrust laws and RICO, which was directly and proximately caused by Defendants' conspiracy to exclude U.S.-grown wheat from the market. Accordingly, Defendants' motion to dismiss should be denied.

**FACTUAL BACKGROUND**

The U.S. is the world's largest exporter of wheat, including hard red winter wheat.[2] Compl. at ¶ 52. Exports are crucial for the U.S. wheat growers, averaging nearly half of total sales since the 1990s. The main competitor of U.S.-grown wheat in the export market is Australian-grown hard wheat. *Id.*

Historically, Iraq has been a top importer of U.S.-grown wheat.[3] *Id.* at ¶ 62. During the 1980s, U.S.-grown wheat had a 29% share of the Iraqi wheat market, second only to Australian-grown wheat, which had a 38% share. *Id.* Because of U.S. sanctions on Iraq from 1990 to 1997, U.S.-grown wheat was not sold to Iraq during that period. *Id.* at ¶ 63. In the absence of U.S. competition, Australian-grown wheat gained a 73% share of the Iraqi wheat market. *Id.* In 1997, however, U.S.-grown wheat re-entered the market under the OFFP, which permitted Iraq

---

[2]    Hereinafter, the term "U.S.-grown wheat" refers to U.S.-grown hard red winter wheat.

[3]    AWB itself viewed Iraq as a distinct market for its wheat. It prepared multiple "Iraq Market Briefs" that reflect this viewpoint. *See, e.g.,* Cole Report Exhs. 1505 (October 2002 "Iraq Market Brief"), 1495 (first quarter 2003 "Iraq Market Brief"), 697 (September 1999 "Iraq Brief"). Benchmark wheat prices within this market were set by reference to U.S. market prices for hard winter wheat. *See* Cole Report Exhs. 697 ("[t]he Iraq market is bench marked against the U.S. Hard Red Winter Ordinary wheat markets traded in Kansas"), 384 ("AWB advise that both it and the Iraqi Grain Board use the U.S. wheat price as the benchmark starting price for all negotiations"). All Cole Report exhibits cited herein are available at http://www.offi.gov.au/agd/ WWW/UNOilForFoodInquiry.nsf/Page/Exhibits.

to sell oil to pay for food, medicine, and humanitarian goods.[4]  *Id.*  Thus, the only way to sell

wheat to Iraq was to secure a contract with the Saddam Hussein regime under the OFFP.

By 1998, U.S.-grown wheat had regained a 6% market share in Iraq.  Compl. at ¶ 67.

According to an internal AWB document, immediately preceding the conspiracy, U.S.-grown

wheat accounted for 15% of the market, whereas Australian wheat had fallen to 66% of the

market.  *See* Cole Report Exh. 1495.  U.S.-grown wheat was the only real competitive threat to

the Australian wheat monopoly.  Compl. at ¶ 68.  In 1999, recognizing the growing threat of U.S.

competition in this vital export market, AWB entered into a combination and conspiracy to

protect its monopoly status in Iraq.  Pursuant to this conspiracy, AWB agreed to pay kickbacks to

the Iraqi Government and the latter agreed to purchase all of its wheat from AWB, thereby

foreclosing U.S.-grown wheat from the market.  *Id.* at ¶ 69.   In furtherance of this scheme, U.S.

dollars in the OFFP escrow account were funneled and laundered through AWB's bank account

in the U.S., through various agents and intermediaries, such as Alia, a Jordanian trucking

company, the Iraqi Grain Board ("IGB"), and the Iraqi State Water Transport Company

("ISWTC"), and ultimately paid to members of the Saddam Hussein regime.  *Id.* at ¶¶ 1, 69, 74-

90.

AWB knew that the conspiracy was illegal but nevertheless agreed to participate in order

to maintain its monopoly status in Iraq.  *Id.* at ¶ 73.  Indeed, AWB's former Regional Manager

for the Middle East and Africa, admitted in a sworn statement that "AWB had two choices: we

either complied with the IGB's requirements under their contracts; or we allowed the wheat

---

[4]      Direct financial transactions with the Government of Iraq were prohibited.  Compl. at ¶
64.  Therefore, under OFFP, proceeds from the sale of Iraqi oil were deposited by the purchaser
into a UN-controlled escrow account at Banque Nationale de Paris ("BNP") in New York and
Iraq's payments to suppliers of food, medicine, and humanitarian goods were made from the
escrow account.  *Id.*

market to disappear altogether to other companies."  Cole Report, Vol. 1, p.xxviii; *see also* Cole Report Exhs. 161, 1505 (maintaining the stranglehold AWB had over that market was "paramount to the success of [its] marketing campaign.").  This sentiment is echoed in the conclusion of the Cole Report:

> The question posed within AWB was:  *What must be done to maintain sales to Iraq?*
>
> The answer given was:  *Do whatever is necessary to retain the trade. Pay the money required by Iraq.  It will cost AWB nothing because the extra costs will be added into the wheat price and recovered from the UN escrow account.  But hide the making of those payments for they are in breach of sanctions.*

Compl. at ¶ 73.

Between July 1999 and March 2003, AWB paid over $224 million in bribes to the Saddam Hussein regime.  *Id.* at ¶ 90.  The conspiracy had the intended effect of excluding U.S.-grown wheat from Iraq and maintaining AWB's monopoly in that market. *Id.* at ¶ 91; *see also* Cole Report Exh. 1495 (referring to AWB as a "dominant supplier" with a "dominant market position" and quantifying the monoplistic share AWB held of the Iraqi wheat market).  During the 1999-2000 season, for example, AWB sold a record 2.4 million metric tons of wheat to Iraq, accounting for 98% of the wheat supplied to Iraq that season.  Compl. at ¶ 91.  During that season and for the remainder of the OFFP, which ended in 2003, U.S.-grown wheat was completely foreclosed from the Iraqi market.  *Id.*

The conspiracy was specifically targeted at excluding U.S.-grown wheat from the market and AWB's key personnel recognized that they had to do everything possible to protect their monopoly from potential competition from U.S. wheat growers.  *Id.* at ¶¶ 1, 68, 69, 73; *see also* Cole Report Vol. 4, page 133, finding 31.70 (April 2000 e-mail from Mark Emons, AWB's Regional Manager for Africa and the Middle East, saying that "we should be accommodating to

the Iraqis so that our business does not come under threat from our U.S. or CWB [Canadian Wheat Board] freinds [sic]"); Cole Report Exh. 384 (sworn statement of Tim Snowball, AWB's U.S. manager, that he had to protect the "commercial position of AWB in this [the Iraqi] market against some stiff competition from our major competitors such as Canada and the U.S.").

Not surprisingly, therefore, the Cole Report found: "[a]t the latest, from March 2000, officers in AWB proceed on the basis that payment of the trucking fees to Iraq through the mechanism of Alia, had the approval of the Chairman, Mr. Flugge, as being a necessary step to keep the Iraqi business, and repulse threats from American and Canadian competitors." Cole Report, Vol. 4, page 219, finding 31.285.

## ARGUMENT

### I.    MOTION TO DISMISS STANDARD

Under the notice pleading standard applicable to antitrust and RICO claims, a complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "[S]pecific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*, No. 06-643, 2007 WL 2694469, at *5 (S.D.N.Y. Sept. 13, 2007) (quoting *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007)). In ruling on a motion to dismiss under 12(b)(6), courts must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 97 (2d Cir. 2007).

The Supreme Court recently explained that in evaluating a motion to dismiss under Rule 12(b)(6), a district court must determine whether the "[f]actual allegations ... raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are

true (even if doubtful in fact)." *Twombly*, 127 S. Ct. at 1965 (internal citations omitted).

According to *Twombly*, a plaintiff need allege "only enough facts to state a claim to relief that is

plausible on its face." *Id*. at 1974. The Second Circuit has stated that *Twombly* does not require

a universally heightened standard of fact pleading under Rule 8, but "instead requir[es] a flexible

'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations

in those contexts where such amplification is needed to render the claim plausible." *Iqbal v.*

*Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007); *see also In re Elevator Antitrust Litig.*, No. 06-

3128-CV, 2007 WL 2471805, at * 2 (2d Cir. Sept. 4, 2007) (*Twombly* "require[s] enough facts to

'nudge [plaintiffs'] claims across the line from conceivable to plausible.'").

## II.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' ANTITRUST CLAIMS

Defendants raise a facial challenge to Plaintiffs' jurisdictional allegations on the grounds

that the alleged unlawful conduct complained of by Plaintiffs occurred outside the U.S.[5]

However, "[i]t is well established by now that the Sherman Act applies to foreign conduct that

was meant to produce and did in fact produce some substantial effect in the United States."

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993); *see also Continental Ore Co. v.*

*Union Carbide & Carbon Corp.*, 370 U.S. 690, 704 (1962) ("A conspiracy to monopolize or

restrain the domestic or foreign commerce of the United States is not outside the reach of the

Sherman Act just because part of the conduct complained of occurs in foreign countries").

---

[5]      A facial challenge to subject matter jurisdiction under Rule 12(b)(1) is reviewed under
the same standards as a motion to dismiss failure to state a claim under Rules 12(b)(6). *Lerner v.*
*Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003). Although Defendants do not specify that
their challenge is a facial one, their attacks are limited to the allegations in Plaintiffs' Complaint,
and they conceded that for purposes of this motion, the Court must accept the factual allegations
in the Complaint as true. Def. Mot. at n.1.

The Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") amended the Sherman Act to clarify the extent to which the antitrust laws of the U.S. reach conduct concerning trade or commerce with foreign nations.[6]  The FTAIA initially lays down a general rule placing all (non-import) activity involving foreign commerce outside the Sherman Act's reach.  *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004).  It then brings such conduct back within the Sherman Act's reach provided that the conduct both (1) sufficiently affects commerce (*i.e.*, it has  a "direct, substantial and reasonably foreseeable effect" on U.S. domestic, import or certain export commerce), and (2) has an effect that "gives rise to" a claim under the Sherman Act.  *Id.*  Plaintiffs sufficiently pled facts to satisfy both of these conditions for purposes of a motion to dismiss.

**A.     Plaintiffs Allege That Defendants' Conduct Had a Direct, Substantial and Reasonably Foreseeable Effect on U.S. Commerce**

In an effort to convince the Court that it lacks subject matter jurisdiction over Plaintiffs' antitrust claims, Defendants characterize the alleged conduct as wholly foreign and Plaintiffs' allegations regarding its effect on U.S. commerce as conclusory.  Even if Defendants' conduct was wholly foreign (it was not), it would be irrelevant.  It is the situs of the *effect*, not the *conduct*, which is crucial.  *See Hartford Fire*, 509 U.S. at 796.

---

[6]     Although the FTAIA applies to Plaintiffs' Clayton Act and Sherman Act claims (*see, e.g., United Phosphorus, Ltd. v. Angus Chem. Co.*, No. 94 C 2078, 1994 WL 577246, at *10 (N.D. Ill. Oct. 18, 1994) (citing cases)), it does not apply to Plaintiffs' claim under the Robinson-Patman Act.  *See Rotec Indus., Inc v. Mitsubishi Corp.*, 348 F.3d 1116, 1120-21 (9th Cir. 2003) (holding that the jurisdictional analysis under § 2(c) of the Robinson-Patman Act is governed by the standard announced by the Supreme Court in *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186 (1974) and, therefore, the reach of § 2(c) extends to persons and activities which are themselves within the flow of commerce among the states or with foreign nations); *Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 WL 2711527, at *18 n.36 (Sept. 16, 2006) (refusing to apply the FTAIA to a Robinson-Patman Act claim).  Defendants' reliance on *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 584 (1986) for a contrary position is misplaced because the Court was addressing the extraterritorial application of the Sherman Act, not the Robinson-Patman Act.

Defendants acknowledge that Plaintiffs specifically allege that AWB's conduct "caused a direct, substantial and reasonably foreseeable" effect on U.S. commerce.  Def. Mot. at 4.  But focusing only on this single sentence, they argue that Plaintiffs' allegations are "conclusory" and insufficient to support jurisdiction.  *Id.*  Defendants' argument entirely ignores the detailed factual predicates supporting this assertion.  Specifically, Plaintiffs allege:

- AWB's conduct was *specifically directed* toward the U.S.:  "U.S.-grown wheat was the only real competitive threat to the Australian wheat monopoly" (Compl. at ¶ 68); "In 1999, recognizing the growing threat of competition from U.S.-grown wheat to the monopoly achieved by AWB in the Iraqi market, AWB and the conspirators … formed an enterprise for the purpose of securing and maintaining AWB's monopoly through anticompetitive conduct" (*Id.* at ¶ 69); "Defendant AWB participated in the bribery and money laundering conspiracy in order to achieve, maintain, and exploit a monopoly on wheat sold in Iraq and to foreclose the market to U.S.-grown wheat" (*Id.* at ¶ 1).

- Defendants' conduct caused a *direct* effect on U.S. commerce:  "U.S.-grown wheat was completely foreclosed from the Iraqi market." (*Id.* at ¶ 91); "U.S. wheat prices are directly affected by market conditions and events in those sub-markets around the world into which the U.S. exports its wheat." (*Id.* at ¶ 55); "Changes in demand for U.S.-grown wheat … cause price changes on the major commodity exchanges" (*Id.* at ¶ 58).

