UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN BOYD, VERYL SWITZER, GILLAN ALEXANDER, ROD BRADSHAW, WILBURT HOWARD, PAT DAILEY, MELVIN ERB, and DENNIS BROTHERS on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AWB LIMITED and AWB (U.S.A.) LIMITED,<br><br>Defendants. | ECF CASE<br><br>No. 1:07 CV 3007 (GEL) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT**

Robert H. Baron
Timothy G. Cameron
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants
AWB Limited and AWB (U.S.A.) Limited*

December 3, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

EXPLANATION OF CITATION FORMS ............................................................... ix

PRELIMINARY STATEMENT ................................................................................ 1

I.     PLAINTIFFS' ANTITRUST CLAIMS. ......................................................... 1

II.    PLAINTIFFS' RICO CLAIM. ...................................................................... 4

ARGUMENT .......................................................................................................... 6

I.     PLAINTIFFS' ANTITRUST CLAIMS (COUNTS I, II, III AND V) MUST BE
DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.............................. 6

    A.   AWB's Alleged Conduct in Iraq Did Not Have a "Direct, Substantial and
Reasonably Foreseeable Effect" on American Domestic Commerce........................... 7

    B.   The Alleged Domestic Effect of AWB's Conduct Cannot Properly Give Rise
to an Antitrust Claim. ...................................................................................... 9

II.    PLAINTIFFS LACK STANDING TO ASSERT THEIR ANTITRUST CLAIMS
(COUNTS I, II, III & V). ............................................................................... 10

    A.   Plaintiffs Have Not Demonstrated "Antitrust Injury"................................... 10

    B.   Plaintiffs Are Not the Proper Parties to Bring This Action against AWB.................. 13

III.   PLAINTIFFS' CLAIM PURSUANT TO SECTION 1 OF THE SHERMAN ACT
(COUNT II) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM............... 15

    A.   Plaintiffs Have Not Adequately Alleged a Contract, Combination or
Conspiracy in Restraint of Trade. ................................................................. 15

    B.   Plaintiffs Have Not Adequately Alleged an Injury to Competition in the
Relevant Market (i.e., Iraq)........................................................................... 16

IV.   PLAINTIFFS' CLAIM PURSUANT TO SECTION 2 OF THE SHERMAN ACT
(COUNT I) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM. ............... 17

    A.   Plaintiffs Have Failed to State a Claim for Monopolization. ...................... 17

        1.   Plaintiffs Have Failed Adequately to Allege That Defendants Possessed
Monopoly Power. ................................................................................. 17

i

Page

      2.   Plaintiffs Have Failed Adequately to Allege That Defendants Sought Monopoly Power in the Relevant Market. ............................................................18

  B.  Plaintiffs Have Failed to State a Claim for Conspiracy to Monopolize. ...................19

V.    PLAINTIFFS' CLAIM PURSUANT TO SECTION 3 OF THE CLAYTON ACT (COUNT III) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM. .............20

  A.  Plaintiffs Have Failed Adequately to Allege the Existence of an Exclusive-Dealing Arrangement. ...................................................................................................20

  B.  Plaintiffs Have Failed Adequately to Allege an Anticompetitive Effect Caused by Defendants' Alleged Conduct. ..................................................................21

VI.   PLAINTIFFS' CLAIM PURSUANT TO SECTION 2(c) OF THE ROBINSON-PATMAN ACT (COUNT V) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM. ..........................................................................................................21

VII.  PLAINTIFFS' RICO CLAIM (COUNT IV) MUST BE DISMISSED. ............................23

  A.  Plaintiffs' RICO Claim Must Be Dismissed for Lack of Subject Matter Jurisdiction. ................................................................................................................23

      1.   Plaintiffs' Claims Require the Extraterritorial Application of RICO. .................23

      2.   This Court Lacks Subject Matter Jurisdiction over Plaintiffs' RICO Claim under the Conduct Test. ...........................................................................25

      3.   This Court Lacks Subject Matter Jurisdiction over Plaintiffs' RICO Claim under the Effects Test. ............................................................................25

  B.  Plaintiffs' RICO Claim Must Be Dismissed Because Plaintiffs Lack RICO Standing. ...................................................................................................................26

  C.  Plaintiffs' RICO Claim Must Be Dismissed Because Plaintiffs Have Not Pleaded the Existence of "Racketeering Activity" under RICO. ...............................28

CONCLUSION ...................................................................................................................30

## TABLE OF AUTHORITIES

Page(s)

### Cases

2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp., 369 F.3d 732
(3d Cir. 2004) ....................................................................................................... 21

Alfadda v. Fenn, 935 F.2d 475 (2d Cir. 1991) ................................................................. 24

Am. Health Sys., Inc. v. Visiting Nurse Ass'n of Greater Phila.,
No. Civ. A. 93-542, 1994 WL 314313 (E.D. Pa. June 29, 1994) ................................ 11, 15, 27

Amarel v. Connell, 102 F.3d 1494 (9th Cir. 1996) ......................................................... 11, 12-13

Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991 (2006) ............................................. 27

Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,
459 U.S. 519 (1983) ............................................................................................... 13

Associated Radio Serv. Co. v. Page Airways, Inc., 624 F.2d 1342 (5th Cir. 1980) ..................... 15

Ayyash v. Bank Al-Madina, No. 04 Civ. 9201 (GEL), 2006 WL 587342
(S.D.N.Y. Mar. 9, 2006) ......................................................................................... 24, 25

Baisch v. Gallina, 346 F.3d 366 (2d Cir. 2003) ............................................................. 26, 27

Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007) ....................................................... 7, 15, 16

Blue Shield of Va. v. McCready, 457 U.S. 465 (1982) ................................................... 12

Blue Tree Hotels Inv. (Can.) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,
369 F.3d 212 (2d Cir. 2004) ................................................................................... 12, 22

Bristol Tech., Inc. v. Microsoft Corp., 42 F. Supp. 2d 153 (D. Conn. 1998) ................... 12

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) ............................. 9-10

Cent. Telecomm., Inc. v. TCI Cablevision, Inc., 800 F.2d 711 (8th Cir. 1986) ............... 11

City of Atlanta v. Ashland-Warren, Inc., No. C 81-106A, 1981 WL 2187
(N.D. Ga. Aug. 20, 1981) ....................................................................................... 15

Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc., 271 F.3d 374
(2d Cir. 2001) ......................................................................................................... 27

Page(s)

Conopco Inc. v. Roll Int'l, 231 F.3d 82 (2d Cir. 2000) ................................................. 30

Coors Brewing Co. v. Miller Brewing Co., 889 F. Supp. 1394 (D. Colo. 1995) ........................... 8

Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991) .......................................... 29

Crimpers Promotions Inc. v. Home Box Office, Inc., 724 F.2d 290 (2d Cir. 1983)..................... 13

Daishowa Int'l v. N. Coast Exp. Co., No. C-81-574 RPA, 1982 WL 1850
  (N.D. Cal. May 24, 1982).................................................................................................. 8

de Atucha v. Commodity Exch., Inc. 608 F. Supp. 510 (S.D.N.Y. 1985) ............................... 13-14

Deem v. Lockheed Corp., 749 F. Supp. 1230 (S.D.N.Y. 1989) ..................................................... 19

Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc., 123 F.3d 301
  (5th Cir. 1997)................................................................................................................. 12

E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23 (2d Cir. 2006).......................... 12, 19

Elec. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240
  (2d Cir. 1997).................................................................................................................. 18

Empire Volkswagen Inc. v. World-Wide Volkswagen Corp., 814 F.2d 90
  (2d Cir. 1987).................................................................................................................. 20

Envtl. Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052 (3d Cir. 1988)................................... 23

Erickson v. Pardus, 127 S. Ct. 2197 (2007)................................................................................. 29

F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155 (2004)................................. 6, 9, 10

Fitch v. Ky.-Tenn. Light & Power Co., 136 F.2d 12 (6th Cir. 1943) ........................................... 21

Floors-N-More, Inc. v. Freight Liquidators, 142 F. Supp. 2d 496 (S.D.N.Y. 2001) .................... 16

George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136 (2d Cir. 1998)....... 10, 12, 13, 16

Giro v. Banco Espanol de Credito, S.A., No. 98 Civ. 6195 (WHP),
  1999 WL 440462 (S.D.N.Y. June 28, 1999)................................................................... 26

Grace v. E.J. Kozin Co., 538 F.2d 170 (7th Cir. 1976) ............................................................... 21

Harris v. Duty Free Shoppers Ltd. P'ship, 940 F.2d 1272 (9th Cir. 1991).................................. 21

Henneberger v. County of Nassau, 465 F. Supp. 2d 176 (E.D.N.Y. 2006) ................................ 1-2

iv

Page(s)

Henthorn v. Dep't of Navy, 29 F.3d 682 (D.C. Cir. 1994) ............................................. 1, 6

In re Colonial Mortgage Bankers Corp., 324 F.3d 12 (1st Cir. 2003) ..................................... 29-30

In re Copper Antitrust Litig., 98 F. Supp. 2d 1039 (W.D. Wisc. 2000)........................................ 14

In re Intel Corp. Microprocessor Antitrust Litig., 452 F. Supp. 2d 555
    (D. Del. 2006) ...............................................................................................8-9

In re NCAA I-A Walk-On Football Players Litig., 398 F. Supp. 2d 1144
    (W.D. Wash. 2005) .......................................................................................... 17

In re Rubber Chems. Antitrust Litig., 504 F. Supp. 2d 777 (N.D. Cal. 2007) ................................ 8

Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp., 98 F. Supp. 2d 480
    (S.D.N.Y. 2000) ............................................................................................. 24

Kahn v. iBiquity Digital Corp., No. 06 Civ. 1536 (NRB), 2006 WL 3592366
    (S.D.N.Y. Dec. 7, 2006)..................................................................................... 16

Larry R. George Sales Co. v. Cool Attic Corp., 587 F.2d 266 (5th Cir. 1979)............................ 21

Lou v. Belzberg, 728 F. Supp. 1010 (S.D.N.Y. 1990)....................................................... 28

Mandeville Island Farms v. Am. Crystal Sugar Co., 334 U.S. 219 (1948)............................. 11, 12

Metallgesellschaft AG v. Sumitomo Corp. of Am., 325 F.3d 836 (7th Cir. 2003) ....................... 9

MM Global Servs. Inc. v. Dow Chem. Co., No. Civ. 3:02CV 1107(AVC),
    2004 WL 556577 (D. Conn. Mar. 18, 2004)................................................................. 8

N.-S. Fin. Corp. v. Al-Turki,100 F.3d 1046 (2d Cir. 1996)................................................. 24

Nasser v. Andersen Worldwide Société Coop., No. 02 Civ. 6832 (DC),
    2003 WL 22179008 (S.D.N.Y. Sept. 23, 2003) ......................................................... 24, 25

Nat'l Group for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.,
    420 F. Supp. 2d 253 (S.D.N.Y. 2006)...................................................................... 25

Nat'l Macaroni Mfrs. Ass'n v. FTC, 345 F.2d 421 (7th Cir. 1965)....................................... 11, 17

Ocean View Capital, Inc. v. Sumitomo Corp. of Am., No. 98 Civ. 4067 (LAP),
    1999 WL 1201701 (S.D.N.Y. Dec. 15. 1999)............................................................... 14

Oceanic Exploration Co. v. ConocoPhillips, Inc., No. 04-332 (EGS),
    2006 WL 2711527 (D.D.C. Sept. 21, 2006) ............................................................... 23

