UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                             :

JOHN BOYD, VERYL SWITZER, GILLAN   :
ALEXANDER, ROD BRADSHAW, WILBURT  :
HOWARD, PAT DAILEY, MELVIN ERB, and  :
DENNIS BROTHERS on behalf of themselves  :
and all others similarly situated,           :
                             :

               Plaintiffs,     :
                             :         07 Civ. 3007 (GEL)

      -v-                  :
                             :        **OPINION AND ORDER**

AWB LIMITED and AWB (U.S.A.) LIMITED,  :
                             :

             Defendants.   :
                             :
-------------------------------------------------------------x

Benjamin D. Brown, Michael D. Hausfeld, Hilary
K. Ratway, Seth R. Gassman, and Michael P.
Lehmann, Cohen, Milstein, Hausfeld & Toll, PLLC,
Washington, DC, New York, NY, and San
Francisco, CA, and L. Palmer Foret, Esq.,
Washington, DC, and Roderick E. Edmond and
Craig T. Jones, Edmond & Jones, Atlanta, GA, and
Bruce L. Simon and Esther Klisura, Pearson,
Simon, Warshaw, Penny, LLP, San Francisco, CA,
and Roberta D. Liebenberg and Donald L. Perelman,
Fine, Kaplan & Black, RPC, Philadelphia, PA, <u>for
Plaintiffs John Boyd, Veryl Switzer, Gillan
Alexander, Rod Bradshaw, Wilburt Howard, and
Pat Dailey</u>.

Gerald J. Rodos, Mark R. Rosen, Jeffrey B.
Gittleman, Chad A. Carder, A. Arnold Gershon, and
Gloria Kui, Barrack, Rodos & Bacine, Philadelphia,
PA, and New York, NY, and Anthony J. Bolognese
and Joshua H. Grabar, Bolognese & Associates,
LLC, Philadelphia, PA, <u>for Plaintiff Melvin Erb</u>.

Steven A. Asher and Mindee J. Rueben, Weinstein,
Kitchenoff & Asher LLC, Philadelphia, PA, and
W. Joseph Bruckner, Richard A. Lockridge, and
Lisa M. Pollard, Lockridge, Grindal, Nauen PLLP,

Minneapolis, MN, and Joseph C. Kohn,
Kohn, Swift & Graf, PC, Philadelphia, PA, and
Indik & McNamara, PC, Philadelphia, PA, <u>for</u>
<u>Plaintiff Dennis Brothers</u>.

Robert H. Baron and Timothy G. Cameron,
Cravath, Swaine & Moore LLP, New York, NY,
<u>for Defendants AWB Limited and AWB (U.S.A.)</u>
<u>Limited</u>.


GERARD E. LYNCH, <u>District Judge</u>:

Plaintiffs, who are wheat farmers in the United States, bring this putative class action

alleging that defendants AWB Limited and AWB (U.S.A.) Limited (collectively, "AWB"),[1] who

exported Australian-grown wheat to Iraq under the United Nations Oil for Food Program,

participated in a bribery and money laundering conspiracy "to achieve, maintain, and exploit a

monopoly on wheat sold in Iraq," and "to foreclose the market to U.S.-grown wheat." (Compl. ¶

2.) Although none of the named plaintiffs claim to have sold or attempted to sell wheat to or in

Iraq, plaintiffs allege that AWB's conduct injured them and other similarly situated wheat

farmers by causing a "decrease in the prices at which U.S. wheat farmers were able to sell their

wheat in the United States." (<u>Id</u>.) The complaint alleges that AWB violated §§ 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1, 2, § 3 of the Clayton Act, 15 U.S.C. § 14, § 2(c) of the Robinson-

Patman Act, 15 U.S.C. § 13(c), and the Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. § 1962(c). (Compl. ¶ 3.) Defendants move pursuant to Fed. R. Civ. P.

12(b)(1) and 12(b)(6) to dismiss the complaint. The motion will be granted.

---

[1] AWB Limited, an Australian corporation, "is the exclusive manager and marketer of all
bulk wheat exports from Australia," and AWB (U.S.A.) Limited, a Delaware corporation, is a
subsidiary wholly owned and controlled by AWB Limited. (Compl. ¶¶ 12-13.) All references to
the complaint in this opinion are to the Consolidated Class Action Complaint (Doc. # 6).

## BACKGROUND

The following facts are taken from the complaint, except where noted.  All factual

allegations in the complaint are assumed to be true for purposes of this motion.  See Merritt v.

Shuttle, Inc., 245 F.3d 182, 186 (2d Cir. 2001).

## I.    The Global Wheat Market

The world wheat trade is dominated by the United States, Australia, the European Union,

Canada, and Argentina, which together supply approximately 80% of the 100 million metric tons

("mmt") of wheat traded globally each year.  (Compl. ¶¶ 43, 50.)  The United States, the world's

largest exporter of wheat, produces a number of different wheat types, including hard red winter

wheat.  (Id. ¶ 52.)  From 1996-2000, the United States exported approximately 31.1 mmt of

wheat annually, of which 13.8 mmt was hard red winter wheat.  (Id.)  The primary competitor of

U.S-grown hard red winter wheat in the export market is a hard wheat grown in Australia.  (Id.

¶ 53.)  The major export markets for both U.S.-grown hard red winter wheat and its Australian

equivalent are countries in the Middle East and Asia.  (Id.)

The complaint alleges that, "[b]ecause of the global nature of the wheat trade, supply and

demand forces in any given geographic sub-market are interrelated with those in every other sub-

market."  (Id. ¶ 54.)  Wheat prices in the United States are thus "directly affected by market

conditions and events in those sub-markets around the world into which the U.S. exports its

wheat."  (Id. ¶ 55.)  According to the complaint, the "main determinant" of domestic wheat

prices is the projected "Ending Stocks" — i.e., "the supply of wheat in the U.S. that remains

unsold at the end of a current crop year."  (Id. ¶ 57.)  When Ending Stocks are lower because of

higher exports of U.S.-grown wheat, the prices of wheat futures contracts traded on commodity

exchanges rise,[2] and because the "prices paid to U.S. farmers for their wheat move in parallel to prices on the commodity exchanges," the prices paid to U.S. wheat farmers also increase.  (Id. ¶¶ 56-58.)  Conversely, when exports of U.S.-grown wheat decline in a particular export market, excess Ending Stocks "cannot simply be diverted to another export market because of a number of factors, including the lack of substitution between wheat classes, the inelasticity of demand, and transportation costs."  (Id. ¶ 59.)  Higher Ending Stocks thus result in lower prices for wheat futures contracts, and correspondingly lower prices paid to domestic farmers for their wheat.  (Id. ¶ 58.)  The complaint thus asserts that "where market conditions dictate an increase or decrease in the amount of U.S.-grown wheat purchased in a particular export market, wheat prices in the U.S. are directly, proximately, and foreseeably affected."  (Id. ¶ 60.)