- Defendants' conduct caused a *substantial* effect on U.S. commerce:  "U.S.-grown wheat was completely foreclosed from the Iraqi market," a country that has, historically, "been a top importer of hard red winter wheat."  (*Id.* at ¶¶ 62, 91).

- Defendants' conduct caused a *reasonably foreseeable* effect on U.S. commerce: "AWB understood … that the foreclosure of U.S.-grown wheat from the Iraqi market would result in … lower prices in the United States" (*Id.* at ¶ 93).

Thus, contrary to Defendants' characterizations, the effects on U.S. commerce from the foreclosure were not collateral and attenuated "ripples" through the global economy.  Plaintiffs allege a far more direct effect on commerce – AWB foreclosed the Iraqi market, which caused a drop in demand in the U.S. market and a concomitant drop in prices in the U.S. market.[7]  *See,*

---

[7]     The fact that the Complaint explains the interrelatedness of geographic submarkets and the pricing mechanisms in the wheat market does not, as Defendants suggest, make Plaintiffs'

*e.g., United States v. LWL Biotechnologies*, 379 F.3d 672, 680 (9th Cir. 2004) (an effect is

"'direct' if it follows as an immediate consequence of the defendant's activity." (quoting

*Republic of Argentina v. Weltover*, 504 U.S. 607, 618 (1992)).  When, as here, bribery is used to

foreclose a market, there is a direct, substantial, and reasonably foreseeable effect on U.S.

commerce.  *See* Franklin A. Gevurtz, *Using the Antitrust Laws to Combat Overseas Bribery by

Foreign Companies: A Step to Even the Odds in International Trade*, 27 VAJIL 211, 234-35

(1987) ("The effect of usurping a competitor's export opportunities in such a case is more than

reasonably foreseeable; it is the very purpose of the bribe. … When one firm gains sales over

another through bribery, the effect of lost exports is about as direct as can be.").

     Moreover, it has been recognized that foreign market foreclosures will have direct

domestic price effects.  *See, e.g., Daishowa Int'l v. North Coast Export Co.*, No. C-81-574, 1982

WL 1850, at *5-6 (N.D. Cal. May 24, 1982) (applying Sherman Act where plaintiffs alleged

boycott to exclude U.S. competitors from Japanese market foreclosed market and depressed

prices in U.S.); *see also* Congressional Research Service, China's Most-Favored-Nation Status:

U.S. Wheat Exports, Report for Congress, 94-447 ENR, May 24, 1994, available at http://digital.

library.unt.edu/govdocs/crs/permalink/meta-crs-79:1 (noting that if China were to shut off

imports of U.S. wheat, the "direct effect" on domestic prices would likely be 3 cents per bushel

in the first year, 9 cents per bushel in the second year, and 15 cents per bushel in the third year.).

Therefore, the effect on commerce of Defendants' market foreclosure and the resulting lost

---

theory more complicated or attenuated.  For example, to provide background, Plaintiffs explain
that prices paid to U.S. farmers move in parallel to prices on the commodities exchanges and that
the main determinant of commodities prices are projected wheat ending stocks.  Complaint at ¶¶
56-57.  However, contrary to Defendants' assertions (*see* Def. Mot. at 6), that does not mean that
Plaintiffs' injuries were dependent on actual ending stocks or the prices of wheat future contracts
entered into after the conclusion of the relevant growing season.

exports and lower domestic prices was sufficiently direct, substantial, and reasonably foreseeable to satisfy the FTAIA.

Indeed, the effects on U.S. commerce alleged by Plaintiffs are more detailed and direct than in other cases where the FTAIA was found to have been satisfied. *See, e.g., MM Global Services, Inc. v. Dow Chem. Co.*, No. 3:02CV1107, 2004 WL 556577, at *3-5 (D. Conn. Mar. 18, 2004) (direct effects test satisfied where complaint alleged a price fixing conspiracy for product sales in India that was intended to prevent erosion of prices, and thus maintenance of artificially high prices in the U.S.); *Coors Brewing Co. v. Miller Brewing Co.*, 889 F. Supp. 1394, 1398 (D. Colo. 1995) ("Defendants' effort to circumscribe Coors' allegations to anticompetitive effects in Canada alone ignores both Coors' allegations regarding its export activities as well as the blurred line between the domestic and foreign effects of conduct in the North American beer market."). Plaintiffs have thus easily satisfied the FTAIA's domestic effects test.

Defendants' reliance on *Latino Quimica-Amtex S.A. v. Akzo Nobel Chems. B.V.*, No. 03 Civ. 10312, 2005 WL 2207017, at *12-13 (S.D.N.Y. Sept. 8, 2005) to argue that Plaintiffs have not sufficiently plead "direct effects" completely misreads the opinion. *See* Def. Mot. at 5. The court found that the "direct effects" requirement was satisfied where the plaintiffs alleged "injury to U.S. commerce by reducing the U.S. MCAA market's competitiveness and by directing anticompetitive conduct at U.S. commerce." 2005 WL 2207017 at *12-13. The court used the "inter-dependence of markets" language upon which Defendants rely in considering whether the "gives rise to" requirement of the FTAIA, not the "direct effects" requirement, was satisfied where *foreign plaintiffs* were seeking to bring a Sherman Act claim, based on *foreign injury*, in U.S. courts. 2005 WL 2207017 at *12-13 ("[U]nder the FTAIA, the mere inter-dependence of

markets cannot be sufficient to satisfy the requirement that a domestic effect "gives rise to" the plaintiff's claim."); *see also In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 785 n.6 (N.D. Cal. 2007) (distinguishing *Empagran I* and its progeny, including *Latino Quimica*: "In each of those cases, the plaintiffs at issue did not participate in the U.S. market and could not draw a causal relationship between domestic anticompetitive effects and any of the injury they alleged.").[8]

> **B.     Plaintiffs Allege that the Domestic Effects of AWB's Conduct Gives Rise to Their Antitrust Claims**

Plaintiffs properly allege that the domestic effects of AWB's conduct "gives rise" to their antitrust claims as required by the FTAIA since Plaintiffs are U.S. farmers whose injuries arose out of depressed prices for wheat in the U.S.  Although a heading in Defendants' brief would suggest otherwise (*see* Def. Mot. at Heading I.B), Defendants do not actually contest that Plaintiffs have properly alleged that the effect on U.S. commerce *gives rise* to their claim for injury.  Rather, Defendants argue in that section that the type of injury upon which Plaintiffs' claims are premised is not the type the antitrust laws consider harmful.  Def. Mot. at 6-7.  However, whether Plaintiffs have suffered antitrust injury is distinct from the FTAIA inquiry. *See Metallgesellschaft AG v. Sumitomo Corp. of Am.*, 325 F.3d 836, 842-43 (7th Cir. 2003).  Plaintiffs will describe how they have properly alleged such injury in Section III.A. below.

## III.     PLAINTIFFS HAVE STANDING TO BRING THEIR ANTITRUST CLAIMS

---

[8]     Similarly, Defendants' reliance on *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 560 (D. Del. 2006) is misplaced.  The causal chain alleged in *Intel* was far more attenuated, to wit "a deal between Intel and a German retailer to promote Intel-based systems directly affects U.S. commerce because it reduces AMD's German subsidiary's sales of German-made microprocessors in Germany, which in turn affects the profitability of the U.S. AMD parent, which in turn affects the funds that AMD has for discounting to U.S. customers, which in turn affects the discounts that it offers in particular U.S. transactions, which in turn affects its competitiveness in the United States, and which in turn affects U.S. commerce."

In *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540 (1983) ("*AGC*"), the Supreme Court explored the limitations of antitrust standing and proclaimed that "the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case." *Id*. at 536 (footnote omitted).  However, the Supreme Court identified several factors for courts to consider in determining standing:  (1) the nature of the plaintiff's alleged injury; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.  *Daniel v. American Bd. of Emergency Medicine*, 428 F.3d 408, 443, (2d Cir. 2005) (citing *AGC*, 459 U.S. at 540-45).  No single factor is determinative; the standing determination is ultimately a product of the particularities of each case.  *Id.* at 535-36.

Based upon the analysis in *AGC*, the Second Circuit has developed a two-pronged test to determine whether a plaintiff has antitrust standing.  *Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994).  Under the Second Circuit test, the court must first determine whether the plaintiff has suffered an antitrust injury.  *Id*.  If such an injury is found, then the court must determine whether the plaintiff is the proper party to bring the action; that is, whether other factors, largely relating to the identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws.  *Id*.

As discussed in more detail below, Plaintiffs have alleged a cognizable antitrust injury and are the proper parties to sue, and hence have standing to sue for damages resulting from Defendants' anticompetitive conduct.

## A.    Plaintiffs Have Pled Facts Sufficient to Establish Antitrust Injury.

An "antitrust injury" is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-*

*O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Here, Plaintiffs allege that they were forced to sell at depressed prices as a result of Defendants' conspiracy to foreclose the Iraqi market through the payment of bribes.  Where competition is foreclosed from a market by virtue of bribery or kickbacks, it is widely recognized that the resulting injuries are the types the antitrust laws were intended to prevent.  *See generally,* Franklin A. Gevurtz, *Commerical Bribery and the Sherman Act, the Case for Per Se Illegality*, 42 U. Miami L. Rev. 365, 391-392, 395 (explaining the anticompetitive effect on competitors from bribery and noting that "few would dispute that a competitor who loses business due to a payoff would have standing to sue the parties to the bribe for violating the Sherman Act."); *see also, e.g., Central Telecomms., Inc. v. TCI Cablevision, Inc.*, 800 F.2d 711, 726 (8th Cir. 1986) (where incumbent monopolist takes action to destroy competitive bidding process, foreclosed potential competitors have suffered antitrust injury); *American Health Sys., Inc. v. Visiting Nurse Ass'n of Greater Philadelphia*, 1994 WL 314313, *14  (E.D. Pa. June 29, 1994) (same).

Defendants, citing to cases involving traditional antitrust conspiracies directed at purchasers, argue that "depressed prices" cannot be proper "antitrust injury."  Def. Mot. 6-7.  However, unlike those cases, this case involves a buyer-side conspiracy directed at sellers.  A conspiracy at the buyer level to stifle competition will typically result in lower prices for sellers and is as unlawful as one at the seller level.  *Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219, 236 (1948); *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001).

Numerous analogous cases have properly determined that suppliers suffered "antitrust injuries" when forced to accept depressed prices for their goods as a result of anticompetitive conduct by buyers.  *See, e.g., Amarel v. Connell*, 102 F.3d 1494, 1509-10 (9th Cir. 1996) (independent rice farmers had standing to sue exporter for conduct that led to depressed rice

prices); *Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 927-28 (7th Cir. 1995)

(soybean farmers had standing to sue the Chicago Board of Trade for a resolution that resulted in

lower prices in the futures market and corresponding lower prices in the cash market); *Reazin v.*

*Blue Cross and Blue Shield of Kan., Inc.*, 899 F.2d 951, 962-963 (10th Cir. 1990) (hospital's

claimed injuries of depressed prices constituted antitrust injury); *see also National Macaroni*

*Mfrs. Ass'n v. Federal Trade Comm'n*, 345 F.2d 421, 426-27 (7th Cir. 1965) (agreement

intended to reduce demand for U.S. durum wheat – and therefore reduce prices on commodities

exchanges – found to violate antitrust laws).[9]

Contrary to Defendants' assertion, the substantive element of "harm to competition" is

distinct from "antitrust injury" and is not a part of the standing inquiry.  *Doctor's Hosp. v.*

*Southeast Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997) ("The antitrust laws do not require a

plaintiff to establish a market-wide injury to competition as an element of standing"); *Bristol*

*Tech., Inc. v. Microsoft Corp.*, 42 F. Supp.2d 153, 165 (D. Conn. 1998) (same); *see also Blue*

*Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212,

220 (2d Cir. 2004) ("[a]ntitrust injury and competitive injury are conceptually distinct."); *E & L*

*Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 28 n.3 (2d Cir. 2006) (failure to allege harm

to competition is analytically distinct from failure to plead antitrust injury).  As discussed in

Section III.B. below, Plaintiffs have properly alleged harm to competition.

### C.    Plaintiffs Are the Proper Parties To Bring This Action

#### 1.    Standing is Not Limited to Consumers and Competitors

---

[9]    Defendants make much of the fact that Plaintiffs' injury occurred in the U.S., rather than
Iraq.  Their argument, however, ignores the fact that this is an export market foreclosure case.
Injuries in such cases must necessarily occur outside of the market that has been foreclosed.

Defendants argue that Plaintiffs do not have standing because they are not consumers or competitors in the relevant market. Def. Mot. at 10. Defendants' own documents, however, belie their argument that Plaintiffs are not their competitors. As discussed above, the conspiracy was directed at excluding their primary competition – U.S.-grown wheat – from the market. Thus, Defendants' argument that Plaintiffs are not "competitors" merely because they do not perform their own foreign contracting and delivery is overly formalistic and inconsistent with AWB's own contemporaneous statements about the market and their competition.