Page(s)

Patrowicz v. Transamerica HomeFirst, Inc., 359 F. Supp. 2d 140 (D. Conn. 2005) .................... 30

Paycom Billing Servs. Inc. v. Mastercard Int'l, Inc., 467 F.3d 283 (2d Cir. 2006) .......... 13, 14, 15

Philip Morris, Inc. v. Grinnell Lithographic Co., 67 F. Supp. 2d 126
(E.D.N.Y. 1999) ......................................................................................................... 22

Reading Indus., Inc. v. Kennecott Copper Corp., 631 F.2d 10 (2d Cir. 1980) ............................ 13

Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951 (10th Cir. 1990).......... 11, 13, 17

Republic of Arg. v. Weltover, Inc., 504 U.S. 607 (1992) ................................................................ 8

Republic of Colom. v. Diageo N. Am., No. 04-CV-4372 (NGG),
2007 WL 1813744 (E.D.N.Y. June 19, 2007) .......................................................... 27

Rotec Indus., Inc. v. Mitsubishi Corp., 348 F.3d 1116 (9th Cir. 2003) ......................................... 6

Sanner v. Bd. of Trade of Chi., 62 F.3d 918 (7th Cir. 1995) ............................................... 11, 13

Schwab v. Philip Morris USA, Inc., 449 F. Supp. 2d 992 (E.D.N.Y. 2006) ................................ 27

Silverman v. Major League Baseball Players Relations Comm., Inc., 67 F.3d 1054
(2d Cir. 1995) ...................................................................................................... 2, 18, 19

Sony Elecs., Inc. v. Soundview Techs., Inc., 157 F. Supp. 2d 180 (D. Conn. 2001).................... 17

Stephen Jay Photography, Ltd. v. Olan Mills, Inc., 903 F.2d 988 (4th Cir. 1990) ................ 21, 22

Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320 (1961) ................................................. 20

Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co., 305 F.3d 1124 (10th Cir. 2002) ........................... 17

Thai Airways Int'l Ltd. v. United Aviation Leasing B.V., 59 F.3d 20
(2d Cir. 1995) ............................................................................................................ 24

Thai Airways Int'l Ltd. v. United Aviation Leasing B.V., 842 F. Supp. 1567
(S.D.N.Y. 1994) ................................................................................................ 24, 28, 29

Todd v. Exxon Corp., 275 F.3d 191 (2d Cir. 2001) ............................................................... 11, 17

Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90 (2d Cir. 1998) ........................................... 18

United States v. LSL Biotechnologies, 379 F.3d 672 (9th Cir. 2004) ........................................... 8

Page(s)

Westchester Radiological Assocs., P.C. v. Empire Blue Cross & Blue Shield, Inc.,
    659 F. Supp. 132 (S.D.N.Y. 1987) ....................................................................... 13

**Statutes and Rules**

15 U.S.C. § 1 ........................................................................................................ 2, 15

15 U.S.C. § 2 ........................................................................................................ 2, 17

15 U.S.C. § 6a .......................................................................................................... 6

15 U.S.C. § 12 .......................................................................................................... 6

15 U.S.C. § 13 ...................................................................................................... 6, 21

15 U.S.C. § 14 ...................................................................................................... 2, 20

15 U.S.C. § 78dd-1 .................................................................................................... 5

15 U.S.C. § 78dd-2 ................................................................................................ 5, 29

15 U.S.C. § 78dd-3 .................................................................................................... 5

18 U.S.C. § 1952 ................................................................................................... 5, 28

18 U.S.C. § 1956 ................................................................................................... 5, 28

18 U.S.C. § 1957 ................................................................................................... 5, 28

18 U.S.C. § 1962 ........................................................................................... 4, 23, 28, 30

Fed. R. Civ. P. 8 ....................................................................................................... 29

Fed. R. Civ. P. 9 ....................................................................................................... 29

N.Y. Penal Law § 180.00 ........................................................................................... 22

**Other Authorities**

Carl W. Ek & Susan B. Epstein, China's Most-Favored-Nation Status: U.S.
    Wheat Exports, Congressional Research Service: Report for Congress, 94-447
    ENR (May 24, 1994), available at
    http://digital.library.unt.edu/govdocs/crs/permalink/meta-crs-160:1 ......................... 8

Page(s)

Convention on Combating Bribery of Foreign Public Officials in International
    Business Transactions, November 21, 1997, DAFFE/IME/BR(97)20 ............................ ix, 5, 28

Franklin A. Gevurtz, Commercial Bribery and the Sherman Act:  The Case for Per
    Se Illegality, 24 U. Miami L. Rev. 365 (1987)..................................................................... 11-12

Franklin A. Gevurtz, Using the Antitrust Laws to Combat Overseas Bribery by
    Foreign Companies:  A Step to Even the Odds in International Trade,
    27 Va. J. Int'l L. 211 (1987)......................................................................................................... 8

H.R. Rep. No. 97-686 (1982)............................................................................................................ 9

Paul A. Volcker, Chairman, Indep. Inquiry Comm. Into the United Nations Oil-
    For-Food Programme, Manipulation of the Oil-For-Food Programme by the
    Iraqi Regime (October 27, 2005) ............................................................................ ix, 5, 29, 30

The Honourable Terence RH Cole AO RFD QC, Report of the Inquiry into certain
    Australian companies in relation to the UN Oil-for-Food Programme
    (November 2006) ...................................................................................................... ix, 5, 16, 21

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this memorandum of law:

- "Complaint" or "<u>Boyd</u> ¶ [ ]" for references to the Consolidated Class Action Complaint filed in this matter, dated July 10, 2007.

- "Memorandum" or "Mem." for references to AWB's Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint, dated August 17, 2007.

- "Opposition" or "Opp." for references to Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint, dated October 24, 2007.

- "Roeser Decl. Ex. [ ]" for references to exhibits attached to the Reply Declaration of Daniel P. Roeser filed herewith, sworn to December 3, 2007.

- "Cole Report [ ]" for references to The Honourable Terence RH Cole AO RFD QC, <u>Report of the Inquiry into certain Australian companies in relation to the UN Oil-for-Food Programme</u> (November 2006).

- "Volcker Report [ ]" for references to Paul A. Volcker, Chairman, Independent Inquiry Committee into the United Nations Oil-For-Food Programme, <u>Manipulation of the Oil-For-Food Programme by the Iraqi Regime</u> (October 27, 2005).

- "OECD Convention" for references to the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, November 21, 1997, DAFFE/IME/BR(97)20.

Far from rebutting the arguments in AWB's motion to dismiss, plaintiffs' Opposition demonstrates why their antitrust and Racketeer Influenced and Corrupt Organizations Act ("RICO") claims are internally inconsistent, fail as a matter of law, and should be dismissed.

## PRELIMINARY STATEMENT

## I.    PLAINTIFFS' ANTITRUST CLAIMS.

AWB showed in its Memorandum that plaintiffs' antitrust claims are fatally flawed because, inter alia, plaintiffs (1) cannot establish that AWB's alleged conduct in the Iraqi wheat market had a "direct, substantial and reasonably foreseeable" effect on U.S. domestic commerce (Mem. Section I.A.); (2) cannot demonstrate that they suffered any antitrust injury as a result of AWB's alleged conduct (id. Section II.A.); (3) cannot identify any anticompetitive effect of AWB's alleged conduct on the Iraqi wheat market (or the U.S. wheat market) (id. Sections I.B., II.A.1); and (4) did not participate in the Iraqi wheat market, the relevant market in this case (id. Section II.A.2). As a result, this Court lacks subject matter jurisdiction over plaintiffs' antitrust claims (id. Section I), and plaintiffs lack standing to assert those claims (id. Section II).

Plaintiffs' response to those arguments is not to defend their own pleadings, but to run from their own Complaint and to try to replead their case in their Opposition. That, however, is not permitted on a motion to dismiss.[1] Gone is plaintiffs' original theory of the case, that (1) because of an alleged conspiracy among AWB, the Iraqi Grain Board ("IGB") and others between 1999 and 2003 (Boyd ¶¶ 14-22, 69); (2) the Iraqi Government purchased little or no U.S.-grown wheat (id. ¶ 91); (3) which caused there to be higher "Ending Stocks" of wheat in the

---

[1] See Henthorn v. Dep't of Navy, 29 F.3d 682, 688 (D.C. Cir. 1994) ("[W]e have found no case . . . suggesting that a trial court must consider contradictory factual allegations made in a brief opposing a motion to dismiss when ruling on a 12(b)(6) motion. In fact, the sparse case law addressing the effect of factual allegations in briefs or memoranda of law suggests that such matters may never be considered when deciding a 12(b)(6) motion") (cited in Henneberger v.

U.S. (id. ¶¶ 57, 93); (4) which resulted in wheat futures contracts trading on various U.S.

commodity exchanges at lower prices (id. ¶¶ 56-57); (5) which resulted in a lower wheat price in

the U.S. (id. ¶¶ 57, 93); (6) which supposedly meant that plaintiffs were unable to sell their wheat

in the U.S. for as much money as they would otherwise have been able to (id. ¶ 94). In its place,

plaintiffs now offer a new theory that is never even mentioned in their Complaint – namely,

(1) that the market for bread wheat imported by Iraq is a "monopsony" (Opp. 23); (2) that a

"buyer-side conspiracy directed at sellers" in Iraq stifled competition in the Iraqi wheat market,

supposedly foreclosing that market to U.S. wheat (id. 1, 13); and (3) that the foreclosure of the

Iraqi market allegedly "caused a drop in demand in the U.S. market and a concomitant drop in

prices" at which plaintiffs were able to sell their wheat in the U.S. domestic market (id. 8, 13).

Not only is that new formulation unduly simplistic, and at odds with plaintiffs' own pleadings, as

described above, but it, too, is fatal to plaintiffs' antitrust claims.

      First, in a monopsony, the buyer exercises "monopoly" power. See Silverman v.

Major League Baseball Players Relations Comm., Inc., 67 F.3d 1054, 1061 (2d Cir. 1995)

(characterizing a monopsony as "a buyer's monopoly"). Consequently, according to plaintiffs, it

was the Iraqi Government – and not AWB – that exercised "monopoly" power in the Iraqi wheat

market. That contention is fatal to plaintiffs' claim under Section 2 of the Sherman Act, 15

U.S.C. § 2 (Count I), which is premised upon the allegation that AWB was the monopolist in that

market. (See Boyd ¶ 105.) The Iraqi Government's status as a monopsonist also makes it wholly

implausible that it would have conspired with AWB to restrain trade in the Iraqi market in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count II), or agreed to an exclusive-

dealing arrangement with AWB in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14

---

County of Nassau, 465 F. Supp. 2d 176, 185 n.2 (E.D.N.Y. 2006)).

(Count III).  Given its monopoly power, the Iraqi Government had no reason to do either.[2]

Second, plaintiffs' description of the alleged conspiracy here – a "buyer-side conspiracy directed at sellers" in Iraq (Opp. 13) – by definition excludes AWB as a conspirator. AWB was never a buyer of wheat in Iraq, but instead was itself a seller, as plaintiffs acknowledge.  (Boyd ¶ 1.)  Consequently, if a "buyer-side conspiracy" existed in Iraq, then AWB, like other sellers of wheat to Iraq, was one of the targets of that conspiracy.