## II.    The Iraqi Wheat Market

Iraq imports approximately 3 mmt of wheat per year and, historically, its purchases of wheat have been limited to hard red winter wheat from the United States and its primarily Australian equivalents.  (Id. ¶ 61.)  During the 1980s, U.S.-grown wheat comprised 29% of the Iraqi wheat market, second only to Australian-grown wheat, which had a 38% share.  (Id. ¶ 62.)  Because of U.S. sanctions on Iraq, U.S.-grown wheat was not sold to Iraq from 1990 to 1997.  (Id. ¶ 63.)  In the absence of competition from U.S.-grown wheat, Australian-grown wheat came to dominate the Iraqi wheat market, with its market share rising to 73%.  (Id.)  In 1997, however, U.S.-grown wheat re-entered the market under the United Nations Oil for Food Program

---

[2] Wheat futures contracts are traded on the Chicago Board of Trade, the Kansas City Board of Trade, and the Minneapolis Grain Exchange.  (Compl. ¶ 56.)  According to plaintiffs, "[a]lthough each exchange focuses on different classes of wheat, prices on each exchange tend to move together."  (Id.)

("OFFP"), and by 1998, had re-gained a 6% share in the market.  (Id. ¶¶ 63, 67.)  According to

the complaint, U.S.-grown wheat was "the only real competitive threat to the Australian wheat

monopoly" in Iraq.  (Id. ¶ 68.)

### III.    AWB's Alleged Conspiracy to Monopolize the Iraqi Wheat Market

The allegations against AWB in this action are based largely on reports documenting the

Iraqi government's manipulation of the OFFP.[3]  Under the terms of the OFFP, the Iraqi

government was permitted to sell oil and use the proceeds to purchase food, medicine, and other

humanitarian goods.  (Id. ¶ 63.)  Because direct financial transactions with the Iraqi government

were prohibited, Iraqi proceeds from the sale of oil were deposited into a U.N.-controlled escrow

account in New York, which the Iraqi government could then use to pay suppliers for food and

other approved goods.  (Id. ¶ 64.)  With regard to Iraq's wheat purchases, the Iraq Grain Board

("IGB") advertised tenders for contracts and forwarded bids to the Ministry of Trade, which

invited bidders to Baghdad to negotiate contracts with the IGB.  (Id. ¶¶ 65, 71.)  The wheat

contracts would then be submitted to the U.N. for approval.  (See id. ¶ 81.)  Wheat shipped into

Iraq under the OFFP was inspected and certified at the border by U.N. inspectors.  (Id. ¶ 66.)

Upon certification, the U.N. would issue a letter of credit in favor of the wheat supplier to be

drawn from the U.N.-controlled escrow account.  (Id.)

---

[3] The complaint references two independent reports, one commissioned by the United
Nations and the other by the Australian government, detailing the illicit activities of the Iraqi
regime in relation to its participation in the OFFP.  (Compl. ¶¶ 99-101.)  The Court has
considered these reports in assessing the instant motion to dismiss.  See Chambers v. Time
Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (noting that on a motion to dismiss, the court may
consider documents "incorporated in [the complaint] by reference").

The complaint alleges that beginning in 1999, through its participation in the OFFP, AWB allegedly entered into a conspiracy with the Iraqi government and various intermediaries "for the purpose of securing and maintaining AWB's monopoly" in the Iraqi wheat market.  (Id. ¶ 69; see id. ¶ 91.)  Specifically, plaintiffs contend that AWB "began paying kickbacks to the Iraqi Government in an elaborate conspiracy whereby U.S. dollars in the [U.N.-controlled] escrow account were funneled and laundered through AWB's bank account in the United States and its co-conspirators, and ultimately paid to the Iraqi Government."  (Id. ¶ 69.)  Plaintiffs allege that beginning in June 1999, AWB received wheat tender offers from the IGB that, unlike previous tenders under the OFFP, "required AWB to pay the cost of transporting the wheat by road from the point of entry into Iraq . . . to the various governorates throughout Iraq."  (Id. ¶ 70.)  Plaintiffs contend that these "newly imposed inland transportation fees were not, in fact, designed to cover the costs of transportation inside Iraq, but instead were illegal payments to the Government of Iraq," and that AWB recognized that it had to pay these fees "in order to secure its monopoly and avoid losing its market share in Iraq."  (Id. ¶ 72.)

To effectuate this alleged bribery scheme, AWB and IGB purportedly agreed to include the "inland transportation fee" in their contractual price for wheat.  (Id. ¶ 76.)  Because the fee was not denoted as a separate line item on the wheat contracts, the U.N. failed to discover the fees and approved the contracts "without question."  (Id. ¶ 81.)  Following delivery and certification of AWB's wheat shipments to Iraq, the proceeds from the sale, which included the alleged kickbacks to the Iraqi government, were deposited from the U.N.-controlled escrow account directly into the U.S. dollar account maintained by AWB with the Bank of New York in New York.  (Id. ¶ 76, 81.)  AWB then allegedly conspired with various intermediaries, including

6

a Jordanian trucking company and certain ship owners, to disguise its payment of the illegal fees by transferring those funds from its New York bank account to the co-conspirator intermediaries, who then funneled the payments to the Iraqi government. (Id. ¶¶ 81-89.) Through twenty-one separate wheat contracts between July 1999 and March 2003, AWB allegedly transferred over $224 million from the U.N.-controlled escrow account to the Iraqi government. (Id. ¶ 90.) Plaintiffs contend that this conspiracy had "the intended effect of maintaining AWB's monopoly in the market for wheat in Iraq." (Id. ¶ 91.) According to plaintiffs, during the 1999-2000 season, AWB sold 98% of the wheat imported into Iraq, and for the remainder of the OFFP, which ended in 2003, U.S.-grown wheat was completely foreclosed from the Iraqi market. (Id.)

Plaintiffs filed this putative class action seeking treble damages under the antitrust laws and RICO on behalf of "[a]ll persons and entities that grew and sold hard red winter wheat in the United States from the period June 1, 1999 until at least March 20, 2003." (Id. ¶ 32.) See 15 U.S.C. § 15(a); 18 U.S.C. § 1964(c). Although plaintiffs do not claim that they themselves sold or attempted to sell wheat to Iraq, they allege that AWB's conduct foreclosed U.S.-grown wheat from the Iraqi market, and that because of "the global nature of the wheat pricing mechanism," this foreclosure resulted in higher Ending Stocks and a corresponding "decrease in prices at which Plaintiffs and members of the Class were able to sell their wheat in the United States." (Compl. ¶¶ 93-94.)