Even if the Court were to find that Plaintiffs are not "direct" competitors, that fact is not dispositive of whether Plaintiffs have antitrust standing. *Mandeville*, 334 U.S. at 236 ("The [Sherman Act] does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers … The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated."); *see also Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982) (same); *Blue Tree*, 369 F.3d at 218 (declining to limit the potential class of Robinson-Patman Act § 2(c) commercial bribery plaintiffs to direct competitors); *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 292 (2d Cir. 1983) ("[A] plaintiff need not be a direct competitor in the market in which defendants operate."); *Westchester Radiological Assocs., P.C. v. Empire Blue Cross and Blue Shield, Inc.*, 659 F. Supp. 132, 137 (S.D.N.Y. 1987) (same).

In *McCready*, the Supreme Court suggested that, for purposes of the standing analysis, the antitrust laws are concerned with the effect on direct victims of boycotts and secondary boycotts.[10] 457 U.S. at 483-84 & n. 21. Thus, the Court held that, where a plaintiff's injury is

---

[10]    The Court explained that if a group of psychiatrists conspired to boycott a bank until that bank stopped making loans to competing psychologists, antitrust standing would exist not only

"inextricably intertwined with the injury the conspirators sought to inflict on the market," the plaintiff has standing. *Id.* at 483-84; *see also Crimpers*, 724 F.2d at 294-95 (trade show operators targeted for exclusion had standing to sue HBO despite not directly competing with HBO in any markets); *Sanner*, 62 F.3d at 928-929 (standing affirmed for farmer participants in soybean cash market despite fact that conduct was intended only to affect futures market); *Amarel*, 102 F.3d at 1507-1513 (rice farmers had antitrust standing because the injuries were intertwined with those suffered by rice mills – arguably the more "direct" competitors); *Reazin*, 899 F.2d at 962-963 (plaintiff hospital had standing despite not being a direct competitor in the relevant market of health care financing because its injuries were inextricably intertwined with direct competitor and it was targeted in the conspiracy).

By foreclosing the Iraqi market to U.S.-grown wheat, Defendants foreseeably impacted both American farmers and the exporters who contract to deliver their wheat. Given the interdependence between exporters and wheat farmers, harming one was tantamount to harming the other. Injuring farmers was thus an integral aspect of the conspiracy alleged.

### 2.    Plaintiffs' Injuries Are Sufficiently Direct and Not Speculative

In arguing that Plaintiffs' injuries are attenuated and speculative, Defendants mischaracterize the allegations in Plaintiffs' complaint and attack the causal chain for Plaintiffs' injuries. However, at this stage of the litigation, Plaintiffs' allegations must be taken as true. *Twombly*, 127 S. Ct. at 1965; *Sanner*, 62 F.3d at 926.

As explained above, Plaintiffs' injuries in this case were directly and foreseeably caused by Defendants' actions without attenuation. *See* Section II.A. *supra.* The injuries suffered by Plaintiffs are no less direct and no more speculative that those suffered by the plaintiffs in

---

for the bank, the target of the primary boycott, but also for the psychologists, against whom the secondary boycott was directed. *Id*. at 484 n.21.

*Crimpers*, *Sanner*, *Amarel*, and *Reazin*.  In *Sanner*, for example, the Chicago Board of Trade issued a resolution which required traders to liquidate open long positions in the futures market. 62 F.3d at 927.  The plaintiffs, sellers of soybeans in the cash market, alleged that the resolution resulted in a glut of soybeans which caused prices in the soybean futures market to plummet.  *Id*. They also alleged that the resolution caused prices in the soybean cash market to fall in direct proportion to prices in the futures market.  *Id*.  *Sanner* is analogous to the present case, where Plaintiffs, sellers of wheat in the cash market, allege that Defendants' conduct resulted in a glut of wheat which caused prices on the futures market and on the cash market to fall.  Thus, the alleged injury suffered by Plaintiffs is sufficiently direct and definite to confer standing.[11]

### 3.    Wheat Exporters Are Not More Appropriate Plaintiffs

Defendants make the conclusory argument that Plaintiffs are not the appropriate persons to vindicate the public interest in antitrust enforcement because they were not as directly affected as wheat exporters.  As discussed in detail above, Plaintiffs were the intended targets of Defendants' conduct and were directly affected by the foreclosure of the Iraqi market.  The fact that wheat exporters could theoretically also have a claim does not divest Plaintiffs of antitrust standing, particularly where, as discussed below, exporters would have a lesser claim.  *Crimpers,*

---

[11]    None of the seller-side cases cited by Defendants support their argument that this case should be dismissed because Plaintiffs' injuries are attenuated and speculative.  In *Reading Indus., Inc. v. Kennecott Copper Corp*., 631 F.2d 10, 13 (2d Cir. 1980), the court found at the summary judgment stage, plaintiff's injury was too speculative and attenuated because the actions of innumerable individual decision-makers must be reconstructed.  The court's opinion in *Ocean View Capital, Inc. v. Sumitomo Corp. of Am*., No. 98 CIV. 4067, 1999 WL 1201701, at *4 (S.D.N.Y. Dec. 15, 1999) was subsequently reversed by the transferee court.  *See In re Copper Antitrust Litig*., No. 99-C-621-C, 2000 WL 34230131, at *15 (W.D. Wis. July 12, 2000) (rejecting defendants' reliance on *Ocean View*); *In re Copper Antitrust Litig*., 98 F. Supp.2d 1039, 1053 (W.D. Wis. 2000) (denying motion to dismiss for lack of antitrust standing under principles espoused in *Sanner*).  In *de Atucha v. Commodity Exch., Inc*., 608 F. Supp. 510, 516 (S.D.N.Y. 1985), the court concluded that foreigners who trade exclusively on a foreign exchange do not have standing under U.S. antitrust or commodities law.  *Id*.

724 F.2d at 293 (existence of theoretically more "direct" parties will not deprive plaintiffs of jurisdiction if existing plaintiffs are favorable under *AGC* factors); *Westchester Radiological*, 659 F. Supp. at 137 (same); *Sanner*, 62 F.3d at 918 (same).

A wheat exporter likely would be in an inferior position to bring antitrust claims here. When an exporter bids on a wheat tender, it does not actually possess the wheat that it offers to sell.  Instead, it merely offers a price at which it believes it could procure and deliver the wheat. An exporter may profit or lose money on any contract, depending on whether and how much wheat prices have gone up between the bid on the tender and the actual purchase of the wheat.[12] Thus, unlike American wheat farmers, who actually manifested direct "out of pocket" losses when they sold their wheat at depressed prices, any injuries claimed by the exporter would be highly speculative, *i.e.*, the profits it would have made had it been able to procure and deliver the wheat for less than its winning bid price.   Such speculative damage models are highly disfavored in antitrust cases.  *Howard Hess Dental Labs Inc. v. Dentsply Intern'l Inc.*, 424 F.3d 363, 374-375 (3d Cir. 2005).[13]

Not only would an exporter's injuries be more difficult to prove, they would likely be substantially less than the injuries suffered by Plaintiffs.  Where a proposed class has a larger potential damages claim than a theoretical competing plaintiff or class, the second *AGC* factor (motivating self-interest) favors conveyance of standing to the proposed class.  *See, e.g.,*

---

[12]     Plaintiffs proffer these general facts about exporters as common knowledge.  However, to the extent that the Court deems these facts outside of common knowledge, the Court should not dismiss Plaintiffs' complaint on the basis of Defendants' argument regarding exporters until the parties have had an opportunity to build a record.

[13]     Moreover, certifying a class of exporters under such a damages theory would be virtually impossible even if there were sufficient numerosity to otherwise maintain such a class.  Lack of a class device would further reduce both the incentives for exporters to bring suit and the likelihood of proving damages.  *See id.* at 375 ( "[R]equiring the complex netting associated with lost profits [would] practically deny recovery" for antitrust injuries).

*Westchester Radiological*, 659 F. Supp. at 137 (upholding antitrust standing, in part, because "the impact of [Defendant's] alleged conduct on the … other potential plaintiffs identified by [Defendant], may indeed not be sufficiently injurious … for them to undertake the time and expense of litigation.").[14]

> **4.    Because Damages Sought By Plaintiffs Are Not Duplicative Of Those Belonging To Any Other Potential Claimants, There Will Be No Difficulty With Apportionment**

The final factors for determining standing under *AGC* are the risk of duplicative recovery and the complexity in apportioning damages.  459 U.S. at 535.  This factor derives from the proscription, first announced in *Illinois Brick Co. v. Illinois*, 431 U.S, 720 (1977), against cases brought by indirect purchasers of goods that were subjected to price fixing under the theory that some of those supracompetitive prices paid by direct purchasers were "passed on" to them. However, the *Illinois Brick* rule is limited to those cases where there is a risk of duplicative

---

[14]    Defendants, acknowledging that *AGC* directs courts to consider whether Plaintiffs' self interests would "motivate them to vindicate the public interest in antitrust enforcement," *AGC,* 459 U.S. at 542, contend it is "ludicrous to suggest" that Plaintiffs' claims here could vindicate legitimate public interests.  Def. Mot. at 12.  Plaintiffs, however, are not the first to suggest that there is a strong public interest in holding AWB accountable for injuring American wheat farmers.  *See, e.g.,* "Murray Calls for Investigation of Australian Wheat Board Sales To Iraq, News From U.S. Senator Patty Murray, October 31, 2003, available at http://murray.senate.gov/ news.cfm?id=214406 ("The ability to U.S. wheat producers to compete in a competitive global marketplace requires our vigilance over unfair practices by any other nation."; *see* "Coleman To Introduce Bill To Investigate Potential Harm of Australian Wheat Board On U.S. Farmers", December 5, 2006 ("First and foremost, we need to analyze whether the deceitful practices of AWB may have injured U.S. farmers.  If we find that they have, we need to focus our efforts on making our farmers whole again."), available at http://coleman.senate.gov/index.cfm?FuseAction =PressReleases.Detail&PressRelease_id=1156; "Harkin Takes Case of U.S. Wheat Growers to Bush Administration," April 3, 2006 letter from U.S. Senators Harkin, Salazar, Conrad, Baucus and Dorgan to The Honorable Robert J. Portman ("[I]t is now evident that AWB maintained its hammerlock on wheat sales to Iraq during this period in large part by means of these kickbacks. The price of maintaining AWB's market share fell on the Iraqi people…but also on competing wheat sellers, including those in the United States."), available at http://harkin.senate.gov/ documents/pdf/4-3auswheat.pdf.  Plaintiffs proffer these statements as verbal acts, not for their veracity.

recovery for prospective claimants or difficult apportionment between direct and indirect actions. *See California v. ARC Am. Corp.*, 490 U.S. 93, 102 n.6 (1989). Here, Plaintiffs are not "indirect purchasers" of any goods and Plaintiffs' "out of pocket" injuries do not overlap with the theoretical "lost profits" of wheat exporters whatsoever. Indeed, there is no reason to believe that the lower U.S. wheat prices, which form the entire basis of Plaintiffs' injuries, negatively affected exporters whatsoever. Thus, there is no difficulty in disentangling Plaintiffs' damages from other damages resulting from Defendants' conduct. *See Crimpers*, 724 F.2d at 297; *Sanner*, 62 F.3d at 930.[15]

## IV.    PLAINTIFFS PROPERLY STATE A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. To state a claim under Section 1, plaintiffs must allege: (1) concerted action; (2) by two or more persons; (3) that unreasonably restrains interstate or foreign trade or commerce. *International Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir. 1987), *cert. denied*, 482 U.S. 915 (1987);

---

[15]    The only case relied on by Defendants for the proposition that there would be difficulty in apportioning damages in this case is easily distinguishable on the facts. *See Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 294 (2d Cir. 2006). In that seller-side case, the plaintiff, an internet merchant, alleged that MasterCard's policy of preventing its member banks from issuing payment cards other than MasterCard or Visa partially foreclosed the market to competing cards such as American Express or Discovery. *Id.* at 288. As a result, competition was weakened and MasterCard was free to impose higher interchange fees than it otherwise could have. *Id.* The plaintiff alleged that it was harmed by this lessened competition. *Id.* Because the plaintiff's injury was derivative of the excluded card services, the court found that it would be virtually impossible to apportion damages between American Express and Discover, and the millions of merchants like the plaintiff that might have been indirectly harmed by MasterCard's policy. *Id.* Unlike *Paycom*, Plaintiffs' damages here would not overlap with any other theoretical plaintiffs. When Plaintiffs were left without an Iraqi market for their wheat and had to sell their wheat at depressed prices, exporters did not share in those losses.

*Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1047 (S.D.N.Y. 1993); *Broadcast Music, Inc. v. Hearst/ABC Viacom Entm't Servs.*, 746 F. Supp. 320, 325 (S.D.N.Y. 1990).

### A. Plaintiffs Have Alleged A Plausible Conspiracy.

Citing *Twombly*, Defendants argue that Plaintiffs fail to state a claim because their Section 1 pleadings are "cursory and devoid of any factual support."[16] Def. Mot. at 14. Defendants' argument, however, is simply without merit. Plaintiffs allege an overarching combination and conspiracy whereby AWB agreed to pay kickbacks to the Iraqi Government and the Iraqi Government, in turn, agreed to purchase all of its wheat needs from AWB, thereby foreclosing U.S.-grown wheat from the market. Compl. at ¶¶ 1, 2, 69. In support, Plaintiffs allege that, prior to the kickback scheme, U.S.-grown wheat accounted for a significant percentage of Iraq's wheat purchases. *Id.* at ¶ 62; *see also* Cole Report Exh. 1495 (noting 15% market share by U.S.). As soon as the kickback scheme began, however, Iraq's purchases from the U.S. ceased, whereas Iraq's purchases from AWB increased to 98% of its total wheat purchases. *Id.* at ¶ 91.