Third, in trying to show that AWB's alleged conduct in Iraq had a "direct" or "reasonably foreseeable" effect on U.S. domestic commerce, and also somehow caused plaintiffs antitrust injury in the U.S., plaintiffs' attempt to recast their case improperly conflates the Iraqi and U.S. domestic wheat markets, and ignores both (1) the fact that plaintiffs never attempted to sell wheat in or to Iraq; and (2) the complexities of the pricing of wheat across international markets that plaintiffs describe in their own Complaint.  (Opp. 8, 13, 14-19.)  Plaintiffs' own pleadings make clear that plaintiffs never participated – or tried to – in the Iraqi wheat market. (Mem. Section II.A.2; see also Boyd ¶¶ 4-11, 65.)  Moreover, the price of wheat in the U.S. domestic market was never derived directly from events in any foreign market (including Iraq), but instead was the result of a complex interplay between projected "Ending Stocks" of U.S. wheat in any given crop year and wheat prices generated by futures contracts traded on U.S. domestic commodity exchanges, where numerous other factors could also influence price.  (Boyd ¶¶ 56-57; see also Mem. Section I.A.)  As AWB's Memorandum made clear, AWB's alleged actions in Iraq did not have any "direct" or "reasonably foreseeable" effect in the U.S., and did

---

[2] The Iraqi Government's status as a monopsonist also means that even if plaintiffs had somehow suffered cognizable antitrust injury as a result of events in the Iraqi wheat market between 1999 and 2003 – which they did not (see Mem. Section II.A.) – the Iraqi Government, and not AWB, would be the proper defendant in any lawsuit asserting antitrust violations.

not cause plaintiffs – who never participated in the Iraqi wheat market – any antitrust injury.[3]

(See Mem. Sections I.A., II.A.) This Court thus lacks subject matter jurisdiction over plaintiffs'

antitrust claims, and plaintiffs lack standing to assert them.

## II.    PLAINTIFFS' RICO CLAIM.

In response to AWB's motion to dismiss their RICO claim, 18 U.S.C. §1962(c)

(Count IV), plaintiffs again try to replead their claim through their Opposition.

First, in an attempt to overcome the fact that this Court lacks subject matter

jurisdiction over plaintiffs' RICO claim (see Mem. Section VII.A), plaintiffs try to argue that the

extraterritorial application of RICO is not required, because the "majority of the actions taken in

furtherance of the conspiracy occurred within the U.S.". (Opp. 37.) That assertion is not only

wrong, but it is inconsistent with plaintiffs' own Complaint, which alleges that the conspiracy

(1) was supposedly formed outside the U.S., in Baghdad, by representatives of AWB (an

Australian company) and the Iraqi Government (Boyd ¶¶ 71-72); and (2) involved only non-U.S.

conspirators (id. ¶¶ 14-22).[4]    This case plainly requires extraterritorial application of RICO,

which, as AWB has demonstrated, is improper because not only did the allegedly illegal conduct

occur outside the U.S., but also it had no "direct" or "foreseeable" effect in the U.S. (Mem.

Section VII.A.) This Court thus lacks subject matter jurisdiction over plaintiffs' RICO claim.

---

[3] It is also important to view plaintiffs' allegations from a practical perspective. Prior to the commencement of the alleged conspiracy, Iraq purchased only six percent of its wheat from the U.S. – representing only 0.58 percent of total U.S. wheat exports and 1.3 percent of total U.S. hard red winter wheat exports that year. (Boyd ¶¶ 52, 61, 67; see also Mem. 2 n.5.) Plaintiffs thus contend that because Iraq stopped purchasing just 1.3 percent of total U.S. hard red winter wheat exports, that caused a "direct, substantial and reasonably foreseeable decrease in prices" for wheat in the U.S. domestic market. (Boyd ¶ 94.) In light of the complex pricing mechanism for U.S. domestic wheat described by plaintiffs themselves, that contention is absurd.

[4] All of AWB's alleged co-conspirators – described by plaintiffs as "various agencies of the Iraqi government, a Jordanian trucking company, and international shipping companies" (see Boyd ¶ 1) – are foreign entities with no alleged connection to the U.S. (id. ¶¶ 14-22).

Second, plaintiffs try to bolster their inadequate pleadings by asserting that the Cole Report and the Volcker Report both found AWB guilty of bribery.[5] That is not true. Neither Report made any finding of bribery against AWB. Indeed, the Cole Report specifically found that there was no reasonable basis to conclude that AWB had engaged in bribery – "[t]he fees were akin to a tariff imposed by the Iraqi government on all goods imported under the Oil-for-Food Programme". (Cole Report Vol. 5, App. 26, p. 347 (Roeser Decl. Ex. A); see also id. Vol. 4, Ch. 31, p. 109 (Roeser Decl. Ex. A); id. Vol. 5, App. 26., pp. 345-48 (Roeser Decl. Ex. A); Mem. Section VII.C.) Plaintiffs' repeated references to bribery throughout their Opposition (see, e.g., Opp. 13, 22, 26) are thus baseless. Plaintiffs cannot establish a violation of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 to -3 ("FCPA"), which is fatal to plaintiffs' RICO claim (Count IV).

Third, confronted with the absence of any "unlawful act" on AWB's part sufficient to establish at least two predicate acts as required for Section 1962(c) liability, plaintiffs blatantly try to supplement their existing pleadings in their Opposition.[6] (See Mem. Section VII.C; see also Opp. 49-50.) For the first time, plaintiffs now allege that AWB engaged

---

[5] "Two independent reports, one commissioned by the United Nations (the 'Volcker Report') and the other by the Australian government (the 'Cole Report'), have both concluded that Defendant AWB Limited . . . illegally funneled money from the OFFP in order to pay bribes to the Iraqi government . . . ." (Opp. 1.) "[T]he Complaint contains detailed factual allegations of the bribery scheme taken from the Volcker Report and the Cole Report and incorporates them by reference." (Id.)

[6] In their Complaint, plaintiffs allege only that AWB violated the Travel Act, 18 U.S.C. § 1952, by violating the FCPA, 15 U.S.C. §§ 78dd-1 to -3, and the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions ("OECD Convention"). (See Mem. 31-32 & n.41; Boyd ¶ 132(a).) Plaintiffs now concede that AWB did not violate the OECD Convention (also a finding in the Cole Report, see Roeser Decl. Ex. A; see also Opp. 46 n.34), and AWB has shown that it did not breach the FCPA. (See Mem. Section VII.C.1.) Plaintiffs have also failed to plead any "unlawful activities" that establish a violation of either 18 U.S.C. § 1956 (Boyd ¶ 132(b)) or 18 U.S.C. § 1957 (Boyd ¶ 132(c)). Those claims must be dismissed.

in "foreign extortion", "cross-border transportation of property stolen or taken by fraud", and "violations of U.S. domestic mail and wire fraud statutes". (Opp. 50.) Those allegations are entirely absent from plaintiffs' Complaint, and cannot now be considered. Henthorn, 29 F.3d at 688. Plaintiffs' RICO claim, as pled, remains defective and must be dismissed.

## ARGUMENT

## I. PLAINTIFFS' ANTITRUST CLAIMS (COUNTS I, II, III AND V) MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.

Plaintiffs do not dispute that the conduct at issue is "foreign conduct" for purposes of the antitrust laws (Opp. 6), and they concede that the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a, governs this Court's jurisdiction over their Sherman Act and Clayton Act claims. (Opp. 7 n.6.)[7] Under the FTAIA, this Court lacks jurisdiction over plaintiffs' antitrust claims unless the conduct both "(1) sufficiently affects American commerce, i.e., it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, imports or (certain) export commerce, and (2) has an effect of a kind that antitrust law considers harmful, i.e., the 'effect' must 'giv[e] rise to a [Sherman Act] claim'". F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 162 (2004) (quoting 15 U.S.C. § 6a(1), (2); emphasis and alterations in original). The conduct here did not affect American commerce and did not have an effect of a kind that antitrust law considers harmful. (Mem. Section I.) Plaintiffs' antitrust claims must therefore be dismissed for lack of subject matter jurisdiction.

---

[7] Plaintiffs argue that the FTAIA does not apply to plaintiffs' claims under the Robinson-Patman Act, 15 U.S.C. § 13(c). (Opp. 7 n.6.) But the case upon which plaintiffs rely, Rotec Industries, Inc. v. Mitsubishi Corp., 348 F.3d 1116 (9th Cir. 2003), shows why the Court nonetheless lacks jurisdiction over that claim. (Opp. 7 n.6.) The Robinson-Patman Act applies only to persons engaged in "trade or commerce among the several States and with foreign nations". 15 U.S.C. § 12(a). Wholly foreign trade – such as trade between AWB (an Australian company) and Iraq – is not covered. See Rotec, 348 F.3d at 1122. Thus, this Court plainly lacks subject matter jurisdiction over plaintiffs' Robinson-Patman Act claim as well.

**A.    AWB's Alleged Conduct in Iraq Did Not Have a "Direct, Substantial and Reasonably Foreseeable Effect" on American Domestic Commerce.**

First, nothing in plaintiffs' Opposition changes the fact that plaintiffs' Complaint relies solely upon boilerplate, conclusory language, without any factual predicate, in alleging a "direct, substantial and reasonably foreseeable effect" on U.S. domestic commerce. (See Mem. 4-5; see also Opp. 8.) Such generalized assertions, without more, are not sufficient. Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1967 (2007).

Second, as explained above, plaintiffs' argument that AWB's alleged conduct in Iraq had a "direct", "substantial" or "reasonably foreseeable" effect on U.S. domestic commerce is contrary both to common sense and to plaintiffs' own pleadings. (Opp. 8; see also 3-4, supra.) In light of plaintiffs' description of the complexities of pricing wheat in the U.S. domestic market, premised upon the interaction between predicted "Ending Stocks" of wheat at various times and wheat futures contracts traded on different U.S. commodity exchanges (Boyd ¶¶ 56-57), it is plain that the cessation of U.S. wheat exports to Iraq – which were only 1.3 percent of total U.S. hard red winter wheat exports prior to the alleged conspiracy (see n.3, supra) – did not have a "direct, substantial or reasonably foreseeable" effect on domestic U.S. prices.[8] As plaintiffs' pleadings make clear, there is no direct link between those two very separate markets. It is not surprising, then, that plaintiffs cannot point to a single case that supports their contention that foreclosure of a foreign market, as a result of alleged bribery, will cause a "direct, substantial

---

[8] Plaintiffs assert that "[t]he fact that the Complaint explains the interrelatedness of geographic submarkets and the pricing mechanisms in the wheat market does not, as Defendants suggest, make Plaintiffs' theory more complicated or attenuated". (Opp. 8 n.7.) But of course it does. Likewise, plaintiffs' assertion that AWB's conduct caused a "reasonably foreseeable" effect on U.S. domestic commerce because "AWB understood . . . that the foreclosure of U.S.-grown wheat from the Iraqi market would result in . . . lower prices in the United States" (Opp. 8; Boyd ¶ 93) is also wrong. Plaintiffs' Complaint is devoid of any pleadings whatsoever that support that assertion. Indeed, it would have been impossible for AWB to "understand" anything of the kind.

and reasonably foreseeable" effect on domestic U.S. commerce.[9] (Opp. 9.) In contrast, however,

In re Intel Corp. Microprocessor Antitrust Litigation, 452 F. Supp. 2d 555 (D. Del. 2006), is on

point. (See Mem. 5-6.) As the Intel court noted, in order for there to be a "direct effect" on U.S.

domestic commerce for FTAIA purposes, "there must be an 'immediate consequence' of the

alleged anticompetitive conduct with no intervening developments". In re Intel, 452 F. Supp. 2d

at 560. Even according to plaintiffs, however, the consequences of AWB's alleged actions in