**DISCUSSION**

AWB moves to dismiss plaintiffs' antitrust and RICO claims for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). These arguments will be addressed in turn.

**I.     Antitrust Claims**

A.     Subject Matter Jurisdiction

On a motion to dismiss for lack of subject matter jurisdiction, the party asserting jurisdiction bears the burden of persuasion. See Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994). Challenges to subject matter jurisdiction may contest "either the facial sufficiency of the pleadings in the complaint or the existence of subject matter jurisdiction in fact." Dow Jones & Co. v. Harrods, Ltd., 237 F. Supp. 2d 394, 404 (S.D.N.Y. 2002). Where, as here, defendants assert only a facial challenge to jurisdiction, the Court "accepts as true the uncontroverted factual allegations in the complaint," id.; see Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998), but "argumentative inferences favorable to the party asserting jurisdiction should not be drawn," Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992).[4]

---

[4] In contrast, where a defendant challenges the factual basis for subject matter jurisdiction, a court is "not obligated to accord presumptive truthfulness to the allegations of the complaint" and "may weigh the evidence on the record accompanying the Rule 12(b)(1) motion, or hold an evidentiary hearing, and decide for itself the merits of the jurisdictional dispute." Dow Jones, 237 F. Supp. 2d at 404; see Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998).

1.    Sherman Act Claims

Congress enacted the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C.

§ 6a, to clarify the extraterritorial reach of the Sherman Antitrust Act.[5]  The FTAIA provides, in

relevant part:

> [The Sherman Act] shall not apply to conduct involving trade or
> commerce (other than import trade or import commerce) with
> foreign nations unless —
>
>> (1) such conduct has a direct, substantial, and reasonably
>> foreseeable effect —
>>
>>> (A) on trade or commerce which is not trade or
>>> commerce with foreign nations [i.e., domestic trade
>>> or commerce], or on import trade or import
>>> commerce with foreign nations; or
>>>
>>> (B) on export trade or export commerce with
>>> foreign nations, of a person engaged in such trade
>>> or commerce in the United States [i.e., on an
>>> American export competitor]; and
>>
>> (2) such effect gives rise to a claim under the provisions of
>> [the Sherman Act], other than this section.

---

[5] Prior to the FTAIA's enactment, courts commonly applied the "effects test," developed
by Judge Learned Hand in United States v. Aluminum Co. of America ("Alcoa"), 148 F.2d 416,
444 (2d Cir. 1945), to determine when foreign conduct fell within the jurisdictional reach of the
Sherman Act.  The Supreme Court has summarized the effects test, stating that "it is well
established by now that the Sherman Act applies to foreign conduct that was meant to produce
and did in fact produce some substantial effect in the United States."  Hartford Fire Ins. Co. v.
California, 509 U.S. 764, 796 (1993), citing Alcoa, 148 F.2d at 444.  "Application of the effects
test, however, . . . proved difficult and the precise extraterritorial reach of the Sherman Act
remain[ed] less than crystal clear."  United States v. LSL Biotechnologies, 379 F.3d 672, 678
(9th Cir. 2004).  In an effort to clarify the extraterritorial reach of the Sherman Act, Congress
enacted the FTAIA in 1982.  The Supreme Court has observed that it is not clear whether the
FTAIA "amends existing law or merely codifies it."  Hartford Fire, 509 U.S. at 796 n.23.  Given
the parties' agreement that the FTAIA applies at least to plaintiffs' Sherman Act claims (see P.
Mem. 7 n.6), the Court will apply the FTAIA to determine whether the jurisdictional reach of the
Sherman Act extends to the alleged extraterritorial conduct in this case.

15 U.S.C. §6a.  Through this statute, Congress intended to "make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements . . . , however anticompetitive, as long as those arrangements adversely affect only foreign markets."  F. Hoffman-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 161 (2004).

Under the FTAIA's statutory framework, all conduct involving non-import foreign commerce is excluded from the scope of the Sherman Act unless (1) the alleged conduct has a "direct, substantial, and reasonably foreseeable effect" on "American domestic, import, or (certain) export commerce;" and (2) the effect is "of a kind that antitrust law considers harmful, i.e., the effect must give rise to a Sherman Act claim."  Id. at 162 (alterations and internal quotation marks omitted).  Satisfaction of both of these conditions is a prerequisite for establishing subject matter jurisdiction over Sherman Act claims for "conduct involving trade or commerce . . . with foreign nations."  15 U.S.C. § 6a; see Latino Quimica-Amtex S.A. v. Akzo Nobel Chem. B.V., No. 03 Civ. 10312, 2005 WL 2207017, at *5 (S.D.N.Y. Sept. 8, 2005); see also Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 931 (2d Cir. 1998) (characterizing FTAIA's requirements as "jurisdiction[al]"); IB Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (hereinafter "Areeda") ¶ 272i2, at 296 (3d ed. 2006) (same).[6]

_____

[6] Although the Second Circuit in Filetech characterized the FTAIA's limitations as a constraint on courts' "jurisdiction," 157 F.3d at 931, the express language of the FTAIA — i.e., that the Sherman Act "shall not apply" to certain kinds of foreign conduct — suggests a limitation, not on a court's power to decide the case, but rather, on the substantive applicability of the statute.  Although the Supreme Court has not decided this issue, see IB Areeda ¶ 272i2, at 296, the Court in another context has recently cautioned against the "profligate" use of jurisdictional terminology when discussing potential defects in a plaintiff's claim.  Arbaugh v. Y&H Corp., 546 U.S. 500, 510 (2006).  Arbaugh highlighted the tendency of courts to term the non-existence of a critical fact a "jurisdictional defect" rather than merely the failure to prove an

Defendants contend that the Court lacks subject jurisdiction over plaintiffs' Sherman Act claims because, *inter alia*, AWB's alleged conduct did not have a "direct" effect on American domestic commerce. (D. Mem. 4, quoting 15 U.S.C. § 6a(1).) Although plaintiffs argue vigorously to the contrary, it is undisputed that the alleged effect on domestic commerce in this case — i.e., a "decrease in prices at which Plaintiffs and members of the Class were able to sell their wheat in the United States during the Class Period" — occurred only as a result of the "global nature of the wheat trade." (Compl. ¶¶ 54, 110) Specifically, plaintiffs allege that

> (1) because of the alleged conspiracy between AWB, the IGB and others between 1999 and 2003 ([id.] ¶ 69); (2) the Iraqi Government purchased little or no U.S.-grown wheat (id. ¶ 91); (3) which caused there to be higher "Ending Stocks" in the U.S. (id. ¶¶ 57, 93); (4) which caused wheat future contracts to trade on various U.S. commodity exchanges at lower prices (id. ¶¶ 56-57); (5) which caused the price of wheat in the United States to decrease (id. ¶¶ 57, 93); (6) which caused plaintiffs to be unable to sell their wheat in the United States for as much money as they would have otherwise been able to (id. ¶ 94).