These allegations, taken as true, properly give rise to the inference of a plausible combination and conspiracy between AWB and the Iraqi Government, and thus, are sufficient for purposes of a motion to dismiss.[17] *Twombly*, 127 S. Ct. at 1974 (a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face."); *see also Associated Radio Serv. Co. v. Page Airways*, 624 F.2d 1342, 1353 (5th Cir. 1980), *cert. denied*, 450 U.S. 1030

---

[16]     In so arguing, Defendants erroneously focus on the paragraph in the Complaint relating to the "Counts" and wholly ignore the detailed factual allegations. However, "[i]n considering [a] motion to dismiss, the Complaint must be read as a whole." *ITT World Commc'ns Inc. v. Western Union Tel. Co.*, 524 F. Supp. 702, 704 (S.D.N.Y. 1981).

[17]     Contrary to Defendants' assertion, Plaintiffs need not allege an express agreement between the Iraqi Government and AWB that the Iraqi Government would not purchase U.S.-grown wheat. *Twombly*, 127 S. Ct. at 1964 (recognizing that an agreement under Section 1 may be either tacit or express).

(1981) (foreign bribery part of pattern of improper conduct that constituted a violation of Section

1), *cert. denied*, 450 U.S. 1030 (1981); *American Health*, 1994 WL 314313 at *11-12 (denying

motion to dismiss Section 1 claim based upon bribery); *City of Atlanta v. Ashland-Warren, Inc.*,

No. C 81-106A, 1981 WL 2187, at *3 (N.D. Ga. Aug. 20, 1981) (in denying motion to dismiss,

court found allegation that bribery of official created a conspiracy to supplant competition

sufficient to establish an actionable Section 1 claim).[18]

It does not matter that the IGB imposed the inland transportation fees.  The defense of

sovereign compulsion is available only if Iraqi law compelled the payment of bribes.  *Trugman-*

*Nash Inc. v. New Zealand Dairy Bd.*, 954 F. Supp. 733, 735 (S.D.N.Y. 1997); *see also* Pierre

Vogelenzang, Note, *Foreign Sovereign Compulsion in American Antitrust Law*, 33 Stan. L. Rev.

131, 153 (1980) ("Such a defense should be available only if the defendant's employees are

subjected to such immediate physical threats that defendant cannot be blamed for giving in, or if

the actual economic loss that threatens defendant as a consequence of failing to obey the foreign

decree objectively outweighs the interest of the United States in enforcing its antitrust laws.").

Defendants have not and cannot demonstrate that their bribery payments were required by law.

*See* Section IX.1.C., *infra*.

---

[18]     The allegations in Plaintiffs' Complaint are far different from the inadequate allegations
in *Twombly*.  In *Twombly*, the complaint "alleged independent non-competitive conduct, [but] it
failed to allege any facts compelling the inference that this conduct arose from an agreement
among the defendants not to compete."  *Behrend v. Comcast Corp.*, Nos. 03-6604, 07-218, 07-
219, 2007 WL 2221415, at *5 (E.D. Pa. Aug. 1, 2007).  Similarly, in *Kahn v. Ibiquity Digital
Corp.*, No. 06 Civ. 1536 (NRB), 2006 WL 3592366 (S.D.N.Y. Dec. 7, 2006), also relied upon by
Defendants (Def. Mot. at 13), "beyond the pleadings barred by the *Noerr-Pennington* doctrine,
plaintiffs only offer[ed] bare conclusions and allegations 'based on information and belief'."  *Id.*
at *5.  Here on the other hand, in addition to the detailed factual allegations set forth in the
Complaint, Plaintiffs cite to and incorporate by reference the Volcker Report and the Cole
Report, both substantiating the bribery scheme alleged herein.  Thus, Plaintiffs' conspiracy
allegations rise far above the "plausible" level.

Finally, Defendants' argument that, because of the political sentiments between 1999 and 2003, Iraq would not have bought wheat from the U.S. anyway, is not only belied by contemporaneous documents, but is also a merits argument that cannot be considered at this stage of the litigation. *See Sanner*, 62 F.3d at 926 (the court must "accept Plaintiffs' causal allegations as true, ultimately leaving for later an allocation of the precise impact that each of the market forces had on the price of soybeans").

### B.    Plaintiffs Plead Harm to Competition in the Relevant Market

Plaintiffs define the relevant geographic market as Iraq and the relevant product market as the market for bread wheat *imported* by Iraq.[19]  Compl. at ¶¶ 40, 41.  Plaintiffs could not have alleged a more clear harm to competition in the relevant market:  as a result of Defendants' conspiracy, AWB's market share went from 73% to 98% in the Iraqi market, and that the market share of U.S.-grown wheat went from 6% to 0%.  Compl. at ¶¶ 63, 67, 91.  The market alleged here is a monopsony.  Injury to competition can occur by monopsony just as it may result from monopoly.  *In re NCAA I-A Walk-On Football Players Litig.*, 398 F. Supp.2d 1144, 1151 (W.D. Wash. 2005) (citing *National Macaroni,* 345 F.2d at 426).  Since Plaintiffs' allege harm to the input market, the have properly alleged harm to competition.  *In re NCAA I-A Walk-On Football*

---

[19]    Defendants imply that Plaintiffs have improperly defined the relevant geographic market as Iraq, rather than the world.  Other cases have defined the relevant market as Plaintiffs have done.  *See, e.g., Amarel*, 102 F.3d at 1503 (alleging bribery to foreclose export market to Korea); *Daishowa*, 1982 WL 1850 at *5-6 (alleging foreclosure of export market to Japan); *United States v. Learner*, 215 F. Supp. 603, 604-05 (D. Haw. 1963) (same).  Nevertheless, Defendants' attacks on Plaintiffs' geographic market definition are inappropriate at this stage of the litigation.  *Todd*, 275 F.3d at 199-200 (market definition is a deeply fact-intensive inquiry); *Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 55 (1st Cir. 2003) (issue of what geographic area constituted relevant market presented a question of fact which could not be decided on a motion to dismiss).

*Players Litig.*, 398 F. Supp.2d 1144, 1151 (W.D. Wash. 2005) (denying motion for judgment on

the pleadings).[20]


None of the seller-side conspiracy cases cited by Defendants support the proposition that

Plaintiffs have failed to plead harm to competition.  In *Virgin Atl. Airways Ltd. v. British Airways*

*PLC*, 257 F.3d 256, 264 (2d Cir. 2001) and *Tops Mkts, Inc. v. Quality Mkts, Inc*., 142 F.3d 90, 96

(2d Cir. 1998), the Second Circuit was considering whether the plaintiffs had proven a Section 1

violation at the summary judgment stage, not whether they had sufficiently stated a claim for

Section 1.  In *Floors-N-More, Inc. v. Freight Liquidators, Inc*., 142 F.Supp.2d 496, 501

(S.D.N.Y. 2001), the district court noted that the plaintiffs failed to "provide a single fact" in

support of their conspiracy allegation.  And in *George Haug Co. v. Rolls Royce Motor Cars, Inc*.,

148 F.3d 136, 139-40 (2d Cir. 1998), the court found that, as an authorized dealer, the plaintiff's

claims of competition to competition were insufficient since it had not pled any facts which

allowed an inference that plaintiff's termination resulted in market concentration, a reduced the

number of outlets, or any other harm to competition.  *Id.*  Here, on the other hand, Plaintiffs have

---

[20]    Defendants argue that, because Plaintiffs failed to provide any allegations about price
increases in Iraq as a result of the conspiracy, Plaintiffs have failed to adequately plead harm to
competition.  Def. Mot. at 9.  Again, however, Defendants fail to appreciate that this case
involves a buyer-side conspiracy.  In such cases, the effects, or lack thereof, on consumers are
irrelevant.  *Telcor Commc'ns, Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1133 n.4 (10th
Cir. 2002) ("The Supreme Court's treatment of monopsony cases strongly suggest that suppliers
. . . are protected by antitrust laws even when the anticompetitive activity does not harm end
users.") (citing cases); *Reazin*, 899 F.2d at 962  (rejecting a monopsony defendant's argument
that injury to sellers without injury to end-users is not cognizable antitrust injury); s*ee also Todd*,
275 F.3d at 214 ("In the traditional oligopoly case, horizontal coordination may inflate prices to
supracompetitive levels.  In an oligopsony, the risk is that buyers will collude to depress prices,
causing harm to sellers."); *Sony Elecs., Inc v. Soundview Techs., Inc.*, 157 F. Supp.2d 180, 186
(D. Conn. 2001) (holding that, in buyers-side cases, there is no need to explain the negative
effects, if any, on end consumers, while noting there are likely to be negative social welfare
consequences of such anticompetitive activity).

set forth detailed conspiracy allegations and have alleged the percentage of market share

absorbed by AWB as a result of ousting U.S.-grown wheat from the market.  Compl. at ¶¶ 68-91.

## V.    PLAINTIFFS PROPERLY STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT

### A.    Plaintiffs Have Properly Stated A Claim For Monopolization

"To establish a claim for monopolization, a plaintiff must show (1) the possession of

monopoly power in the relevant market and (2) the willful acquisition or maintenance of that

power as distinguished from growth or development as a consequence of a superior product,

business acumen, or historic accident."  *Heerwagen v. Clear Channel Comm'ns*, 435 F.3d 219,

226 (2d Cir. 2006) (citations omitted).  Despite the extensive and specific allegations made by

Plaintiffs, AWB argues that Plaintiffs fail to satisfy either of these elements.  AWB's argument

rests on the following premises:  (a) bribery did not give AWB the power to exclude

competition, nor can it qualify as anticompetitive conduct, because it was the IGB, not AWB,

that had the power to choose wheat vendors for Iraq; and (b) excepting the allegations of bribery,

Plaintiffs have not pled sufficient additional allegations that AWB had monopoly power or

willfully sought such power.  Both premises are false.

### 1.    Plaintiffs Have Adequately Alleged that AWB Held Monopoly Power.

Monopoly power "may be proven directly by evidence of …the exclusion of competition,

or it may be inferred from one firm's large percentage share of the relevant market."

*Heerwagen*, 435 F.3d at 227 (citations omitted); *see also Geneva Pharms. Tech. Corp. v. Barr

Labs., Inc.*, 386 F.3d 485, 500 (2d Cir. 2004).  AWB argues that, because the IGB ultimately had

the authority to choose wheat vendors for Iraq, it necessarily lacked the power to exclude

competition from the Iraqi wheat market.  Def. Mot. at 17.

AWB's argument is without merit. A plaintiff may demonstrate monopoly power by alleging that a defendant "has engaged in improper conduct that has or is likely to have the effect of … excluding competition, thus creating or maintaining market power." *Heerwagen*, 435 F.3d at 226-27 (quoting *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 108 (2d Cir. 2002)). This is precisely what Plaintiffs have alleged. According to the complaint, the IGB made it clear to AWB that, if AWB paid bribes to the Iraqi Government, AWB could "secure its monopoly" in the relevant market and avoid losing market share. Compl. at ¶ 72. Thus, in accordance with *Heerwagen*, Plaintiffs have pled an improper act (the payment of bribes) which was, at the very least, *likely* to have the effect of excluding competition.[21]

Monopoly power may also be inferred from "one firm's large percentage share of the relevant market." *Heerwagen*, 435 F.3d at 227; *Geneva Pharms.*, 386 F.3d at 500. Plaintiffs have stated allegations sufficient to demonstrate AWB's monopoly power based on market share. Plaintiffs allege that, in the eight years preceding the Class period, AWB held a monopoly share of the Relevant Market, reaching as high as 73%. Compl. at ¶ 63. This allegation, standing alone, is significant evidence that AWB was a monopolist prior to the beginning of the Class Period. *See Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981), *cert. denied*, 454 U.S. 968 (1981) (stating that "a [market] share above 70% is usually strong evidence of monopoly power"). Plaintiffs bolster this allegation by also

---

[21]    Contrary to AWB's assertion, bribery may support a claim for a Section 2 violation. *See Doron Precision Sys. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 185 (S.D.N.Y. 2006); *Interstate Props. v. Pyramid Co. of Utica*, 586 F. Supp. 1160, 1162-63 (S.D.N.Y. 1984); *see also Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1354-56 (5th Cir. 1980) (finding that the payment of bribes was evidence of exclusionary conduct for the purpose of stating a claim under Section 2 of the Sherman Act); *American Health Sys., Inc. v. Visiting Nurse Ass'n of Greater Philadelphia*, No. CIV.A. 93-542, 1994 WL 314313, at *12 (E.D. Pa. June 29, 1994) (denying motion to dismiss where plaintiffs alleged monopolization premised on illegal kickbacks and commercial bribery).

asserting that AWB's share of the relevant market reached 98% during the Class Period.  Compl. at ¶ 91.  Under *Broadway Delivery*, this near-total market share entitles Plaintiffs to a strong inference that AWB possessed monopoly power.[22]  And, as noted above, AWB's own internal documents, attached as exhibits to the Cole Report, concede its dominance in the Iraqi market.