Iraq were far from "immediate" – indeed, the Complaint identifies a six-step chain of events that

would have to occur before domestic U.S. wheat prices might even potentially be affected. (See

1-2, supra; Mem. 2-3, 6.) In an analogous situation, the Intel court found that the alleged

domestic effects of the challenged conduct were not "direct" because they were "premised on a

multitude of speculative and changing factors affecting business and investment decisions,

---

[9] The cases cited by plaintiffs (see Opp. 9-11) are all inapposite because either (a) the alleged effects were not found to be "direct", see United States v. LSL Biotechnologies, 379 F.3d 672, 681 (9th Cir. 2004); (b) they predate the FTAIA, see Daishowa Int'l v. N. Coast Exp. Co., No. C-81-574 RPA, 1982 WL 1850 (N.D. Cal. May 24, 1982); (c) they involve an entirely different statute, see Republic of Arg. v. Weltover, Inc., 504 U.S. 607, 617 (1992); (d) they do not address the question here at issue because it was not raised by the parties, see In re Rubber Chems. Antitrust Litig., 504 F. Supp. 2d 777, 781 (N.D. Cal. 2007); (e) they are distinguishable on their facts, because they are premised upon allegations that U.S. defendants formed a conspiracy in the U.S. intended to obstruct competition in the U.S. market, which is not the case here, see MM Global Servs. Inc. v. Dow Chem. Co., No. Civ. 3:02CV 1107(AVC), 2004 WL 556577, at *3, *5 (D. Conn. Mar. 18, 2004); or (f) they suggest that the foreign and U.S. markets at issue were effectively a single market, which even on plaintiffs' pleadings was not the case here, see Coors Brewing Co. v. Miller Brewing Co., 889 F. Supp. 1394, 1398 (D. Colo. 1995). In the absence of any supporting case law, plaintiffs rely upon a twenty-year-old law review article, Franklin A. Gevurtz, Using the Antitrust Laws to Combat Overseas Bribery by Foreign Companies: A Step to Even the Odds in International Trade, 27 Va. J. Int'l L. 211 (1987) (cited at Opp. 9). Not only does that article fail to identify any cases to support plaintiffs' arguments, but it contends only that certain "lost exports" might satisfy the FTAIA. Id. at 235. Plaintiffs here, however, are not exporters, and thus they cannot claim any such loss. (Mem. 10-13.) Finally, plaintiffs cite a Congressional Research Service analysis written by agriculture and trade policy experts that does not contain any legal analysis but happens to use the phrase "direct effect". Carl W. Ek & Susan B. Epstein, China's Most-Favored-Nation Status: U.S. Wheat Exports, Congressional Research Service: Report for Congress, 94-447 ENR (May 24, 1994), available at http://digital.library.unt.edu/govdocs/crs/permalink/meta-crs-160:1 (cited at Opp. 9). That analysis has no bearing on this case.

including market conditions, the cost of financing, supply and demand, . . . the availability of funds and world-wide economic and political conditions". Id. at 561. That is precisely the case here.[10] (Mem. 5-6.) Thus, plaintiffs cannot satisfy the first prong of the exception to the FTAIA.

**B.    The Alleged Domestic Effect of AWB's Conduct Cannot Properly Give Rise to an Antitrust Claim.**

Plaintiffs assert that they meet the second prong of the exception to the FTAIA because depressed prices for wheat in the U.S. constitute a domestic effect that "gives rise" to antitrust claims under the FTAIA. (Opp. 11.) They are wrong. Congress placed the words "gives rise to a claim" in the FTAIA "to make clear that the domestic effect must be an adverse (as opposed to a beneficial) effect". See Empagran, 542 U.S. at 174 (emphasis in original) (quoting H.R. Rep. No. 97-686, at 11 (1982)). Plaintiffs must show that AWB's alleged conduct gave rise to "an effect [in the U.S.] of a kind that antitrust law considers harmful". Id. at 162. Plaintiffs have not met, and cannot meet, that requirement.[11]

As AWB demonstrated in its Memorandum, the domestic effect complained of by plaintiffs – a decrease in the prices at which plaintiffs could sell their wheat in the U.S. (see, e.g., Boyd ¶¶ 94, 110) – is not an effect that U.S. antitrust law considers harmful, and therefore will not give rise to an antitrust claim. (See Mem. 6-7 (citing Brunswick Corp. v. Pueblo Bowl-O-

---

[10] Plaintiffs try to distinguish Intel on the ground that the "causal chain alleged in Intel was far more attenuated" than the chain here. (Opp. 11 n.8.) That is wrong. As in this case, the Intel plaintiffs alleged six separate steps in the causal chain between the challenged conduct and the alleged effect on U.S. domestic commerce. (Compare Opp. 11 n.8 with 1-2, supra; see also Mem. 2-3, 6.) In that case, as in this, such a lengthy causal chain is too attenuated to result in a "direct effect" in the U.S., as required by the FTAIA. In re Intel, 452 F. Supp. 2d at 560-61.

[11] Citing Metallgesellschaft AG v. Sumitomo Corp. of America, 325 F.3d 836 (7th Cir. 2003), plaintiffs argue they should not be required to make that showing, because "antitrust injury is distinct from the FTAIA inquiry". (Opp. 11.) That, however, is wrong. Not only does the case not say that, see 325 F.3d at 843, but also Metallgesellschaft was decided a year before the Court laid out the requirements of the exception to the FTAIA in Empagran, 542 U.S. at 162.

Mat, Inc., 429 U.S. 477, 488 (1977) ("[t]he antitrust laws . . . were enacted for the protection of

competition not competitors") (internal quotation marks omitted)).)  Plaintiffs try to get around

that obstacle by arguing in their Opposition that "this case involves a buyer-side conspiracy

directed at sellers" in Iraq, which "will typically result in lower prices for sellers and is as

unlawful as one at the seller level".  (Opp. 13.)  But that argument, too, fails.  Plaintiffs may have

alleged a "buyer-side conspiracy" in Iraq – where plaintiffs are neither customers nor competitors

(see Mem. 10) – but they do not, and cannot, allege a buyer-side conspiracy in the U.S. domestic

market.  As a result, lower wheat prices in the U.S. – the alleged domestic effect of AWB's

conduct in Iraq – cannot constitute an antitrust injury to plaintiffs (see Section II.A., infra; see

also Mem. 8-10 & n.13), and certainly do not constitute an "adverse" effect on domestic U.S.

commerce that "gives rise" to an antitrust claim.  Empagran, 542 U.S. at 162, 174.

   Plaintiffs' allegations thus fall outside the exception to the FTAIA, and

consequently this Court lacks subject matter jurisdiction over plaintiffs' antitrust claims.

## II. PLAINTIFFS LACK STANDING TO ASSERT THEIR ANTITRUST CLAIMS (COUNTS I, II, III & V).

   Plaintiffs acknowledge that in order to determine whether they possess antitrust

standing, the Court must decide (1) whether they have suffered an "antitrust injury" and, if so,

(2) whether they are the proper party to bring the action.  (Opp. 12; see Mem. Section II.)

Plaintiffs cannot satisfy either prong of that test.

### A. Plaintiffs Have Not Demonstrated "Antitrust Injury".

   To allege an antitrust injury, plaintiffs must show (1) that there was an actual

anticompetitive effect in the relevant market (i.e., Iraq), and (2) that they participated in that

market.  See George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139-40 (2d Cir.

1998).  Plaintiffs do neither:  (1) plaintiffs do not show that AWB's alleged conduct had an

actual adverse effect on competition in the relevant market, which they define as "the market for bread wheat imported by Iraq" (Boyd ¶ 40),[12] and (2) none of the named plaintiffs is alleged <u>ever</u> to have sold, or even attempted to sell, wheat either in or to Iraq (<u>id.</u> ¶¶ 4-11, 65). (<u>See</u> Mem. 9-10.) Plaintiffs cannot, as a matter of law, demonstrate antitrust injury, and thus lack standing.

In their Opposition, plaintiffs try to argue that they have suffered antitrust injury, as a result of an unpleaded, newly identified "buyer-side conspiracy [in Iraq] directed at sellers". (Opp. 13.) But that assertion ignores the fact that (1) plaintiffs never participated as sellers in the Iraqi market (Mem. 10), and (2) the Iraqi wheat market is entirely separate and distinct from the U.S. domestic wheat market. For those reasons, none of the "buyer-side conspiracy" cases cited by plaintiffs in their brief actually supports a finding of antitrust injury in plaintiffs' favor.[13]

---

[12] Plaintiffs do not allege, for example, that AWB's alleged conduct resulted in higher wheat prices, reduced wheat output, or decreased wheat quality in the Iraqi market, and they admit that the payment by AWB of the allegedly illegal "inland transportation fees" "did not directly affect . . . the price for which the wheat was sold" to the Iraqi Government. (Boyd ¶ 77; <u>see</u> Mem. 9.)

[13] None of the cases cited by plaintiffs involves sellers in one market seeking damages caused by an alleged "buyer-side conspiracy" in an entirely different market in which they did not participate. In the cases cited by plaintiffs, the defendants were either (a) buyers in the same market in which the buyer-side conspiracy was alleged, <u>see</u> Mandeville Island Farms v. Am. Crystal Sugar Co., 334 U.S. 219, 222-23 (1948); Todd v. Exxon Corp., 275 F.3d 191, 195 (2d Cir. 2001); Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 954-55 (10th Cir. 1990); Nat'l Macaroni Mfrs. Ass'n v. FTC, 345 F.2d 421, 423 (7th Cir. 1965); or (b) sellers in that same market, <u>see</u> Amarel v. Connell, 102 F.3d 1494, 1500, 1502-03 (9th Cir. 1996); Am. Health Sys., Inc. v. Visiting Nurse Ass'n of Greater Phila., No. Civ. A. 93-542, 1994 WL 314313, at *1 (E.D. Pa. June 29, 1994). Here, plaintiffs and defendants did not participate in the same market. (Mem. 9-10.) Sanner v. Board of Trade of Chicago, 62 F.3d 918 (7th Cir. 1995), on which plaintiffs rely heavily, is wholly inapposite: plaintiffs and defendants in that case operated in the <u>same</u> market for purposes of antitrust standing, <u>id.</u> at 929; the defendants' alleged conduct had a <u>direct</u> effect on that market, <u>id.</u> at 927-28; and the plaintiffs alleged a conspiracy <u>intended</u> to cause and maintain artificially depressed prices in the market, <u>id.</u> at 921-22. None of those circumstances exists here: plaintiffs and defendants do not participate in the same market; plaintiffs' factual allegations do not support claims of a direct effect on the U.S. market (<u>see</u> Section I.A., <u>supra</u>; Section VII.B., <u>infra</u>); and plaintiffs have not alleged that AWB intended to lower wheat prices in the U.S. domestic market. Plaintiffs also cite Central Telecommunications, Inc. v. TCI Cablevision, Inc., 800 F.2d 711 (8th Cir. 1986), but that case does not address antitrust injury; the court simply rejected defendant's argument that it could not possess monopoly power in a regulated industry. <u>See id.</u> at 726. Finally, plaintiffs cite another Gevurtz article, this time for the proposition that "a competitor who loses business due to a payoff [has] standing". Franklin A. Gevurtz, Commercial Bribery and the Sherman Act: The Case for Per Se

Plaintiffs then argue, contrary to George Haug, 148 F.3d at 139-40, that the requirement of showing "'harm to competition' [in the relevant market] is distinct from 'antitrust injury' and is not part of the standing inquiry". (Opp. 14.) That is not the law in this Circuit.[14]

Finally, plaintiffs make several weak attempts to argue that they did somehow participate in the Iraqi wheat market, and thus should have standing. Plaintiffs first assert that they are actually AWB's direct competitors, despite the fact that they "do not perform their own foreign contracting and delivery". (Opp. 15.) That is ridiculous. None of the named plaintiffs is alleged ever to have sold wheat to, or in, Iraq, or even participated in the OFFP tender process. (Boyd ¶¶ 4-11, 65; Mem. 10.) Plaintiffs then claim that, even if they are not AWB's competitors, they are proper plaintiffs because their injury is "inextricably intertwined with the injury the conspirators sought to inflict on the market". (Opp. 15-16 (internal quotation marks and citations omitted).) That too, is wrong.[15] Lastly, plaintiffs try to argue that they should have standing

_____

Illegality, 24 U. Miami L. Rev. 365, 395 (1987) (quoted at Opp. 13). However, that article goes on to note: "Of course, competitors have the difficult burden of proving that they would have received the contract had there been no bribe." Id. at 395 n.212. Plaintiffs cannot meet that burden here, as they never even sought the contracts awarded by the Iraqi Government to AWB. (See Mem. 10.)