(D. Mem. 6; see P. Mem. 8.)

---

element of the claim — so called "drive-by jurisdictional rulings." Id. at 511. As this Court has previously noted, "such imprecision has significant consequences." Ayyash v. Bank Al-Madina, No. 04 Civ. 9201 (GEL), 2006 WL 587342, at *4 n.2 (S.D.N.Y. Mar. 9, 2006) (noting that "[u]nlike merits challenges, challenges to a court's subject matter jurisdiction cannot be waived and can be raised even after trial has concluded and judgment has been entered," and that "factual disputes as to jurisdictional questions are typically resolved by the judge in a pre-trial hearing, not by a jury at trial"). Arbaugh held that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." 546 U.S. at 516. Because nothing in the statutory language of the FTAIA indicates that its limitations are jurisdictional, Arbaugh may require that the Second Circuit review its treatment of that issue. In this case, however, none of the parties challenges the characterization of the issue as jurisdictional in nature, and this Court is, in any event, bound by the Second Circuit's decisions until such time as they are directly overruled by that court or the Supreme Court.

11

Although the complaint's description of "the global nature of the wheat pricing mechanism" (Compl. ¶ 93) may paint a plausible scenario by which AWB's conduct in Iraq might well have been a factual, or "but for," cause of a drop in domestic wheat prices, such "'but for' causation is not the type of *direct* causation contemplated by the FTAIA."  In re Intel Corp. Microprocessor Antitrust Litig., 452 F. Supp. 2d 555, 561 (D. Del. 2006) (emphasis added); see United States v. LSL Biotechnologies, 379 F.3d 672, 680 (9th Cir. 2004) (defining effect as "direct" under FTAIA if "it follows as an *immediate consequence* of the defendant's activity" with no "intervening developments" (emphasis added)).  Accepting as true plaintiffs' allegations that AWB's conduct foreclosed the Iraqi wheat market to U.S.-grown wheat, that this foreclosure affected the projected Ending Stocks for U.S.-grown wheat, and that the "main determinant" of domestic wheat prices is the level of projected Ending Stocks (Compl. ¶ 57), the fact remains that a myriad of other factors — including foreign and domestic market conditions, crop yields, harvesting and transportation costs, and other factors affecting global supply and demand — also impacted projected Ending Stocks, and hence domestic wheat prices, during the proposed class period.  In theory, holding all other factors constant, the alleged foreclosure of the Iraqi market would have had the "immediate consequence" of increasing projected Ending Stocks in the United States, which would have caused a corresponding decline in domestic wheat prices.  LSL Biotechnologies, 379 F.3d at 680.  "The real economic world," however, in contrast to "an economist's hypothetical model," does not operate under conditions of *ceteris paribus*.[7]

---

[7] See, e.g., David Streitfeld, A Global Need for Grain That Farms Can't Fill, N.Y. Times, Mar. 9, 2008, at A1 (noting that global prices for wheat have recently "tripled, partly because of a drought in Australia and bad harvests elsewhere and also because of unslaked global demand for crackers, bread and noodles").

Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 493 (1968).

Given the multitude of "intervening developments" that simultaneously affect projected Ending Stock levels, the claimed drop in domestic wheat prices could very well have resulted from factors wholly unrelated to the alleged conspiracy.  Id.; see In re Intel Corp., 452 F. Supp. 2d at 561 (concluding that alleged domestic effects of challenged conduct were not "direct" because they were "premised on a multitude of speculative and changing factors affecting business and investment decisions, including market conditions, the cost of financing, supply and demand, . . . and world-wide economic and political conditions").  This is particularly true since, immediately prior to the alleged market foreclosure, wheat exports to Iraq made up less than one percent of total U.S. wheat exports, and only slightly more than one percent of total U.S. hard red winter wheat exports.[8]  In light of the multitude of variables affecting projected Ending Stocks, the foreclosure of the Iraqi wheat market — which increased projected Ending Stocks by approximately one percent — simply could not have been a substantial factor among the total mix of global inputs that determine Ending Stocks, and hence wheat prices, in the United States.  Cf. Baisch v. Gallina, 346 F.3d 366, 373-74 (2d Cir. 2003) (noting that plaintiff suffered "direct" injury in RICO context where defendant's acts were "a substantial factor in the

_____

[8] In 1998, immediately prior to the alleged market foreclosure, Iraq purchased 6% (or 0.18 mmt) of its wheat from the United States.  (Compl. ¶ 67.)  United States wheat exports during that same time averaged 31.1 mmt annually, of which 13.8 mmt was hard red winter wheat.  (Id. ¶ 52.)  Iraqi purchases of U.S.-grown wheat thus constituted 0.58 percent of total U.S. wheat exports and 1.3 percent of total U.S. hard red winter wheat exports.  (Id. ¶¶ 52, 61, 67.)  Although it is possible that U.S.-grown wheat could have captured more than a 6% share of the Iraqi wheat market had the market remained open to U.S.-grown wheat from 1999 to 2003, any estimate of the market share U.S.-grown wheat would have had absent the alleged conspiracy would be inherently speculative, particularly given the deteriorating relations between the two countries that ultimately led to the invasion of Iraq by U.S. forces in March 2003.

sequence of responsible causation" (internal quotation marks omitted)).

Although plaintiffs cite numerous district court decisions from other circuits to support their contention that the foreclosure of the Iraqi wheat market directly caused domestic wheat prices to fall, these cases are all either inapposite or distinguishable on their face.[9]  (See P. Mem. 9-11; D. Reply Mem. 8 n.9.)  In the absence of supporting case law, plaintiffs quote a 1987 law review article which stated that "[w]hen one firm gains sales over another through bribery, the effect of *lost exports* is about as direct as can be."  (P. Mem. 9 (emphasis added), quoting Franklin A. Gevurtz, Using the Antitrust Laws to Combat Overseas Bribery by Foreign Companies: A Step to Even the Odds in International Trade, 27 Va. J. Int'l L. 211 (1987)).  Plaintiffs in this case, however, are domestic wheat *farmers*, not exporters, and even if the alleged bribery conspiracy may have had a "direct" effect of "lost exports," plaintiffs' asserted injury is a drop in domestic wheat *prices*, not lost exports.  Indeed, as discussed below, plaintiffs' injury is, at best, merely derivative of the injury suffered by domestic wheat exporters.[10]  Finally, plaintiffs' citation to a Congressional Research Service report on wheat exports to China, which contains no legal analysis but happens to use the phrase "direct effect"

---

[9] Specifically, plaintiffs' citation to Daishowa International v. North Coast Export Co., No. 81 Civ. 574, 1982 WL 1850 (N.D. Cal. May 24, 1982) is of little value because that decision predated the enactment of the FTAIA.  Similarly, plaintiffs' citations to MM Global Services, Inc. v. Dow Chemical Co., No. 02 Civ. 1107, 2004 WL 556577 (D. Conn. March 18, 2004), and Coors Brewing Co. v. Miller Brewing Co., 889 F. Supp. 1394 (D. Colo. 1995), are unpersuasive because the former involved allegations that defendants specifically intended to obstruct competition in the *United States* market, which plaintiffs do not allege here, and the latter premised its holding on the view that the foreign and U.S. markets at issue were effectively a single market (i.e., "the North American beer market," Coors Brewing, 889 F. Supp. at 1398), which, even on plaintiffs' pleadings, is not the case here.