In sum, Plaintiffs have pled facts which demonstrate that AWB had near-total market share and that it engaged in improper conduct that was both likely to and actually did exclude competition from the relevant market.[23]

> ### 2.  Plaintiffs Have Alleged in That AWB Willfully Sought to Maintain Monopoly Power.

In addition to demonstrating monopoly power, a plaintiff seeking to state a claim for monopolization must also show that the defendant's acquisition or maintenance of this power was willful and not "a consequence of a superior product, business acumen, or historic accident." *Heerwagen*, 435 F.3d at 226 (citations omitted); *see also Verizon Comm'ns. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (stating that possession of monopoly power is unlawful where "it is accompanied by an element of anticompetitive conduct").

---

[22]    AWB's reliance on *Tops Markets* is misplaced.  Therein, the court stated that high market share did not necessarily permit an inference of monopoly power if there was "no other evidence…[which] supports the conclusion that [defendant] can control prices or exclude competition" at the summary judgment stage.  142 F.3d at 98-99.  AWB's reliance on *Oahu Gas Serv., Inc. v. Pacific  Res. Inc.*, 838 F.2d 230, 366 (9th Cir. 1988) is similarly misplaced as the court therein was reviewing a jury verdict.  At the motion to dismiss stage, however, the Court must construe all reasonable inferences in Plaintiffs' favor.  *ATSI*, 493 F.3d at 97.

[23]    Defendants, in a footnote, also argue that the UN exercised control over who could participate in the Iraqi wheat market and, thus, AWB necessarily lacked the ability to exclude competition.  Def. Mot. at 18 n.24.  This argument rests on the allegations contained in paragraph 81 of the Complaint regarding the UN's right of approval as to the AWB/IGB wheat contracts.  However, in paragraph 81, Plaintiffs allege that, because the money paid in bribes by AWB was hidden in the contract price of wheat, the UN was unable to detect the illegal fees levied by the IGB and therefore approved these contracts "without question."  Compl. at ¶ 81.  Thus, because of the deception engaged in by AWB and the IGB, the UN had no basis for rejecting the AWB/IGB wheat contracts and, therefore, had no real control over participation in the Iraqi wheat market.

Plaintiffs make it abundantly clear that AWB's maintenance of its monopoly power was due to its willful payment of bribes to the Iraqi Government – a fact that AWB itself recognized – and certainly was not due to a superior product, business acumen, or historic accident. Plaintiffs describe in detail how and when AWB became aware that the IGB wanted bribes to be paid to the Iraqi Government in connection with wheat tenders. *See* Compl. at ¶¶ 70-72. Plaintiffs also specifically allege that the IGB informed AWB that the payment of bribes was necessary if AWB wanted to retain its monopoly in the relevant market. *Id.* at ¶ 72. Finally, Plaintiffs allege that AWB willfully paid bribes to the Iraqi Government for the purpose of maintaining a monopoly position in the relevant market. *Id.* at ¶ 73. Again, AWB's own documents, attached as exhibits to the Cole Report, support this contention.

AWB's claim of insufficient pleading rests, however, on its previously-discussed conclusion that the payment of bribes "can have had no anticompetitive effects" and therefore do not support Plaintiffs' Section 2 claim. Def. Mot. at 19. As set forth in the preceding section, however, this argument is contrary to the law.

**B.    Plaintiffs Have Properly Stated A Claim For Conspiracy To Monopolize**

To state a claim for conspiracy to monopolize, [a plaintiff] must allege that there was (1) concerted action (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize. *Walsh Trucking Co.*, 812 F.2d at 795. AWB summarily argues that Plaintiffs' Complaint lacks sufficient specificity to state a claim for conspiracy to monopolize. Def. Mot. at 20. Again, Defendants ignore the detailed allegations in Plaintiffs' Complaint.

**1.    AWB Engaged in Concerted Action With Other Conspirators in Furtherance of the Conspiracy.**

As discussed above, the Complaint alleges in detail the facts relating to AWB's agreement with the IGB to pay bribes, as well as the motive for the bribes. *See* Factual

Background, *supra*. These allegations standing alone demonstrate concerted action by AWB and the IGB, as well as the commission of overt acts in furtherance of the conspiracy's objective: AWB's maintenance of its monopoly in the relevant market. Plaintiffs plead much more, however. The Complaint goes into great detail regarding the methods agreed to and carried out by AWB and the IGB, through which bribes would be paid to the Iraqi Government and concealed from regulators– all of which were concerted acts taken in furtherance of the conspiracy. *See, e.g.,* Compl. at ¶¶ 74- 76, 82, 85. The IGB was not the only conspirator with whom AWB acted, however. Plaintiffs further allege that AWB acted in concert with several intermediaries to make, and keep secret, illegal payments to the Iraqi Government. *Id.* at ¶¶ 86, 87. These allegations demonstrate that AWB acted in concert with a number of conspirators to commit acts in furtherance of the conspiracy.

> **2.    AWB and its Conspirators Acted With the Specific Intent to Maintain AWB's Monopoly.**

Plaintiffs' allegations make clear that both AWB and the IGB understood that the purpose of AWB's payment of bribes to the Iraqi Government was to "secure [AWB's] monopoly and avoid losing its market share in Iraq." *Id.* at ¶ 72. Plaintiffs also allege that all of the intermediaries, which assisted in making and keeping secret AWB's illegal payments to the Iraqi Government, "knew of the illegality of the monetary transfers and thus knowingly and willingly joined the conspiracy. Each was paid a fee or commission for its services and thus had a pecuniary interest in the conspiracy." *Id.* at ¶ 89. The findings of and exhibits to the Cole Report, which are extensively cited in the Complaint and may be considered on this motion, provide still more detail. *See* Factual Background, *supra*.

Thus, Plaintiffs have adequately alleged not only that AWB and its conspirators acted in concert to commit overt acts in furtherance of the conspiracy, but that each of the conspirators

acted with the specific intent of furthering the conspiracy's illegal purpose of maintaining

AWB's monopoly in the relevant market. Therefore, Plaintiffs have properly stated a claim for

conspiracy to monopolize.

## VI.    PLAINTIFFS PROPERLY STATE A CLAIM UNDER SECTION 3 OF THE CLAYTON ACT

Remarkably, AWB also argues that Plaintiffs have failed to plead facts with sufficient

specificity to state a claim for violation of Section 3 of the Clayton Act (15 U.S.C. § 14).

Section 3 of the Clayton Act makes it unlawful to sell goods on the "condition, agreement, or

understanding" that the purchaser refrains from dealing with competitors of the seller where the

effect "may be to substantially lessen competition or tend to create a monopoly in any line of

commerce." 15 U.S.C. § 14.

The Supreme Court has held that a contract does not require specific terms of exclusivity

in order to qualify as an exclusive dealing contract under § 3, as long as the *practical effect of the

agreement is to exclude competitors*. *Tampa Elec. Co. v. National Coal Co.*, 365 U.S. 320, 329-

30 (1961); *see also Tire Sales Corp. v. Cities Serv. Oil Co.*, 637 F.2d 467, 474 (7th Cir. 1980);

*McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332, 338 (4th Cir. 1959). As the

preceding sections makes clear, the Complaint alleges that AWB's direct involvement, consent

and acquiescence to this illegal scheme was an attempt, ultimately successful, to gain

"monopolistic" power by foreclosing U.S.-grown wheat from Iraq. This exclusivity was

purchased at the price of over $224 million in bribes to Iraq. Compl. at ¶90. This violated

Section 3 of the Clayton Act.

A contract will be held violative of Section 3 of the Clayton Act if the Court finds it

probable that performance of the contract will foreclose competition in a substantial share of the

line of commerce affected. *Tampa Electric*, 365 U.S. at 327-28. The Complaint specifically

alleges that, "AWB has entered into agreements with the IGB for the sale of wheat pursuant to which AWB has conditioned the payment of bribes on the IGB's agreement to refrain from purchasing wheat from other suppliers . . ." Compl. at ¶ 120. Further, Plaintiffs allege that AWB's motivation in conspiring with the Hussein regime was to achieve and maintain a monopoly on wheat sales. *Id.* at ¶ 69. Then, during the 1999-2000 season AWB sold a record 2.4 mmt of wheat to Iraq which accounted for 98% of the wheat supplied to Iraq. *Id.* at ¶ 91. The Complaint not only alleges that AWB attempted to and successfully gained a monopoly via its exclusive dealing agreement with Iraq but alleges that it used intermediaries to avoid detection of the illegal scheme. *Id.* at ¶¶ 82, 85-89. The aforementioned conduct is exactly what Section 3 of the Clayton Act proscribes.

Defendants also argue that Plaintiffs fail to adequately allege any anticompetitive effects from the agreements between AWB and IGB. Def. Mot. at 22. Therein, Defendants' selectively quote from the Complaint to imply that Plaintiffs do not allege that the agreements between AWB and IGB had any effect on who was awarded wheat contracts or at what price. *Id.* citing Compl. at ¶ 77. However, a plain reading of paragraphs 76 and 77 of the Complaint in context reveals that Plaintiffs were merely describing how the bogus "inland transportation fees" were billed and accounted for so as not to affect AWB's bottom line or the price previously agreed between AWB and the IGB after they had already agreed to their exclusive dealing arrangement. Plaintiffs' complaint *cannot* be fairly read to allege that the foreclosure of U.S. wheat did not affect the prices at which Iraq purchased its wheat or the entities who won those contracts. *See,*

*e.g.,* Compl. at ¶ 92 (alleging that, absent market foreclosure, U.S. wheat producers would have won contracts).[24]

Because Plaintiffs have alleged both an agreement that effectively excluded competitors and anticompetitive effects flowing from that agreement, their Section 3 claim is adequately pled.

## VII.    PLAINTIFFS PROPERLY STATE A CLAIM UNDER SECTION 2 (C) OF THE ROBINSON-PATMAN ACT

Section 2(c) of the Robinson-Patman act provides, in pertinent part, that "[i]t shall be unlawful for any person engaged in commerce … to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation … except for services rendered in connection with the sale or purchaser of goods, wares or merchandise …"  15 U.S.C. § 13(c).  The *sine qua non* of a Section 2(c) violation is an improper payment for purposes other than services actually rendered.  *Blue Tree*, 369 F.3d at 223.  Plaintiffs' allegations of kickbacks and bribery state a proper claim under Section 2(c).

### A.    Commercial Bribery Is Actionable Under Section 2(c)

Contrary to Defendants' argument, commercial bribery is actionable under the Robinson-Patman Act.  Every circuit to have confronted the issue has concluded that Section 2(c) encompasses commercial bribery.  *See 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732 (3d Cir. 2004); *Stephen Jay Photography, Ltd. v. Olan Mills*, 903 F.2d 988 (4th Cir. 1990); *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266 (5th Cir. 1979); *Fitch v. Kentucky-Tennessee Light & Power Co.*, 136 F.2d 12 (6th Cir. 1943); *Grace v. E.J. Kozin Co.*,

---

[24] Defendants also incorporate their contentions that Plaintiffs are required to allege damages to Iraqi consumers and are required to have contracted directly with Iraq to have standing.  For the reasons stated in Sections II and III, *supra*, these arguments are unavailing.

538 F.2d 170, 173 (7th Cir. 1976); *Harris v. Duty Free Shoppers Ltd. P'ship*, 940 F.2d 1272, 1274 (9th Cir. 1991).[25]

While the Second Circuit has left open the question of whether commercial bribery falls within the ambit of Section 2(c) (*see Blue Tree Hotels*, 369 F.3d at 219; *Monsieur Touton Selection v. Future Brands, LLCS*, No. 06 Civ. 1124, 2006 WL 2192790, *4 (S.D.N.Y. Aug. 1, 2006)), district courts in this Circuit have concluded that it does. *See, e.g., Philip Morris, Inc. v. Grinnell Lithographic Co., Inc.*, 67 F. Supp.2d 126, 130-31 (E.D.N.Y. 1999); *Hansel 'N Gretel Brand, Inc. v. Savitsky*, No. 94 Civ. 4027, 1997 WL 543088, at *7 (S.D.N.Y. Sept. 3, 1997) ("commercial bribery falls generally within the ambit of this section"), *rev'd on other grounds by Blue Tree Hotels*; *Federal Paper Bd. Co., Inc. v. Amata*, 693 F. Supp. 1376, 1385-86 (D. Conn. 1988).[26] Defendants have presented no compelling reason to suggest that the Second Circuit would reject the reasoning of the United States Supreme Court and the six Courts of Appeals that have ruled Section 2(c) encompasses commercial bribery.

### B.    Plaintiffs Allege Sufficient Facts to Support Their Section 2(c) Claim

Plaintiffs have alleged that AWB paid bribes to the Iraqi Government directly and to agents of the Iraqi Government (Compl. at ¶¶ 15-18, 69, 73, 83, 86), that the purpose of the bribes was influence the purchase of wheat from AWB in order to exclude U.S.-grown wheat

---

[25]    Although the Supreme Court has never decided a Section 2(c) commercial bribery case, it has noted in dicta that Section 2(c) encompasses commercial bribery. *California Motor Transp. Co., v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) ("bribery of a public official may constitute a violation of § 2(c)); *Federal Trade Comm'n v. Henry Broch & Co*., 363 U.S. 166, 169 n.6 (1960) ("the debates on the bill show clearly that § 2(c) was intended to proscribe other practices such as the 'bribing' of a seller's broker by the buyer").