[14] E & L Consulting, Ltd. v. Doman Industries Ltd., 472 F.3d 23, 28 n.3 (2d Cir. 2006), states that "a party cannot establish antitrust injury without establishing . . . an injury to competition". Blue Tree Hotels Investment (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 221 (2d Cir. 2004), did not reach the question of whether the claims at issue asserted antitrust injury, because the plaintiffs otherwise failed to state a claim. In Bristol Technology, Inc. v. Microsoft Corp., 42 F. Supp. 2d 153, 165 (D. Conn. 1998), harm to competition was adequately shown. Finally, even if the Fifth Circuit decision in Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc., 123 F.3d 301, 305 (5th Cir. 1997) is read to suggest that a showing of harm to competition is not required, that decision is neither binding upon, nor even persuasive before, this Court in the face of George Haug, 148 F.3d at 139-40.

[15] Not only is plaintiffs' alleged injury in the U.S. domestic market not "inextricably intertwined" with the Iraqi market or AWB's alleged conduct, given the operation of the wheat pricing mechanism pleaded by plaintiffs (see Section I.A., supra; Boyd ¶¶ 56-57), but plaintiffs' cases do not support their argument. (Opp. 15-16.) The Blue Tree court did not determine whether the plaintiffs had antitrust standing. 369 F.3d at 221. Plaintiffs' other cases all involve plaintiffs who, unlike here, were participants in the relevant market. See Blue Shield of Va. v. McCready, 457 U.S. 465, 467-68 (1982); Mandeville, 334 U.S. at 222-23; Amarel, 102 F.3d at

because AWB's alleged conduct somehow "impacted both American farmers and the exporters who contract to deliver their wheat". (Opp. 16.) Plaintiffs cite no authority for that argument because there is none. To assert antitrust injury, a party must be either a consumer or competitor in the market in which trade was allegedly restrained (i.e., the Iraqi wheat market). See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 539 (1983) ("AGC"). Plaintiffs are neither. As a result, plaintiffs cannot assert antitrust injury, see id.; see also George Haug, 148 F.3d at 140, and thus lack antitrust standing.

**B.      Plaintiffs Are Not the Proper Parties to Bring This Action against AWB.**

Even if a plaintiff adequately alleges an antitrust injury, it lacks standing if it is not the proper antitrust plaintiff. See AGC, 459 U.S. at 540-45; Paycom Billing Servs. Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 294 (2d Cir. 2006). Plaintiffs are not proper antitrust plaintiffs in this case because (a) their asserted injury is extremely indirect; (b) their injury claims are wildly speculative; (c) persons directly affected by the alleged anticompetitive conduct – i.e., who attempted, but were not permitted, to sell wheat to Iraq – would be far more appropriate plaintiffs; and (d) allowing plaintiffs to proceed with their claims will lead to great difficulty in apportioning liability between plaintiffs (who allegedly suffered indirect injury in the U.S.) and wheat exporters (who may allege direct injuries in Iraq).[16] (See Mem. 11-13.)

---

1500, 1502-03; Sanner, 62 F.3d at 929; Reazin, 899 F.2d at 962-63; Crimpers Promotions Inc. v. Home Box Office, Inc., 724 F.2d 290, 294 (2d Cir. 1983); Westchester Radiological Assocs., P.C. v. Empire Blue Cross & Blue Shield, Inc., 659 F. Supp. 132, 135 (S.D.N.Y. 1987).

[16] Plaintiffs' attempts to distinguish the cases cited by AWB to show that plaintiffs' injury claims are extremely indirect and wildly speculative are unavailing. (Opp. 17 n.11; see Mem. 11-12.) Plaintiffs point to the fact that Reading Industries, Inc. v. Kennecott Copper Corp., 631 F.2d 10 (2d Cir. 1980), involved a summary judgment decision. (Opp. 17 n.11.) That is irrelevant – plaintiffs' allegations here are equally as convoluted as the facts there, and should not survive the dismissal stage. de Atucha v. Commodity Exchange, Inc. 608 F. Supp. 510 (S.D.N.Y. 1985), did not turn on the foreign status of the plaintiffs and the market. Rather, the court held that direct causation was not established because there were "numerous complex

Plaintiffs respond to AWB's arguments by baldly intoning, again, that their injuries "were directly and foreseeably caused by Defendants' actions without attenuation". (Opp. 16.)  For the reasons discussed earlier in this memorandum, that assertion is neither correct nor credible.  (See Section I.A., supra; Mem. 4-6, 11-12.)

Plaintiffs also try to argue that "[t]here [w]ill [b]e [n]o [d]ifficulty [w]ith [a]pportionment" of damages between different claimants.  (Opp. 19.)  That, too, is wrong.  Both plaintiffs' and wheat exporters' potential "out of pocket" damages depend directly on the price at which U.S. domestic wheat could have been sold to U.S. exporters, had the alleged foreclosure of the Iraqi market not occurred.  (See Opp. 18.)  In light of the complex wheat pricing mechanism in the U.S. domestic market described by plaintiffs (Boyd ¶¶ 56-57), that price is unknown and unknowable.[17]  Consequently, as AWB has already indicated, allowing plaintiffs to pursue their antitrust claims will lead to great difficulty in apportioning damages between plaintiffs and any wheat exporters who might claim to have suffered direct injuries in Iraq.  (Mem. 12-13.)  "The probability of duplicative recoveries would be very large."  See Paycom, 467 F.3d at 294.[18]

---

transactions which must be considered" and "additional factors that must be evaluated to make a determination as to how the markets interact, if they do".  Id. at 516.  That is also true here. Finally, with respect to Ocean View Capital, Inc. v. Sumitomo Corp. of America, No. 98 Civ. 4067 (LAP), 1999 WL 1201701 (S.D.N.Y. Dec. 15. 1999), while the transferee court did conclude that the plaintiff was directly injured, it did so because it found that "the alleged goal of the conspiracy" was to cause the price increase that harmed the plaintiff.  See In re Copper Antitrust Litig., 98 F. Supp. 2d 1039, 1052 (W.D. Wisc. 2000).  That is not the case here. Plaintiffs have not alleged that the "goal of the conspiracy" involving AWB was to create a price reduction in the U.S. domestic wheat market.  Nor is there any basis for such an allegation.

[17] Plaintiffs also say that "any injuries claimed by the exporter would be highly speculative". (Opp. 18.)  If that is true, then non-exporting U.S. farmers' injuries must be even more so.

[18] Plaintiffs attempt to distinguish Paycom on the ground that their damages would not "overlap" with those of other potential plaintiffs.  (Opp. 20 n.15.)  Even if that were true here – and it is not – that misses the point.  In Paycom, a merchant sued Mastercard, alleging in relevant part that Mastercard's policy prohibiting its member banks from working with competing credit-card companies reduced competition in the credit-card industry and hence ensured that the terms available to the merchant when it contracted with credit-card companies were less favorable than

III.  **PLAINTIFFS' CLAIM PURSUANT TO SECTION 1 OF THE SHERMAN ACT (COUNT II) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.**

Plaintiffs do not dispute that, to state a claim pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, they must allege (1) an agreement in restraint of trade, and (2) injury to competition in the relevant market. (Opp. 20-21.) Plaintiffs have met neither requirement.

A.  **Plaintiffs Have Not Adequately Alleged a Contract, Combination or Conspiracy in Restraint of Trade.**

Both plaintiffs' Complaint and their Opposition make clear that plaintiffs' Section 1 allegations are based entirely upon the fact that sales of U.S. wheat to the Iraqi market declined after 1999. (See Opp. 21-23.) Indeed, plaintiffs make the bald assertion that a decline in the market share of U.S. wheat in the Iraqi market after 1999 "properly give[s] rise to the inference of a plausible combination and conspiracy between AWB and the Iraqi Government, and thus, [is] sufficient for purposes of a motion to dismiss". (Opp. 21.) Plaintiffs are wrong.

First, under Bell Atlantic, 127 S. Ct. at 1966, that type of pleading is no longer sufficient.[19] Following Bell Atlantic, a plaintiff must plead "allegations plausibly suggesting (not merely consistent with) agreement". 127 S. Ct. at 1966. As explained in detail in AWB's Memorandum, the Complaint points to nothing that makes it more plausible than not that AWB

_____

they would otherwise have been. Paycom, 467 F.3d at 288. The court held that the plaintiff was not an appropriate plaintiff in part because "quantifying [its] damages would require wholesale speculation as to the extent and type of all of the various plaintiffs' injuries", including most importantly those of the credit-card companies that were barred from working with Mastercard's member banks. Id. at 294. Even though the Paycom plaintiffs' damages would now have "overlapped" with those of other possible plaintiffs, apportioning damages among the different plaintiffs would have been "virtually impossible". Id. The same is true here.

[19] In discussing the standard for pleading an agreement under Section 1, plaintiffs cite three cases. (Opp. 21-22.) Two do not even address the issue. See Associated Radio Serv. Co. v. Page Airways, Inc., 624 F.2d 1342, 1350 (5th Cir. 1980) (rejecting post-verdict challenge to plaintiff's proof of injury to competition); City of Atlanta v. Ashland-Warren, Inc., No. C 81-106A, 1981 WL 2187, at *2-*3 (N.D. Ga. Aug. 20, 1981) (rejecting argument that plaintiff failed to allege harm to competition). The third, American Health Systems, 1994 WL 314313, at *12, was decided thirteen years before Bell Atlantic, and provides no useful guidance today.

and the Iraqi Government expressly agreed that Iraq would not purchase wheat from U.S. growers between 1999 and 2003 – particularly in light of the pending sanctions, and the abysmal relations between the U.S. and Iraq during that time.  (Boyd ¶ 63; see Mem. 13-15.)  As in Bell Atlantic, plaintiffs "mention no specific time, place, or person involved" in this alleged agreement.[20] 127 S. Ct. at 1970 n.10; see also Kahn v. iBiquity Digital Corp., No. 06 Civ. 1536 (NRB), 2006 WL 3592366, at *5 (S.D.N.Y. Dec. 7, 2006).  Plaintiffs' Section 1 allegations thus fail as a matter of law.