[10] See infra at 22.

14

(P. Mem. 9), simply has no bearing on the application of the FTAIA to the facts of this case.

In sum, although plaintiffs may have alleged a plausible theory of causation based on the global interrelatedness of the wheat markets in Iraq and the United States, AWB's extraterritorial conduct in Iraq was, at most, only a "but for" cause of the alleged drop in wheat prices in the United States.  Plaintiffs thus have failed to demonstrate that AWB's conduct in Iraq had the kind of "direct" effect on domestic commerce that could give rise to an antitrust claim within the jurisdictional reach of the Sherman Act.[11]  Accordingly, plaintiffs' Sherman Act claims must be dismissed.

2.    Clayton Act Claims

AWB contends, and plaintiffs apparently concede, that the FTAIA's jurisdictional limitations also apply to plaintiffs' Clayton Act claims.  (D. Mem. 4 n.7; P. Mem. 7 n.6.)  In particular, AWB cites Latino Quimica-Amtex S.A. v. Akzo Nobel Chemicals B.V. for the proposition that courts have applied the FTAIA "to decline jurisdiction over Clayton Act claims."  (D. Mem. 4 n.7, citing 2005 WL 2207017, at *1, 8-9.)  The plaintiffs in Akzo, however, alleged substantive violations of the Sherman Act, and the Clayton Act (specifically §§ 4 and 16) merely provided the private right of action.  2005 WL 2207017, at *1 & n.3, 8-9; see, e.g., United Phosphorus, Ltd. v. Angus Chem. Co., No. 94 Civ. 2078, 1994 WL 577246, *4 (N.D. Ill. 1994) (collecting cases where "federal courts have recognized that the FTAIA applies to actions under the Clayton Act which allege Sherman Act violations" (emphasis added)).  Here,

_____

[11] Because plaintiffs have failed to allege a sufficiently "direct" effect on domestic trade or commerce, the Court need not address whether that effect was "substantial" or "reasonably foreseeable," 15 U.S.C. § 6a(1), or whether that effect properly "gives rise" to a Sherman Act claim, id. § 6a(2).

plaintiffs allege not only Sherman Act violations, but also a substantive violation of § 3 of the

Clayton Act.  15 U.S.C. § 14.  (Compl. ¶¶ 119-25.)  Because the FTAIA by its express terms

applies only to Sherman Act claims, the FTAIA does not place any jurisdictional limitations on

plaintiffs' Clayton Act § 3 claim.  See IB Areeda, ¶ 272i, at 289 (noting that the "FTAIA does

not limit the Clayton Act").

Nevertheless, pursuant to the express terms of the statute, subject matter jurisdiction is

lacking over plaintiffs' Clayton Act § 3 claim.  Section 3 of the Clayton Act states:

> It shall be unlawful for any person engaged in commerce, in the
> course of such commerce, to lease or make a sale or contract for
> sale of . . . commodities . . . for use, consumption, or resale within
> the United States or any . . . other place under the jurisdiction of
> the United States, . . . on the condition, agreement, or
> understanding that the lessee or purchaser thereof shall not use or
> deal in the . . . commodities of a competitor or competitors of the
> lessor or seller, where the effect of such lease, sale, or contract for
> sale or such condition, agreement, or understanding may be to
> substantially lessen competition or tend to create a monopoly in
> any line of commerce.

15 U.S.C. § 14.  The jurisdictional reach of § 3 thus extends only to sales of commodities for

"use, consumption, or resale within the United States."  Id.; cf. XIV Areeda ¶ 2316b, at 52

(characterizing analogous requirement of "use, consumption, or resale within the United States"

in § 2(a) of Robinson-Patman Act as "jurisdictional"); IB Areeda, ¶ 272i, at 289 (explaining that

the "proscriptions of the Clayton Act generally do not reach foreign commerce at all" because,

inter alia, § 3 requires "that the covered commodities be 'for use, consumption, or resale within

the United States,'" quoting 15 U.S.C. § 14).  Nothing in the complaint remotely suggests that

the transactions between AWB and the Iraqi government involved the purchase or sale of any

wheat or other commodity that was bound "for consumption, use, or resale within the United

States." 15 U.S.C. § 14.  Accordingly, as with their Sherman Act claims, plaintiffs' Clayton Act

§ 3 claim must be dismissed for lack of subject matter jurisdiction.

       3.    <u>Robinson-Patman Act Claim</u>

    AWB also contends that the Court lacks subject matter jurisdiction over plaintiffs' claim

pursuant to § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).  (Compl. ¶¶ 140-46; D. Mem.

Reply 6 n.7.)  Section 2(c) provides:

> It shall be unlawful for any person engaged in commerce, in the
> course of such commerce, to pay or grant, or to receive or accept,
> anything of value as a commission, brokerage, or other
> compensation, or any allowance or discount in lieu thereof, except
> for services rendered in connection with the sale or purchase of
> goods, wares, or merchandise, either to the other party to such
> transaction or to an agent, representative, or other intermediary
> therein where such intermediary is acting in fact for or in behalf, or
> is subject to the direct or indirect control, of any party to such
> transaction other than the person by whom such compensation is
> so granted or paid.

15 U.S.C. § 13(c).  As the Supreme Court explained in <u>Gulf Oil Corp. v. Copp Paving Co., Inc.</u>,

"the explicit reach of [the Robinson-Patman Act] extends only to persons and activities that are

themselves 'in commerce,' the term 'commerce' being defined in § 1 of the Clayton Act . . . as

'trade or commerce *among* the several States and *with* foreign nations.'"  419 U.S. 186, 194

(1974) (emphasis added), quoting 15 U.S.C. § 12(a); <u>see id</u>. at 188, 199 (characterizing "in

commerce" requirement as "jurisdictional"); <u>Rotec Indus., Inc. v. Mitsubishi Corp.</u>, 348 F.3d

1116, 1121-22 (9th Cir. 2003).  Commerce "with" foreign nations means commerce between the

United States and a foreign nation.  <u>See</u> IB Areeda, ¶ 272a, at 275; <u>id</u>. ¶ 272i, at 286.  Thus, the

jurisdictional reach of § 2(c) does not extend to "purely foreign" commerce — <u>i.e.</u>, commerce

"between" or "among" foreign nations.  <u>Den Norske Stats Oljeselskap As v. HeereMac Vof</u>, 241

F.3d 420, 426 & n.18 (5th Cir. 2001) (distinguishing between "United States commerce *with* foreign nations" and "commerce *between* or *among* foreign nations," and noting that Commerce Clause does not empower Congress to regulate the latter).