[26]    *But see Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*, 88 F. Supp.2d 133, 140 (S.D.N.Y. 2000) (2(c) applies only to brokerage fees). Defendants rely on this case, which presents no meaningful analysis as to why Section 2(c) does not apply to commercial bribery. This holding is in conflict with pronouncements of the Supreme Court and the holdings of the six Courts of Appeals to have addressed the issue.

from the market (*id*. at ¶¶ 2, 69, 73), and that these payments were not made in exchange for any services rendered in connection with the sale of wheat (*id*. at ¶83, 86). These allegations have been discussed in detail herein and, despite Defendants' characterizations to the contrary, go well beyond boilerplate and conclusory pleadings. Plaintiffs have therefore stated a claim under Section 2(c). *See, e.g., United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, No. 00 CIV 3367, 2001 WL 1607039 (S.D.N.Y. Dec. 17, 2001) (denying motion to dismiss § 2(c) claim where bribery claims were sufficiently detailed); *In re Warfarin Sodium Antitrust Litig.*, No. MDL 98-1232, 1998 WL 883469, at *16 (D. Del. Dec. 7, 1998) (same), *rev'd in part on other grounds*, 214 F.3d 395.[27]

### C.    The Payments Alleged By Plaintiffs Constitute Commercial Bribery Under Section 2(c)

Defendants also argue that dismissal is appropriate because the payments alleged by Plaintiffs do constitute commercial bribery under Section 2(c).[28] However, Defendants'

---

[27]    The only case cited by Defendants in support of their argument, *Monsier Touton*, simply stands for the proposition that "a plaintiff must allege at a minimum that payments were made with the intent to influence improperly the conduct of another by bestowing a benefit." 2006 WL 2192790 at *4. This is precisely included among Plaintiffs' allegations: that AWB bribed the Iraqi Government by funneling funds from the UN account in order to influence the IGB to purchase all of its wheat from AWB. Compl. at ¶¶ 2, 69, 73. Thus, *Monsier Touton* does not support dismissal of Plaintiffs' Section 2(c) claim. Unlike Plaintiffs' Complaint, the complaint in *Monsier Touton* contained only a page and a half of factual allegations. In addition to incorporating these bare factual allegations, the plaintiffs' Robinson-Patman claim simply stated, "The Defendants have conspired among themselves and others unnamed to discriminate against the Plaintiffs as to price, availability, quantity and other terms so as to eliminate the Plaintiff as a competitor in the relevant market in violation of 15 U.S.C. 13(a) *et seq.*" Dkt #1 (Complaint) at 4-5, 11, *Monsieur Touton Selection, Ltd. v. Guture Brands, LLC et al.*, No. 06 Civ. 1124 (available on PACER). Thus, Defendants' reliance on this case for the proposition that the detailed factual allegations in the instant complaint are insufficient is unavailing.

[28]    Defendants' reliance on *Blue Tree* and the New York Penal Code for this proposition is misplaced. While the court in *Blue Tree* cited to the Penal Code definition of commercial bribery, it did not hold, as Defendants suggest, that Section 2(c) incorporates that definition in all respects. 369 F.3d at 222. Rather, the court referenced the Penal Code to make the point that improper intent to influence is a crucial element of bribery and therefore Section 2(c). *Id.*

argument that payments must be made to the purchaser's agent in order to be actionable under Section 2(c) is simply incorrect.[29]  Not only do Defendants ignore the plain language of the statute, they ignore the express pronouncement of the Second Circuit in *Blue Tree*, the very case upon which they rely.  *See* 15 U.S.C. § 13(c) ("It shall be unlawful for any person … to pay …anything of value … *either* to the other party to such transaction or ([that party's] agent …"); 369 F.3d at n.9 ("As we have stated, the proscriptions of § 2(c) apply regardless of whether the improper payment is made to the purchaser or its agent."); *see also Biddle Purchasing Co. v. Federal Trade Comm'n*, 96 F.2d 687, 691 (2d Cir. 1938) ("It may not be said that payments to buyers are in any different category than those to agents or those who act for or under the control of the buyers.").

Defendants' argument that payments cannot constitute commercial bribery under Section 2(c) if they are "required" by the purchaser is similarly incorrect.  "Section 2(c) was enacted primarily to prevent large buyers from obtaining indirect price discrimination by *demanding* that the suppliers pay fees to bogus brokers."  *Philip Morris*, 67 F. Supp.2d at 130 (citing cases); *Stephen Jay*, 903 F.2d at 992 (Section 2(c) applied to the practice whereby "a large buyer with economic clout might *insist* that in order to do business sellers must pay a fee to a designated 'broker' …").

Bribes paid to foreign officials in order to secure contracts and eliminate competition have served as the basis for Section 2(c) commercial bribery claims in other cases.  For example, in *Oceanic Exploration*, 2006 WL 2711527 at *17-18, the plaintiffs alleged that ConocoPhillips

---

[29]     To the extent that Defendants argue that payments were made only to the Iraqi Government as the principal, Defendants misconstrue the allegations in Plaintiffs' complaint. Contrary to Defendants' assertion, Plaintiffs allege that AWB made payments directly to the Saddam Hussein regime, as well as to its various agents, including the IGB, the ISWTC, and Alia.  Compl. at ¶¶ 69, 82.

funneled illegal payments to Indonesian government officials in order to eliminate competitors

and secure oil and gas rights in the Timor Gap and then bribed East Timorese officials to ensure

that they recognized the oil and gas rights of ConocoPhillips oil but not those of its competitor.

In *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1066-67 (3d Cir. 1988), the

plaintiffs alleged that the defendants participated in a successful scheme to influence the award

of a Nigerian defense contract through bribery of Nigerian government officials.  The plaintiffs

in both cases were permitted to proceed on their claims.  *Oceanic*, 2006 WL 2711527 at *17-18

(motion to dismiss denied); *Environmental Tectonics*, 847 F.2d at 1066-67 (finding plaintiffs had

standing to pursue § 2(c) claim).  Plaintiffs should similarly be permitted to proceed with their

Section 2(c) claims premised on commercial bribery.

## XIII.  PLAINTIFFS PROPERLY STATE A RICO CLAIM

Contrary to Defendants' argument, Plaintiffs' allegations do not implicate the

extraterritorial application of RICO, and even if they did, Plaintiffs' allegations satisfy both tests

for extraterritorial application.  Moreover, Plaintiffs have sufficiently alleged a causal chain and

RICO predicate acts to state a claim under RICO.

### A.    The Alleged Predicate Acts Occurred in the United States and Therefore the Extraterritorial Application of RICO is Not Required

Although Defendants assume that Plaintiffs' allegations implicate the extraterritorial

application of RICO, the Second Circuit has twice confirmed, and courts within this district

routinely hold, that no test of RICO's extraterritorial application is necessary in transnational

cases where, as here, predicate acts have occurred in the U.S.  *See North-South Fin. Corp. v. Al-*

*Turki*, 100 F.3d 1046, 1052 n.7 (2d Cir. 1996); *Alfadda v. Fenn*, 935 F.2d 475, 479-480 (2d Cir.

1991); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 98 F. Supp.2d 480, 485

(S.D.N.Y. 2000); *Thai Airways Int'l Ltd. v. United Aviation Leasing B.V.*, 842 F. Supp. 1567,

1570 (S.D.N.Y. 1994), *aff'd* 59 F.3d 20 (2d Cir. 1995).  Not every part of each predicate act need

take place in the U.S. to render the extraterritorial test unnecessary.  Rather, it is sufficient if

merely a portion of the predicate acts occurs in the U.S.  *See*, *e.g.*, *Johnson Elec.*, 98 F. Supp.2d

at 485-486 (finding that jurisdiction was conferred where fraudulent mailings took place

exclusively or partially in the U.S.); *Thai Airways*, 842 F. Supp. at 1571 (finding jurisdiction

conferred where defendants used wire transfers to transfer funds into a U.S. bank account and

then to transfer funds back to foreign bank account).

        Here, a majority of the actions taken in furtherance of the conspiracy occurred within the

U.S.  Plaintiffs specifically allege that, because direct financial transactions with the Government

of Iraq were prohibited, proceeds from the sale of Iraqi oil were deposited by the purchaser into a

U.N.-controlled escrow account at BNP in New York.  Compl. at ¶ 64.  Defendants' payment of

the fictitious "inland transportation fees" and "after-sales-service fees" were included in the

contract prices submitted to the U.N. and recouped from this account.  *Id.* at ¶¶ 64, 66, 74, 77,

81.  These funds were transferred directly from the BNP account into the U.S. dollar account

maintained by AWB with the Bank of New York in New York.  *Id.* at ¶ 81.  Subsequently, to

avoid detection and in furtherance of the conspiracy, Defendants would use Alia, a Jordanian

trucking company, as a conduit to funnel the money back to the Iraqi government and would

wire the amount of the "inland transportation fee" to Alia from Defendants' New York bank

account.  *Id.* at ¶¶ 82, 85.  As Plaintiffs allege, "[w]ithout these accounts, the money laundering

and bribery scheme could not have occurred."  *Id.* at ¶ 135.

        In addition to the entire monetary prong of Defendants' fraudulent scheme being

executed in the U.S., Plaintiffs also allege that AWB maintained an office in the U.S., initially in

New York and later in Oregon, which was "integral to the conduct of the affairs of the

enterprise." *Id.* at ¶ 136. Specifically, AWB's U.S. office "ensured that AWB was paid efficiently and promptly for the shipments of wheat to Iraq under the Oil for Food program and monitored the progress of U.N. approvals of contracts…that were executed under the Oil for Food Program." *Id.* at ¶ 134. Plaintiffs allege that an employee of AWB, Tim Snowball, actively participated in the bribery and money laundering conspiracy by communicating with other AWB employees via the mail and wires from the U.S. about the conduct of the enterprise. *Id.*

Defendants' use of a U.S. office to coordinate the activities of their enterprise, including transferring funds between U.S. bank accounts and to Alia, was essential to the enterprise and is sufficient to satisfy the U.S. nexus element of Plaintiffs' RICO claim. In the highly analogous *Thai Airways* case, this Court held that the test for the extraterritorial application of RICO was unnecessary because:

> [T]he alleged violations of *18 U.S.C. § 2314* can be traced to UAL's alleged wire transfer of the security deposits from a New York bank account to a Swiss bank account, where the security deposits were commingled with UAL's general funds. This wire transfer was not merely a preparatory act, but rather was an integral part of the alleged conversion. Further, the transfer necessary involved conduct in the United States for which the principal causing it may be held criminally liable.

*Thai Airways*, 842 F. Supp. at 1571.

### B.      Plaintiffs' Allegations Are More Than Adequate to Invoke the Extraterritorial Application of RICO

Even if this case implicates the extraterritorial application of RICO, however, Plaintiffs' allegations are more than adequate to invoke its application.[30] The Second Circuit,

---

[30]      Defendants characterize the extraterritorial application of RICO as a limit on this Court's subject matter jurisdiction over Plaintiffs' claim. However, Defendants' arguments are not properly focused on this Court's jurisdiction. As this Court previously recognized, the Supreme Court, in an effort to curb "drive-by jurisdictional rulings," has recently held that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat

acknowledging that no specific test has been formulated to determine when RICO should be applied extraterritorially, has applied the both a "conduct test" and an "effects test." *See Al-Turki*, 100 F.3d at 1052; *see also Republic of Columbia v. Diageo N. Am. Inc.*, No. 04-CV-4372 (NGG), 2007 WL 1813744 (E.D.N.Y. June 19, 2007)[31]; *Ayyash*, 2006 WL 587342 at *4. The conduct test allows the application of RICO where the U.S. is the locus of conduct that is both material to the completion of the fraud and a direct cause of the alleged injury. *Al-Turki*, 100 F.3d at 1052. The effects test requires that the fraud itself have a substantial effect on the United States. *Id.* Although Plaintiffs' allegations need only satisfy *one* of these tests to permit extraterritorial application of RICO, Plaintiffs' allegations here satisfy *both*.

### 1.    Plaintiffs' Allegations Satisfy the Conduct Test

As discussed above, the United States is the primary locus of the predicate acts. Therefore, to the extent that Plaintiff need to establish the propriety of the extraterritorial application of RICO, the conduct test is satisfied. This Court has held that the conduct test is satisfied where, like here, the facts demonstrate that "a wire transfer into or from the United States is integral to the fraud." *Ayyash*, 2006 WL 587342 at *6 (citing cases). In this case, Plaintiffs have not only alleged that wire transfers that were integral to the perpetration of the fraud were made through and to the U.S., but have also alleged that the Defendants maintained

---

the restriction as nonjurisdictional in character." *See Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201 (GEL), 2006 WL 587342, *4 n.2 (S.D.N.Y. Mar. 9, 2006) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 (2006)). Because the RICO statute is silent about whether the required nexus to the U.S. is an element of the RICO claim or a jurisdictional constraint (*Ayyash*, 2006 WL 587342 at *4 n.2), *Arbaugh* mandates that any limitation on coverage be treated as nonjurisdictional. This distinction is of significant consequence because "factual disputes as to jurisdictional questions are typically resolved by the judge in a pre-trial hearing, and not by a jury at trial." *Id.*

[31]    The *Diageo* court recently granted the defendants' request for an interlocutory appeal of this opinion. *Republic of Columbia v. Diageo N. Am. Inc.*, No. 04-CV-4372 (NGG), 2007 WL 2683689, at *1 (E.D.N.Y. Sept. 7, 2007). The Second Circuit has yet to rule on this request.

an office in the U.S. that was used to coordinate completion of Defendants' fraudulent scheme. Under this Court's prior holding in *Ayyash*, Plaintiffs' allegations are more than sufficient to satisfy the conduct test. *Id.*; *see also National Group for Commc'ns and Computers Ltd. v. Lucent Techs., Inc.*, 420 F. Supp.2d 253, 264 (S.D.N.Y. 2006).