**B.**       **Plaintiffs Have Not Adequately Alleged an Injury to Competition in the Relevant Market (i.e., Iraq).**

Plaintiffs rely on the allegation that AWB's market share in Iraq allegedly increased from 73 percent to 98 percent, while U.S. exporters' market share allegedly decreased from six percent to zero percent, as supposed evidence of an anticompetitive effect in the Iraqi market.  (Opp. 23.)  It is not.  Plaintiffs fail to address the point that such a claim is at most an allegation of harm to potential competitors of AWB, and not of an "actual adverse effect on competition as a whole in the [Iraqi] market".  George Haug, 148 F.3d at 139 (internal quotations omitted); see also Floors-N-More, Inc. v. Freight Liquidators, 142 F. Supp. 2d 496, 501-02 (S.D.N.Y. 2001); Mem. 9-10, 16.[21]  As noted above, plaintiffs do not allege that AWB's conduct

---

[20] Plaintiffs' assertion in their Opposition that the Iraqi Government "agreed to purchase all its wheat needs from AWB" during the alleged conspiracy (Opp. 21) is also contradicted by Cole Report Ex. 1495 ("Market Brief 1st Quarter 2003 Iraq") § 3.3.2 (Roeser Decl. Ex. B) (cited at Opp. 21), which shows that the Iraqi Government continued to purchase wheat from Argentina, Canada, the European Union, and "Others" during that time.

[21] Plaintiffs try to distinguish George Haug, 148 F.3d at 139, on the ground that the plaintiff in that case did not adequately plead harm to competition.  (Opp. 24.)  But that is the point – neither do plaintiffs in this case, because they make exactly the allegation rejected as insufficient in George Haug.  (Compare Opp. 23-25 with 148 F.3d at 140.)  Plaintiffs also try to distinguish Floors-N-More, Inc., 142 F. Supp. 2d at 501, on the ground that plaintiffs in that case did not "provide a single fact" to support their conspiracy allegation.  (Opp. 24.)  While the same is also true in this case (see Mem. 13-16), it is also beside the point.  Plaintiffs do not and cannot show harm to competition in Iraq.  (Mem. 16.)

resulted in higher wheat prices, reduced wheat output, or decreased wheat quality in the Iraqi

market.  (See Opp. 24 n.20; Boyd ¶ 77.)

Plaintiffs try to sidestep this flaw in their case by claiming for the first time in

their Opposition that "[t]he market alleged here is a monopsony" and that "[i]njury to

competition can occur by monopsony just as it may result from monopoly".  (Opp. 23.)  If this

was a monopsony, however, then the Iraqi Government was the monopsonist – not AWB.

Consequently, to the extent that plaintiffs were injured by the monopsony, the Iraqi Government,

and not AWB, is the proper defendant in any antitrust suit.[22]

## IV.    PLAINTIFFS' CLAIM PURSUANT TO SECTION 2 OF THE SHERMAN ACT (COUNT I) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.

### A.    Plaintiffs Have Failed to State a Claim for Monopolization.

Plaintiffs acknowledge that, to state a claim under Section 2 of the Sherman Act,

15 U.S.C. § 2, they must allege (1) possession of monopoly power in the relevant market (Iraq)

and (2) willful acquisition or maintenance of that power.  (Opp. 25.)  They have done neither.

#### 1.    Plaintiffs Have Failed Adequately to Allege That Defendants Possessed Monopoly Power.

First, as discussed earlier, plaintiffs' new allegation that "[t]he market alleged here

is a monopsony" (Opp. 23) is fatal to plaintiffs' Section 2 claims.  By definition, it is the buyer in

a monopsony – here, the Iraqi Government – that has "monopoly" power in such a market.  See

---

[22] The cases cited by plaintiffs (Opp. 23-24 & n.20) stand for precisely that proposition.  In Telecor Communications, Inc. v. Southwestern Bell Telephone Co., 305 F.3d 1124, 1128 (10th Cir. 2002), pay phone providers sued another provider over its attempt to acquire all available pay phone locations.  In In re NCAA I-A Walk-On Football Players Litigation, 398 F. Supp. 2d 1144, 1146-47 (W.D. Wash. 2005), college football players sued schools and a league over their agreement to limit scholarships.  In Sony Electronics, Inc. v. Soundview Technologies, Inc., 157 F. Supp. 2d 180, 181 (D. Conn. 2001), a patent holder sued potential licensees over their agreement to fix prices.  See also 11 n.13, supra (discussing Todd, 275 F.3d at 195; Reazin, 899 F.2d at 954-55; Nat'l Macaroni Mfrs., 345 F.2d at 423).  Thus, plaintiffs properly should be suing the alleged monopsonist buyer in the market, namely, the Iraqi Government, and not AWB.

Silverman, 67 F.3d at 1061.  Consequently, AWB did not, and could not, possess monopoly power in the Iraqi wheat market.

Second, plaintiffs' argument that monopoly power may be inferred from AWB's market share in Iraq (Opp. 26-27) is wrong.  As AWB explained (see Mem. 17 n.23), the Second Circuit will "draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics".  Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 98 (2d Cir. 1998).[23]  Plaintiffs have now conceded that, as a monopsonist, the Iraqi Government controlled wheat prices in Iraq and determined sellers' share of that market.  (Opp. 23.)  Consequently, AWB's market share – plaintiffs' only supposed evidence of monopoly power on AWB's part – means nothing.  (Mem. 17-18 & n.23.)  Plaintiffs cannot state a claim for monopolization by AWB.

## 2.    Plaintiffs Have Failed Adequately to Allege That Defendants Sought Monopoly Power in the Relevant Market.

First, plaintiffs' allegations of anticompetitive conduct are far too conclusory to support a Section 2 claim.  See Elec. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 244-45 (2d Cir. 1997); see also Mem. 19-20.  Plaintiffs do not allege, and there is no basis to believe, that AWB and the Iraqi Government ever agreed that Iraq would not purchase wheat from U.S. growers, or that AWB ever suggested such a thing.  (Mem. 19.)  Plaintiffs' pleadings are insufficient to plead monopolization.  Elec. Commc'ns Corp., 129 F.3d at 244-45.

Second, given plaintiffs' assertion that the Iraqi wheat market was in fact a monopsony controlled by the Iraqi Government (Opp. 23), it is plain that AWB could not have

---

[23] Plaintiffs try to distinguish Tops Markets, 142 F.3d at 98, on the ground that it is a summary judgment case (Opp. 24, 27 n.22), but that is irrelevant to this issue.  The Second Circuit's guidelines for assessing monopoly power are equally applicable at the motion to dismiss stage.

possessed the intent or the ability to obtain or maintain monopoly power. If, as plaintiffs assert, the Iraqi Government controlled whether AWB would be able to maintain its share of the Iraqi wheat market (Opp. 28), then AWB certainly did not have monopoly power. The Iraqi Government did. See Silverman, 67 F.3d at 1061.[24]

**B.    Plaintiffs Have Failed to State a Claim for Conspiracy to Monopolize.**

Plaintiffs recognize that, in order to state a claim for conspiracy to monopolize, they must allege (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize. (Opp. 28.) Plaintiffs fail to meet all three requirements.

First, plaintiffs' assertion that the Complaint provides "great detail" about the alleged conspiracy (Opp. 29) is simply wrong. Neither plaintiffs' pleadings nor Opposition contains factual assertions of concerted action into which AWB deliberately entered with the specific intent to achieve an unlawful monopoly in Iraq. (Mem. 20.) Plaintiffs' allegations do not, and cannot, establish that AWB acted with the intent necessary to state a claim under Section 2. See id. (citing Deem v. Lockheed Corp., 749 F. Supp. 1230, 1237 (S.D.N.Y. 1989) (dismissing conspiracy to monopolize claim where the "complaint fails to adequately allege defendants' specific intent to monopolize")).

Second, while the Opposition asserts that plaintiffs have alleged "concerted action by AWB and the IGB" (Opp. 29), the Complaint alleges something very different – that the Iraqi Government held the power and dictated all the terms to AWB. (Boyd ¶¶ 70, 72, 78.) That is consistent with plaintiffs' new assertion that the Iraqi Government was a monopsonist, which means that the Iraqi Government alone exercised "monopoly" power at all relevant times.

_____

[24] Plaintiffs do not dispute that the price of wheat did not increase in the Iraqi market as a result of AWB's alleged conduct. (Boyd ¶ 77.) Yet that would be the expected result if AWB actually exercised monopoly power in that market. See E & L Consulting, 472 F.3d at 28.

(Opp. 13, 23, 24 n.20).  Plaintiffs cannot plausibly suggest that the (monopsonist) Iraqi

Government conspired with AWB in order to give AWB monopoly power over the Iraqi wheat

market (and thereby cede the Iraqi Government's own monopsony power).  In such

circumstances, plaintiffs cannot plausibly argue that AWB ever intended to monopolize the Iraqi

wheat market.  Plaintiffs' Section 2 claims should thus be dismissed.

## V.    PLAINTIFFS' CLAIM PURSUANT TO SECTION 3 OF THE CLAYTON ACT (COUNT III) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.

A claim under Section 3 of the Clayton Act, 15 U.S.C. § 14, requires both (1) an

agreement and (2) an anticompetitive effect.  (Mem. 21.)  Plaintiffs cannot show either.

### A.    Plaintiffs Have Failed Adequately to Allege the Existence of an Exclusive-Dealing Arrangement.

The traditional formulation of a Clayton Act violation is the imposition by a seller

of an exclusive-dealing arrangement on a buyer.  See, e.g., Empire Volkswagen Inc. v. World-

Wide Volkswagen Corp., 814 F.2d 90, 97 (2d Cir. 1987).  Plaintiffs do not allege such an

arrangement.  Indeed, plaintiffs fail to provide any factual basis whatsoever for their claim that

AWB somehow conditioned its alleged payments of transportation fees to the Iraqi Government

on exclusivity for AWB.  (See Mem. 21-22.)  That claim is wholly inconsistent with plaintiffs'

classification of the Iraqi Government as a monopsonist in the Iraqi wheat market, wielding

monopoly power over all sellers (including AWB) with which it dealt.  (See Boyd ¶¶ 70, 72, 78;

Opp. 13, 23, 24 n.20.)  Plaintiffs' Clayton Act claim is implausible, and should be dismissed.[25]

---

[25] Plaintiffs' argument that exclusive effects are sufficient even in the absence of an exclusivity agreement (Opp. 30) is wrong.  The primary case relied upon by plaintiffs to support that argument is inapposite.  The Court in Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 329-30 (1961) (cited at Opp. 30), did not determine whether the contract at issue was an exclusive-dealing arrangement within the purview of Section 3.  Moreover, Tampa Electric observed that contracts are proscribed by Section 3 where the practical effect is to prevent buyers from dealing in the goods of other sellers.  See id. at 326.  Plaintiffs, however, do not – and cannot – allege that the Iraqi Government's contracts with AWB prevented Iraq from doing

**B.**    **Plaintiffs Have Failed Adequately to Allege an Anticompetitive Effect Caused by Defendants' Alleged Conduct.**

In their Opposition, plaintiffs baldly assert that they have adequately alleged an anticompetitive effect caused by AWB's alleged conduct. (Opp. 31.)  For reasons described above (see Section II.A., supra), that is wrong.  Not only do plaintiffs fail to allege, for example, that AWB's alleged conduct resulted in higher wheat prices, reduced wheat output, or decreased wheat quality in the Iraqi market, but they admit that the payment by AWB of the allegedly illegal "inland transportation fee" "did not directly affect . . . the price for which the wheat was sold" to the Iraqi Government.[26]  (Boyd ¶ 77; see Mem. 9-10.)