The "commerce" at issue in this case involves the shipment of Australian-grown wheat to Iraq pursuant to a contractual agreement between AWB, an Australian corporation,[12] and the government of Iraq. AWB asserts that such activity constitutes "wholly foreign" commerce beyond the jurisdictional reach of § 2(c) and cites a Ninth Circuit case, Rotec Industries, Inc. v. Mitsubishi Corp., to support this contention. (D. Reply Mem. 6 n.7.) In Rotec, the Ninth Circuit observed that defendants' "allegedly unlawful payments occurred completely outside the United States between a Japanese corporation . . . and a Chinese corporation," and that "[t]he money was to be transferred to a bank in Hong Kong." 348 F.3d at 1122. Rotec concluded that "[n]one of this activity can be considered to have occurred 'within the flow of' commerce among the several states or with foreign nations." Id., quoting Gulf Oil, 419 U.S. at 195.[13] In this case, however, plaintiffs allege that "AWB began paying kickbacks to the Iraqi Government in an

---

[12] Although one of the defendants in this action is AWB (U.S.A.) Limited, a Delaware corporation that is wholly owned and controlled by defendant AWB Limited, an Australian corporation (Compl. ¶¶ 12-13), plaintiffs do not allege that the American subsidiary engaged in any independent commercial transactions with the government of Iraq.

[13] Gulf Oil explained that, in contrast to § 1 of the Sherman Act, the "in commerce" language of the Robinson-Patman Act extends only to persons or activities "within the flow" of commerce among the states or with foreign nations — i.e., "the practical, economic continuity in the generation of goods and services for interstate [or foreign] markets and their transport and distribution to the consumer" — and does not extend to all activities that "affect" such commerce. Gulf Oil, 419 U.S. at 195; see United States v. Am. Bldg. Maint. Indus., 422 U.S. 271, 277 (1975) (noting that "in commerce" language was not intended to be coextensive with reach of congressional power under Commerce Clause, and was intentionally narrower than Sherman Act's "affecting commerce" language); Rotec, 348 F.3d at 1122.

elaborate conspiracy whereby U.S. dollars in the [OFFP] escrow account were funneled and laundered *through AWB's bank account in the United States* and its co-conspirators, and ultimately paid to the Iraqi Government." (Compl. ¶ 69 (emphasis added)). Specifically, plaintiffs allege that AWB's payment of the allegedly fictitious "inland transportation fees" were included in the wheat contract prices submitted to the U.N., which were then recouped from the U.N.-controlled escrow account and deposited directly into AWB's bank account in New York. (Id. ¶ 76, 81.) Subsequently, AWB wired the funds for payment of the illegal fees from its New York bank account to various co-conspirator intermediaries, who then allegedly funneled those payments back to the Iraqi government. (Id. ¶¶ 81-89.)

In contrast to Rotec, then, AWB's use of a United States bank facility was integral to its scheme to pay kickbacks to the Iraqi government, and those kickbacks, in turn, allegedly enabled AWB to secure the wheat contracts necessary to maintain its monopoly in the Iraqi wheat market. As a result, even though AWB did not ship any wheat into or from the United States, its use of a bank located within the United States clearly occurred "within the flow of" its commercial transactions with Iraq. Gulf Oil, 419 U.S. at 195. AWB thus engaged in the requisite "United States commerce with foreign nations," Den Norske, 241 F.3d at 426, and its unlawful payments to the Iraqi government occurred "in the course of such commerce," 15 U.S.C. § 13(c). Accordingly, AWB's jurisdictional challenge to plaintiffs' Robinson-Patman Act § 2(c) claim must be denied.

In sum, the majority of plaintiffs' allegations against AWB involve conduct outside the reach of United States antitrust laws. Specifically, plaintiffs' antitrust claims pursuant to §§ 1 and 2 of the Sherman Act (Counts I and II), and § 3 of the Clayton Act (Count III), must be

19

dismissed for lack of subject matter jurisdiction, and only their Robinson-Patman Act § 2(c)

claim (Count V) may proceed on the merits.

  B.  <u>Antitrust Standing</u>

  Although plaintiffs' remaining antitrust claim alleges a violation of § 2(c) of the

Robinson-Patman Act, 15 U.S.C. § 13(c), the private right of action for such a claim is provided

by § 4 of the Clayton Act, <u>id</u>. § 15(a); <u>see</u> <u>Blue Tree Hotels Inv., Ltd. v. Starwood Hotels &</u>

<u>Resorts Worldwide, Inc.</u>, 369 F.3d 212, 220 (2d Cir. 2004).  A private plaintiff suing under

Clayton Act § 4 must make a showing of "antitrust standing."  <u>Port Dock & Stone Corp. v.</u>

<u>Oldcastle Ne., Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007).  This requirement stems from the

recognition that "Congress did not intend the antitrust laws to provide a remedy in damages for

all injuries that might conceivably be traced to an antitrust violation."  <u>Associated Gen.</u>

<u>Contractors v. California State Council of Carpenters, Inc.</u>, 459 U.S. 519, 534 (1983) (internal

quotation marks omitted); <u>see</u> <u>Blue Shield of Virginia v. McCready</u>, 457 U.S. 465, 477 (1982)

(noting that while "[a]n antitrust violation may be expected to cause ripples of harm," "[i]t is

reasonable to assume that Congress did not intend to allow every person tangentially affected by

an antitrust violation to maintain an action").

  To establish antitrust standing, a private plaintiff must both allege "antitrust injury" and

establish that it is an "'efficient enforcer' to assert a private antitrust claim."  <u>Port Dock</u>, 507

F.3d at 121.  To demonstrate antitrust injury, "a plaintiff must show (1) an injury-in-fact; (2) that

has been caused by the violation; and (3) that is the type of injury contemplated by the statute."

<u>Blue Tree Hotels</u>, 369 F.3d at 220.  Even where a plaintiff adequately alleges an antitrust injury,

moreover, it may still lack standing if it is not an "efficient enforcer" of the antitrust laws.