### 2.    Plaintiffs' Allegations Also Satisfy the Effects Test

The Second Circuit has explained that the "effects test" for the extraterritorial application of RICO is to be applied consistent with the application of the "effects test" in antitrust cases. *See Al-Turki*, 100 F.3d at 1052-53. Plaintiffs have adequately alleged the direct, substantial and foreseeable effects of Defendants' conduct in the U.S. sufficient to satisfy the effects test under the antitrust laws and, therefore, the extraterritorial application of RICO is justified here. *See* Sections II.A, III, *supra* (detailing Plaintiffs' allegations that the Defendants implemented their bribery and money laundering conspiracy with a purpose and effect of achieving, maintaining and exploiting a monopoly on wheat sold in Iraq and foreclosing the market to U.S.-grown wheat). Plaintiffs have thereby satisfied the effects test, justifying the extraterritorial application of RICO in this case.[32]

### C.    Plaintiffs Have Standing to Prosecute Their RICO Claim

RICO standing is conferred upon a plaintiff injured in his business or property by reason of a violation of 18 U.S.C. § 1962. *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001). In order to bring suit under § 1962(c), a plaintiff must plead: (1) the defendant's violation of § 1962; (2) an injury to the plaintiff's business or property; and

---

[32]    Defendants cite only one case for their argument that Plaintiffs have failed to satisfy the effects test – *Giro v. Banco Espanol de Credito, S.A.*, No. 98 Civ. 6195 (WHP), 1999 WL 440462 (S.D.N.Y. June 28, 1999). That case is easily distinguishable. *Giro* involved foreign actors extorting money from a foreign plaintiff in a foreign country. Here, U.S. class members were injured in the U.S. due to conduct directed at them and perpetrated largely in the U.S. and necessarily requiring wire transfers through U.S. bank accounts.

(3) causation of the injury by the defendant's violation. *Id*. Defendants' challenge to standing

regards the causation element.

The causation element is satisfied if "the defendant's injurious conduct is both the factual

and the proximate cause of the injury alleged." *Baisch v. Gallina*, 346 F.3d 366, 372 (2d Cir.

2003); *see also Moore v. Guesno*, 485 F. Supp.2d 300, 306 (W.D.N.Y. 2007) (discussing *Baisch*

requirements); *Flier v. Cayuga Cty.*, No. 5:03-CV-578, 2007 WL 2655698, *6 (N.D.N.Y. Sept.

15, 2006) (same). The Second Circuit applies a two-prong test to determine the existence of

proximate cause. First, the plaintiff's injury must result from the defendants' racketeering

activity or commission of the RICO predicates acts. *Baisch*, 346 F.3d at 373. Second, the Court

must determine "whether the defendants' responsible acts were 'a substantial factor in the

sequence of responsible causation,' and whether the plaintiff's injury was 'reasonably

foreseeable or anticipated as a natural consequence.'" *Id*. at 346 (quoting *Lerner v. Fleet Bank,

N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)). As discussed in detail above, Defendants' conspiracy

to foreclose the Iraqi market specifically targeted U.S.-grown wheat and directly and foreseeably

depressed the prices of Plaintiffs' wheat in the U.S. market. *See* Section II.A. and III, *supra*.

Plaintiffs' injuries are far more direct and foreseeable than those in recent cases from this

Circuit that have been found to state a proper claim under RICO. In *Commercial Cleaning*, for

example, the Second Circuit determined a plaintiff had adequately alleged proximate causation

for its RICO claim where it alleged that defendant's hiring of illegal immigrants at low wages

allowed it to out-bid plaintiff on a lucrative cleaning contract. 271 F.3d at 378-379, 380-385.

Unlike the present case, the scheme did not appear directed specifically at the plaintiff, but the

Court nonetheless determined that proximate cause existed, in large part because:

> There is no class of potential plaintiffs who have been more directly injured by
> the alleged RICO conspiracy than the defendant's business competitors, who have

> a greater incentive to ensure that a RICO violation does not go undetected or unremedied, and whose recovery would indirectly cure the loss suffered by these plaintiffs.

*Id*. at 385.  Similarly, Plaintiffs here have the greatest incentive and are best situated to bring a RICO case.

In *Schwab v. Philip Morris*, 449 F.Supp.2d 992 (E.D.N.Y. 2006), the court determined that a more attenuated causal chain was still sufficiently direct and foreseeable to satisfy RICO's proximate cause element:

> Plaintiffs here allege a simple and short chain of causation: defendants represented that "light" cigarettes provided health benefits that they knew these cigarettes did not provide; plaintiffs believed the misrepresentation and so continued to buy "light" cigarettes in larger numbers than they would have absent the fraud; this kept demand for "light" cigarettes at a much higher level than it otherwise would have been; elevated demand allowed defendants to keep prices higher than they otherwise would have; and plaintiffs paid more for "light" cigarettes than they otherwise would have.

*Id.* at 1049.  If the causal chain in *Schwab* can fairly be characterized as "simple and short," the more direct and foreseeable causal chain in the present case is certainly adequate to confer standing.

The causal chain in the present case is similarly more direct and foreseeable than in *Diageo*.  Therein, the plaintiffs, domestic Columbian sellers and producers of liquor products, alleged that defendants, American and foreign manufacturers of such well-known liquor brands as Tanqueray gin, Smirnoff vodka, Guinness stout, and Baileys Original Irish Cream, were members of a RICO enterprise that included illegal narcotics traffickers.  2007 WL 1813744 at *2.  Plaintiffs alleged that defendants conspired to illegally smuggle liquor into Columbia and launder the proceeds of illegal narcotics sales.  *Id*. at *2-3.  Allegedly, this RICO enterprise allowed defendants to sell large quantities of liquor to consumers at below-market prices, which reduced plaintiffs' market share and caused plaintiffs to lower their prices.  *Id*. at *5.  The Court

42

thoroughly analyzed Supreme Court and Second Circuit precedent, and found that the complaint satisfied RICO's proximate cause requirement.  *Id*. at *57-64.

Plaintiffs' allegations here are much more direct and foreseeable than those advanced and accepted in any of these cases.  Here, Defendants' enterprise was designed to, and did, directly affect Plaintiffs.  Compl. at ¶¶ 92-93 (detailing Defendants' knowledge that U.S.-grown wheat was the only viable alternative to Australian-grown wheat for sale to Iraq, that more U.S.-grown wheat would have been sold in Iraq absent Defendants' conspiracy, and that Defendants understood the worldwide wheat pricing mechanism described above and the fact that their quest to foreclose U.S.-grown wheat would certainly have the effect of depressing prices of wheat in the U.S.).

*American Health* is particularly instructive.  1994 WL 314313 at *3-6.  As in the present case, the plaintiff in *American Health* alleged RICO violations premised on a bribery scheme.  The plaintiff was a home health agency which received a majority of its patient referrals from hospitals.  *Id.* at *1.  The plaintiff alleged that one of the defendants, a competitor home health agency, attempted to monopolize the home health care market and destroy competition by paying illegal kickbacks to the referring hospitals.  As Defendants do herein, the defendants in *American Health* argued that the plaintiff lacked standing because it was not directly injured by the alleged predicate acts of fraud and bribery.  *Id.* at *5.  The court was not persuaded that this argument justified granting a motion to dismiss, noting that a plaintiff is allowed to sue so long as the plaintiff alleges that the competitor's illegal activity injured the plaintiff in its business or

properly.[33]  *Id.*  The court concluded that the alleged predicate acts consisted of bribery that resulted in a business loss to plaintiff who was outside of the bribery scheme.  *Id.* at *6.

Defendants' reliance on *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006) is misplaced.  Therein, the plaintiff, a steel mill product manufacturer, alleged it was harmed by a competitor's refusal to pay state sales tax.  The Court's conclusion that the plaintiff's alleged injury was too attenuated was based upon: (1) the fact that the State of New York did not receive the sales tax from the defendant and was, therefore, the most direct victim of the enterprise; (2) it could reasonably be expected that the State of New York could vindicate its rights as the most direct victim of the enterprise, and (3) assessing the damage done to plaintiff as the result of defendant's conduct would prove incredibly difficult.  *Id*. at 1996-98.  In the present case, Plaintiffs, not a third party, were the target of the scheme and no other party is well-situated to bring a RICO suit against Defendants.  Unlike *Anza*, the damage done to Plaintiffs here is measurable due to the existence of a commodities exchange that reacted throughout the proposed class period to the foreclosure of American wheat from the Iraqi market.  Moreover, Plaintiffs' damages do not overlap with any other class of victims.

### D.    Plaintiffs Have Adequately Alleged Racketeering Activity Under RICO

In order to demonstrate racketeering activity under RICO, "the plaintiff must plead at least two predicate acts, show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity."  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997).  In this case, Plaintiffs have alleged as predicate acts Defendants'

---

[33]    Even if the Court concludes that Plaintiffs were not direct competitors, they nevertheless have standing as their injuries were foreseeable.  The foresseability component of proximate cause is established where the plaintiff was a target and intended victim of the racketeering enterprise, even if he was not the primary target.  *Baisch*, 346 F.3d at 374-75.  "No precedent suggest that a racketeering enterprise may have only one target, or that only a primary target has standing."  *Id.* at 375.

violations of federal money laundering statutes, 18 U.S.C. §§ 1956 and 1957, and violation of the

Travel Act, 18 U.S.C. § 1952.

To adequately allege a violation of Section 1956, a plaintiff must allege:  (1) the

individual conducted a financial transaction in interstate commerce, (2) with knowledge that the

property involved in the transaction represented some form of unlawful activity, (3) with the

transaction in fact involving the proceeds of specified unlawful activity, (4) with the purpose, in

whole or in part, of concealing or disguising the nature, the location, the source, the ownership or

the control of the illegally acquired proceeds.  *United States v. Maher*, 108 F.3d 1513, 1527-28

(2d Cir. 1997).  Similarly, to allege a violation of Section 1957, Plaintiffs must allege that the

Defendants:  (1) knowingly engaged or attempted to engage in a monetary transaction involving

criminally derived property, (2) with such property being valued at more than $ 10,000, and (3)

with such money actually being derived from specific criminal activity.  *Bernstein v. Misk*, 948

F. Supp. 228, 236 n.2 (E.D.N.Y. 1997).  Here, Plaintiffs allege that Defendants violated the

money laundering statutes by fraudulently obtaining money from the UN escrow account, and

then wiring it, through intermediaries, to the Saddam Hussein regime, for purposes of bribing the

regime to influence the award of wheat contracts.  Compl. at ¶¶ 31, 68-91, 132.

To allege the predicate act of a violation of the Travel Act, a plaintiff must allege: (1)

travel in or use of the mail or any facility of interstate or foreign commerce, (2) intent to

distribute the proceeds of an unlawful activity or facilitate the promotion, management,

establishment, or carrying on, of any unlawful activity, and (3) performance of an additional act

in furtherance of the specified unlawful activity.  *United States v. Jenkins*, 943 F.2d 167, 171 (2d

Cir. 1991), *cert. denied*, 502 U.S. 1014 (1991).  Here, Plaintiffs have alleged that Defendants

traveled and used the mails and wires in interstate and foreign commerce in order to bribe the

Saddam Hussein regime with proceeds fraudulently obtained from the UN escrow account and laundered through intermediaries.  Compl. at ¶¶ 31, 68-91, 132.  Plaintiffs further allege that Defendants' bribery scheme violated the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1 to -3.  *Id.* at ¶ 132.

Defendants issue a narrow challenge to the adequacy of Plaintiffs' substantive RICO allegations, arguing that Plaintiffs cannot adequately plead their predicate acts of money laundering and violation of the Travel Act because they cannot demonstrate that Defendants violated the FCPA.[34]  Def. Mot. at 30-35.  However, Defendants have cited no authority for their proposition that, where the statutes that establish the predicate acts of a RICO offense *themselves* include *further* predicate acts as elements, Plaintiffs need to specifically plead the elements of those "secondary" predicate acts.[35]  In so arguing, Defendants seek to impose additional pleading requirements beyond those set in the case law.[36]  Nevertheless, Plaintiffs' Complaint adequately

---

[34]     Plaintiffs do not maintain that participation in the Organization for Economic Cooperation and Development Convention on Combating Bribery of Foreign Officials in International Business Transactions (the "OECD Convention") is part of the predicate acts.