**VI.**    **PLAINTIFFS' CLAIM PURSUANT TO SECTION 2(c) OF THE ROBINSON-PATMAN ACT (COUNT V) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.**

No circuit has ever treated AWB's alleged conduct as actionable under the Robinson-Patman Act, 15 U.S.C. § 13(c).[27]  Neither should this Court.  Indeed, if plaintiffs are correct, tariffs paid to U.S. customs officials would be actionable under the Act.  That is wrong.

_____

anything.  As evidenced by Cole Report Ex. 1495 ("Market Brief 1st Quarter 2003 Iraq") (Roeser Decl. Ex. B) (cited at Opp. 21), the Iraqi Government continued to purchase wheat from Argentina, Canada, the European Union, and "Others" during the alleged conspiracy.

[26] Plaintiffs' protest that the "[C]omplaint cannot be fairly read to allege that the foreclosure of U.S. wheat did not affect the prices at which Iraq purchased its wheat or the entities who won those contracts" (Opp. at 31 (emphasis in original)) is just another attempt by plaintiffs to walk away from their own pleadings.  The words quoted above from the Complaint speak clearly for themselves.  Nor is it plausible to suggest that the monopsonist Iraqi Government made a deal with AWB with the effect of increasing the prices at which Iraq purchased its wheat.

[27] Plaintiffs' assertion that "six Courts of Appeals . . . have ruled that Section 2(c) encompasses commercial bribery" (Opp. 33) is grossly overstated.  All of the cases they cite either do not decide the issue, see Stephen Jay Photography, Ltd. v. Olan Mills, Inc., 903 F.2d 988, 993 (4th Cir. 1990); Larry R. George Sales Co. v. Cool Attic Corp., 587 F.2d 266, 270 (5th Cir. 1979), or hold that commercial bribery is actionable only when it interferes with the fiduciary relationship between the bribed agent and his principal, see 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 737 n.4 (3d Cir. 2004); Harris v. Duty Free Shoppers Ltd. P'ship, 940 F.2d 1272, 1274 (9th Cir. 1991); Grace v. E.J. Kozin Co., 538 F.2d 170, 173 (7th Cir. 1976); Fitch v. Ky.-Tenn. Light & Power Co., 136 F.2d 12, 14 (6th Cir. 1943) – a circumstance plaintiffs do not (and cannot) allege here.

First, plaintiffs have failed to plead the elements of commercial bribery as defined by the New York Penal Law. Commercial bribery requires the intent to influence an agent's conduct in relation to his principal's affairs. See N.Y. Penal Law § 180.00 (cited in Blue Tree Hotels, 369 F.3d at 222); see also Mem. 24. In this context, commercial bribery would require payments to an Iraqi official, without the consent of the Iraqi Government, with an intent on AWB's part to influence his or her conduct in relation to the Iraqi Government's purchase of wheat. The Complaint does not allege that happened. To the contrary, plaintiffs allege that AWB made payments to the Iraqi Government, not only with its consent, but at its insistence.[28] (Boyd ¶¶ 70, 72.) There is no allegation of an intent to influence the conduct of any Iraqi official, and thus, there is no basis for a Robinson-Patman Act claim.

Second, plaintiffs fail to state a claim even under their own (incorrect) definition of commercial bribery. Plaintiffs argue that the Robinson-Patman Act covers commercial bribery as they define it:  bribes paid to foreign officials to secure contracts and eliminate competition. (Opp. 34 n.28, 35.) But the alleged payments at issue were made to the Iraqi Government pursuant to previously executed contracts between the parties. (Boyd ¶ 70.) Iraqi officials did no more than receive the payments to which the parties had already agreed. Consequently, those officials certainly did not influence the Iraqi Government's decision to purchase wheat from AWB and exclude U.S.-grown wheat, which plaintiffs claim was the purpose of the alleged "bribes". (Opp. 33.)

---

[28] Plaintiffs cite Stephen Jay Photography, 903 F.2d at 993, and Philip Morris, Inc. v. Grinnell Lithographic Co., 67 F. Supp. 2d 126, 130 (E.D.N.Y. 1999), for the proposition that payments required by buyers can constitute commercial bribery. (Opp. 35.) However, neither case even analyzed that question.

Plaintiffs' own cases, Environmental Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052 (3d Cir. 1988), and Oceanic Exploration Co. v. ConocoPhillips, Inc., No. 04-332 (EGS), 2006 WL 2711527 (D.D.C. Sept. 21, 2006) (both cited at Opp. 35-36), prove the point. There, bribes were paid to individual officials who then influenced the award of rights and/or contracts by the government. See Envtl. Tectonics, 847 F.2d at 1055; Oceanic Exploration, 2006 WL 2711527, at *18. Here, AWB allegedly paid "transportation fees" to the Iraqi Government as part of already-awarded contracts. The "improper intent to influence" element – which plaintiffs themselves recognize as "crucial" (Opp. 34 n.28) – is wholly lacking.

## VII.   PLAINTIFFS' RICO CLAIM (COUNT IV) MUST BE DISMISSED.

In addition to their antitrust claims, plaintiffs have alleged that AWB violated RICO, 18 U.S.C. § 1962(c), by engaging in an "enterprise" that was allegedly "designed to and did unlawfully funnel U.S. dollars to the Government of Iraq and achieve, maintain, and exploit AWB's monopoly position in the Iraq wheat market". (Boyd ¶ 130.) Plaintiffs' RICO claim must be dismissed because (1) this Court lacks subject matter jurisdiction over it, (2) plaintiffs lack standing, and (3) plaintiffs have failed to state a claim. (See Mem. 25-35.)

### A.    Plaintiffs' RICO Claim Must Be Dismissed for Lack of Subject Matter Jurisdiction.

#### 1.    Plaintiffs' Claims Require the Extraterritorial Application of RICO.

Despite plaintiffs' argument to the contrary (Opp. 36-38), plaintiffs' claim requires the extraterritorial application of RICO because the only conduct alleged to have occurred in the U.S. is entirely incidental to the alleged "enterprise" – namely, that AWB had an office in the U.S. that allegedly "ensured that AWB was paid efficiently and promptly for the shipments of wheat to Iraq under the [OFFP] and monitored the . . . UN approvals of contracts" and a bank account in New York that was used to receive amounts payable to AWB under the

23

OFFP. (Boyd ¶¶ 31, 135-36.) Such incidental activity was not material to the alleged fraud –

which allegedly was consummated outside the U.S. (see Mem. 3 n.6) – and was not the direct

cause of plaintiffs' alleged loss. See Nasser v. Andersen Worldwide Société Coop., No. 02 Civ.

6832 (DC), 2003 WL 22179008, at *3 (S.D.N.Y. Sept. 23, 2003). Instead, plaintiffs' purported

injury was allegedly caused by a conspiracy formed outside the U.S., in Baghdad, by

representatives of AWB (an Australian company) and the Iraqi Government (Boyd ¶¶ 71-72), and

which involved only non-U.S. conspirators (id. ¶¶ 14-22). Critically, it is plain that the alleged

predicate acts occurred abroad and, therefore, extraterritorial application of RICO is required.[29]

Accordingly, to invoke this Court's subject-matter jurisdiction,[30] plaintiffs must

demonstrate either (1) that conduct material to the completion of the alleged RICO scheme

---

[29] The cases on which plaintiffs rely (Opp. 36-38) do not suggest that where the predicate acts occurred abroad, merely incidental acts in the U.S., as alleged here, support RICO jurisdiction. North-South Finance Corp. v. Al-Turki, far from rejecting application of the extraterritorial test, considers the adequacy of pleadings under the extraterritorial "conduct test". See 100 F.3d 1046, 1052 n.7 (2d Cir. 1996). Alfadda v. Fenn stands for the proposition that "predicate acts which occurred primarily in the United States" confer the court with jurisdiction. 935 F.2d 475, 480 (2d Cir. 1991) (emphasis added). Johnson Electric North America Inc. v. Mabuchi Motor America Corp. also held that extraterritorial application was unnecessary where "RICO predicate acts occurred primarily in the United States". 98 F. Supp. 2d 480, 485 (S.D.N.Y. 2000) (emphasis added). Johnson and Thai Airways International Ltd. v. United Aviation Leasing B.V., 842 F. Supp. 1567, 1570 (S.D.N.Y. 1994), aff'd, 59 F.3d 20 (2d Cir. 1995), found jurisdiction based on factual allegations that "all of the allegedly fraudulent mailings took place either exclusively or partially within the United States through the United States Postal Service", Johnson, 98 F. Supp. 2d at 486 (emphasis added), "both corporations do business in the United States", id. (emphasis added), there was "sale of allegedly infringing motors [] within the United States", id. (emphasis added), and "[a]ll correspondence related to the negotiation and execution of the Lease Agreements and the Guarantee Agreements was sent or received via the United States wires or mails", Thai Airways, 842 F. Supp. at 1571 (emphasis added). In the present case, plaintiffs do not allege (or even imply) domestic conduct at anything close to that level. Indeed, none of the alleged predicate acts occurred "primarily" in the U.S. in this case.

[30] Plaintiffs deny that extraterritorial application of RICO is a jurisdictional issue, citing Ayyash v. Bank Al-Madina, No. 04 Civ. 9201 (GEL), 2006 WL 587342 (S.D.N.Y. Mar. 9, 2006). (Opp. 38 n.30.) In Ayyash, however, this Court observed that it is "bound by the Court of Appeals' decisions until such time as they are directly overruled by that court or the Supreme Court" and consequently must follow the "line of cases ending with Al-Turki, [wherein] the [Second Circuit] Court of Appeals characterized the limit on RICO's extraterritorial application as a constraint on courts' subject-matter jurisdiction". 2006 WL 587342, at *4 n.2 (internal quotation marks omitted).

occurred in the U.S. (the "conduct test"), or (2) that the alleged transactions had substantial and direct adverse effects within the U.S. (the "effects test"). Plaintiffs have not done either.