20

Paycom Billing Servs. v. Mastercard Int'l, Inc., 467 F.3d 283, 290 (2d Cir. 2006) (internal

quotation marks omitted).  The relevant factors to consider in determining whether a party who

states an antitrust injury is nevertheless not a proper antitrust plaintiff include:

> (1) whether the violation was a direct or remote cause of the
> injury; (2) whether there is an identifiable class of other persons
> whose self-interest would normally lead them to sue for the
> violation; (3) whether the injury was speculative; and (4) whether
> there is a risk that other plaintiffs would be entitled to recover
> duplicative damages or that damages would be difficult to
> apportion among possible victims of antitrust injury.

Port Dock, 507 F.3d at 121-22.

     As explained above,[14] given the multitude of factors affecting projected Ending Stocks,

and hence wheat prices, in the United States, AWB's conduct was, at most, only a "but for"

cause of plaintiffs' asserted injury as it is entirely "possible that the . . . [decreased domestic

wheat] prices for the specified period of time were due to factors wholly unrelated to defendants'

transactions" with the Iraqi government.  Ocean View Capital, Inc. v. Sumitomo Corp., No. 98

Civ. 4067, 1999 WL 1201701, at * 4 (S.D.N.Y. Dec. 15, 1999); see Associated Gen.

Contractors, 459 U.S. at 542 (finding no antitrust standing where, *inter alia*, plaintiffs' injury

"may have been produced by independent factors").  Plaintiffs thus cannot show that AWB's

conduct in Iraq was a "proximate cause" of their injury, a required element of antitrust standing.

Associated Gen. Contractors, 459 U.S. at 535.

     In addition, plaintiffs — who are domestic wheat *farmers* who did not sell wheat to Iraq

or even participate in the OFFP tender process — are not "efficient enforcer[s]" of the antitrust

laws in this case, because, *inter alia*, "there is an identifiable class of other persons whose

---

[14] See supra at 12-15.

self-interest would normally lead them to sue for the violation" — i.e., domestic wheat *exporters*
who actually attempted to sell wheat to Iraq through the OFFP but were precluded from doing so
as a result of AWB's conduct.  Port Dock, 507 F.3d at 121.  Indeed, plaintiffs' asserted injury is,
at best, merely "derivative" of the direct injury suffered by these domestic wheat exporters.
Associated Gen. Contractors, 459 U.S. at 541 n.46 (collecting cases that "have denied standing
to plaintiffs with merely derivative injuries").  Specifically, AWB's conduct foreclosed the
opportunity for exporters to sell wheat and realize profits in the Iraqi market, and because wheat
exporters allegedly could not recoup this lost business by selling wheat in other export markets
(Compl. ¶ 59), they purchased less wheat from plaintiff wheat farmers, which, in turn, allegedly
caused the increase in Ending Stocks and decrease in domestic wheat prices complained of by
plaintiffs.  Because plaintiffs' asserted injury is, at best, only derivative of those suffered by
wheat exporters, allowing plaintiffs to proceed with their claims would also engender difficulty
in identifying and apportioning damages between directly victimized wheat exporters and
indirectly affected wheat farmers.[15]

---

[15] Indeed, plaintiffs' claimed injury in this case is significantly more indirect than the
injury alleged by the plaintiffs in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).  In Illinois
Brick, the plaintiffs were "indirect purchasers of concrete block, which pass[ed] through two
separate levels in the chain of distribution before reaching" plaintiffs.  Id. at 726.  Plaintiffs
alleged that defendants had engaged in a price-fixing conspiracy resulting in overcharges that
were, at least in part, passed on to plaintiffs and not absorbed at the first two levels of
distribution.  Id. at 727.  The Supreme Court, citing the risk of duplicative recovery and the
litigative burdens associated with attempting to allocate the overcharge among direct and
indirect purchasers, held that only direct purchasers had standing to bring suit.  Id. at 730-31,
735-38.  In this case, however, plaintiffs do not claim that they were injured as a result of lost
sales to domestic wheat exporters stemming from the foreclosure of the Iraqi wheat market;
rather, plaintiffs claim that they were harmed in their sales to everyone but domestic wheat
exporters on the theory that their lost sales to domestic wheat exporters caused an increase in
Ending Stocks, which, in turn, caused a decrease in domestic wheat prices.  Accordingly, unlike
in Illinois Brick, plaintiffs' alleged injuries were incurred, not through the immediate chain of

Finally, plaintiffs' claim rests at bottom on an inherently speculative measure of harm

that would require the fact-finder essentially to "trace the complex economic adjustments" of a

decrease in exports amounting to approximately one percent of total U.S. wheat exports, and less

than two-tenths of one percent of worldwide wheat trade, and to isolate that factor from the

multitude of other factors affecting global wheat prices.  Illinois Brick Co. v. Illinois, 431 U.S.

720, 732 (1977).  Needless to say, such a damages inquiry would involve "massive evidence and

complicated theories" of causation that strongly weigh against a finding of antitrust standing.

McCready, 457 U.S. at 475 n.11.[16]

In sum, plaintiffs can demonstrate neither that they suffered antitrust injury nor that they

are "efficient enforcer[s]" of the antitrust laws in this case.  Paycom, 467 F.3d at 290.

Accordingly, their remaining antitrust claim pursuant to § 2(c) of the Robinson-Patman Act must

---

distribution for wheat, but rather, through the much more convoluted global "wheat pricing
mechanism."  (Compl. ¶ 93.)

[16] Plaintiffs contend that wheat exporters are inferior antitrust plaintiffs because "unlike
American wheat farmers, who actually manifested direct 'out of pocket' losses when they sold
their wheat at depressed prices, any injuries claimed by the exporter would be highly speculative,
i.e., the profits it would have made had it been able to procure and deliver the wheat for less than
its winning bid price."  (P. Mem. 18.)  Plaintiffs' argument rests on their factual contention —
advanced for the first time in their opposition brief (and not in their pleadings) — that "[w]hen
an exporter bids on a wheat tender, it does not actually possess the wheat that it offers to sell.
Instead it merely offers a price at which it believes it could procure and deliver the wheat."  (Id.)
Thus, according to plaintiffs, "[a]n exporter may profit or lose money on any contract, depending
on whether and how much wheat prices have gone up between the bid on the tender and the
actual purchase of the wheat."  (Id.)  Even if plaintiffs' description of the export tender/bidding
process is accurate, the injuries suffered by wheat exporters are certainly no more speculative
than plaintiffs' claimed injuries, which would require the Court to engage in "hopeless
speculation concerning the relative effect of an alleged conspiracy in the market [for wheat in
Iraq] on the price of [wheat in United States], where countless other market variables could have
intervened to affect those pricing decisions."  Reading Indus., Inc. v. Kennecott Copper Corp.,
631 F.2d 10, 14 (2d Cir. 1980).

be dismissed.[17]

## II.    RICO Claim

In addition to alleging violations of the antitrust laws, plaintiffs also allege that AWB violated the RICO statute, 18 U.S.C. § 1962(c), by engaging in an "enterprise" which was allegedly "designed to and did unlawfully funnel U.S. dollars to the Government of Iraq and achieve, maintain, and exploit AWB's monopoly position in the Iraqi wheat market."  (Compl. ¶ 130.)  As with plaintiffs' antitrust claims, AWB moves to dismiss plaintiffs' RICO claim for lack of subject matter jurisdiction.