[35]     Defendants' citation to *First Capital Asset Mgmt., Inc v. Satinwood, Inc.*, 385 F.3d 159, 178-82 (2d Cir. 2004) and *GICC Capital Corp. v. Technology Finance Group, Inc*., 67 F.3d 463, 465-67 (2d Cir. 1995) for the proposition that inadequate pleading of one or more unlawful acts requires dismissal for failure to state a claim is wholly disingenuous.  Neither the money laundering statutes nor the Travel Act, let alone the pleading requirements under these statutes, are even discussed in these cases.  Instead, these cases address the continuity requirement for pleading a pattern of racketeering activity.  Defendants do not challenge that Plaintiffs have alleged "continuing criminal activity."  Nor could they.  *See* Complaint at ¶¶ 69, 78-80, 85, 90-91, 130-131 (detailing multiple violations occurring throughout the relevant period).

[36]     Plaintiffs have found no civil RICO cases requiring the level of specificity sought by Defendants.  In fact, in criminal cases, where due process concerns are much greater than in civil cases, courts have found indictments sufficient without the level of specificity sought by Defendants.  For example, in *United States v. Bitzur*, No. 96 Cr 572 (LLS), 1996 WL 665621 (S.D.N.Y. Nov. 18, 1996), the court concluded that an indictment for money laundering was sufficient despite the fact that it did not plead even a single fact delineating the federal offense which formed the specified unlawful activity underlying the money laundering charges.  *See id.* at *3.  The court explained that "while the government will have to show at trial that the proceeds were obtained 'with the intent to promote the carrying on of' a violation of [the

alleges a violation of the FCPA and specifies additional unlawful activity which may serve as a basis for their money laundering and Travel Act predicate acts. Thus, they have sufficiently alleged a pattern of predicate acts under RICO.

### 1. Plaintiffs Have Adequately Alleged Defendants' Violations of the FCPA.

The FCPA, which outlaws foreign bribery, is one of an extensive litany of criminal statutes that may form a predicate act for violations of both the Travel Act and the federal money laundering laws. *See* 18 U.S.C. §§ 1952(b), 1956(c)(7), 1957(f)(3). In order to prove a violation of the FCPA, it must be shown that a defendant: (1) made use of a means or instrumentality of interstate commerce (2) corruptly (3) in furtherance of an offer or payment of anything of value to any person (4) while knowing that the money would be offered or given directly or indirectly to any foreign official (5) for purposes of influencing any act or decision of such foreign official in his official capacity. *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'sl B.V. v. Schreiber*, 327 F.3d 173, 179-80 (2d Cir. 2003). Here, Plaintiffs have alleged that Defendants paid bribes, via the wires, indirectly through intermediaries to the Saddam Hussein regime for purposes of influence the award of wheat

---

unlawful activity], that showing is a matter of proof, not of the indictment's sufficiency." *Id.*; *see also United States v. Phillips*, 874 F.2d 123, 128 n. 4 (3d Cir.1989) (indictment need not specify which acts of bribery and extortion Defendants conspired to commit); *United States v. Smith,* 44 F.3d 1259, 1265 (4th Cir.1995) (money laundering); *United States v. Sutherland*, 656 F.2d 1181, 1197 (5th Cir. 1981) (indictment held to be sufficient despite the fact that it did not specify particular acts of bribery nor the specific state statutory provision that formed the basis of the predicate act); *United States v. Crockett*, 979 F.2d 1204, 1209 (7th Cir.1992); *United States v. Glecier*, 923 F.2d 496, 500 (7th Cir.1991) (indictment need not enumerate each potential predicate offense); *United States v. Coung Gia Le*, 310 F. Supp. 2d 763, 779-780 (E.D. Va. 2004) (no obligation to plead the elements of predicate acts); *United States v. Stavroulakis*, 952 F.2d 686, 691 (2d Cir. 1992) ("[T]he focal point of the statute is the laundering process, not the underlying unlawful conduct that soiled the money.").

47

contracts.  *See* Compl. at ¶¶ 82-91, 132.  These allegations are sufficient to plead a violation of the FCPA.

Defendants counter that, by alleging only that payments were made to the "Iraqi government," Plaintiffs have failed to allege payments to a "foreign official," "foreign political party" or to any "person" with knowledge that such funds would be given to a "foreign official" as required by the FCPA.  Def. Mot. at 32-33.  This argument ignores that, logically, illicit payments to a foreign government *must* be received by a "foreign official."  Moreover, Plaintiffs specify that many of Defendants' payments were funneled through various other entities, including ship owners, trucking companies, and various other intermediaries, in an attempt to conceal the source of the funds that were eventually transmitted to the Iraqi officials.[37]  ¶¶ 82-91. At this early stage of the litigation, before discovery has taken place, Plaintiffs are not required to specify to which officials in the Saddam Hussein regime bribes were funneled.  *Erickson*, 127 S. Ct. at 2200 (complaint need not contain specific facts).  *Erickson*, 127 S. Ct. at 2200.  Therefore, Plaintiffs' allegations are more than adequate to plead a violation of the FCPA.

Defendants also argue that, even if Plaintiffs have sufficiently alleged a violation of the FCPA, the alleged bribes at issue fall into one of the enumerated affirmative defenses specified in the statute because they were imposed under Iraqi law pursuant to an official directive of the

---

[37]    Additionally, it can be inferred from Plaintiffs' Complaint that Mr. Zuhair Daoud, the former director of the IGB, benefited from the illicit bribes as he was responsible for awarding wheat contracts to AWB.  Complaint at ¶15.  Moreover, the Volcker Report noted that the money was directed to ministries or departments unassociated with ministries, often at the specific request of the ministries themselves or the "Presidential Diwan."  Volcker Report at 229. Examples given are the Ministries of Defense & Military Industrialization, the Mukhabarat (Iraqi intelligence) or the Diwan itself.  *Id.*  Presumably, the ministry heads themselves made these requests.  The report noted that in March of 2003, Sadam Hussein's son, Qusay, arrived at the Central Bank of Iraq with a note signed by his father seeking immediate payment of $1 billion in cash, which was paid out.  *Id.*

Iraqi Government.[38]  Even if such a directive was issued, neither the Complaint nor the Volcker

Report upon which Defendants rely, provides a sufficient record from which it can be concluded

that the "directive" amounted to a "written law or regulation" that would immunize all conduct

under the OFFP under the FCPA.[39]  A complaint can be dismissed for failure to state a claim

pursuant to a Rule 12(b)(6) motion raising an affirmative defense only "if the defense appears on

the face of the complaint."  *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d

Cir.1998).  Therefore, Defendants' argument should not be evaluated until the parties have had

an opportunity to conduct discovery.

### 2.    Plaintiffs May Establish Their Predicate Acts Even Without Proving a Violation of the FCPA.

Neither the Travel Act nor the money laundering statutes, which are the alleged predicate

acts in Plaintiffs' RICO claim, requires that Plaintiffs demonstrate a violation of the FCPA.

Instead, the money laundering statutes merely require that the relevant transaction(s) involve the

proceeds of a "specified unlawful activity."  *See* 18 U.S.C. §§1956(a)(1), 1957(a).  Similarly, the

Travel Act requires an intent to distribute the proceeds of an "unlawful activity" or facilitate the

carrying on, of "any unlawful activity."  18 U.S.C. § 1952(a)(1), (3).  These statutes each include

an extensive list of criminal laws that may form the basis of the "unlawful activity."  *See* 18

U.S.C. §§ 1952(b) (defining "unlawful activity" and also incorporating any act indictable under

18 U.S.C. § 1956, 1957), 1956(c)(7) (enumerating acts that constitute "specified unlawful

---

[38]    It is an affirmative defense to an FCPA violation that "the payment, gift, offer, or promise of anything of value that was made, was lawful under the written laws and regulations of the foreing official's, political party's, party official's, or candidate's country."  15 U.S.C § 78dd-2(c)(1).

[39]    Given that Iraq was permitted to buy wheat and other humanitarian supplies only under the auspices of the OFFP, it is highly unlike that it would have enacted laws and regulations in direct contradiction to the rules of the OFFP prohibiting such payments.

activity" and incorporating indictable acts listed in 18 U.S.C. §1961), 1957(f)(3) (defining

"specified unlawful activity" as it is defined in 18 U.S.C. §1956).

Plaintiffs do not allege that the unlawful activity underlying the money laundering and

Travel Act crimes was limited to FCPA violations. Compl. at ¶¶ 132(a) (alleging that "unlawful

activity" underlying Travel Act violation "included *but was not limited to* bribery in violation of

[FCPA]"), 132(b), (c) & (d) (not further specifying the "unlawful activity" underlying the money

laundering violations). Indeed, by incorporating the remainder of the Complaint, Plaintiffs'

RICO count implicitly implicates numerous "unlawful activities" underlying the predicate acts,

including foreign extortion,[40] cross-border transportation of property stolen or taken by fraud,[41]

and violations of U.S. domestic mail and wire fraud statutes (including the deprivation of the

right to honest services).[42] Plaintiffs do not specify the "unlawful activity" underlying the

predicate acts because they need not.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

---

[40]    Foreign extortion is specifically enumerated as a separate predicate for money laundering and United States jurisprudence defines common law extortion to include passive public bribery. *See* 18 U.S.C. § 1956(c)(7)(B)(ii); *Evans v. United States*, 504 U.S. 255 (1992) (extortion under color of official right).

[41]    *See* 18 U.S.C. §§ 2314, 2315. The transportation of funds from the UN's escrow account through the U.S. would constitute property stolen or obtained via fraud.

[42]    *See* 18 U.S.C. §§ 2, 1341, 1343, 1346.

October 24, 2007                              Respectfully submitted,


                                              By: ___*/s/ Benjamin D. Brown*_____
                                              Michael D. Hausfeld, Esq.
                                              Benjamin D. Brown, Esq.
                                              Hilary K. Ratway, Esq.
                                              COHEN, MILSTEIN, HAUSFELD
                                              & TOLL, PLLC
                                              West Tower, Suite 500
                                              1100 New York Avenue NW
                                              Washington, DC 20005
                                              Telephone (202) 408-4600
                                              Telecopy (202) 408-4699

                                              Seth R. Gassman, Esq.
                                              COHEN, MILSTEIN, HAUSFELD
                                              & TOLL, PLLC
                                              150 East 52nd Street
                                              Thirtieth Floor
                                              New York, NY 10022
                                              Telephone (212) 838-7797
                                              Telecopy (212) 838-7745

                                              Michael P. Lehmann, Esq.
                                              COHEN, MILSTEIN, HAUSFELD
                                              & TOLL, PLLC
                                              One Embarcadero Center, Suite 526
                                              San Francisco, CA 94111
                                              Telephone (415) 623-2048
                                              Telecopy (415) 433-5994

                                              L. Palmer Foret, Esq.
                                              THE LAW FIRM OF L. PALMER FORET, PC
                                              1735 20th Street, NW
                                              Washington, DC 20009
                                              Telephone (202) 332-2404
                                              Telecopy (202) 332-2808

                                              Roderick E. Edmond, Esq.
                                              Craig T. Jones, Esq.
                                              EDMOND & JONES, LLP
                                              127 Peachtree Street N.E., Suite 410
                                              Atlanta, GA 30303
                                              Telephone (404) 525-1080
                                              Telecopy (404) 525-1073

Bruce L. Simon, Esq.
Esther Klisura, Esq.
PEARSON, SIMON, WARSHAW, PENNY, LLP
44 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone (415) 433-9000
Telecopy (415) 433-9008

Roberta D. Liebenberg, Esq.
Donald L. Perelman, Esq.
FINE, KAPLAN & BLACK, RPC
1835 Market Street, 28th Floor
Philadelphia, Pennsylvania 19103
Telephone (215) 567-6565
Telecopy (215) 568-5872

*Counsel for Plaintiffs John Boyd, Veryl Switzer,
Gillan Alexander, Rod Bradshaw, Wilburt Howard
and Pat Dailey.*

Gerald J. Rodos, Esq.
Mark R. Rosen, Esq.
Jeffrey B. Gittleman, Esq.
Chad A. Carder, Esq.
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone (215) 963-0600
Telecopy (215) 963-0838

A. Arnold Gershon, Esq.
Gloria Kui, Esq.
BARRACK, RODOS & BACINE
1350 Broadway, Suite 1001
New York, NY 10018
Telephone (212) 688-0782

Anthony J. Bolognese, Esq.
Joshua H. Grabar, Esq.
BOLOGNESE & ASSOCIATES, LLC
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, PA 19103

Telephone: (215) 814-6750

*Counsel for Plaintiff Melvin Erb*


Steven A. Asher, Esq.
Mindee J. Reuben, Esq.
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street
Suite 1100
Philadelphia, PA 19103
Telephone (215) 545-7200
Telecopy (215) 545-6535

W. Joseph Bruckner
Richard A. Lockridge
Lisa M. Pollard
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone (612) 339-6900
Telecopy (612) 339-0981

Joseph C. Kohn
KOHN, SWIFT & GRAF, PC
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone (215) 238-1700
Telecopy (215) 238-1968
Thomas S. McNamara

INDIK & MCNAMARA, PC
100 South Broad Street
Suite 2300
Philadelphia, PA 19110
Telephone (215) 567-7125
Telecopy (215) 563-8330

*Counsel for Plaintiff Dennis Brothers*