### 2. This Court Lacks Subject Matter Jurisdiction over Plaintiffs' RICO Claim under the Conduct Test.

The conduct test is met only where the U.S. is the locus of conduct "that is both material to the completion of the fraud and a direct cause of the alleged injury". (Opp. 39.) Given plaintiffs' pleadings, the assertion that the U.S. is "the primary locus" of the predicate acts (id.) is absurd. Not only is the incidental activity in the U.S. alleged by plaintiffs "far removed from the consummation of the fraud", but it was not the direct cause of plaintiffs' alleged loss (which resulted from a complex chain of causal events driven by the operation of the global wheat market). Nasser, 2003 WL 22179008, at *3; see Mem. 26 n.32. The alleged unlawful conduct complained of by plaintiffs – including the formation of the alleged conspiracy and the imposition by Iraq of the allegedly improper "transportation fees" here at issue – all occurred outside the U.S. (Boyd ¶¶ 70-72.) Consequently, plaintiffs' allegations fail the conduct test.[31]

### 3. This Court Lacks Subject Matter Jurisdiction over Plaintiffs' RICO Claim under the Effects Test.

In their Opposition, plaintiffs repeat their contention that the effects in the U.S. of AWB's alleged conduct were direct, substantial, and foreseeable. (Opp. 40.) They even go so far as to pretend that "U.S. class members were injured in the U.S. due to conduct directed at

---

[31] Plaintiffs' reliance on Ayyash, 2006 WL 587342, and National Group for Communications & Computers Ltd. v. Lucent Technologies Inc., 420 F. Supp. 2d 253 (S.D.N.Y. 2006) (cited at Opp. 39-40), is misplaced. Ayyash explicitly notes that the "conduct test" is not satisfied where the transfer of funds into or out of the U.S. is "peripheral to the principal fraud". 2006 WL 587342, at *6 (internal quotation marks omitted). National Group lists the allegation that defendants "maintained and used U.S. bank accounts to pay bribes" as one of "[m]any of the predicate acts of bribery" satisfying the first prong of the conduct test. 420 F. Supp. 2d at 262-63. Plaintiffs, in contrast, rely almost exclusively on the use of two U.S. bank accounts for peripheral purposes only, to satisfy the test. (Opp. 39-40.) That is insufficient.

them and perpetrated largely in the U.S." (Opp. 40 n.32.)  For the reasons discussed above (see

Section I.A., supra), that is not only fiction, but it is unsupported by, and at odds with, plaintiffs'

pleadings.  AWB's extraterritorial conduct did not have a "direct", "substantial" or "foreseeable"

effect in the U.S. (Mem. 27.)  Consequently, plaintiffs' allegations fail the effects test.[32]

**B.**    **Plaintiffs' RICO Claim Must Be Dismissed Because Plaintiffs Lack RICO Standing.**

Plaintiffs concede that RICO standing requires that the defendant's injurious

conduct be both the factual and proximate cause of the injury alleged. (Opp. 41.)  Plaintiffs

further concede that in order to establish proximate cause (1) their injury must result from

defendants' commission of the predicate acts, and (2) those acts must be a "substantial factor in

the sequence of responsible causation" and plaintiffs' injury must also be reasonably foreseeable

or anticipated as a natural consequence.  See Baisch v. Gallina, 346 F.3d 366, 373-74 (2d Cir.

2003). (Opp. 41.)  Plaintiffs cannot meet those requirements.

In their Opposition, plaintiffs contend that AWB's conduct "was designed to, and

did, directly affect [p]laintiffs". (Opp. 43; see also id. at 44 n.33 (implying plaintiffs were

"target[s] and intended victim[s]").)  Plaintiffs implausibly assert that AWB knew U.S.-grown

wheat was the only viable alternative to Australian-grown wheat for sale to the Iraqi

Government; that more U.S.-grown wheat would have been sold in the Iraqi market absent

AWB's conduct; that AWB realized that its "quest to foreclose U.S.-grown wheat" would have

---

[32] Plaintiffs attempt to distinguish Giro v. Banco Espanol de Credito, S.A., No. 98 Civ. 6195 (WHP), 1999 WL 440462 (S.D.N.Y. June 28, 1999), by suggesting that the foreign status of the plaintiff was central to the court's "effects test" analysis. (Opp. 40 n.32.)  As its name implies, however, the "effects test" is an inquiry into the nature of the alleged "effects" of the challenged conduct, not the national status of the plaintiff.  Where the nature of the domestic effects is manifestly "indirect" – for example, when (as here) it is mediated through transnational pricing mechanisms incorporating events in "sub-markets around the world" (Opp. 8) – the "effects test" is not satisfied.  See Giro, 1999 WL 440462, at *3.

the effect of depressing wheat prices in the U.S.; and that AWB carried out transactions with the IGB for that very purpose. (Opp. 43.)

As discussed earlier, there is no factual basis for the assertion (1) that AWB's alleged fee payments were the direct cause of plaintiffs' injury, or (2) that plaintiffs' alleged injury was a "reasonably foreseeable" consequence of AWB's alleged conduct. Baisch, 346 F.3d at 373-74; see also Section I.A., supra. There are an infinite number of factors that affect the worldwide wheat pricing mechanism and, hence, the price of wheat in both the U.S. domestic market and the rest of the world. Notwithstanding plaintiffs' naked assertion that AWB's alleged payments of the transportation fees imposed by the Iraqi Government caused a price decline in U.S. domestic wheat prices, they allege no facts to show why that is necessarily so. Nor can they. Plaintiffs' allegation that the Iraqi Government would have bought U.S. wheat during this period is naked and implausible speculation. Moreover, it would be impossible to disentangle the numerous, complex factors that affect world wheat prices, and U.S. wheat prices. Plaintiffs cannot establish proximate cause, and thus they lack RICO standing.[33] Plaintiffs' claim should be dismissed.

---

[33] The cases on which plaintiffs rely (cited at Opp. 41-44) are not to the contrary. Each includes a key fact that is absent here. In Commercial Cleaning Services, LLC v. Colin Service Systems, Inc., 271 F.3d 374, 382 (2d Cir. 2001), and American Health Systems, 1994 WL 314313, at *5, the courts based their decisions on the plaintiffs and the defendants being direct competitors. Here, plaintiffs do not allege that they competed with defendants for contracts with the IGB. Even the causation at issue in Republic of Colombia v. Diageo North America, No. 04-CV-4372 (NGG), 2007 WL 1813744, at *59 (E.D.N.Y. June 19, 2007), which the court characterized as "a close case", involved fewer steps than plaintiffs invoke here: "Defendants' laundering of narcotics proceeds and the associated mail and wire fraud enabled Defendants to sell their liquor at lower prices (the money-laundering discount) which, in turn, caused Plaintiffs to lose profits and revenues". (Compare Mem. 2-3.) Schwab v. Philip Morris USA, Inc., 449 F. Supp. 2d 992, 1050 (E.D.N.Y. 2006), does not address RICO standing and, in any event, found that the plaintiffs had proven proximate cause of their injuries because they were "both the direct target of the fraud and the party injured". Plaintiffs attempt to distinguish Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991, 1996-98 (2006), on the same basis – that they, "not a third party, were the target of the scheme" (Opp. 44) – but the Complaint neither makes nor supports that allegation.

**C.    Plaintiffs' RICO Claim Must Be Dismissed Because Plaintiffs Have Not Pleaded the Existence of "Racketeering Activity" under RICO.**

Plaintiffs cannot establish the existence of "racketeering activity" for purposes of 18 U.S.C. § 1962(c) without pleading one or more underlying "unlawful acts" that establish that AWB has violated the Travel Act, 18 U.S.C. § 1952, and the federal money-laundering statutes, 18 U.S.C. §§ 1956-57.  (See Mem. 31-32.)  Plaintiffs have failed to do so.  (See n.6, supra.)[34]

First, plaintiffs try to excuse their deficient pleadings by arguing that "Defendants [are] seek[ing] to impose additional pleading requirements beyond those set in the case law". (Opp. 46.)  That is wrong.  Consistent with the drafting of the various statutes here at issue – all of which refer to the requirement of some kind of underlying "unlawful activity" (see Opp. 45) – a plaintiff must adequately plead the underlying specified unlawful activity that supports its RICO claim.  See Lou v. Belzberg, 728 F. Supp. 1010, 1025 (S.D.N.Y. 1990) (plaintiff "has failed to plead adequately the Section 10(b) claims and thus a Section 10(b) claim cannot be considered as sufficiently alleged to constitute a predicate act for RICO").[35]

Second, and for the same reason, plaintiffs' attempt to assert in their Opposition a variety of new "unlawful acts" that are not mentioned anywhere in the Complaint (see 5-6, supra; Opp. 50) must be rejected.  Those new assertions are unpleaded, unparticularized and unsubstantiated.

Third, in response to AWB's showing that plaintiffs cannot establish a violation of the FCPA as an underlying unlawful activity (see Mem. 32-34), plaintiffs make the weak

---

[34] Plaintiffs concede in their Opposition that they no longer rely on any alleged violation of the OECD Convention as an underlying "unlawful activity".  (See Opp. 46 n.34; Mem. 34-35.)

[35] In Thai Airways, 842 F. Supp. at 1571-72 (cited at Opp. 36-38), the court dismissed a RICO claim because the plaintiff failed to plead the underlying unlawful activity adequately.

argument that because AWB allegedly paid the transportation fees at issue to the Iraqi

Government, "logically", those fees must have been received by Iraqi officials. (Opp. 48.) As an

initial matter, plaintiffs' overreaching attempts to "infer" bribes of Iraqi officials are rank

speculation, as plaintiffs all but admit. (Opp. 48 n.37.) Even in their Opposition, plaintiffs offer

no specific fact or circumstance related to those inferred "bribes". That is insufficient.[36]

Moreover, even if AWB's alleged fee payments were made to Iraqi officials, plaintiffs' argument

still fails. As described above, those officials would simply have been receiving payments in

accordance with decisions already made by the Iraqi Government. (See Section VI, supra.)

Plaintiffs do not (and cannot) allege that the fee payments influenced those officials' acts.

Finally, plaintiffs respond to AWB's showing (Mem. 33-34) that the RICO claim

must be dismissed because the alleged payments fall within one of the enumerated affirmative

defenses specified by the FCPA, see, e.g., 15 U.S.C. § 78dd-2(c)(1), not by disputing that the fees

were imposed under Iraqi law pursuant to an official directive of the Iraqi Government (Opp. 48-

49), but by contending that neither the Complaint nor the Volcker Report states that the

"directive" amounted to a "written law or regulation" (id. at 49). That is ridiculous. The Volcker

Report found that the fees were part of the written law of Iraq. (Mem. 33-34.) AWB's

compliance with Iraqi law thus cannot constitute an FCPA violation.[37]

---

[36] Plaintiffs' reliance on Erickson v. Pardus, 127 S. Ct. 2197 (2007), to justify the absence of factual allegations on this issue in the Complaint is badly misplaced. (Opp. 48.) In Erickson, the Court permitted an incarcerated, pro se plaintiff the benefit of a more liberal pleading standard than that enunciated in Fed. R. Civ. P. 8(a)(2). See 127 S. Ct. at 2200. Here, in contrast, plaintiffs' allegations of fraudulent conduct are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b). See Thai Airways, 842 F. Supp. at 1571 (cited at Opp. 36-38).

[37] Plaintiffs contend that the Court may not grant dismissal based on this affirmative defense because not all relevant facts appear in the text of the Complaint. (Opp. 49.) But, as plaintiffs acknowledge (see Opp. 1 n.1), "the complaint is deemed to include . . . any statements or documents incorporated in it by reference". Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991). A court may dismiss based on an affirmative defense if "the facts that

Because plaintiffs cannot demonstrate the "unlawful activity" required to show commission of two or more predicate acts, plaintiffs cannot establish the "pattern" of "racketeering activity" necessary for liability under Section 1962(c). 18 U.S.C. § 1962(c). Plaintiffs' RICO claim should therefore be dismissed.

## CONCLUSION

For the foregoing reasons and those set forth in their initial Memorandum of Law, defendants AWB Limited and AWB (U.S.A.) Limited respectfully request that the Court dismiss with prejudice all counts of the Consolidated Class Action Complaint.

December 3, 2007

CRAVATH, SWAINE & MOORE LLP

by

_____

Robert H. Baron
Timothy G. Cameron
Members of the Firm

825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants AWB Limited and
AWB (U.S.A.) Limited*

---

establish the defense [are] definitively ascertainable from the allegations of the complaint [and] the documents (if any) incorporated therein". In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 16 (1st Cir. 2003); see also Conopco Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000); Patrowicz v. Transamerica HomeFirst, Inc., 359 F. Supp. 2d 140, 144 (D. Conn. 2005). Here, the Volcker Report, referenced in the Complaint, includes the facts establishing the defense.