### A.    Subject Matter Jurisdiction

In North-South Finance Corp. v. Al-Turki, the Second Circuit held that while foreign entities are not, due to their foreign status alone, shielded from RICO's reach, the statute's extraterritorial application is limited.  100 F.3d 1046, 1051-52 (2d Cir. 1996).[18]  Specifically, Al-Turki discussed two tests (one of which must be met) that can be used to determine whether that

---

[17]  For the same reasons, even apart from the jurisdictional infirmity of plaintiffs' Sherman Act and Clayton Act claims, those claims would still have to be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for lack of antitrust standing.  See Blue Tree Hotels, 369 F.3d at 220 (noting that the antitrust standing requirement "applies to all private actions filed under [Clayton Act] § 4, regardless of the type of antitrust claim involved" (internal quotation marks omitted)).

[18]  Although Al-Turki characterized the limit on RICO's extraterritorial application as a constraint on courts' "subject-matter jurisdiction," 100 F.3d at 1051, plaintiffs point out that the Supreme Court's decision in Arbaugh, 546 U.S. 500 (see supra note 6), suggests that the inquiry into RICO's extraterritorial reach should not be treated as a question of subject matter jurisdiction.  (P. Mem. 38 n.30.)  As this Court previously noted in Ayyash v. Bank Al-Madina, however, the Court is "bound by the Court of Appeals' decisions until such time as they are directly overruled by that court or the Supreme Court."  2006 WL 587342, at *4 n.2.  Because no intervening Supreme Court or Second Circuit case has held otherwise, the Court must continue to treat the limitation on RICO's extraterritorial application as a jurisdictional constraint.

24

limit is satisfied: the "effects" and "conduct" tests.  See id.[19]  Under the effects test, subject

matter jurisdiction exists only where the foreign conduct has "substantial effects" within the

United States.  Id. at 1051.  "Remote and indirect effects" do not qualify as substantial, id. at

1052; rather, the domestic effect "must be a direct and foreseeable result of the conduct alleged,"

Nasser v. Andersen Worldwide Societe Coop., No. 02 Civ. 6832, 2003 WL 22179008, at *3

(S.D.N.Y. Sept. 23, 2003) (internal quotation marks omitted).[20]  Under the alternative conduct

test, subject matter jurisdiction exists "only where conduct material to the completion of the

fraud occurred in the United States," and the conduct is "the direct cause of the alleged injury."

Al-Turki, 100 F.3d at 1051, 1053.  "Mere preparatory activities, and conduct far removed from

the consummation of the fraud, will not suffice to establish jurisdiction."  Id. at 1051.

   As explained above, the purported domestic "effect" of AWB's extraterritorial conduct

— i.e., a decrease in the prices at which plaintiffs could sell their wheat in the United States —

was simply not a "direct" result of that conduct.  Nasser, 2003 WL 22179008, at *3.  AWB's

conduct in Iraq, and the alleged market foreclosure that resulted, was simply one factor among

---

   [19] Although the Second Circuit recognized that the application to RICO of these two tests, drawn from the securities and antitrust contexts, may not be appropriate, see 100 F.3d at 1052, it nevertheless applied those tests in Al-Turki because, as in this case, the parties assumed that those tests were applicable.  To date, no other test has been established by the Second Circuit or proposed by the parties in this case.

   [20] The Second Circuit in Al-Turki also described a slightly different version of the effects test based on the antitrust laws.  See Al-Turki, 100 F.3d at 1052 (noting that in "antitrust cases, the [extraterritoriality] analysis proceeds along similar lines [to securities cases], but there is more emphasis on the effects of the relevant conduct in the United States, and less emphasis on where that conduct took place").  As noted above, see supra note 5, the effects test in the antitrust context examines whether the "foreign conduct . . . was meant to produce and did in fact produce some substantial effect in the United States."  Hartford Fire, 509 U.S. at 796, citing Alcoa, 148 F.2d at 444.  The requisite "substantial" effect must also be "direct."  Alcoa, 148 F.2d at 424; see IB Areeda ¶ 272d, at 280.

many that affected Ending Stocks, and hence, wheat prices, in the United States.  Plaintiffs'

asserted injury thus could very well have resulted from factors wholly unrelated to the alleged

RICO conspiracy.[21]  For this same reason, even though plaintiffs have sufficiently alleged that

"conduct material to the completion of the fraud occurred in the United States" — i.e., AWB's

use of a United States bank account that was "integral" to its alleged kickback scheme[22] —

plaintiffs cannot establish that AWB's conduct was "the *direct cause* of the[ir] alleged injury."

Al-Turki, 100 F.3d at 1053 (emphasis added).  AWB's use of a United States bank facility may

have directly furthered the alleged RICO conspiracy, but the consummation of that conspiracy,

and the alleged market foreclosure that resulted, was, at most, only a "but for" cause of the drop

in domestic wheat prices complained of by plaintiffs.[23]

Plaintiffs thus cannot satisfy either the effects or conduct tests for the extraterritorial

application of the RICO statute.  Accordingly, their RICO claim must be dismissed for lack of

subject matter jurisdiction.

---

[21] See supra at 12-15.

[22] Ayyash, 2006 WL 587342, at *6 (noting that "courts have held the [RICO] jurisdictional requirement satisfied where a wire transfer into or from the United States is integral to the fraud").

[23] As a result, even if plaintiffs could overcome AWB's jurisdictional challenge, their RICO claim would still be dismissed for lack of standing because their injury was not "proximately caused" by defendants' acts.  Baisch, 346 F.3d at 373; see Lerner v. Fleet Bank, N.A. 318 F.3d 113, 129-30 (2d Cir. 2003).  This outcome is not surprising as "Congress modeled [RICO] on the civil-action provision of the federal antitrust laws," Holmes, 503 U.S. at 267-68, and as explained above, plaintiffs also lack antitrust standing.

## CONCLUSION

For the foregoing reasons, defendant AWB's motion to dismiss the consolidated class action complaint (Doc. # 13) is granted in its entirety.

SO ORDERED.

Dated: New York, New York
      March 25, 2008

                                   GERARD E. LYNCH
                             United States District Judge